IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MERITOR HEAVY VEHICLE SYSTEMS, LLC )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>QUIMMCO, S.A. DE C.V., and )<br>SISTEMAS AUTOMOTRICES DE MEXICO, )<br>S.A. DE C.V. )<br>)<br>Defendants. )<br>) | Case No. _____<br><br>Honorable _____<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Meritor Heavy Vehicle Systems, LLC ("MHVS"), as its Complaint for declaratory relief and breach of contract against Defendants Quimmco, S.A. DE C.V. ("Quimmco") and Sistemas Automotrices De Mexico, S.A. DE C.V. ("Sisamex"), alleges:

## PRELIMINARY STATEMENT

1. MHVS sues to stop its Mexican joint venture partner Quimmco and the joint venture company Sisamex from usurping business that MHVS and Quimmco agreed was reserved to MHVS.

2. MHVS is an American manufacturer and a major global supplier of axles, brakes, and drive shafts used in commercial vehicles, including trucks, trailers, and buses. MHVS' customers include commercial vehicle original equipment manufacturers ("OEMs") around the world.

3. As the sole Shareholders of the joint venture company Sisamex, MHVS and Quimmco designed the JV to play a specific and contractually-limited role in making and

assembling axles and other products that MHVS sells to OEMs in Mexico.  MHVS and Quimmco agreed that MHVS would design, manufacture and sell specific axle and other components to Sisamex; that Sisamex would manufacture certain specifically-defined components; and that Sisamex would then assemble these MHVS manufactured components and Sisamex manufactured components into certain finished products, *e.g.,* completed axles that Sisamex would sell to MHVS for resale to MHVS' customers in Mexico.

4. A Shareholders Agreement between MHVS and Quimmco defines the scope of Sisamex's business and prohibits any expansion of the business without the mutual consent of the two Shareholders (the "Shareholders Agreement").

5. The Shareholders Agreement contemplates certain circumstances in which MHVS grants consent to Sisamex to manufacture itself or outsource to third parties production of certain MHVS components.

6. A component supply agreement between MHVS and Sisamex called "Supply Agreement C" obligates Sisamex to purchase its requirements for specific components—including some of those at issue in this case—from MHVS.

7. This dispute involves MHVS-manufactured components of two MHVS products: the "14x" and the "185" axles.  In each case, the Shareholders Agreement between MHVS and Quimmco expressly does *not* give Sisamex the right to manufacture the disputed components itself, and Supply Agreement C between MHVS and Sisamex *does* obligate Sisamex to purchase those components from MHVS.

8. MHVS has invested significant resources to develop the intellectual property, technical expertise, production capacity, and skilled labor force required to manufacture the components at issue.

9. The Defendants refer to having Sisamex manufacture the MHVS axles at issue, or components thereof, without MHVS' consent "insourcing."

10. The Defendants refer to having third parties manufacture the MHVS axles at issue, or components thereof, without MHVS consent "outsourcing."

11. In correspondence and communications with MHVS, Defendants have stated their intent to have Sisamex "insource" (manufacture) the MHVS 14x and 185 axles or components thereof, and thereby desource MHVS, in breach of the Shareholders Agreement and Supply Agreement C.

12. In correspondence and communications with MHVS, Defendants have stated their intent unilaterally to expand the scope of Sisamex's business eventually to take over all of MHVS' component manufacturing for products that MHVS sells to OEMs in Mexico, in breach of the Shareholders Agreement and Supply Agreement C.

13. In correspondence and communications with MHVS, Defendants have also stated their intent to "outsource" some production of components in breach of the Shareholders Agreement and Supply Agreement C.

14. Defendants are in actual and anticipatory breach of the Shareholders Agreement and Supply Agreement C by attempting to seize MHVS' business related to the 14x and 185 axle or components thereof without MHVS' consent and over its objection in breach of the terms of those agreements.

## PARTIES

15. MHVS is a limited liability company organized under the laws of the State of Delaware. MHVS supplies axles, brakes, and other products and related components to commercial vehicle manufacturers.

