| | | |
|---|---|---|
| SISTEMAS AUTOMOTRICES DE MEXICO, S.A. DE C.V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 5289 |
| | ) | |
| MERITOR HEAVY VEHICLE SYSTEMS, LLC, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |
| | ) | |
| MERITOR HEAVY VEHICLE SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 5319 |
| | ) | |
| QUIMMCO S.A. DE C.V. and SISTEMAS AUTOMOTRICES DE MEXICO, S.A., DE C.V., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sistemas Automotrices de Mexico, S.A. de C.V. ("SISAMEX") is a joint venture formed in 2002 between Defendant Meritor Heavy Vehicle Systems, LLC ("Meritor") and Quimmco, S.A. de C.V. ("Quimmco") to manufacture and sell axle and brake components used in medium and heavy duty vehicles. Meritor is a U.S.-based manufacturer and distributer of products used in medium- and heavy-duty vehicles. Quimmco is a Mexico-based manufacturing group. The parties executed a Shareholders Agreement and three Supply Agreements that govern the relationships between Meritor, Quimmco, and the joint venture. For ten years, the parties agreed on the meaning of their contracts and had a successful working relationship: Meritor provided technical assistance to SISAMEX so that SISAMEX could manufacture certain Meritor Products, which Meritor purchased exclusively from SISAMEX in

order to re-sell the Products to original equipment manufacturers ("OEMs") who assemble vehicles. As called for by the parties' agreement, Meritor also assisted SISAMEX in obtaining materials from third-party vendors at competitive prices. In 2013, new management took over Meritor and asserted that, although the three Supply Agreements grant SISAMEX the right to manufacture Meritor *Products*, SISAMEX does not have the right to manufacture the Products' corresponding component parts. Instead, Meritor asserts, the agreements require SISAMEX to purchase those Components from Meritor unless Meritor explicitly authorizes SISAMEX to manufacture the Components on its own. Meritor also ceased providing technical assistance in 2013 and now insists that SISAMEX obtain Meritor's approval of any third-party vendors before SISAMEX purchases materials.

Two lawsuits are pending. SISAMEX filed the first of these on July 10, 2014, seeking a declaratory judgment that it has the right to manufacture component parts for Meritor Products (Count I), that Meritor is required to provide technical assistance to SISAMEX (Count II), and that Meritor's imposition of a vendor pre-approval requirement violates the parties' agreement (Count III). SISAMEX also seeks damages for breach of contract based on the conduct alleged in Counts I–III (Count IV). In Counts V, VI, and VII, SISAMEX alleges that Meritor breached its express and implied warranties to use best efforts and perform in good faith when it failed to market and promote the sale of Meritor Products to SISAMEX's satisfaction. Three days after SISAMEX filed its complaint, Meritor filed a related action against SISAMEX and Quimmco, seeking a declaratory judgment that SISAMEX may not produce Components without Meritor's consent and breach of contract damages for SISAMEX's attempts to produce the Components. Meritor also seeks a declaratory judgment that manufacturing Components is beyond the scope of SISAMEX's business and asks the court to award damages from Quimmco for allegedly breaching the Shareholders Agreement by expanding SISAMEX's business beyond the scope established in that Agreement. The allegations Meritor raises in its complaint turn on whether SISAMEX has the right to produce components and, thus, effectively mirror Count I of

SISAMEX's complaint.

Meritor moves to dismiss SISAMEX's first amended complaint [24] and SISAMEX and Quimmco move to dismiss Meritor's complaint in the related action. (Defs.' Mot. to Dismiss Meritor's Compl., *Meritor v. Quimmco and Sistemas*, No. 14-cv-5319 [17].) Because the contracts are ambiguous and their proper interpretation requires extrinsic evidence, the court denies SISAMEX and Quimmco's motion to dismiss Meritor's complaint in the related case and denies Meritor's motion to dismiss with respect to Count I of SISAMEX's complaint. For the reasons explained below, Meritor's motion to dismiss SISAMEX's complaint is granted with respect to Count II and denied with respect to the remaining Counts (III, IV, V, VI, and VII).

Meritor also moves to disqualify SISAMEX's attorneys: In this case, Meritor moves to dismiss SISAMEX's amended complaint without prejudice on the ground that its counsel was not properly retained [27]. In the related action, Meritor moves that the court order the withdrawal of SISAMEX's counsel. (*See* Meritor's Motion that the Court Order the Withdrawal of SISAMEX's Counsel, *Meritor v. Quimmco and Sistemas*, No. 14-cv-5319 [30].) Meritor raises the same objection in both motions: that SISAMEX's Director General failed to obtain the required approval from the SISAMEX Board of Directors before hiring outside counsel for this litigation. Meritor's challenge finds support in the Shareholders Agreement, but on this record, the court cannot definitely interpret that Shareholders Agreement or evaluate SISAMEX's equitable estoppel defense to the counsel-approval requirement. The court, therefore, denies both motions challenging the authority of SISAMEX's attorneys.

## BACKGROUND

Meritor is a U.S.-based manufacturer of parts for commercial vehicles. Quimmco is a Mexico-based manufacturing group. (SISAMEX Am. Compl. [14] ¶ 2.) Meritor and Quimmco created SISAMEX[1] in 2002 by restructuring an existing joint venture, previously named Dirona.

---

[1] The Shareholders Agreement also refers to SISAMEX's wholly-owned subsidiary Super Diesel, S.A. de C.V. ("Sudisa"). The parties have referred to SISAMEX and Sudisa

(SISAMEX Am. Compl. ¶ 2.)   The restructuring was intended to take advantage of new economic opportunities created by the North American Free Trade Agreement, and to distribute shareholder control equally between the two parties so that neither shareholder could unilaterally control the operation of the joint venture.   (SISAMEX Am. Compl. ¶¶ 16, 17.) Accordingly, in the Shareholders Agreement executed on October 25, 2002, Meritor increased its ownership interest in SISAMEX by approximately ten percent,[2] to a total interest of one-share less than 50%.  (SISAMEX Am. Compl. ¶ 17; Meritor Reply Mem. in Supp. of its Mot. to Dismiss [66], hereinafter "Meritor Reply," 1.)  The Agreement recognized "that Mexico has evolved into a significant market and a key production region for the North American automotive industry," and set forth the following purposes for the joint venture:

> (i)     to manufacture for, and sell exclusively to [Meritor], Meritor Products . . .
>          for sale to OEM Customers in Mexico;
> (ii)    to manufacture for, and sell exclusively to [Meritor] and its Affiliates Core
>          Components and Non-Core Components for use by them worldwide;
>          [and]
> (iii)   to manufacture and sell [SISAMEX] Products to any customer worldwide.

(Shareholders Agreement, Ex. 1 to Decl. of Peter Bensinger in Supp. of Mot. to Dismiss [32], hereinafter "Shareholders Agreement," Whereas clauses (f), (g)(6).)  As a condition of closing, the Shareholders Agreement required the execution of three Supply Agreements (A, B, and C) (SISAMEX Am. Compl. ¶ 18), which were in fact executed on January 14, 2003.  (*Id.* ¶ 14.) The Supply Agreements set forth the specific rights and obligations of SISAMEX and Meritor in order for the parties to achieve the purposes listed in the Shareholders Agreement.

Each of the three Supply Agreement begins with the same series of "Whereas" clauses that set forth the purposes and objectives of the contracts and describe how the Supply

---

collectively as "SISAMEX" unless clarification is required.  (See SISAMEX Am. Compl. ¶ 10.) The court likewise refers to SISAMEX and SUDISA collectively as "SISAMEX," except where clarification is needed.

[2]     The parties have not specified what ownership interest Meritor had in Dirona before the restructuring.

Agreements relate to one another. These Whereas clauses state that the business of SISAMEX is

> (i) to manufacture for, and sell exclusively to, [Meritor], "Meritor Products," . . . for sale to OEM Customers in Mexico on the terms and conditions set forth in [Supply Agreement A]; and

> (ii) to manufacture for, and sell exclusively to, [Meritor] "Core Components" and "Non-Core Components" for use by [Meritor] worldwide, on the terms and conditions set forth in [Supply Agreement B] . . .

and that

> [SISAMEX] and Sudisa shall be the exclusive importers, manufacturers, assemblers, and/or shipping points of Meritor Products . . . sold by [Meritor] to OEM Customers in Mexico . . . as provided in, subject to the limitations of, and during the term of [Supply Agreement A].

(Supply Agreement A, Ex. 2 to Decl. of Peter Bensinger in Supp. of Mot. to Dismiss [32-1], hereinafter "Supply Agreement A," Whereas clause (a); Supply Agreement B, Ex. 3 to Decl. of Peter Bensinger in Supp. of Mot. to Dismiss [32-2], hereinafter "Supply Agreement B," Whereas clause (a); Supply Agreement C, Ex. 4 to Decl. of Peter Bensinger in Supp. of Mot. to Dismiss [32-3], hereinafter "Supply Agreement C," Whereas clause (a).) Meritor also agreed to

> manufacture for, and sell on a non-exclusive basis to [SISAMEX] certain products, components and/or assemblies to be used by [SISAMEX] solely in products or components to be manufactured and sold to [Meritor] under [Supply Agreement A] or the Supply Agreement B . . . pursuant to a separate Supply Agreement C. . .

(Supply Agreement A, Whereas clause (b); *see also* Supply Agreement B, Whereas clause (b); Supply Agreement C, Whereas clause (b).)