16. Quimmco is a corporation organized under the laws of the United Mexican States and is the holding company of a Mexican industrial conglomerate. Quimmco and its affiliates are engaged in various industrial and commercial activities in Mexico.

17. Sisamex is a corporation organized under the laws of the United Mexican States and is jointly owned by Quimmco and MHVS. The Shareholders Agreement defines and limits Sisamex's business.

18. Quimmco owns 50 percent plus one share of the stock of Sisamex, and MHVS owns 50 percent minus one share of Sisamex's stock.

## JURISDICTION AND VENUE

19. MHVS is a Delaware LLC with its principal place of business in Troy, Michigan. The sole member of MHVS is Meritor, Inc., an Indiana corporation with its principal place of business in Troy, Michigan.

20. Quimmco and Sisamex are citizens of Mexico, a foreign state.

21. The amount in controversy exceeds $75,000.

22. This court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

23. Quimmco and Sisamex have each specifically consented to personal jurisdiction in this district and to this venue. In Section 9.12(i) of the Shareholders Agreement, Quimmco and MHVS agreed that in the event of a claimed breach of Article 2 (the provision at issue here):

> Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the federal court sitting in the City of Chicago, Illinois as to such action, suit or proceeding, and irrevocably accepts for itself and in respect of its property, generally and unconditionally, jurisdiction of the aforesaid court as to such action, suit or proceeding. Each of the Parties irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection which it may now or hereafter have to the laying of venue of any such action, suit, or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

24. Sisamex and MHVS agreed to an identical consent to jurisdiction and venue in Section 11.16(i) of Supply Agreement C.

## BACKGROUND

25. MHVS is a wholly-owned subsidiary of Meritor, Inc., which is headquartered in Troy, Michigan. MHVS traces its history to 1909, when Timken Detroit Axle was formed in Detroit, Michigan. Today, MHVS is the world's largest independent manufacturer of axles for commercial vehicles, including trucks and trailers.

26. MHVS manufactures and sells its products to OEMs and other customers around the world, including Volvo, Daimler Truck, Navistar and PACCAR. MHVS has developed valuable technical, engineering, and production expertise that allows it to offer customers products that provide greater strength at lighter weights, increasing the payloads and operating efficiencies of the vehicles its customers manufacture. MHVS has invested significant amounts of money to develop its products and manufacturing capabilities.

27. MHVS has production facilities around the world, including in the United States and Mexico.

**A.** **MHVS And Quimmco Restructure The Dirona Joint Venture To Create Sisamex**

28. In 1975, Meritor's predecessor Rockwell International Corporation contracted with two Mexican governmental entities to create a joint venture called Dirona, S.A. ("Dirona").

29. MHVS and Quimmco are the successors of Rockwell and the Mexican governmental entities, respectively. Immediately before MHVS and Quimmco agreed to restructure Dirona in 2002, MHVS owned 40% of the Dirona joint venture and Quimmco owned 60%.

30. Beginning in approximately 2001, Quimmco and MHVS began negotiations to restructure the Dirona joint venture.

31. Those negotiations led to the execution of a "Shareholders Agreement (For Restructuring The Scope of Dirona's Business)" dated October 25, 2002 between MHVS and Quimmco. In return for payments by MHVS of over $11 million and other consideration, Quimmco transferred some of its shares to MHVS to increase MHVS' stake and the JV was renamed Sistemas Automotrices De Mexico S.A. DE C.V., called "Sisamex."

32. In the Dirona restructuring negotiations, Quimmco would not agree to 50/50 ownership, insisting that it needed to remain a nominal majority owner for Mexican tax purposes. As a result, Quimmco holds *one share* more than 50% of Sisamex's stock: Quimmco owns 195,001 shares of Series A stock and MHVS owns 194,999 shares of Series B stock.

33. Because Quimmco insisted on remaining the majority Shareholder, MHVS demanded and Quimmco agreed to provisions throughout the Shareholders Agreement and the related Supply Agreements to protect MHVS as the minority shareholder. Those safeguards prevent Quimmco from using its single share dominance to change Sisamex's agreed-upon scope of business without MHVS' consent.