In sum, Supply Agreement A sets out the terms and conditions for SISAMEX's sale of Products to Meritor for re-sale in Mexico. Supply Agreement B sets out the requirements for SISAMEX's sale of Components to Meritor for re-sale worldwide. Supply Agreement C establishes the terms and conditions for Meritor's sale of Products and Components to SISAMEX to enable SISAMEX to fulfil Supply Agreements A and B.

## I. Supply Agreement A

Supply Agreement A governs SISAMEX's sale of "Products" to Meritor for re-sale in the Mexican market. Products are defined as "original equipment ["OE"] products and assemblies for on-highway medium- and heavy-duty trucks, buses, trailers and other medium- and heavy-duty commercial vehicles licensed for on-highway use which are both (a) [Meritor] controlled designs and (b) are identified on Schedule 2 as 'Meritor Products.'" (Supply Agreement A at 4.) Schedule 2 is a series of tables listing various models of axles, drivelines, brakes, trailer axles, and assemblies. (Supply Agreement A at 43.) Components are not defined in Supply Agreement A, nor mentioned outside of the Whereas clauses.

Supply Agreement A establishes a basic requirements contract: by its terms, SISAMEX "shall manufacture for, and sell exclusively to, [Meritor] all Meritor Products . . . in such amounts as may be ordered by [Meritor] for sale to OEM Customers in Mexico for OE Use." (Supply Agreement A § 2.1.) SISAMEX is prohibited from selling Meritor Products to any other customer. (*Id.*) Supply Agreement A creates a parallel restriction on Meritor's ability to purchase "Meritor Products" from other suppliers: Meritor "shall purchase exclusively from [SISAMEX] and [SISAMEX] shall supply to [Meritor], all of [Meritor]'s requirements for Meritor Products . . . for sale by them [Meritor] to OEM Customers in Mexico for Domestic Use and for Export use." (Supply Agreement A § 2.2(a).) These two provisions create an exclusive purchasing arrangement: Meritor is obligated to purchase from SISAMEX all of the Products it requires for sale to OEMs in Mexico, and SISAMEX is obligated to provide those Products to Meritor (and to no one else). Finally, the Agreement reiterates SISAMEX's role as the exclusive importer, manufacturer, assembler and/or shipping point of Meritor Products for sale in Mexico. (Supply Agreement A § 2.2(b).)

## II. Supply Agreement B

Supply Agreement B governs SISAMEX's sale of Components to Meritor for re-sale

worldwide. The term "Components" encompasses "Core Components" and "Non-Core Components." (Supply Agreement B at 3.) Core Components are "the Meritor Components, Meritor Products and Dirona Products listed on Schedule 1." (*Id.*) Schedule 1 presents a table listing the Core-Components that correspond to each Meritor Product:

| PRODUCT | CORE COMPONENTS |
|---|---|
| - 14x | Gear Sets |
| - 16x | Gear Sets |
| - 14x | Housings |
| - 16x | Housings |
| - 16x | Differential Cases |
| - 14x | Forward Carrier Mountings |
| - 16x | Forward Carrier Mountings |
| - 14x | Rear Carrier Mountings |
| - 16x | Rear Carrier Mountings |
| All Meritor and Dirona | Carrier Assemblies |
| Meritor Products | Assemblies |

Non-Core Components are "(i) Meritor Components and Meritor Products manufactured and sold now or in the future by [SISAMEX] that are not Core Components, and (ii) Dirona Components, Dirona Products, [SISAMEX] Components and [SISAMEX] Products." (*Id.* at 4.)

SISAMEX agreed to "manufacture for, and sell exclusively to [Meritor] all Core Components and Non-Core Components for sale worldwide by [Meritor], in each case in such amounts as may be ordered by [Meritor] from time to time." (Supply Agreement B § 2.1.) SISAMEX was again prohibited from selling to other customers. (*Id.*)

The parties further agreed that Meritor "will purchase from [SISAMEX], and [SISAMEX] will supply to [Meritor], Core Components and Non-Core Components at such times and in such amounts as [Meritor] may choose to order, for sale on a worldwide basis." (Supply Agreement B § 2.2(a).) Meritor specifically agreed to purchase from SISAMEX, and SISAMEX agreed to manufacture and sell to Meritor, "a percentage of [Meritor]'s requirements for Core Components for original equipment use in products for OEM Customers in the United States and Canada for OE Use and Aftermarket Use as provided on Schedule 3." (*Id.* at § 2.2(b).) Related to this obligation—to provide a percentage of the Core Components for sale within U.S. and Canada— SISAMEX is "required to manufacture [itself] all Core Components ordered by [Meritor] under

this Agreement and [SISAMEX] shall not be entitled to source any Core Components from [Meritor] or any third party." (*Id.*)

## III. Supply Agreement C

Supply Agreement C obligates SISAMEX to purchase certain Components from Meritor. Specifically, SISAMEX is required to purchase the Components it needs to fulfil its obligations under Supply Agreements A and B. SISAMEX agreed to "purchase exclusively from [Meritor], and [Meritor] will supply to [SISAMEX], all of [SISAMEX]'s requirements for Core Components that [SISAMEX] does not manufacture itself." (Supply Agreement C § 2.2(a).) This purchase obligation is "subject to Section 2.4," which establishes three exceptions to SISAMEX's obligations under Section 2.2. SISAMEX is not required to purchase from Meritor:

> (a) Core Components for which [Meritor] is unable or unwilling to supply to [SISAMEX] to meet the delivery, quality or other terms and conditions of this Agreement or [SISAMEX]'s customers.[3]

> (b) Core Components which [SISAMEX] and [Meritor] have agreed to be an exception to the purchase commitments of this Agreement.

> (c) Core Components during a Force Majeure Event . . . .

(Supply Agreement C § 2.4.) Under those three circumstances, SISAMEX is "entitled to manufacture such Components itself and/or to source such Components from any of its Affiliates or any other supplier or suppliers." (*Id.*)

## IV. History of performance

According to SISAMEX, the parties had a successful working relationship for ten years, when both companies operated with the intention that SISAMEX would eventually "fully integrate" the production of all of Meritor's products. (SISAMEX Am. Compl. ¶ 33.) SISAMEX maintains that the parties intended that SISAMEX would invest in equipment and develop its capacity to manufacture the component parts of every Meritor Product covered by Supply Agreement A for sale to OEM customers in Mexico. (SISAMEX Am. Compl. ¶ 32.) This

---

[3] The court notes that for the purposes of Supply Agreement C, SISAMEX's only customer is Meritor.

intention, SISAMEX continues, is evidenced by Meritor's agreement to provide SISAMEX with Meritor's intellectual property and technical assistance to manufacture Meritor's Products. (SISAMEX Am. Compl. ¶¶ 39, 56; *see* Shareholders Agreement § 2.2(e); Supply Agreement A § 13.3(a); Supply Agreement B §13.3(a).)

While SISAMEX was building up that capacity, however, it asserts that the agreements provided a temporary mechanism for SISAMEX to purchase Components from Meritor, assemble the Products, and sell the fully-assembled Products back to Meritor. (SISAMEX Am. Compl. ¶ 32.) SISAMEX asserts that this is how the parties developed SISAMEX's capacity to produce the "160 axle." (SISAMEX Am. Compl. ¶ 34.) At first, SISAMEX purchased the component parts of the 160 axle from Meritor, used them to assemble the axle, and then sold the fully-assembled axle back to Meritor for re-sale in the Mexican market. (*Id.*) Once SISAMEX developed the capacity to manufacture all the component parts of the 160 axle on its own, it "exercise[d] its exclusive right to manufacture the 160 axle . . . with Meritor's full support," and took over manufacturing the Core Components. (*Id.*)

SISAMEX also alleges that it routinely sourced production materials from third-party vendors. (SISAMEX Am. Compl. ¶¶ 51–52.) Because the production materials had to conform to Meritor's specifications, SISAMEX continues, SISAMEX often needed to share Meritor's intellectual property with the third party vendors. (*Id.*) SISAMEX maintains that Meritor "has endorsed this process for years" and has even provided SISAMEX with Meritor's own non-disclosure agreement to use with third-party vendors. (SISAMEX Am. Compl. ¶ 52.)

## V.    Meritor's new management

In 2013, Meritor appointed new management. (SISAMEX Am. Compl. ¶¶ 36–37.) Meritor's new managers have asserted that the Supply Agreements do not give SISAMEX the right to manufacture the Core Components of Meritor Products, but rather, that Meritor retains discretion to decide when SISAMEX can produce the component parts. (SISAMEX Am. Compl. ¶ 47.) One illustration of this dispute relates to production of the "14x axle." For three years,

SISAMEX had purchased Components from Meritor to produce the 14x axle; now, SISAMEX asserts, it is ready to fully integrate the production of the 14x axle on its own, but Meritor's new management objects, insisting that SISAMEX must continue purchasing Components from Meritor. (SISAMEX Am. Compl. ¶ 45.) Meritor is in breach of the parties' agreement in other ways, as well, SISAMEX contends. For example, after new management was appointed, Meritor stopped providing technical assistance to SISAMEX, demanding additional fees, in violation of Section 2.2(e) of the Shareholders Agreement. (SISAMEX Am. Compl. ¶ 57.) Finally, SISAMEX alleges that Meritor instituted a new requirement that SISAMEX obtain pre-approval of vendors as a condition of furnishing Meritor's intellectual property to those vendors. (SISAMEX Am. Compl. ¶ 53.)

For its part, Meritor contends that it is SISAMEX that has breached the parties' agreement by attempting to manufacture the 14x axle on its own. In addition, Meritor alleges, SISAMEX has stated its intention to manufacture the Core Components for a Meritor Product called the "185 carrier assembly." (Compl., *Meritor v. Quimmco and Sistemas*, No. 1:14-cv-5319 [1], hereinafter "Meritor Compl.," ¶¶ 11, 67.) SISAMEX's efforts to produce the Components for the 14x axle and 185 carrier assembly violate the parties' agreement, Meritor alleges. (Meritor Compl. ¶¶ 69–71.)