34. MHVS and Quimmco agreed that the two entities together as Shareholders, acting by mutual consent, would be the ultimate authority over the Sisamex business; that Sisamex's business would be specifically defined and limited by the Shareholders Agreement; and that any expansion or change of that business scope would require the consent of *both* Shareholders.

**B.  The Board Of Directors**

35. Under the Shareholders Agreement, the Board of Directors of Sisamex is composed of four directors appointed by Quimmco and four appointed by MHVS. Each Shareholder must designate two members of its own executive management to sit on the Board, ensuring that both Shareholders will have a strong voice in the direction of the joint venture company. (Shareholders Agmt. § 3.5.2(a)(i).)

36. The Shareholders Agreement requires that any matter presented to the Board of Directors be approved by *six* Directors. (*Id.* § 3.5.2(d).) Taken together, the equally-sized Board delegations and a supermajority requirement prevent Quimmco from using its one share majority position to control Sisamex over MHVS' objection.

37. The Shareholders Agreement specifies twenty-one different categories of activities that may *not* be undertaken by Sisamex on its own initiative and that instead require the approval of the Board of Directors (and, in some cases, additional approval by the Shareholders). (*Id.* § 3.5.2(e)(i)-xxi).) In addition, Shareholder approval is required as to each Sisamex Business Plan that changes the scope of Sisamex's business and any amendment or modification to an approved Business Plan that changes the scope of Sisamex's business. (*Id.* § 3.5.1(a)(viii).)

38. The Shareholders Agreement provides that, at the request of any director, any matter which would otherwise require approval by the Board of Directors "shall instead be submitted for approval by the Shareholders." (*Id.* § 3.5.2(f).) This ensures that the Shareholders remain the ultimate decision-makers over Sisamex's affairs.

**C.     The Shareholders**

39. As noted above, the Shareholders Agreement reserves authority over the scope of the JV's business jointly and exclusively to MHVS and Quimmco. Under Section 3.5.1(a)(viii), the joint approval of the Shareholders is required for "[a]ny change in the business of [Sisamex] or any manufacture or sale of any products other than as contemplated in Section 2.1(b)." (*Id.*)

40. As the shareholders, Quimmco and MHVS are each entitled to cast one vote for each share of Sisamex stock they own as Series A and B shareholders, respectively. Critically, however, the affirmative vote of 75%, collectively, of *both* series of shares is required for shareholder approval of resolutions. Thus, the parties ensured that neither Quimmco's status as

a Series A Shareholder, nor its one-share majority, would be sufficient to unilaterally carry a Shareholder vote. Instead, the mutual agreement of both Shareholders is required.

41. Under Section 3.10 of the Shareholders Agreement, if the Shareholders are not able to agree on a matter that requires their approval, the matter must first be presented at two Shareholder meetings, then referred to the chief executive officers of each Shareholder for good faith negotiation. (*Id*., § 3.10(a)-(b).) If the CEOs are unable to reach agreement, then the *status quo* holds: neither party has the right to litigate or arbitrate the merits of "whether any action taken or not taken by the Board of Directors or the Shareholders is in the best interests of [Sisamex]," and instead "the matter shall conclusively be deemed to not have been approved by the Shareholders or the Board of Directors, as the case may be." (*Id.* § 3.10(c).)

42. Absent the agreement of both Shareholders, the business of the Sisamex joint venture cannot be expanded.

**D. The Shareholders' Proprietary Activities And The Defined Scope Of Sisamex's Business**

43. The Shareholders Agreement carefully distinguishes between the proprietary activities of the Shareholders and the contractually-defined scope of Sisamex's business.

44. Quimmco and MHVS acknowledged that each company engages in business that it is *not* obligated to contribute to the JV. Thus, the Shareholders Agreement establishes a presumption that "any Shareholder may, notwithstanding the existence of this Agreement, engage in whatever other activities such Shareholder chooses without having or incurring any obligation to offer any interest in such activities to [Sisamex] or to any other Party to this Agreement." (*Id.* § 3.5.1(g).)