SISAMEX initiated litigation, filing this action on July 10, 2014 for various forms of relief. The core dispute relates to SISAMEX's claim that it has the unilateral right to produce component parts of Meritor's Products (Count I). SISAMEX also seeks a declaration that it has a right to obtain materials from third-party vendors without Meritor's prior approval of those vendors (Count II), and that Meritor is obligated to provide technical assistance to enable SISAMEX to manufacture Meritor Products (Count III). In Count IV, SISAMEX seeks breach of contract damages based on the conduct alleged in Counts I through III. Counts V, VI, and VII allege that Meritor acted in bad faith, putting its own interests ahead of the interests of SISAMEX in violation of Michigan law: Count V alleges that Meritor failed to use its best efforts

to promote sales of the Products as required by § 440.2306(2) of the Michigan Uniform Commercial Code ("UCC"); Count VI alleges a violation of Meritor's statutory duty of good faith under § 440.1304 of the UCC; and Count VII alleges a violation of Meritor's implied common law duty of good faith in performance of the contract.

Meritor filed its own complaint on July 13, 2014, naming both SISAMEX and Quimmco, SISAMEX's other shareholder, as defendants, and seeking a declaratory judgment and damages. In Count I, Meritor seeks a declaration that SISAMEX does not have the right to produce any Meritor Components without the consent of both Meritor and Quimmco as shareholders. Meritor further alleges in Count I that Quimmco violated the Shareholders Agreement it executed with Meritor by attempting to expand SISAMEX's business to include manufacturing Components. In Count II, Meritor requests damages for breach of contract based on the conduct alleged in Count I. In Counts III and IV, Meritor seeks a declaratory judgment and contract damages based on SISAMEX's alleged failure to comply with its requirements-contract obligation to purchase Meritor Components from Meritor pursuant to Supply Agreement C.

## DISCUSSION

I.      **Motions to Dismiss**

Meritor moves to dismiss SISAMEX's first amended complaint [14] and SISAMEX and Quimmco[4] move to dismiss Meritor's complaint in the related action. (Defs.' Mot. to Dismiss

---

[4]      Quimmco separately urges the court to dismiss Meritor's complaint against Quimmco because Meritor failed to plead compliance with Section 9.12 of the Shareholders Agreement, executed by Meritor and Quimmco. (Defendants Mem. of Law in Supp. of Mot. to Dismiss, *Meritor v. Quimmco*, 1:14-cv-5319 [18], 14.) That section establishes procedures for a dispute resolution process and provides that "the provisions of this Section shall be a complete defense to any action or proceeding instituted in . . . federal . . . court with respect to the Dispute." (Shareholders Agreement § 9.12(h).) The parties further agreed that "if the Parties are not able to resolve the Dispute using the procedures set forth in Sections 9.12(a) and (b) . . . a Party may elect to bring a suit, action, or other proceeding on such Dispute." (Shareholders Agreement § 9.1.2(i).) Quimmco is correct that Meritor's complaint fails to allege compliance with Section 9.12 (*see generally* Meritor Compl.), but, the court agrees with Meritor that Quimmco's attorneys admitted that "the parties" had completed the dispute resolution process. Mr. Haas, representing both Quimmco and SISAMEX, asserted that "[t]here has been great

Meritor's Compl., *Meritor v. Quimmco*, No. 14-cv-5319 [17].)  The well-pleaded allegations of a complaint are accepted as true.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).  To evaluate a motion to dismiss, the court considers both "documents attached to the complaint" and "documents that are critical to the complaint and referred to in it."  *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); FED. R. CIV. P. 10(c).  If a contract attached to the complaint is unambiguous, a court may interpret the contract as a matter of law at the motion to dismiss stage.  *McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000); *De Lage Landen Fin. Servs., Inc. v. M.D.M. Leasing Corp.,* No. 07-cv-0045, 2007 WL 4355037, at *2 (N.D. Ill. Dec. 10, 2007) ("The interpretation of an unambiguous contract is a question of law that can be decided at the motion to dismiss stage.").  If, however, the contract is ambiguous or if the court requires extrinsic evidence to interpret it, granting a motion to dismiss is inappropriate.

The parties' agreements provide that Michigan law governs interpretation of their terms. (Shareholders Agreement 9.11(b); Supply Agreement A § 13.15(b); Supply Agreement B § 13.15; Supply Agreement C § 11.15(b).)  Under Michigan law, a "contract is ambiguous when two provisions "irreconcilably conflict with each other, or when a term is equally susceptible to more than a single meaning." *Coates v. Bastian Bros., Inc.*, 276 Mich. App. 498, 503, 741 N.W.2d 539, 543 (Mich. App. Ct. 2007) (internal citations omitted).  When contractual language is ambiguous, its meaning becomes a question of fact for the jury.  *Klapp v. United Ins. Grp.*

---

effort[] to resolve this issue . . . over the last year where there has been extraordinary correspondence back and forth between the parties.  The contract has a dispute resolution process that we went through and fulfilled."  (9/9/14 Trans. 16:8–13.)  Quimmco now maintains that Mr. Haas meant only that SISAMEX and its counsel completed the dispute resolution process, but that Quimmco had not.  (SISAMEX Reply Br. in Supp. of Mot. to Dismiss, *Meritor v. Quimmco*, No. 1:14-cv-5319 [66], 12.)  Mr. Haas, however, was representing both Quimmco and SISAMEX at the hearing and spoke broadly in terms of "the parties."  Furthermore, the central dispute—whether SISAMEX has the right to produce Core Components—has already been addressed in the dispute resolution process.  The court is satisfied that the parties have completed the required dispute resolution procedures and that the issues are ripe for this court's adjudication.

*Agency, Inc.*, 468 Mich. 459, 469, 663 N.W.2d 447, 453–54 (Mich. 2003) ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury."); *Klein v. HP Pelzer Auto. Sys., Inc.*, 306 Mich. App. 67, 75–76, 854 N.W.2d 521, 526 (Mich. App. Ct. 2014) ("If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate.").

Meritor and SISAMEX each assert that the plain language of the Supply Agreements unambiguously supports their position. As explained below, the court sees things differently: The agreements are, in fact, difficult to reconcile, and the parties' dispute cannot be fully resolved based on the plain language. Under Michigan law, where the plain language of a contract is ambiguous, "the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation." *Klapp*, 468 Mich. at 470, 663 N.W.2d at 454. Because extrinsic evidence is required to determine the meaning of the Supply Agreements, the court denies Meritor's motion to dismiss SISAMEX's complaint with respect to Count I and denies SISAMEX's motion to dismiss Meritor's complaint in the related case.[5]

## A. The core dispute: SISAMEX's right to manufacture Core Components

Counts I and IV of SISAMEX's complaint and all four Counts of Meritor's complaint in the

---

[5] In the event the court requires extrinsic evidence, SISAMEX urges the court to convert SISAMEX's motion to dismiss in the related case to a motion for summary judgment under Federal Rule of Civil Procedure 12(d) and consider the deposition of Bradley Arnold, Meritor's "lead negotiator" during the restructuring. (Defs.' Reply Br., *Meritor v. Quimmco,* No. 1:14-cv-5319 [66], hereinafter "SISAMEX Reply," 11.) When a party presents materials that are not attached to or referred to in the complaint, the court has discretion to exclude the materials and handle the case as a straightforward motion to dismiss or to consider the materials and convert to a motion for summary judgment. *See Hecker v. Deere & Co.,* 556 F.3d 575, 583 (7th Cir. 2009); *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). The court declines to convert the motion. Before converting a motion to a motion for summary judgment "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. PRO. 12(d). Meritor has had no such opportunity and the parties have not presented any materials beyond Mr. Arnold's deposition.

related case turn on whether SISAMEX has a right to manufacture certain Core Components of Meritor's Products. Accordingly, the parties each seek a declaration that they have the right to decide which Components SISAMEX may produce.

The parties agree that the Supply Agreements and Shareholders Agreement must be read together. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, *Meritor v. Quimmco*, 1:14-cv-5319 [18], hereinafter "SISAMEX Mem.," 5; Meritor Resp. to Mot. to Dismiss, *Meritor v. Quimmco*, No. 1:14-cv-5319 [56], hereinafter "Meritor Resp.," 2.) Each party also asserts that the contracts unambiguously grant it the right to produce Components. (Meritor Mem. in Supp. of Mot. to Dismiss [25], hereinafter "Meritor Mem.," 3; SISAMEX Resp. to Mot. to Dismiss [56], hereinafter "SISAMEX Resp.," 4–5.) SISAMEX insists the agreements authorize SISAMEX to decide when to fully integrate a Product and manufacture its Components; SISAMEX notes that the Supply Agreement A grants it the exclusive right to manufacture "Products," which, SISAMEX urges, necessarily contemplates the manufacture of the Products' component parts. (SISAMEX Resp. at 4–5.) Furthermore, SISAMEX argues that section 2.2 of Supply Agreement C confirms that SISAMEX retains discretion to engage in manufacturing, specifically in stating that SISAMEX shall purchase Components from Meritor that "it does not manufacture itself." (SISAMEX Resp. at 6–7.)