45. In Section 2.1(b) of the Shareholders Agreement captioned "SCOPE OF THE BUSINESS," Quimmco and MHVS agreed to confine Sisamex's business to three specific categories. (*Id.* § 2.1(b).)

46. The parties provided that Sisamex's "Business" as specifically defined in Sections 2.1(a) and 2.1(b) is the only activity Sisamex may engage in absent Shareholder approval. Section 2.1(a) defines the term "Business" in general fashion, and Section 2.1(b) then establishes specific limits.

47. The introduction to Section 2.1(b) states that "the Business of the Company [Sisamex] and SUDISA [a Sisamex subsidiary] shall be *solely* as follows," and its concluding sentence commands that Sisamex and SUDISA "will not conduct any other business, or manufacture, assemble or sell any other products, components or assemblies, *without the mutual agreement of the Parties*," *i.e.*, MHVS and Quimmco. (*Id.* § 2.1(b), emphasis added.)

48. The limitations on Sisamex's Business are driven by the careful distinction that MHVS and Quimmco drew between "Meritor Products" and "Meritor Components." The Shareholders Agreement defines Meritor Products and Meritor Components as separate and distinct categories. (*See id.* § 1.1. at 9-10.) Meritor Products are defined as finished products. In contrast, Meritor Components are separately defined as "those components and assemblies *which are used in Meritor Products.*" (*Id.* at 9, emphasis added.)

49. The Meritor Components at issue that the Defendants seek to "insource" or "outsource" are expressly outside the defined scope of Sisamex's Business. Section 2.1(b) does not give Sisamex the right to desource MHVS and have Sisamex itself manufacture the Meritor Components that make up Meritor Products sold in Mexico absent MHVS' consent. In addition, as a condition to the closing of the Shareholders Agreement, Quimmco and MHVS

9

agreed that Sisamex would sign Supply Agreement C, under which Sisamex is obligated to purchase components *from MHVS*. (*Id*. § 7.3(m).)

50. Supply Agreement C subdivides the category of Meritor Components into Core Components and Non-Core Components. (Supply Agmt. C § 1.1 at 3-4, definitions.) With respect to Core Components, Sisamex is obligated to purchase exclusively from MHVS "all of [Sisamex's] requirements for Core Components that [Sisamex] does not manufacture itself," *i.e.*, those it was not specifically given the right to manufacture under the Shareholders Agreement or by subsequent agreement of the Shareholders. (*Id*. § 2.2(a).) Core Components are identified on Schedule 1 to Supply Agreement C. That list includes all gear sets, housings, and carrier mountings for the 14x axle, and all carrier assemblies for any Meritor axle, including the 14x axle, the 185 axle or any other. (*Id.* at Schedule 1.) The manufacture of these Meritor Components was thus expressly reserved to MHVS.

51. Meritor Products are addressed in Section 2.1(b)(i) of the Shareholders Agreement. That clause provides in relevant part that Sisamex and its subsidiary "shall be the exclusive importers, manufacturers, assemblers and/or shipping points of, Meritor Products" that MHVS (or its subsidiary) would sell to Mexican OEM customers. (Shareholders Agmt. § 2.1(b)(i).) It does not, however, grant Sisamex the right to manufacture the Meritor Components that comprise the finished Meritor Products. Except for specific components that are identified under the agreements, there is no affirmative grant of rights to Sisamex to manufacture the components that make up the finished Meritor Products. Further, except as otherwise specifically agreed between the Shareholders, production of such components is reserved to MHVS under Supply Agreement C.

E.   **Beginning In 2009, Quimmco And Sisamex Demand To "Insource" The Production Of 14x Components That Were Contractually Reserved To MHVS**

52.   At no time has Sisamex manufactured 14x carrier assemblies for MHVS. The carrier assembly is the portion of the axle assembly that transfers power from the drive shaft through a set of gears to the wheels via the axle shaft.