Meritor, on the other hand, highlights the distinction between "Components" and "Products" in the titles of the Supply Agreements, urging that this reflects the intention of the parties to clearly distinguish between Products and Components. (Meritor Reply at 2.) Meritor reads Section 2.4 of Supply Agreement C as granting Meritor alone the discretion to decide which Components SISAMEX may produce. In support of this interpretation, Meritor points out that SISAMEX is only relieved of its obligation to purchase Components from Meritor in the three circumstances listed in Section 2.4: if Meritor is "unwilling" or unable to produce the Components; if Meritor agrees to SISAMEX's production of the Components; or in the event of a Force Majeure. (Meritor Reply at 4–6.) According to Meritor, Section 2.4 confirms that Meritor

14

must agree before SISAMEX can begin manufacturing a Component for use in fulfilling Supply Agreement A. (*Id.*) The court concludes that both interpretations of the contract language are reasonable—meaning that the contracts are ambiguous and extrinsic evidence is required to interpret the contracts.

### 1. Does the right to manufacture "Products" necessarily include the right to manufacture "Components"?

SISAMEX urges that Section 2.2(a) of Supply Agreement A grants it the exclusive right to manufacture Components. (SISAMEX Resp. at 4.) That section states that SISAMEX "shall supply" and Meritor "shall purchase exclusively" from SISAMEX all Meritor Products sold to OEMs in Mexico. (Supply Agreement A § 2.2(a).) According to SISAMEX, the right to be the exclusive supplier of "Products" necessarily encompasses the right to be the exclusive manufacturer of "Components." (SISAMEX Resp. at 4–5.) Section 2.2(b) confirms this interpretation, SISAMEX continues, because that Section states that SISAMEX and Sudisa "shall be the exclusive importers, manufacturers, assemblers and/or shipping points of Meritor Products" sold by Meritor to OEMs in Mexico. (*Id.*) Any other interpretation requires the court to ignore the word "manufacturer" and instead relegates SISAMEX to be no more than the "assembler" of Meritor Products. (*Id.* at 5.)

SISAMEX's reading of the agreements is not entirely convincing. First, there is some indication in the agreements that the parties intended to treat Components and Products as distinct categories. As reflected in their titles, each of the Supply Agreements addresses a different subject matter: Supply Agreement A governs "Products" for SISAMEX sale to Meritor, while Supply Agreements B and C govern "Components" for sale between SISAMEX and Meritor. This distinction between the subject matters of the Supply Agreements is reiterated in the Shareholders Agreement (Shareholders Agreement at § 7.3(k)–(m)),[6] and in the "Whereas"

---

[6] Section 7.3 lists the requirements for the closing of the Shareholders Agreement, including the execution of the three Supply Agreements. (Shareholders Agreement § 7.3(k)–(m).)

clauses of each of the three Supply Agreements. Second, the definition of Products does not include "Components." Rather, Meritor Products are defined as: "original equipment products and assemblies for on-highway medium- and heavy-duty trucks, buses, trailers and other medium- and heavy-duty commercial vehicles licensed for on-highway use which are both (a) [Meritor] controlled designs and (b) are identified on Schedule 2 as 'Meritor Products.'" (Supply Agreement A at 4.) Schedule 2 includes tables displaying model numbers for various axles, drivelines, brakes, trailer axles, and assemblies, but does not list the component parts of those various Products. (Supply Agreement A at 43–49.)

Finally, SISAMEX acknowledges in its amended complaint that for some period of time it did operate as the exclusive assembler of the 160 axle and the 14x axle. (SISAMEX Am. Compl. ¶¶ 34, 42.) In doing so, SISAMEX purchased Components from Meritor (which Meritor manufactured), assembled the axle, and sold the assembled axle back to Meritor for re-sale in Mexico. (SISAMEX Am. Compl. ¶¶ 34, 42.) Thus, according to SISAMEX itself, it does not operate as the exclusive manufacturer of all Core Components for Products it assembles. This is consistent with the use of "and/or" in the clause granting SISAMEX the right to be the "exclusive importer[], manufacturer[], assembler[] and/or shipping point[] of Meritor Products." (Supply Agreement A at Whereas Clause (a)(ii), § 2.2(b).) SISAMEX may in some instances manufacture Products, but in other instances may only assemble or ship them. Therefore, the right to be the exclusive supplier of Products in Supply Agreement A does not necessarily encompass the right to manufacture all Core Components of Meritor Products.

On the other hand, the court is not persuaded by Meritor's position that "Products" and "Components" are completely distinct categories. Meritor's position is that SISAMEX may only manufacture the Core Components covered by Supply Agreement B for Meritor's re-sale in worldwide market, and may never manufacture other Core Components of the Meritor Products for re-sale in Mexico, which are covered by Supply Agreement A, without Meritor's agreement. It is difficult to understand, however, how SISAMEX could possibly "manufacture" a Product

under Supply Agreement A without manufacturing any of its component parts. Meritor has not explained what distinction would exist between SISAMEX's role as a "manufacturer" and an "assembler" if SISAMEX must always purchase Core Components from Meritor and may never manufacture the Core Components itself.

Further confusion is introduced by the definition of "Core Components" in Supply Agreements B and C, which includes certain "Meritor Products." (Supply Agreement B at 3; Supply Agreement C at 3.) As SISAMEX notes, "interpreting the Agreements to preclude SISAMEX from manufacturing all Core Components would preclude it from manufacturing all Meritor Products." (SISAMEX Resp. at 8.) The court agrees and declines to adopt such a strained interpretation. Although the court is not convinced that Supply Agreement A necessarily gives SISAMEX the right to produce *all* Core Components of Meritor's Products, the text of the agreements does suggest that SISAMEX has the right to manufacture at least *some* component parts for Meritor Products. The question, properly framed, is which party has the authority to decide which Core Components SISAMEX may manufacture.

### 2. Which party is granted discretion to determine whether and when SISAMEX can "fully integrate" a Product?

Unfortunately, the agreements do not clearly resolve the central question of who decides which Core Components SISAMEX may produce. According to SISAMEX, the phrase "importers, manufacturers, assemblers and/or shipping points of Meritor Products" necessarily implies that SISAMEX's role will vary and therefore that some party has discretion to determine which role SISAMEX will adopt. (SISAMEX Reply Br. in Supp. of Mot. to Dismiss, *Meritor v. Quimmco*, No. 1:14-cv-5319 [66], hereinafter "SISAMEX Reply," 1, 4–5.) SISAMEX urges that it, rather than Meritor, has the authority to decide what role SISAMEX will take on with respect to each Product. Thus, SISAMEX contends, SISAMEX is entitled to take on the manufacturing process for Core Components where it elects to act as the exclusive "manufacturer" for a particular Meritor Product. (*Id.* at 4–5.)

The strongest evidence in support of SISAMEX's position is the text of Section 2.2 of Supply Agreement C. Supply Agreement C governs Components that Meritor manufactures, and that SISAMEX purchases from Meritor, for SISAMEX to use when producing Meritor Products under Supply Agreement A and Meritor Components under Supply Agreement B. In Section 2.2 of Supply Agreement C, SISAMEX agreed to purchase all of its requirements for certain Components from Meritor. Specifically, SISAMEX agreed to "purchase exclusively from [Meritor], and [Meritor] will supply to [SISAMEX], all of [SISAMEX]'s requirements for Core Components that [SISAMEX] does not manufacture itself." (Supply Agreement C § 2.2(a).) SISAMEX urges that the reference to Components that SISAMEX "does not manufacture itself" reflects that SISAMEX has the discretion to decide which Components to manufacture itself and which to purchase from Meritor. This is a reasonable interpretation based on the plain language of that clause. *See Citizens Ins. Co. v. Pro-Seal Serv. Grp., Inc.*, 477 Mich. 75, 84, 730 N.W.2d 682, 686-87 (Mich. 2007) (courts "interpret[] the words used in a contract in accordance with their commonly used meanings.").

Meritor interprets the reference to Components that SISAMEX "does not manufacture itself" quite differently, however. According to Meritor, that expression is a reference to SISAMEX's obligation to manufacture certain Components under Supply Agreement B, which requires SISAMEX to produce certain Core Components for Meritor's re-sale to "OEM Customers in the United States and Canada." (Meritor Resp. at 2–3; Supply Agreement B § 2.2(b).) Under the terms of Supply Agreement B, "Suppliers [SISAMEX and Sudisa] are required to manufacture themselves all Core Components ordered by [Meritor]" under that Agreement and SISAMEX is specifically prohibited from "sourcing any Core Components from [Meritor] or any third party." (*Id.*) Meritor urges that these two phrases—"does not manufacture itself" and "required to manufacture themselves"—demonstrate that the "does not manufacture itself" language in Section 2.2 of Supply Agreement C is a reference to Supply Agreement B. That is, Meritor asserts that the "does not manufacture itself" clause harmonizes what would

otherwise be a contradiction between SISAMEX's obligation under Supply Agreement C to purchase its requirements for Components from Meritor and its obligation under Supply Agreement B to manufacture Components itself. But assuming that was the parties' intention, the court is uncertain why they failed to make the obvious, explicit cross-reference. The Supply Agreements were executed on the same day and make references to each other and the Shareholders Agreement throughout their text. Adopting Meritor's interpretation would require reading in a cross-reference to Supply Agreement B that appears to have been deliberately omitted.

Further undermining Meritor's interpretation: Meritor asserts that the "does not manufacture itself" language also refers to Section 2.4 of Supply Agreement C. That section permits SISAMEX to manufacture Core Components itself, if Meritor is "unwilling" or if Meritor agrees to permit SISAMEX to manufacture the particular Component. (Meritor Resp. at 5.) Meritor's suggestion that the "does not manufacture itself" clause refers to two separate clauses, in two separate Supply Agreements, illustrates the dangers of presuming the parties intended a cross-reference that is absent from the text. According to Meritor, the parties may have intended to refer to Section 2.4 of Supply Agreement C alone, to Supply Agreement B alone, or to both sections. Meritor has not explained how the court should decide among these possible cross-references and the court declines to do so.