53.   Sisamex and Quimmco first demanded to take the production of 14x gears and carrier assemblies and other axle components from MHVS in approximately 2009 as a response to the global recession. MHVS was then, as it is now, manufacturing 14x gears and carrier assemblies (*i.e.*, for the 143, 145, and new generation 14x family) and selling them to Sisamex under Supply Agreement C.

54.   MHVS did not agree to Sisamex's and Quimmco's demand. MHVS had invested heavily in the technology and the manufacturing capacity necessary to build these components. Transferring production to Sisamex would have forced MHVS to idle, reduce or eliminate production at its own plants and could ultimately force the closure of one or more of these plants. Accordingly, as it was entitled to do under the Shareholders Agreement and Supply Agreement C, MHVS declined to curtail its own production of 14x gears and carrier assemblies. MHVS did, however, look for other ways to assist in enhancing Sisamex's profitability.

55.   To that end, MHVS, Quimmco and Sisamex negotiated and executed a temporary agreement dated January 1, 2010, and running through December 31, 2013 (the "Interim Purchasing Commitment"). Under the portions of the Interim Purchasing Commitment relevant to this dispute, MHVS agreed to increase beyond the contractually-specified minimum levels its purchase of specific components for another axle, the 160 family, that Sisamex was already producing for MHVS. Quimmco and Sisamex agreed that Sisamex would *not* take over the manufacture of 14x carrier assemblies, but instead reaffirmed that Sisamex would continue to

purchase 100% of its requirements for the 14x carrier assemblies from MHVS. The Interim Purchasing Commitment created no rights for Sisamex that would remain in effect following expiration at the end of 2013.

### F. Quimmco And Sisamex Renew Their Attempt To Take Production From MHVS, Over MHVS' Objection And Without Regard For The Contractual Limits On Sisamex's Business

56. In the latter half of 2013, as the expiration of the Interim Purchasing Agreement approached, Quimmco and Sisamex again asked to take the production of Meritor Components away from MHVS. In September 2013, Quimmco Director General, Jesus L. Barrera Lozano, wrote to Meritor, Inc.'s CEO, Ike Evans, that Quimmco was unilaterally directing Sisamex to include in its 2014 business plan Sisamex "insourcing" (manufacturing) of the 14x gears and carrier assemblies in order to improve Sisamex's financial performance.

57. Quimmco has no authority under the Shareholders Agreement to cause Sisamex to execute a business plan that is not approved by MHVS.

58. Quimmco has no authority under the Shareholders Agreement to cause Sisamex to execute a business plan to which MHVS expressly objected because the plan incorporated a change in the scope of the agreed-upon Business of Sisamex.

59. Likewise, Sisamex has no authority to carry out such a business plan absent the mutual agreement of its Shareholders.

60. At a meeting of the Sisamex Board of Directors on December 2, 2013, at Quimmco's direction and with full knowledge of MHVS' objection, Sisamex presented to its Board a 2014 business plan that included Sisamex taking over production of the Meritor Components in the 14x axles, rather than buying those components from MHVS under Supply Agreement C.

12

61. Sisamex's Director General, Manuel Valdes Aguirre, confirmed that Quimmco directed him to include that proposal in the business plan over MHVS' objection.

62. The proposed business plan also incorporated the assumption that Sisamex would purchase from third parties other Meritor Components that Sisamex was contractually obligated to purchase from MHVS.

63. At the December 2, 2013, Sisamex Board Meeting, MHVS reiterated to Quimmco and Sisamex that any change and expansion of the Business of Sisamex required Shareholder approval. As MHVS explained, Quimmco and Sisamex's demand for Sisamex to take over the manufacture of 14x components and to source from third parties other components it was obligated to purchase from MHVS was a change in the Business of Sisamex beyond the agreed-upon scope established in the Shareholders Agreement.