That said, the court is also unwilling to adopt SISAMEX's interpretation of the "does not manufacture itself" language. SISAMEX's interpretation is difficult to reconcile with Section 2.4 of Supply Agreement C. That section recognizes just three exceptions to SISAMEX's obligation to purchase Components from Meritor: (1) if Meritor is "unable or unwilling to supply" the Components, (2) if Meritor and SISAMEX "have agreed" to exempt a Component from the purchase commitments of Supply Agreement C, and (3) "during a Force Majeure Event." (Supply Agreement C § 2.4.) If SISAMEX is relieved of its obligation to purchase Components from Meritor under one of these three exceptions, SISAMEX "shall be entitled to manufacture

such Components itself and/or to source such Components from any of its Affiliates or any other supplier or suppliers." (*Id.*) As Meritor points out, Section 2.4 of Supply Agreement C gives Meritor discretion over which Components to produce: One of the only scenarios in which SISAMEX is released from its purchase obligation and may "manufacture . . . Components itself" is if Meritor is "unwilling" to supply the required Components.[7]

Moreover, as Meritor notes, if SISAMEX can elect at any time to manufacture Core Components itself, under Section 2.2 of Supply Agreement C, the three limited exceptions in Section 2.4 to SISAMEX's purchase obligation would be deprived of their meaning. "[C]ourts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity . . . Instead, contracts must be construed so as to give effect to every word or phrase as far as practicable." *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 467, 663 N.W.2d 447, 453 (Mich. 2003) (internal quotations omitted). SISAMEX attempts to resolve this conflict by arguing that Section 2.4 provides it with incremental rights and "permits SISAMEX to purchase Core Components that it does not manufacture itself from a third party, instead of Meritor." (SISAMEX Resp. Br. at 9.) That is, SISAMEX urges, SISAMEX itself decides which Components to "manufacture itself," and the three exceptions in Section 2.4 apply only to the residual category of Products that it has elected not to manufacture itself. In those three circumstances, SISAMEX continues, rather than purchase Components from Meritor, SISAMEX is entitled to obtain Components from third-parties.

SISAMEX's interpretation ignores the language in Section 2.4 which states that "under the circumstances indicated below in this Section 2.4 . . . [SISAMEX] *shall be entitled to manufacture such Components itself and/or* to source such Components from any of its Affiliates or any other supplier or suppliers." (Supply Agreement C §2.4) (emphasis added.)

---

[7]     SISAMEX has argued elsewhere, that identical language in Supply Agreements A and B, grant it discretion over which Products or Components to produce. (*See* SISAMEX Reply at 9.) SISAMEX has not explained why this language would grant it discretion under Supply Agreements A and B, but not grant Meritor discretion under Supply Agreement C.

Under SISAMEX's reading, Section 2.4 would govern only the circumstances in which SISAMEX may purchase Components from a third-party rather than Meritor. In fact, Section 2.4 of Supply Agreement C also governs the circumstances in which SISAMEX may manufacture Components itself. These three exceptions to SISAMEX's purchase obligation, which permit SISAMEX to manufacture Components itself, would be meaningless if SISAMEX could always elect to manufacture a Component itself, regardless of whether any of the three circumstances existed.

Finally, although neither party has devoted great attention to it, the court notes that Table 2.3 in Supply Agreement A appears to provide some insight into how the parties intended the contracts to interact with one another. The table appears in Schedule 2 of Supply Agreement A as part of the definition of "Meritor Products." (Supply Agreement A at 47.) Table 2.3 describes which brakes constitute "Meritor Products" and clarifies that

> AIR AND HYDRAULIC DISC BRAKES- for on-highway vehicles with GVW[8] greater than 15,000 lbs, are included but are considered Core Components under SUPPLY AGREEMENT C (COMPONENTS FOR [Meritor] SALE TO [SISAMEX]), and are not to be manufactured by [SISAMEX] until otherwise agreed by [Meritor].

(*Id.*) The court understands this clause to mean that Air and Hydraulic Disc Brakes are categorized as both a "Product" under Supply Agreement A and a "Core Component" under Supply Agreement C. This supports SISAMEX's argument that there is overlap between Products and Components as the terms are used in the contracts,[9] but undermines the argument that SISAMEX may unilaterally decide to "fully integrate" the manufacturing of Components for Products covered by Supply Agreement A. When faced with this overlap between SISAMEX's rights under Supply Agreement A and Meritor's rights under Supply

---

[8] The acronym GVW is not defined.

[9] No other Product listed in Schedule 2 of Supply Agreement A contains a similar caveat, implying those Products—unlike the air and hydraulic brakes—do not constitute Components for the purposes of Supply Agreement C.

Agreement C, the parties specifically memorialized their understanding of how Air and Hydraulic Disc Brakes would be treated: Meritor maintains the right to manufacture the brakes as Core Components under Supply Agreement C and SISAMEX is prohibited from manufacturing the brakes without Meritor's approval. Table 2.3 lends support to Meritor's reading of Supply Agreement C, suggesting that SISAMEX may only manufacture Components covered by Supply Agreement C with Meritor's agreement (or in the other two circumstances listed in Section 2.4. of Supply Agreement C).

The upshot of this analysis is that the language of the Supply Agreements is ambiguous. Supply Agreement A does not grant SISAMEX the right to manufacture *all* component parts of the Meritor Products: thus, at least one of the parties must exercise discretion over which Components SISAMEX manufactures itself. Yet the text of Supply Agreement C can be read to allocate discretion over Component manufacturing to either party: The plain language of Section 2.2 of Supply Agreement C appears to give SISAMEX the discretion over which Components it "manufactures itself." Yet, Section 2.4 of Supply Agreement C appears to limit the circumstances in which SISAMEX can manufacture Components itself to situations where Meritor is "unwilling" or Meritor agrees to SISAMEX's manufacturing, suggesting Meritor's consent is required before SISAMEX can take on production of additional Components. Neither party's proposed interpretation rests on unambiguous language: Meritor's interpretation requires reading in a cross-reference to Supply Agreement B that does not appear in the text of Section 2.2 of Supply Agreement C. SISAMEX's interpretation, on the other hand, requires ignoring key portions of Section 2.4 of Supply Agreement C. Neither party has offered an explanation that satisfactorily reconciles the terms of these agreements.

Under governing Michigan law, where the terms of a contract are ambiguous, the meaning of the contract becomes a question of fact. *Klapp*, 468 Mich. at 469, 663 N.W.2d at 453–54. Because extrinsic evidence is required to evaluate SISAMEX and Meritor's claims, granting either motion to dismiss is inappropriate. Under Rule 12(b)(6), the court does not ask

whether a plaintiff will ultimately prevail; rather, it asks whether the plaintiff is entitled to offer evidence to support his allegations. *Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325, 327 (7th Cir. 1999). Meritor's motion to dismiss is denied with respect to Count I of SISAMEX's complaint and SISAMEX and Quimmco's motion to dismiss Meritor's complaint is denied.

**B.    Counts II and IV: SISAMEX's right to obtain materials from third-party vendors**

In Count II, SISAMEX seeks a declaration that Meritor is not entitled to demand pre-approval of vendors from whom SISAMEX sources production materials. In Count IV, SISAMEX seeks damages for Meritor's alleged interference, via the pre-approval process, with SISAMEX's access to more cost-effective vendors. According to SISAMEX, Meritor has misinterpreted Section 8.1 of Supply Agreements A and B and, relying on that provision, has instituted "restrictive protocols requiring Meritor's pre-approval and consent for third-party vendors." (SISAMEX Am. Compl. ¶ 53.) The parties' disagreement concerns the meaning of the provision in Section 8.1 that SISAMEX "shall have the right to purchase production materials independent of [Meritor] subject to the approval, not to be unreasonably withheld, of [Meritor]'s engineering and purchasing representatives." (Supply Agreement A § 8.1; Supply Agreement B § 8.1.) Meritor argues this provision allows approval of vendors, while SISAMEX urges that Meritor has the right to approve only the objective quality of the materials themselves.

Although the sentence by itself is not immediately clear, the context of Section 8.1 demonstrates that the clause "subject to the approval . . . of Meritor's engineering and purchasing representatives" extends to vendors as well as the materials themselves. *See Hastings Mut. Ins. Co. v. Safety King, Inc.*, 286 Mich. App. 287, 294, 778 N.W.2d 275, 280 (Mich. App. Ct. 2009) ("contractual terms must be construed in context"). Section 8.1 requires Meritor to assist SISAMEX in procuring materials from third-party vendors at competitive prices and favorable terms:

> **Purchasing Support**. During the term of this Agreement, MHVS [Meritor] shall provide the Company [SISAMEX] with support in the development of best-in-

> class procurement practices, including using commercially reasonable efforts to provide the Company with access to MHVS's third-party vendors on equivalent terms and conditions as available to MHVS. . . . To the extent necessary (and to the extent it may do so under the applicable vendor arrangements) to allow the Company to realize the benefit of any special pricing or other terms and conditions from its third party vendors, MHVS shall purchase such materials directly as agent for the Company (without any markups or commissions being imposed except for reimbursement by the Company to MHVS of all costs incurred by MHVS in such process). . . . MHVS hereby assigns to the Suppliers [SISAMEX] (as far as MHVS is legally able to do so) the benefits of any guaranty and/or warranty given to MHVS by any third party vendor as to any such materials purchased by MHVS for Suppliers under any such arrangement. . . . *Suppliers shall have the right to purchase production materials independent of MHVS subject to the approval, not to be unreasonably withheld, of MHVS's engineering and purchasing representatives.* For clarification, nothing in this Section 8.1, or any actions by MHVS under this Section 8.1, shall affect or diminish any of Suppliers' obligations under this Agreement (including but not limited to Articles 4 and 6) and to be responsible for payments to third party vendors whether or not MHVS may have facilitated purchases from the third party vendors or taken any other action (or refrained from taking any action) contemplated by this Section 8.1).