64. On December 13, 2013, Quimmco's Director General sent MHVS a letter on Sisamex's letterhead saying that absence of MHVS shareholder consent would have no effect on Sisamex's sourcing decision and that Sisamex management would continue to pursue sourcing that is in the best interests of Sisamex. Though they acknowledged that MHVS had not consented to this expansion of Sisamex's Business, Quimmco and Sisamex stated that Sisamex would expand manufacturing of Meritor Components even in the absence of MHVS' approval.

65. In January 2014, MHVS emphasized to Quimmco and Sisamex, again, that the components at issue were "Meritor Components" for which production was reserved to MHVS, rather than "Meritor Products," and that Sisamex had no right to manufacture them. MHVS reiterated that it had not consented to the expansion of Sisamex's Business, as required by the Shareholders Agreement. Finally, MHVS put Quimmco and Sisamex on notice that their stated

13

intent to unilaterally expand the Business by establishing production capacity for Meritor Components at Sisamex constituted an actual or anticipatory breach of the Shareholders Agreement and the related supply agreements.

66. Later in January 2014, Quimmco's Director General responded on Sisamex letterhead that it was Quimmco's and Sisamex's position that Sisamex's right to assemble the 14x axle as a Meritor Product also entailed the right to manufacture *all its component parts,* including any Core Components [which includes Meritor Components].

67. In February 2014, Sisamex told MHVS that Sisamex planned to "insource" first the 185 axle carrier assemblies and eventually other components from the 185 axle. To date, Sisamex's involvement with the 185 axle has been minimal: Sisamex receives fully assembled axles from MHVS, performs minor disassembly and reassembly to change a bracket, then acts as the shipping point for those axles to OEM customers in Mexico. Nonetheless, Sisamex now claims that it is entitled to take over the entire production process for the 185 axle.

68. Under the interpretation of the parties' agreements that Quimmco and Sisamex have propounded, Sisamex contends it is entitled to take from MHVS the production of *any* Meritor Component at *any* time, taking MHVS' component designs for Sisamex's own use (or, worse, "outsourcing" that valuable intellectual property to a third party). Thus, Quimmco and Sisamex now contend that MHVS entered into the Shareholder and Supply Agreements with the intent to give its Mexican joint venture and joint venture partner as much of MHVS' U.S. component manufacturing business as *Sisamex and Quimmco* unilaterally choose to take for Sisamex even over MHVS' objection. The Defendants' position lacks common sense and is in anticipatory and real breach of the parties' agreements.

69. Neither the Shareholders Agreement nor any other agreement gives Quimmco and Sisamex the unilateral right to take away MHVS' production without MHVS' consent.

70. The Shareholders Agreement, which defines and limits the scope of Sisamex's Business, nowhere states that Sisamex can unilaterally decide to manufacture any Meritor Components that it desires.

71. Supply Agreement C expressly states that Sisamex is to purchase Meritor Components that are Core Components—like those at issue here—from MHVS. Finally, Supply Agreement C provides that MHVS retains sole ownership of all designs, drawings, software, technical information, know how, trade secrets, and other confidential and proprietary information. (*See*, *e.g.*, Supply Agmt. C § 11.3.)

72. The fact that Sisamex cannot appropriate MHVS' intellectual property shows that Sisamex cannot take over production of a Meritor Component without MHVS' consent.

## COUNT I:

## DECLARATORY JUDGMENT: SHAREHOLDERS AGREEMENT

73. MHVS restates and alleges each and every allegation set forth in Paragraphs 1–72 above as though fully set forth herein.

74. MHVS and Quimmco entered into the Shareholders Agreement, which has at all relevant times remained binding and enforceable.

75. An actual and justiciable controversy within the meaning of 28 U.S.C. §2201 exists between MHVS and Quimmco concerning the attempt to expand Sisamex's Business beyond the scope defined in Section 2 of the Shareholders Agreement.

76. MHVS is entitled to a declaration that (a) Quimmco has breached Section 2 of the Shareholders Agreement and (b) Sisamex may not "insource" or "outsource" the production of

any Meritor Component, including components of the 14x or 185 axles, without the consent of both MHVS and Quimmco as Shareholders.