(Supply Agreement A § 8.1; Supply Agreement B § 8.1) (emphasis added.) The thrust of Section 8.1 is a commitment by Meritor to assist SISAMEX in procuring production materials from third-party vendors at competitive prices and favorable terms. One approach to accomplish this goal is for Meritor to purchase the materials directly from the third-parties to obtain favorable terms and resell them, at Meritor's own cost, to SISAMEX. Another option is for SISAMEX to purchase the materials directly from the third-party vendors, subject to Meritor's approval. In light of Section 8.1's emphasis on pricing and other "terms and conditions from [Meritor's] third-party vendors," the court is unpersuaded by SISAMEX's assertion that the parties intended Meritor's approval to govern only "the quality and specifications" of the materials, rather than the price and terms offered by the vendors. (SISAMEX Resp. at 11.) Notably, Meritor's approval is to be given by its "engineering and purchasing representatives." (Supply Agreement A § 8.1; Supply Agreement B § 8.1.) The inclusion of "purchasing" representatives suggests that the scope of Meritor's approval is not limited to the objective qualities of the materials themselves, but rather extends to the specific terms and conditions offered by each vendor. SISAMEX has, therefore, failed to state a claim that entitles it to a

declaration that "SISAMEX has the right under Section 8.1 of Supply Agreements A and B to obtain production materials from third-party vendors without Meritor's pre-approval of those vendors." (SISAMEX Am. Compl. ¶ 92.)

The court recognizes the possibility that Meritor's implementation of the vendor pre-approval process could constitute a breach of Section 8.1: For example, if Meritor failed to approve purchases from vendors offering competitive prices and terms, unreasonably withholding its approval might violate Meritor's obligation to "provide [SISAMEX] with access to [Meritor]'s third-party vendors on equivalent terms and conditions as available to [Meritor]." (Supply Agreement A § 8.1; Supply Agreement B §8.1.) Yet SISAMEX has not alleged that it ever requested approval of a vendor under the pre-approval process. Nor has SISAMEX alleged that Meritor unreasonably withheld approval of a vendor. Instead, SISAMEX objects to the use of any pre-approval process at all. (*See* SISAMEX Am. Compl. ¶ 53) ("Meritor has insisted that SISAMEX agree to restrictive protocols requiring Meritor's pre-approval and consent for third-party vendors as a condition of furnishing the design information or issuing the purchase orders required to manufacture the products encompassed by the parties' Agreements.") The Agreements, however, do give Meritor the right to approve the "purchase of production materials," including the pricing and terms offered by the vendors. SISAMEX has not alleged that Meritor has unreasonably withheld approval of purchases from third-party vendors or prohibited SISAMEX from accessing competitive pricing and terms from third-party vendors. Accordingly, the court grants Meritor's motion to dismiss Count II.

### C.     Counts III and IV: Meritor's Obligation to Provide Technical Assistance

In Count III, SISAMEX seeks a declaration that Meritor is obligated to comply with its duty to provide technical assistance to enable SISAMEX to manufacture Meritor Products. In Count IV, SISAMEX seeks damages for Meritor's refusal to comply with that duty. Meritor committed in Section 2.2(e) of the Shareholders Agreement "to provide [SISAMEX] with technical assistance for the manufacture of Meritor Products." (Shareholders Agreement

§ 2.2(e).)  Meritor urges the court to dismiss these Counts because SISAMEX is not a party to the Shareholders Agreement and therefore lacks standing to enforce Meritor's duty to provide technical assistance.  (Meritor Mem. at 12.)

The court rejects Meritor's argument. Though SISAMEX is not a party to the Shareholders Agreement, it is a third-party beneficiary of Section 2.2(e).  Third-party beneficiaries have standing to enforce contract provisions.  *Shay v. Aldrich*, 487 Mich. 648, 665–66, 790 N.W.2d 629, 640 (Mich. 2010) ("A party who qualifies as a third-party beneficiary effectively stands in the shoes of the original promisee and has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee") (internal quotations omitted). Meritor notes that Section 9.14 of the Shareholders Agreement states that there are no third-party beneficiaries (Meritor Mem. at 11), but this reading ignores the exception from the general prohibition for third-party beneficiaries "expressly contemplated by this Agreement."  (Shareholders Agreement § 9.14.)  SISAMEX is the third-party beneficiary of Section 2.2(e): SISAMEX is identified by name as the intended beneficiary of Meritor's assistance and is the party injured by Meritor's alleged failure to provide such assistance.  *See Brunsell v. City of Zeeland*, 467 Mich. 293, 297, 651 N.W.2d 388, 390 (Mich. 2002) (a person is a third-party beneficiary of a contract when the promisor undertakes an obligation directly to or for the person).  SISAMEX is an intended third-party beneficiary with standing to enforce the requirements of Section 2.2(e) of the Shareholders Agreement.

### D.  Count V: Meritor's Obligation to provide best efforts to promote sale of Products

In Count V, SISAMEX alleges that Meritor violated its obligation to "to use best efforts to promote the[] sale" of Meritor Products that SISAMEX produced under Supply Agreement A. (SISAMEX Am. Compl. ¶¶ 109, 113.)  Under Michigan law, "[a] lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation . . . by the buyer to use best efforts to promote their sale."  Mich.

Comp. Laws § 440.2306(2). Supply Agreement A establishes an exclusive requirements contract under which Meritor is obligated to purchase from SISAMEX all of its requirements for Products for sale "to OEM Customers in Mexico for Domestic Use and for Export Use." (Supply Agreement A § 2.2(a).) Meritor is therefore obligated under Michigan law to use its best efforts to promote the sale of Products to OEM Customers in Mexico.

SISAMEX asserts that once Meritor took over responsibilities for sales of Meritor Products, Meritor "slashed its Mexican sales force," impairing long-term contracts with SISAMEX's customers and "outsourced to a third party the sales and marketing activities" for certain trailer products that SISAMEX manufactures for the Mexican market. (SISAMEX Am. Compl. ¶ 62.) SISAMEX asserts that Meritor "focused its efforts on the export market" and abandoned the domestic Mexican market. (*Id.* ¶ 63.) Meritor's focus on the export market allegedly allowed Meritor to earn "a larger retention amount . . . than it made on sales to OEMS for resale to the Mexican market," causing SISAMEX's own profits to dwindle. (*Id.*) According to SISAMEX, it had a leading position in the Mexican market, which Meritor abandoned in favor of the export market—which was more profitable for Meritor, but not for SISAMEX—with the result that SISAMEX lost valuable market share. (*Id.* ¶ 64.)

Meritor urges that SISAMEX has failed to state a claim because its allegations amount only to a claim that Meritor did not sell to SISAMEX's preferred customers. Declining to sell to SISAMEX's preferred customers does not violate the obligation to use "best efforts," Meritor contends. Meritor maintains that it is permitted to "resell Meritor Products to either kind of OEM customer (for domestic or export use)," and therefore its decision to focus on the export market is permissible under the terms of the contract. (Meritor Reply at 11.) The court disagrees. Supply Agreement A explicitly obligates Meritor to purchase exclusively from SISAMEX all of Meritor's requirements for Products for sale "to OEM Customers in Mexico for Domestic Use *and* for Export Use." (Supply Agreement A § 2.2(a)) (emphasis added.) Meritor therefore had an obligation to use its best efforts to promote the sale of Meritor Products to both kinds of OEM

customers. According to SISAMEX's complaint, Meritor has abandoned the Mexican market in favor of the export market. SISAMEX has adequately pleaded a violation of § 440.2306 for failure to use its best efforts in the Mexican domestic market.

### E. Counts VI and VII: Breach of implied duties of good faith performance

In Counts VI and VII, SISAMEX alleges Meritor breached its implied duties to perform in good faith: Count VI alleges a breach of its statutory duty of good faith dealing (SISAMEX Am. Compl. ¶ 120), and Count VII alleges a breach of its common-law duty. (SISAMEX Am. Compl. ¶¶ 125–26.) Meritor urges the court to dismiss these counts because SISAMEX has failed to identify a particular contractual provision giving Meritor discretion in performing its obligations. Meritor asserts that SISAMEX must identify particular contract provisions that grant Meritor discretion in the manner of its performance. (Meritor Mem. at 15.) SISAMEX's broad assertions that Meritor has failed to perform its "marketing, engineering, and sales functions," Meritor continues, are not sufficiently specific. (*Id.*)

Under Michigan law, the implied covenant applies to the performance and enforcement of contracts where a contractual term leaves the manner of performance to one party's discretion. *Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 243, 357 N.W.2d 669, 673 (Mich. App. Ct. 1984); *Burkhardt v. City Nat'l Bank of Detroit*, 57 Mich. App. 649, 652; 226 N.W.2d 678, 680 (Mich. App. Ct. 1975). Meritor is correct that Michigan does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing apart from a claim for breach of the contract itself. *Belle Isle Grill Group v. City of Detroit*, 256 Mich. App 463, 476; 666 N.W.2d 271, 279 (Mich. App. Ct. 2003). "Breach of contract actions based upon the breach of an implied covenant of good faith and fair dealing are limited to contracts where a contractual term leaves the manner of performance to one party's discretion." *McLiechey v. Bristol W. Ins. Co.*, 408 F. Supp. 2d 516, 522 (W.D. Mich. 2006) (applying Michigan law). SISAMEX, therefore, must allege that Meritor's "sales, marketing, pricing, and engineering practices" violated particular contract provisions that leave open the manner of Meritor's

performance rather than allege that Meritor's actions breached a freestanding obligation to act in good faith.