## COUNT II:

## BREACH OF CONTRACT: QUIMMCO – SHAREHOLDERS AGREEMENT

77. MHVS restates and alleges each and every allegation set forth in Paragraphs 1–76 above as though fully set forth herein.

78. MHVS has performed its obligations under the Shareholders Agreement.

79. Pursuant to the Shareholders Agreement, Quimmco undertook certain duties and obligations as a Shareholder in the Sisamex joint venture.

80. Quimmco has failed to fulfill its duties and obligations.

81. Quimmco has breached Section 2 of the Shareholders Agreement by directing Sisamex to "insource" or "outsource" the production of Meritor Components, including components of the 14x or 185 axles, without the consent of MHVS as a Shareholder.

82. Quimmco has also breached the Shareholders Agreement by disregarding or failing to acknowledge MHVS' right under Section 3.5.1(a)(viii) of the Shareholders Agreement to consent to any change in the Business of Sisamex.

83. As a result of Quimmco's breaches, MHVS has incurred damages in an amount to be quantified at trial.

## COUNT III

## DECLARATORY JUDGMENT: SUPPLY AGREEMENT C

84. MHVS restates and alleges each and every allegation set forth in Paragraphs 1–83 above as though fully set forth herein.

85. MHVS and Sisamex entered into Supply Agreement C, which has at all relevant times remained binding and enforceable.

86. An actual and justiciable controversy within the meaning of 28 U.S.C. § 2201 exists between MHVS and Sisamex concerning Sisamex's obligations under Sections 2.1 and 2.2 of Supply Agreement C.

87. MHVS is entitled to a declaration that (a) Sisamex is in breach of Section 2 of Supply Agreement C; (b) pursuant to Sections 2.1 and 2.2 of Supply Agreement C, Sisamex must purchase from MHVS all of its requirements for Core Components, unless and until the Shareholders of Sisamex have mutually agreed to change Sisamex's Business; and (c) that the 14x axle components and 185 axle components, including carrier assemblies, that Sisamex has stated it intends to "insource" (manufacture) are "Core Components" as defined in Supply Agreement C.

## COUNT IV:
## BREACH OF CONTRACT: SISAMEX - SUPPLY AGREEMENT C

88. MHVS restates and alleges each and every allegation set forth in Paragraphs 1–87 above as though fully set forth herein.

89. MHVS has performed its obligations under Supply Agreement C.

90. Pursuant to Supply Agreement C, Sisamex undertook the obligation to purchase from MHVS all of its requirements for Meritor Components defined as "Core Components."

91. Sisamex has stated that it is actively initiating its own manufacture of certain Core Components, including 14x and 185 carrier assemblies and other axle components, thereby changing the scope of Sisamex's Business without the approval of MHVS as a Shareholder in contravention of Sections 2 and 3 of the Shareholders Agreement.

92. Sisamex is in breach of Section 2 of Supply Agreement C as Sisamex has failed to comply with or is threatening to refuse to comply with its purchase obligations under Supply Agreement C.

93. As a result of Sisamex's actual or anticipatory breaches of Supply Agreement C, MHVS has incurred damages in an amount to be quantified at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Meritor hereby prays for the relief set forth above; for an award of costs, expenses and attorneys' fees under Section 3.5.3(b) of the Shareholders Agreement and applicable law; and for any such other or further relief as the Court may find proper.

## JURY DEMAND

MHVS demands a trial by jury on all claims so triable.


Dated: July 13, 2014                Respectfully submitted,


/s/ Peter B. Bensinger, Jr.

Peter B. Bensinger, Jr. (IL Bar No. 6217347)

BARTLIT BECK HERMAN
 PALENCHAR & SCOTT LLP
54 West Hubbard Street
Chicago, Illinois  60654
Tel.:  312-494-4400
Fax:  312-494-4440
peter.bensinger@bartlit-beck.com

*Attorney for Meritor Heavy Vehicle Systems, LLC*