SISAMEX refers the court to paragraphs 5, 19–20, and 30 of its amended complaint to identify the relevant contract provisions. (SISAMEX Resp. at 14.) Of these paragraphs, only paragraph 19 identifies specific contract provisions or language. In Paragraph 19, SISAMEX refers to Section 2.2(c) of the Shareholders Agreement, which gives Meritor the "sole right and responsibility for determining the product offering mix and marketing strategies, including pricing" of SISAMEX products. (Shareholders Agreement § 2.2(c).) The court agrees that this language leaves the manner of Meritor's performance to Meritor's discretion and, under Michigan law, the implied covenant of good faith attaches. SISAMEX, therefore, has adequately pleaded a breach of Section 2.2(c) based on a breach of the implied covenant of good faith.

SISAMEX also cites Sections 2.2(d), (e), (f), and Whereas clause (g)(1) of the Shareholders Agreement. Section 2.2(e) imposes Meritor's obligation to provide technical assistance, which is addressed as a breach of contract claim in Count III. SISAMEX has therefore also adequately pleaded a breach of Section 2.2(e) based on a breach of an implied covenant of good faith.

The remaining provisions SISAMEX cites do not support a breach of contract claim based on a breach of the implied covenant of good faith: Section 2.2(d) requires SISAMEX to maintain sufficient sales staff to manage its obligations under the Supply Agreements and does not impose any obligations on Meritor. Section 2.2(f) and Whereas clause (g)(1) dictate which staff and intellectual property SISAMEX will transfer to Meritor; they do not grant Meritor discretion in the manner of its performance.

SISAMEX's claim of a breach of an implied duty of good faith survives the motion, but is limited to the obligations imposed on Meritor by Sections 2.2(c) and 2.2(e) of the Shareholders Agreement.

## II.    SISAMEX's authority to retain counsel

Meritor moves to dismiss SISAMEX's complaint (Mot. to Dismiss without Prejudice [27]), and disqualify SISAMEX's counsel in the related action because SISAMEX did not properly retain outside counsel.  (Meritor's Motion that the Court Order the Withdrawal of SISAMEX's Counsel, *Meritor v. Quimmco and Sistemas*, No. 14-cv-5319 [30].)    SISAMEX retained Patterson Belknap Webb & Tyler LLP to file this action against Meritor for breach of the Supply Agreements.  In its amended complaint, SISAMEX asserts that "[t]his action was commenced at the direction of the Director General of SISAMEX, who has the authority to enforce compliance with the Supply Agreements" (SISAMEX Am. Compl. ¶ 73 n. 14), and SISAMEX later admitted that the Director General did not obtain approval of the Board of Directors.  (*See* Decl. of Manuel Valdes Aguirre Regarding Mot. to Dismiss [55] ¶ 4.)

Meritor urges that the Shareholders Agreement requires the Director General to obtain approval of the SISAMEX Board of Directors before hiring outside counsel.  (Meritor's Mem. in Supp. of its Mot. that the Ct. Order the Withdrawal of SISAMEX's Counsel, *Meritor v. Quimmco*, No. 1:14-cv-5319 [31], hereinafter "Mot. to Withdraw," 2–3.)  SISAMEX insists that the Director General had authority to hire outside counsel without Board approval, and even if the Director General lacked the authority, Meritor is estopped from raising this objection because the Director General has routinely hired outside counsel without Board approval, and Meritor has never before objected.  (SISAMEX Mem. in Opp. to Meritor's Motions to (1) Dismiss SISAMEX's Am. Compl. and (2) Order the Withdrawal of Counsel, *Meritor v. Quimmco*, No. 14-cv-5319 [51], hereinafter "SISAMEX Mem. in Opp. to Mot. to Withdraw," 10–12.)  The question of the Director General's authority turns on the terms of the Shareholders Agreement.    Both parties' interpretations of the Shareholders Agreement have some merit, but whether SISAMEX is entitled to assert an equitable estoppel defense is a question of fact, which cannot be resolved at this stage.

## A. The Shareholders Agreement requires the Director General to obtain approval of the SISAMEX Board of Directors in order to hire outside counsel

SISAMEX asserts that the Director General, Manuel Valdes Aguirre, has authority to hire outside counsel without Board approval based on Exhibit U-1 to the Shareholders Agreement. That Exhibit, entitled "Director General Delegation of Authority," delegates certain authority to the Director General of SISAMEX, including the authority to "enforce compliance with the Related Agreements" (Ex. U-1 to Shareholders Agreement, Ex. 5 to Decl. of Peter Bensinger in Supp. of Meritor's Mot. to Withdraw, *Meritor v. Quimmco*, No. 14-cv-5319 [31-6], hereinafter "Exhibit U-1," 9), including the Supply Agreements. (Shareholders Agreement at 11.) That delegated authority, however, remains "subject to the terms and conditions of the Agreement (including Section[] . . . 3.5.2(e))." (Exhibit U-1.) Section 3.5.2(e) requires the SISAMEX Board of Directors to approve certain actions, which "may not be approved by the Chairperson, the Director General or any other officer of the Company." (Shareholders Agreement § 3.5.2(e).) Included among the actions which require Board approval is the "[a]ppointment or removal of the . . . legal counsel of the Company." (Shareholders Agreement § 3.5.2(e)(xiv).) Meritor asserts that because the Director General's authority under Exhibit U-1 remains "subject to" section 3.5.2(e), the Director General must obtain Board approval before hiring outside counsel, even when exercising his delegated authority.

SISAMEX maintains that "[a]ppointment . . . of the . . . legal counsel" refers only to the appointment of SISAMEX's general counsel rather than outside counsel. The Director General must have authority to hire counsel to enforce the Supply Agreements, SISAMEX continues, because the Board of Directors specifically delegated authority to the Director General to "enforce compliance with the" Supply Agreements. (Exhibit U-1 ¶ 9.) Finally, as SISAMEX points out, under Meritor's reading of the Agreement, SISAMEX would be precluded from ever enforcing the Supply Agreements against Meritor: The SISAMEX Board of Directors is made up of four members from Quimmco and four members from Meritor. (Shareholders Agreement

§ 3.5.2(a)(i).) Six affirmative votes are required for Board approval. (*Id.* § 3.5.2(d).) Therefore any decision to hire counsel to sue Meritor would require approval of at least some of the Meritor directors.

Meritor urges the court to reject SISAMEX's reading of the Shareholders Agreement for three reasons. First, Meritor argues that limiting Section 3.5.2(e)(xiv) to "outside" counsel requires reading in a limitation on "legal counsel" that is not present from the plain text of the contract. Second, Meritor emphasizes that the Director General's delegated authority is always "subject to" the Board Approval requirement set forth in Section 3.5.2(e)(xiv). Finally, Meritor maintains that SISAMEX has an avenue to enforce the Supply Agreements without going through the Board: the Chairperson has delegated authority to enforce the Supply Agreements according to Exhibit U-2 to the Shareholders Agreement, entitled "Chairperson Delegation of Authority"—but that approach imposes fee-shifting if SISAMEX is not successful on the merits. (*See* Shareholders Agreement § 3.5.3(b).)

The court recognizes that there is some uncertainty about the meaning of the term "legal counsel" as it is used in Section 3.5.2(e)(xiv). Meritor's interpretation is plausible, as the context of the term in Section 3.5.2(e)(xiv) suggests that "legal counsel" refers to outside counsel: that Section addresses the "[a]ppointment or removal of the Auditors and legal counsel of the Company." "Auditors" are defined elsewhere as outside professionals. (*See* Shareholders Agreement § 3.7(f).) The grouping of these two terms, Meritor continues, suggests that "legal counsel" likewise refers to outside professionals. Notably, elsewhere in the contract the parties refer to "independent legal counsel"[10] (*see* Shareholders Agreement § 3.5.4(h)), suggesting a

---

[10] Section 3.5.4(h) governs how Directors, Officers, and Employees can enforce claims for indemnification against the company:

> If a claim under the provisions set forth in this Section is not paid in full by the Company within thirty days . . . the claimant may at any time thereafter bring suit against the Company . . . Neither the failure of the Company (including its Board of Directors, a committee thereof, *independent legal counsel*, or its Shareholders) to have made a determination prior to the commencement of such action that

distinction between "legal counsel" and "independent legal counsel." Neither term is defined in the Shareholders Agreement, however, and there is little evidence in the text of the Agreement that suggests the parties intended to create a general counsel role for SISAMEX. Unlike the Director General, Chairperson, and Controller of SISAMEX—whose roles are explicitly established, defined, and financed by the Shareholders Agreement (*see* Shareholders Agreement at 6–8, §§ 3.5.2(e)(iii)–(iv))—there is no reference to the powers or compensation of the "legal counsel" throughout the Shareholders Agreement.

SISAMEX urges that Meritor's interpretation precludes it from ever enforcing the Supply Agreements (SISAMEX Mem. in Opp. to Mot. to Withdraw at 5), and the court agrees that obtaining Board approval for a suit against Meritor would presumably not be possible, given Meritor's controlling position on the Board. But as Meritor points out, that is not SISAMEX's only option: The Shareholders Agreement contemplates SISAMEX enforcing the Supply Agreements without obtaining Board approval, through the Chairperson's authority, rather than the Director General's authority. The Chairperson is designated by Quimmco from among its Directors and is appointed by the Board of Directors, and the Shareholders Agreement required Meritor to vote in favor of Mr. Jesus Barrera, Quimmco's Director General, as Chairperson. (Shareholders Agreement § 3.5.2(h).) The Chairperson has the delegated authority to enforce compliance with the Supply Agreements. (*See* Ex. U-2 to Shareholders Agreement, Ex. 3 to Decl. of Erik Haas in Supp. of SISAMEX's Opp. to Mot. to Withdraw [54-3], hereinafter "Exhibit U-2," ¶ 5.) Unlike the Director General's authority, the Chairperson's delegated authority is not subject to the

---

indemnification of the claimant is proper in the circumstances because such claimant has met the applicable standard of conduct set forth herein nor an actual determination by the Company (including its Board of Directors, a committee thereof, *independent legal counsel* or its Shareholders) that the claimant has not met such applicable standard of conduct shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

(Shareholders Agreement § 3.5.4(h).)

restrictions in Section 3.5.2(e), meaning that the Chairperson may hire counsel and enforce the Supply Agreements without the consent of the SISAMEX Board of Directors. (*See* Exhibit U-2) ("Pursuant to Section 3.5.2(h) of the Agreement, the Board of Directors of [SISAMEX] hereby delegates the following powers and authority to the Chairperson . . . Authority to enforce compliance with" the Supply Agreements.)  Though Meritor had some role in selecting the Chairperson when the Shareholders Agreement was negotiated, once selected, Meritor's representatives on the Board of Directors have no authority to block the Chairperson's decision to bring a suit under his delegated authority.  (Exhibit U-2.)  SISAMEX's assertion that it has no way to enforce the Supply agreements thus appears to be an overstatement: it could avoid the Board by relying on the authority of the Chairperson, rather than the Director General.

Nor does the court agree with SISAMEX that Meritor's interpretation forces a conflict between two contract provisions.  SISAMEX notes that under Section 3.5.2(e)(xiv), the Chairperson must obtain Board approval to hire outside counsel, while Exhibit U-2 permits the Chairperson to retain counsel without such approval.  This is not a conflict: the specific delegation in Exhibit U-2 creates an exception to the broader limitations in Section 3.5.2(e)(xiv), which apply to the Director General, Chairperson, and other officers of the company. *DeFrain v. State Farm Mut. Auto. Ins. Co.*, 491 Mich. 359, 368 n.22, 817 N.W.2d 504, 509 n.22 (Mich. 2012) ("The settled rule" is that a specific contract provision controls over a related, but more general provision.); *Royal Prop. Grp., LLC v. Prime Ins. Syndicate, Inc.*, 267 Mich. App. 708, 719, 706 N.W.2d 426, 434 (Mich. App. Ct. 2005) ("specific provisions normally override general ones.").

Section 3.5.3(b) of the Shareholders Agreement provides further support for Meritor's position.  That Section explicitly contemplates the Chairperson initiating suits against Meritor to enforce the Supply Agreements:

> On the event that the Chairperson exercises his authority under item 5 of the Chairperson Delegation of Authority [authority to enforce the Supply Agreements] and any litigation or arbitration proceedings are commenced against [Meritor],

and [SISAMEX] is not successful on the merits of the claim, Quimmco shall reimburse [SISAMEX and Meritor] for all costs and expenses incurred by them (including attorneys fees) in connection with such claim.

(Shareholders Agreement § 3.5.3(b).)  SISAMEX therefore has two options for enforcing the Supply Agreements:  First, the Director General can enforce the agreements with approval from the Board.  Alternatively, the Chairperson can circumvent the Board and proceed on his own, but runs the risk of fee-shifting under Section 3.5.3(b).  SISAMEX, however, adhered to neither protocol.  SISAMEX asserts that it "hired outside counsel in these two cases at the direction of SISAMEX's Director General," but did not obtain Board Approval.  (SISAMEX Mem. in Opp. to Mot. to Withdraw at 1.)  Instead, SISAMEX has attempted to enforce the agreements without either Board approval or the risk of fee-shifting by relying on the Director General's authority without obtaining the required Board approval.  (*Id.* at 2) ("Meritor's fall-back attempt to leverage a fee-shifting theory fails because SISAMEX's Director General clearly has authority to hire outside counsel and did so here.")

Though the court recognizes that SISAMEX's Chairperson may hire counsel to bring an action against Meritor, the court is concerned that Meritor's interpretation prohibits SISAMEX from retaining outside counsel to defend itself against litigation that Meritor initiates.  The language of Exhibit U-2 and Section 3.5.3(b) appears to contemplate the Chairperson's exercising his authority solely to initiate a claim against Meritor:  Section 3.5.3(b) contemplates "litigation or arbitration proceedings [that] *are commenced against*" Meritor.  (Shareholders Agreement § 3.5.3(b)) (emphasis added.)  Meritor makes no mention of the possibility that the Chairperson could hire counsel to *defend* SISAMEX against litigation brought by Meritor.  (*See* Meritor's Consolidated Reply Mem. in Supp. of its Mot. to Dismiss and Mot. to Withdraw [62] at 6) ("The Shareholder's Agreement gives Sisamex's Chairperson the authority *to hire counsel to commence litigation* or arbitration against Meritor without Sisamex board approval") (emphasis added); (*id.* at 8) ("Read in context, the Chairperson's delegation of authority enables *Sisamex to sue Meritor* even without the approval of the Board, but subject to fee shifting") (emphasis

added.)  Indeed, Meritor effectively contends that SISAMEX is not authorized to hire outside counsel to defend itself in the case brought against SISAMEX by Meritor.  (*See* Meritor Mot. to Withdraw at 1) ("Until counsel obtains authority to act on behalf of Sisamex in this action, Sisamex cannot answer or move to dismiss Meritor's complaint.")  The court hesitates to adopt an interpretation of the Shareholders Agreement that prohibits SISAMEX from defending itself without evidence that this is consistent with the parties' intent.

### B.    SISAMEX may be able to assert an equitable estoppel defense

SISAMEX argues that, even if the court adopts Meritor's interpretation of the Shareholders Agreement, Meritor should be estopped from objecting to SISAMEX's retention of counsel because it has never before objected when the Director General retained outside counsel without Board approval.  Under Michigan law, "equitable estoppel is . . . a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact."  *AFSCME v. Bank One*, 267 Mich. App. 281, 293, 705 N.W.2d 355, 363 (Mich. App. Ct. 2005).  Equitable estoppel may be raised when "(1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts."  *AFSCME*, 267 Mich. App. at 293, 705 N.W.2d at 363.  SISAMEX alleges that it "has relied on Meritor's conduct as conveying agreement that the Director General has authority to retain outside counsel without Board approval and would be prejudiced if Meritor were now permitted to argue otherwise." (SISAMEX Mem. in Opp. to Mot. to Withdraw at 12.)

SISAMEX continues that a motion to dismiss is inappropriate because the record is insufficient to properly evaluate the applicability of equitable estoppel.  (*Id.*)  The court agrees.  If Meritor has never objected to the Director General's authority to appoint counsel (*see* Decl. of Aguirre at ¶¶ 5–6), SISAMEX may have a viable defense to any Board approval requirement: "There are some circumstances . . . wherein justice requires that a person be treated *as though*

he had waived a right where he has done some act inconsistent with the assertion of such right and without regard to whether he knew he possessed it. This is the doctrine of estoppel." *Reed Estate v. Reed*, 293 Mich. App. 168, 177, 810 N.W.2d 284, 290-91 (2011).  Without evidence on this issue, the court cannot evaluate the applicability of the equitable estoppel defense.

Finally, even if SISAMEX is not successful in asserting its equitable estoppel defense, the court is not convinced that the appropriate remedy is to dismiss SISAMEX's complaint. Meritor urges that SISAMEX lacked the capacity to initiate the suit (*see* Meritor Mem. in Supp. of its Mot. to Dismiss SISAMEX's Am. Compl. Without Prejudice [28], 1–2), but Meritor's argument, properly framed, is that SISAMEX breached the Shareholders Agreement by hiring outside counsel under the Director General's authority without Board Approval.  The court, therefore, believes that the appropriate remedy would be to impose the fee-shifting provision that would apply, had the Chairperson initiated the suit without Board approval.

## CONCLUSION

The Shareholders Agreement and Supply Agreements are ambiguous regarding whether SISAMEX is entitled to manufacture Components of Meritor Products.  The court therefore denies SISAMEX's motion to dismiss Meritor's complaint in the related case (SISAMEX's Mot. to Dismiss Meritor's Compl., *Meritor v. Quimmco and Sistemas*, No. 14-cv-5319 [17]), and denies Meritor's motion to dismiss [24] with respect to Count I of SISAMEX's complaint.  Meritor's motion to dismiss SISAMEX's complaint is granted with respect to Count II and denied with respect to the remaining Counts (III, IV, V, VI, and VII).

The Shareholders Agreement appears to require SISAMEX's Director General to obtain Board approval before hiring outside counsel, which SISAMEX failed to obtain. Without a more complete record, however, the court cannot evaluate SISAMEX's equitable estoppel defense. The court denies Meritor's motion to dismiss SISAMEX's amended complaint without prejudice [27] and its motion that the court order the withdrawal of SISAMEX's counsel in the related

action  (Meritor's Motion that the Court Order the Withdrawal of SISAMEX's Counsel, *Meritor v. Quimmco and Sistemas*, No. 14-cv-5319 [30].)

ENTER:

Dated:        January 28, 2015

RE
United States District Judge