## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **SISTEMAS AUTOMOTRICES DE MEXICO, S.A. DE C.V.,** )<br><br>Plaintiff, )<br><br>v. )<br><br>**MERITOR HEAVY VEHICLE SYSTEMS, LLC,** )<br><br>Defendant. ) | **Civil Action Nos. 14 Civ. 5289 and 14 Civ. 5319**<br><br>**Judge Rebecca R. Pallmeyer**<br><br>**Jury Trial Demanded** |
| **MERITOR HEAVY VEHICLE SYSTEMS, LLC,** )<br><br>Plaintiff, )<br><br>v. )<br><br>**QUIMMCO S.A. DE C.V. AND SISTEMAS AUTOMOTRICES DE MEXICO, S.A. DE C.V.,** )<br><br>Defendants. ) | |

## MERITOR'S MEMORANDUM IN OPPOSITION
## TO SISAMEX'S AND QUIMMCO'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ..................................................................................................................... 21

I.      With The Court Drawing All Reasonable Inferences In Meritor's Favor, SISAMEX/ Quimmco Has The Burden Of Proving No Reasonable Jury Could Find For Meritor .... 21

II.     Genuine Issues Of Material Fact Preclude Summary Judgment On The Core Issue Of Who Decides What Parts SISAMEX Makes .................................................................. 22

III.    Genuine Issues Of Material Fact Preclude Summary Judgment On SISAMEX/Quimmco's Technical Assistance Claim ....................................................... 24

IV.    Genuine Issues Of Material Fact Preclude Summary Judgment On SISAMEX/Quimmco's Third Party Sourcing Claims ..................................................... 25

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................. 21
*Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc.*,
    837 N.W.2d 244 (Mich. 2013) ........................................................................... 22
*Gillis v. Litscher*,
    468 F.3d 488 (7th Cir. 2006) .............................................................................. 21
*Klapp v. United Ins. Grp. Agency, Inc.*,
    663 N.W.2d 447 (Mich. 2003) ........................................................................... 21
*Penzien v. Dielectric Prods. Eng'g Co., Inc.*,
    132 N.W.2d 130 (Mich. 1965) ........................................................................... 21
*Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*,
    475 F.3d 805 (6th Cir. 2007) .............................................................................. 21
*Stokes v. Bd. of Educ. of The City of Chicago*,
    599 F.3d 617 (7th Cir. 2009) .............................................................................. 21
*Valenti v. Qualex, Inc.*,
    970 F.2d 363 (7th Cir. 1992) .............................................................................. 21

**Other Authorities**

Mich. Comp. Laws Ann. § 440.1303 (2013) ........................................................... 22
Mich. Comp. Laws Ann. § 440.2202 (2013) ........................................................... 22

# INTRODUCTION

In ruling on the motions to dismiss, this Court noted that "[t]he question, properly framed, is which party has the authority to decide which Core Components SISAMEX may manufacture." So who decides? SISAMEX's Board of Directors or its Director General without Board approval?

The answer is the Board. Meritor's 56.1 Response cites contemporaneous documents showing that Meritor and Quimmco agreed to equal control over SISAMEX's strategic decisions, including Board approval of the Business Plans and capital expenditures that determine what SISAMEX makes. Thus, SISAMEX's Bylaws say it can only make products and components provided for in a Board-approved Business Plan. The Bylaws and the Shareholders Agreement require Board approval of the Business Plan and say the Director General cannot decide.

Yet, SISAMEX/Quimmco ignore the "who decides" question. They argue instead that "SISAMEX is the exclusive manufacturer of Meritor products and components." They rely on language in the agreements saying SISAMEX shall be the "exclusive importers, manufacturers, assemblers and/or shipping points of … Meritor Products." But when asked about this language, Meritor negotiator Brad Arnold testified it "does not have anything to do with the manufacturing content of the product." He disputed that SISAMEX had "exclusive" manufacturing rights.

Even so, Arnold's counterparty Jesus Barrera (Quimmco's Director General and SISAMEX's Chairman), testified that Meritor supposedly agreed SISAMEX's Director General has the unilateral right to decide what parts SISAMEX makes – without Board approval. Barrera says the Board is just a "rubber stamp" and has "no say" on the insourcing of Meritor Products.

SISAMEX/Quimmco cite no parol evidence to support this bold assertion. The only evidence they cite (apart from draft agreements) is Barrera's notes of a negotiating session with Arnold. Barrera's notes confirm Meritor "wants equal say on annual operating plan and capital expenditures plan." They show Meritor bargained for equal control. They support Meritor.

1

Lacking contemporaneous evidence, SISAMEX/Quimmco quote out of context internal Meritor documents prepared years later. Some of these documents acknowledge that SISAMEX has the right to insource components of Meritor Products, which Meritor does not dispute so long as such insourcing is pursuant to a Board-approved Business Plan or agreed by the parties. But these documents, written years after contract formation, do not resolve disputed issues of material fact as to the intent of Meritor and Quimmco at the time they entered into the agreements at issue.

In fact, the parties' course of performance is consistent with *Meritor's* position. From inception, SISAMEX's Director General annually presented for Board approval proposed Business Plans and capital expenditures. Neither SISAMEX nor Quimmco ever claimed the Board had "no say" in managing the business or was simply to "rubber stamp" the Director General's proposals. Likewise, in December 2013, the Director General submitted a proposed Business Plan to the Board, but this plan proposed SISAMEX insource Meritor's 14X axle. In response, a Meritor Director requested that the Business Plan be submitted to the Shareholders for a vote, which the SISAMEX Bylaws expressly permit. SISAMEX did not pursue the issue further at the Shareholder level. Therefore, Meritor is not in breach of any agreement.

While the Court has ruled the agreements at issue are ambiguous, SISAMEX/Quimmco seek to meet their burden of proof on summary judgment with a tsunami of 192 exhibits supposedly to prove that no reasonable juror could find for Meritor even with the Court resolving all reasonable inferences in Meritor's favor. In response, Meritor's Rule 56.1(b)(3)(C) Statement painstakingly cites admissible evidence directly refuting, or at least putting in dispute, SISAMEX/Quimmco's assertions. Such evidence shows there are genuine issues of material fact about the parties' intent, witness credibility, industry custom and usage, and the parties' course of performance. Thus, the core "who decides" question is not suitable for summary judgment.

Finally, as to the secondary issues of technical assistance and third party sourcing, there are also substantial factual disputes that preclude summary judgment. First, the parties removed technical assistance from the Shareholders Agreement and now dispute whether Meritor has to provide any technical assistance or sensitive intellectual property to SISAMEX when its Board has not approved a Business Plan authorizing it to make the component at issue. The parties also dispute whether any required technical assistance is limited to product design engineering (design drawings and Bills of Materials) or also includes manufacturing process engineering (how to implement processes on various machines to make certain parts). Second, there are significant factual disputes about whether the third parties from which SISAMEX sought to source parts (Ramkrishna and Zhuzhou) had quality or reliability issues that justified Meritor's refusal to permit SISAMEX to buy parts from them for Meritor Products.

## STATEMENT OF FACTS

**As a minority owner lacking control over its prior joint venture with Quimmco, Meritor wanted to restructure the joint venture to gain equal control over key strategic decisions.**

Originally, Meritor and Quimmco were in a joint venture called Dirona, in which Quimmco owned 60% and Meritor owned 40%. (SISAMEX/Quimmco Rule 56.1 Statement of Undisputed Facts ("SUF") ¶ 3.) The agreements at issue in this case resulted from negotiations between Meritor and Quimmco to restructure Dirona into a new joint venture called SISAMEX. (SMX Ex. 1, 10/25/02 Shareholders Agr., MER0005913-87, Whereas clauses at -19-20.)

From October 1, 2000 through September 15, 2006, Thomas Gosnell was Meritor's President of Commercial Vehicle Systems ("CVS"), the business group whose responsibilities included the Dirona relationship and the newly-restructured joint venture. (MER Ex. 8, Declaration of Thomas Gosnell ¶ 1.) The Meritor team responsible for negotiating the Dirona restructuring consisted of Brad Arnold, Larry Burgin, and Larry Dowers. (*Id.* ¶ 3.)

Arnold reported directly to Gosnell and sought guidance on Meritor's negotiating parameters. (*Id.* ¶ 4.) From Meritor's perspective, the intent in restructuring Dirona to a 50/50 joint venture with Quimmco was for Meritor to obtain mutual and equal control of the key strategic business decisions, including who makes what. (*Id.* ¶ 5.) This control enabled Meritor to include the restructured joint venture in Meritor's strategy of "Global Layered Capacity." (*Id.*) Global Layered Capacity means that Meritor has redundancy at various plants and the ability to allocate the making of parts efficiently within its global network of plants in response to changing market conditions. (*Id.*)

On April 27, 2000, Arnold reported on a meeting with Jesus Barrera, the Director General of Quimmco. (MER Ex. 4, MER0103868-71.) The two discussed restructuring the joint venture, including that "Meritor and Quimco [sic] reformulate Dirona to a 50/50 arrangement focused on component supply as a Tier 2 entity" (*id.* at -69) and that "Dirona would ultimately make more money and Quimco [sic] would make more money under a larger Tier 2 role" (*id.* at -70).

Meritor is a "Tier 1" supplier to Original Equipment Manufacturers (truck manufacturers) or OEMs. (MER Ex. 19, Declaration of Larry Dowers ¶ 24.) A Tier 2 supplier does not sell directly to the truck manufacturers, but instead is typically a "contract manufacturer" to the Tier 1, making parts according to the Tier 1's orders and designs. (*Id.*; MER Ex. 12, Declaration of Christopher Patterson ¶ 15.) On May 3, 2000, Arnold reported to Meritor's CEO on his April 26, 2000 meeting with Barrera. (SMX Ex. 8, MER0103893-97.) Arnold recounted the options, including "[c]hanging the structure of Dirona to a Quimco [sic]-Meritor 50/50 Meritor managed operation as a Tier 2 supplier," and said that "[t]his option has been extensively discussed" but that "[t]o date Quimco [sic] has been unable to digest Dirona going to Tier 2." (*Id.* at -94.)

4

**Meritor told Quimmco it would block any Dirona – Daimler-Chrysler joint venture.**

On June 9, 2000, Arnold met with Barrera and representatives of Daimler-Chrysler. (SUF ¶ 8.) They told Arnold that Quimmco and Daimler-Chrysler intended to form a joint venture using Dirona. (*Id.* ¶ 6.) In his report to Meritor management, Arnold stated he "commented very strongly that Dirona was not part of any deal in any way and as a shareholder we [Meritor] would prevent any agreement of any sort in this regard." (SMX Ex. 11, 6/9/00 Arnold memo, MER0103860-62 at -61.) Arnold wrote that he told Barrera, "Dirona perhaps would supply a DC [Daimler Chrysler]-Quimco [sic] company but any other involvement would be blocked." (*Id.*) Arnold said this was "[v]ery strongly communicated with no lack of clarity." (*Id.*)

While Arnold had subsequent negotiations with Barrera, Arnold testified "[t]here was never any inclusion of Daimler in the discussions. There was always that spectre of a threat on the horizon, but all of our discussions were about how we could pursue our mutual interests by restructuring the then Dirona." (SMX Ex. 14, Arnold Dep. at 39:21-40:13.) Indeed, Barrera's notes of a later meeting with Arnold on the same day as the Quimmco-Daimler meeting have no reference to Daimler and confirm that Arnold communicated Meritor's intent. (SMX Ex. 15, QMC000190082-86 at -82 (noting that "M wants 50/50 ownership" and "would like to help run the company and not be passive investors.").) Barrera also recorded that "**M wants equal say on annual operating plan and capital expenditures plan**." (*Id.* (emphasis added).)

**Meritor insisted on equal control of the restructured joint venture.**

Arnold met with Barrera again on June 15, 2000, and reported to management. (MER Ex. 3, 6/19/00 Arnold memo, MER1485684-91 at -87.) Consistent with Barrera's earlier notes, Arnold wrote that as to "Company Organization," he and Barrera discussed "[b]alanced BOD [Board of Directors] membership" and "BOD control of all key management decisions including

5

management appointments, AOP [Annual Operating Plan], capital plan, long term supply agreements … Note: **BAA emphasized active involvement with control over AOP/Cap Ex**." (*Id*. (emphasis added).) As to "Company Mission," Arnold noted he discussed with Barrera that the restructured joint venture would be a "[c]ontract manufacture[r] of components and assemblies at world class cost" and the "[p]rimary shipping point for Meritor axle and brake product shipments to global OE plants located in Mexico." (*Id*. at -88.)

Arnold's subsequent August 11, 2000 report to management confirmed that Barrera had agreed to restructure Dirona as a Tier 2 supplier to Meritor. Arnold reported that Barrera "agreed" that "Dirona becomes 'NewCo' with a new Tier 2 mission," but Arnold noted that "Tier 2 is inflammatory to Rudolpho [Barrera]/Jesus [Barrera]." (SMX Ex. 35, MER0104274-76 at -74.) Rudolpho is Jesus's father. (*See* SMX Ex. 3, Barrera Dep. at 46:22-47:1.) In a section captioned "how is the company managed," Arnold wrote, "I have characterized this matter [company management] as a '**deal breaker.**'" (SMX Ex. 35 at -76 (emphasis added).) Arnold further recounted, "I have told Jesus very clearly that **we must be actively involved in day to day management and BOD matters**." (*Id*. (emphasis added).)

**The September 2000 Meritor/Quimmco MOU stated that the Board of the restructured joint venture will decide what parts the joint venture will make.**

On September 5, 2000, Meritor and Quimmco entered into a Memorandum of Understanding for restructuring Dirona into a new joint venture ("MOU"). (SMX Ex. 16, SMX001607323-36.) Section 2 of the MOU is captioned "Purpose and Scope of a Restructured Dirona." (*Id*. at -24.) Section 2(d) is captioned "Tooling and Capital Investment" and states:

> Decisions with respect to creating capacity for NewCo to manufacture Meritor designed products would be based on acceptable economic returns and 'pay backs' driven by market volumes **as agreed by the Board of Directors**. Subject to the completion of the Business Plan referenced in section 10, it is currently envisioned that NewCo's initial role will be to manufacture the -16x family of components.

**Additional roles will be added based on economic 'paybacks' as agreed by the Board of Directors on a case by case basis**.

(*Id*. at -24, -25 (emphases added).)

The MOU does not say Meritor and Quimmco agreed that SISAMEX's Director General would have the unilateral right to decide which parts of Meritor Products SISAMEX would make without Board approval. Instead, the MOU says the Board decides who makes what. Accordingly, MOU Attachment II lists "Matters Requiring Approval of the Parties or the Board of Directors." (*Id*. at -34.) Matters requiring Board approval include "Approval of Annual Business Plans" and "Commitments for Capital Expenditures Over a Specified Amount." (*Id*.)

Indeed, the final agreements reflect this agreed corporate governance. The SISAMEX Bylaws state, "[a]ll business of the Company shall be conducted according to a Business Plan of the Company developed by the Director General and **approved by the Board of Directors of the Company. The Company shall only manufacture, sell and commercialize those products and components provided for in the Business Plan."** (MER Ex. 21, Art. 32, MER0006347-87 at -66 (emphasis added).) The Shareholders Agreement reflects the same and says the Director General cannot approve the Business Plan. (SMX Ex. 1, Shareholders Agr. § 2.3 at -45.)

**The parties' intended SISAMEX would be the exclusive delivery point for Meritor Products, not that SISAMEX would make each component of Meritor Products.**

In support of their argument that "SISAMEX is the exclusive manufacturer of Meritor products and components," SISAMEX/Quimmco rely upon language in the Shareholders Agreement and Supply Agreement A which says SISAMEX shall be the "exclusive importers, manufacturers, assemblers and/or shipping points of … Meritor Products." (*See* SISAMEX/Quimmco Mem. at 19.) But when asked about this language, Meritor negotiator Arnold testified that it "does not have anything to do with the manufacturing content of the product." In other

words, this language is not about "exclusive" manufacturing rights or about who makes which

components of Meritor Products:

> Q. In paragraph one, SISAMEX has the exclusive right to manufacture Meritor products sold by Meritor to OEMs in Mexico, correct?
> A. The language says what it says. It says importers, manufacturers, assemblers, and/or shipping points of Meritor products.
> Q. And that would include the right to manufacture exclusively those Meritor products sold to Meritor for sale to OEM in Mexico, correct?
> A. I don't know. **I interpret this as -- I mean, just I will say what I believe this to be. That the joint venture has the exclusive right for the delivery of the products to OEMs in Mexico.**
> Q. Okay.
> A. **That's the -- the overriding direction of the joint venture restructure. That the joint venture would be the exclusive delivery point for Meritor products to OEMs in Mexico.** That's my view of how this -- of what this means.
> Q. And I wanted to --
> A. **It does not have any** -- this language doesn't have anything to do with the manufacturing content of the product, I don't believe.

(SMX Ex. 14, Arnold Dep. at 78:15-79:18 (emphases added) (objections omitted).)

Arnold testified that the parties intended SISAMEX to be the exclusive delivery point and

he disputed that the parties agreed SISAMEX would be the exclusive manufacturer:

> Q. -- the negotiation of the terms of the contract, that the joint venture would be the manufacturer, and not just the shipping point, not just the delivery point, but the manufacturer of the products that were to be sold by Meritor to OEMs in Mexico?
> A. I guess I don't really know how to answer the question after all of that exchange there. **There was an understanding that the joint venture would be the delivery point for all of Meritor's axle and brake products to the OEMs. And I know you're going to come back and ask me manufacturer.**
> Q. Right.
> A. **And I'm going to come back and say delivery.**

(*Id*. at 47:7-22 (emphases added) (objection omitted).)

Meritor negotiator Burgin also testified that the "clear strategy was for SISAMEX to be

the shipping point, assembler and shipping point, for all products sold to OEs in Mexico." (SMX

Ex. 6, 1/12/16 Burgin Dep. at 46:5-14.) The final Meritor negotiator, Dowers, concurs with

Arnold and Burgin and disputes that the parties intended that SISAMEX would make all parts of the products Meritor sold to OEMs in Mexico. (MER Ex. 19, Dowers Decl. ¶ 13-15.)

Finally, contemporaneous documents show that the parties did not intend the language "exclusive importers, manufacturers, assemblers and/or shipping points of … Meritor Products" to mean that SISAMEX's Director General had the unilateral right to make any component of any Meritor Product without Board approval and over Meritor's objection. (*See, e.g.*, SMX Ex. 4, 4/20/01 Meritor Business Review Dirona to NewCo, MER0103774-98 at -76-78 ("Newco Will Be ARM [Meritor] **Exclusive Shipping Point** for OEM Deliveries in Mexico for Truck and Trailer Axles/brakes" and "**Newco To Manufacture Agreed Content** of Sales to OEM.") (emphases added); Meritor Resp. to SUF ¶¶ 8, 11, 12(b), 13.).)

**Meritor negotiated for control over the joint venture's key strategic decision making.**

The contemporaneous documents show Meritor negotiated for control over the joint venture's key strategic decision making. First, on April 20, 2001, Arnold revised a "Business Review Dirona to NewCo" presentation, noting that "ARM Will Actively Participate in NewCo Management and BOD." (SMX Ex. 4 at -79.) Under "Planned NewCo Business/Organization Structure," Arnold wrote that "**BOD Will Control Key Activity (e.g. AOP, CapEx)**." (*Id*. at -80 (emphasis added).) Under "Strategic Impact for CVS [Commercial Vehicle Systems]," Arnold noted "JV Structure Allowing 'Control' of Strategic Decisions." (*Id*. at -89.) Finally, under "Recommendation – Key Imperatives," Arnold wrote "JV Articles/By-Laws That Have **Supermajority Requirement For All Key NewCo Actions**." (*Id*. at -95 (emphasis added).)

Second, on August 21, 2001, Arnold emailed Gosnell and other members of the Meritor Corporate Strategy Review Board about the ongoing negotiations. (MER Ex. 16, MER1455705; MER Ex. 8, Gosnell Decl. ¶ 6.) The Strategy Review Board consisted of Meritor senior

executives who reviewed and approved key strategic initiatives. (MER Ex. 8, Gosnell Decl. ¶ 6.) These executives were the CEO, CFO, General Counsel, President of Light Vehicles, Senior Vice President of Business Development, and Gosnell as President of Commercial Vehicles. (*Id*.)

Arnold recounted the "imperatives in the negotiations" including two key points on governance: "[t]hat ARM insures that corporate governance documents including the shareholder agreements and by-laws provide for **direct ARM participation in the management of the on-going business**" and "[t]hat these documents allow **veto rights for certain critical matters such as annual operating p[l]ans, capital expenditures** and the like." (*Id*. ¶ 7 (emphases added) (quoting MER Ex. 16, MER1455705).)

Third, in his August 22, 2001 report, Arnold again noted that he told Barrera that Meritor participation in management was a "deal breaker." (MER Ex. 25, MER1460911-12 at -12.) ("ARM priority was for participation in managing the company and that new clear shareholder agreements was a '**deal breaker**' item. **Jesus acknowledged and understood our position and commented that this should not be an issue**.") (emphases added).)

Fourth, after more negotiations, Arnold prepared a presentation that Gosnell made to the Meritor Strategy Review Board on May 22, 2002. (MER Ex. 7, MER1339807-39; MER Ex. 8, Gosnell Decl. ¶ 12.) The presentation had a slide captioned "Current Negotiated Framework Structure," noting "new Shareholder Agreements and BOD Structure" with a "Supermajority Required For Key Operating Matters (Supply, Related Party Transactions, CapEx and Officers)." (MER Ex. 7 at -16.) (*See also* MER Ex. 10, BAA comments of 9/25/02 updating 5/22/02 Strategy Review Dirona to NewCo, MER1466146-60 at -47, -48, -54) (noting "No Change In Framework Structure" since previous update, "Newco Will Be ARM **Exclusive Shipping Point** for OEM

Deliveries in Mexico for Truck and Trailer Axles/brakes," and "JV Articles / By-Laws That Have Supermajority Requirement For All Key NewCo Actions.") (emphasis added).)

Fifth, on October 1, 2002, Arnold prepared a "Strategy Review Dirona to NewCo" deck that Gosnell presented to the Strategy Review Board at a point when "definitive agreements have been drafted." (MER Ex. 8, Gosnell Decl. ¶ 16; MER Ex. 27, MER0735574-601 at -75.) The slide "Progress on Previous Open Issues," stated "Shareholder Agreement Structure Insures ARM Participation And 'Control.'" (*Id*. at -76.) The slide "Concern: Does The Current Deal Structure Protect ARM Governance and Control?," stated: "Current Agreements Structured to Protect ARM" and "BOD Structure and SHA [Shareholders Agreement] Provide for Business Plan Input /Approval." (*Id*. at -82.) Based on this update, the Meritor Strategy Review Board authorized the Meritor negotiating team to execute the restructuring in line with the previously discussed and agreed-upon framework. (MER Ex. 8, Gosnell Decl. ¶ 18.)

**Barrera admitted internally that SISAMEX is Meritor's contract manufacturer.**

Years later, Jesus Barrera admitted internally that SISAMEX is a contract manufacturer for Meritor, consistent with SISAMEX's Tier 2 role. (MER Ex. 11, 4/27/11 Lambreton email (certified translation), QMC000014868E-69E.) In response to a question from Quimmco's CFO about comparing SISAMEX and Meritor margins on 145 axle sales, Barrera wrote, "[u]nfortunately the information isn't comparable. One business [Meritor's] has all of the functions, including sales, design, engineering, production. **The other one, the one that is ours [SISAMEX], whether we like it or not, is a contracting manufacturer**. The fact that we have similar margins is mere coincidence." (*Id*. at -68 (emphasis added).)

**Key provisions SISAMEX/Quimmco now rely upon were actually Meritor revisions intended to protect Meritor's control over the joint venture.**

**Meritor revised Section 3.4(a) of the Shareholders Agreement to protect Meritor.**

In the negotiations of the Shareholders Agreement, Meritor revised Section 3.4(a) to protect Meritor from a scenario in which Meritor would be unable to satisfy OEM customer orders for Meritor axles on account of SISAMEX's inability to meet Meritor's forecasts. In mid-2002, Meritor was concerned that the joint venture might need to invest quickly in additional capacity to meet Meritor's forecasts for products or components. (MER Ex. 19, Dowers Decl. ¶ 26.) Meritor therefore proposed a revision to Section 3.4(a) of the Shareholders Agreement to allow the joint venture's Director General to borrow money without further Board approval to make capital expenditures to meet the Meritor forecasts. (*Id*.; *see* MER Ex. 30, 10/1/02 redline MER0009678-791 at -703-04; SMX Ex. 1, Shareholders Agr.§ 3.4(a) at -37.)

This revision was only meant to apply to instances where there was a Board-approved Business Plan, but no capacity in Meritor's network for meeting the forecast. (MER Ex. 19, Dowers Decl. ¶ 26.) Section 3.4(a) was not intended to apply where capacity already existed in Meritor's supply chain, but the Director General no longer wanted to buy from Meritor or other approved suppliers. (*Id*.) At no point did Quimmco ever put in writing or tell Meritor that the intent of Section 3.4(a) was to give the SISAMEX Director General the unilateral right to elect to make at SISAMEX any component of any Meritor Product over the objection of the SISAMEX Board (or over Meritor's objection as a Shareholder if raised to that level by a Board member pursuant to provisions of the Shareholders Agreement and Bylaws). (*Id*. ¶ 28.)

**Meritor revised Section 2.2(a) of Supply Agreement C to protect Meritor.**

In negotiating the Shareholders Agreement and Supply Agreements with Quimmco, Meritor created two different categories of components: "Core" and "Non-Core." (MER Ex. 19,

Dowers Decl. ¶ 16.) Meritor wanted to control supply of "Core Components" and insisted the joint venture buy these components from Meritor if it did not manufacture them itself pursuant to a Board-approved Business Plan. (*Id.*) Consistent with this negotiating parameter, Meritor – not Quimmco – inserted the "does not manufactures itself" language into Section 2.2(a) of Supply Agreement C. (MER Ex. 19, Dowers Decl. ¶ 16; MER Ex. 33, 5/28/02 Supply Agr. C redline, MER0012537-60 at -40 (Meritor adding "does not manufacture itself" to Section 2.2(a)).) In negotiations, Quimmco later tried to change this provision so that the joint venture would have no obligation to purchase Core Components from Meritor. (*Id.*; MER Ex. 34, 6/12/02 Supply Agr. C redline, MER0008080-105 at -83 (Quimmco deleting the phrase "[a]ll of its requirements for Core Components that it does not manufacture itself exclusively from Supplier" and replacing it with "on a non-exclusive basis.").) Meritor rejected Quimmco's proposed "on a non-exclusive basis" change, and the final Supply Agreement C includes protection for Meritor such that SISAMEX can only make Core Components with Board approval or the express approval of Meritor under Supply Agreement C Section 2.4(b). (MER Ex. 19, Dowers Decl. ¶ 16; SMX Ex. 56, Supply Agr. C, MER0006578-613 at -83 for § 2.2(a), at -84 for § 2.4(b).)

**Meritor's brakes division requested the note on air and hydraulic disc brakes in Supply Agreement A to ensure Meritor approved any SISAMEX insourcing of such brakes.**

The Meritor brake division executives who reported to Gosnell wanted to ensure that the brake division's market share was not diminished by Meritor's axle-focused joint venture in Mexico. (MER Ex. 8, Gosnell Decl. ¶ 30.) Their concern was that because air and hydraulic disc brakes were listed as Meritor Products under Supply Agreement A, the joint venture might start making these brakes without Meritor's express permission. (MER Ex. 19, Dowers Decl. ¶ 18.)

To address these concerns, Meritor negotiator Dowers included a special note in Table 2.3 of Supply Agreement A that while air and hydraulic disc brakes were included as Meritor

Products in Supply Agreement A and Core Components in Supply Agreement C, the joint venture had to buy them from Meritor and not make them, unless Meritor itself as a company agreed otherwise. (*Id.* ¶ 19.) Thus, Table 2.3 created a special exception such that SISAMEX Board approval of a Business Plan and capital expenditures calling for insourcing air and hydraulic disc brakes would not alone be sufficient authorization absent separate approval from Meritor as a company. (*Id.* ¶¶ 19-20.) In creating this additional approval to appease the Meritor brakes division, Dowers did not intend for the note in Table 2.3 to otherwise affect Meritor's ability to control the joint venture through its Board of Directors and the requirement that the Board approve any SISAMEX Business Plan and capital expenditures. (*Id.* ¶ 20.)

**The Agreements do not obligate Meritor to provide technical assistance.**

The parties agree that the First Amendment to the Shareholders Agreement changed the definition of the "Technical Assistance and Management Agreement" in the Shareholders Agreement to refer only to the "Management Services Agreement." (SUF ¶ 22.) That amendment stated that all references to the "Technical Assistance and Management Agreement" in the Shareholders Agreement shall instead only refer to the "Management Services Agreement," and that Exhibit CC to the Shareholders Agreement is amended to eliminate any reference to technical assistance. (SMX Ex. 44, 12/12/02 1st Am. to Shareholders Agr., MER0007013-19 at ¶¶ 17, 41.) As executed, the Management Services Agreement contains no provision obligating Meritor to provide any technical assistance. (*Id. passim*; SUF ¶ 22.)

Because Meritor has no obligation to provide technical assistance, Meritor treats SISAMEX like any of the Tier 2 suppliers that manufacture components for Meritor: where Meritor authorizes a supplier to make a part, then Meritor provides the product design drawings and necessary Bill of Materials ("BOMs"). (MER Ex. 19, Dowers Decl. ¶ 31; SMX Ex. 6, 1/12/16

Burgin Dep. at 119:9-120:18 ("Product engineering only.").) As to SISAMEX as a supplier, if the part SISAMEX wants to make is not in a Board-approved SISAMEX Business Plan, then Meritor does not provide its design drawings and BOMs to SISAMEX. (MER Ex. 19, Dowers Decl. ¶ 31.)

Meritor did not agree to provide SISAMEX free assistance for manufacturing process engineering. (*Id*. ¶ 32; Meritor Resp. to SUF ¶¶ 20-23.) Such engineering means the processes and parameters that SISAMEX uses to make a particular part and was the responsibility of the staff of the joint venture. (*Id*.)

**The SISAMEX Bylaws and the Shareholders Agreement give the SISAMEX Board control over management of the restructured joint venture.**

Article 22 of the SISAMEX Bylaws states that, "[t]he management and handling of business and activities, operations, and policies of the Company shall be vested in the Board of Directors." (MER Ex. 21 at -66.) Article 32 is entitled, "Business Plan," and states: "All business of the Company shall be conducted according to a Business Plan of the Company developed by the Director General and **approved by the Board of Directors of the Company. The Company shall only manufacture, sell and commercialize those products and components provided for in the Business Plan."** (*Id*. at -82 (emphasis added).)

The Shareholders Agreement provisions are consistent with the SISAMEX Bylaws. Section 2.3 of the Shareholders Agreement is captioned, "Business Plan and Transition Plan." (SMX Ex. 1, Shareholders Agr. § 2.3 at -34.) Section 2.3(a) establishes that the Board, not the Director General, approves the Business Plan:

> **From and after the Closing Date, all business of the Company [SISAMEX] will be conducted according to a Business Plan of the Company developed by the Director General and approved by the Board of Directors of the Company**. The initial Business Plan will cover the Company's and SUDISA's first five years of operations after the Closing Date. **The initial Business Plan of the Company shall be updated no less frequently than every year by the**

> **Director General and presented to the Board of Directors of the Company as provided in Section 3.7(b) for its approval.**

(*Id*. at -34, -35 (emphases added).) The Shareholders Agreement is also explicit that the SISAMEX Director General cannot approve the Business Plan. Section 3.5.2(e) states:

> It is expressly agreed, moreover, that the following matters shall require approval by the Board of Directors (in addition to any approval of the Shareholders required under this Agreement, the New Company Bylaws or applicable law) and **may not be approved by the Chairperson, the Director General or any other officer of the Company.**

(*Id*. at -43 (emphasis added).) There follows a list of actions that only the SISAMEX Board (or Shareholders) can approve, which begins with approval of the Business Plan. (*Id*.)

The Shareholders Agreement and SISAMEX Bylaws have a supermajority requirement for SISAMEX Board action. (*Id*. § 3.5.2(d) at -43 ("[A]pproval of any matter presented to the Board of Directors shall require the affirmative vote of not less than six (6) Directors."); MER Ex. 21, SISAMEX Bylaws Art. 25 at -69 (same).) Meritor and Quimmco each appoint four regular directors. (SMX Ex. 1, Shareholders Agr. § 3.5.2(a)(i) at -42; MER Ex. 21, SISAMEX Bylaws Art. 22 at -66.) But since six votes are required to approve any Board action, Meritor and Quimmco, through their four regular directors, effectively each have a "veto" on Board approvals.

**Meritor and Quimmco agreed that any SISAMEX Director can ask that the Shareholders decide any issue that would otherwise require SISAMEX Board approval.**

During negotiations, Meritor and Quimmco agreed that any SISAMEX Director could request that any issue requiring Board approval could instead be submitted for approval to the Shareholders. (MER Ex. 19, Dowers Decl. ¶ 10.) Shareholders Agreement Section 3.5.2(f) states:

> Notwithstanding anything to the contrary contained herein, any Director may elect at any time that any matter which would otherwise require approval of the Board of Directors pursuant to Section 3.5.2(e) above shall instead be submitted for approval by the Shareholders pursuant to Section 3.5.1(a)(xviii); provided that this Section 3.5.2(f) shall not apply to Section 3.5.2(e)(xix).

(SMX Ex. 1, Shareholders Agr. § 3.5.2(f) at -46.) Article 25 of the SISAMEX Bylaws provides

for the same. (MER Ex. 21 at -69.)

**The parties negotiated an interim purchasing agreement during the great recession.**

In February 2009, SISAMEX informed Meritor that it was out of cash and about to breach

bank covenants. (MER Ex. 49, 2/13/09 Hopgood email, MER1098815-16 at -15 ("Info on

Sisamex outlook. Will be talking to the bank for sure. They are essentially out of cash at this point

as evidenced by their innability [sic] to pay us for trade receivables. I will be discussing details

with Jesus S. and Pedro next week.").) At that time, Arnold was assessing the SISAMEX

relationship and various options for dealing with the recession and migration of OEMs to Mexico,

including maintaining the "Status Quo" via "Normal support of BOD," or initiating "logical

negotiation" to try to reach agreement about what SISAMEX should make. (MER Ex. 50, 2/11/09

Arnold email, MER1058221, attaching MER Ex. 51, SISAMEX Options, MER1058222.)

On March 18, 2009, Arnold asked the SISAMEX Director General, Armando Mirandez, if

SISAMEX was interested in modifying the supply agreements to reflect an updated agreement

about who makes what and Mirandez said "sure." (MER Ex. 52, 3/18/09 Arnold email,

MER1057890.) Thereafter, on July 16, 2009, Arnold sent SISAMEX a rough proposal. (MER

Ex. 53, 7/16/09 Arnold cover email, SMX001861812, attaching MER Ex. 54, 7/17/09 Arnold

Supply Strategy presentation, SMX001861813.) The slide captioned "ARM strategy," said "[in]

absence of mutual agreements, take actions to protect ARM profitability – In-source/resource

from SISAMEX – Re-price non-core components." (*Id.*)

SISAMEX's Manuel Valdes then emailed back saying, "[a]s your file clearly states: In the

absence of mutual agreements, the JV has the obligation to protect the shareholders profitability

and thus it will insource 145 carrier assemblies and gear set cutting for the Mexican market to

17

fully utilize its assets." (MER Ex. 55, 7/16/09 Valdes email, MER1049771-73 at -72.) Meritor's

Joe Plomin then called Valdes to address his "inflammatory" mischaracterization of what Meritor

had said and Valdes admitted it was an "emotional response" as SISAMEX was "under pressure

because of their financial situation." (SMX Ex. 105, Plomin Dep. at 182:15-183:15.) Valdes said

he was "sorry" and "[l]et's get back to trying to make the optimum solution that's good for both

companies and that he would discontinue the saber rattling via e-mail." (*Id*.) The parties then

negotiated a three-year interim agreement reflecting mutual supply obligations that did not

modify the original Agreements. (SMX Ex. 151, 1/1/10 Interim Agr., SMX001892459-60.)

**The SISAMEX Director General always presented an annual Business Plan to the
SISAMEX Board for approval.**

      The minutes of SISAMEX Board meetings reflect that from the outset of the restructured

joint venture, SISAMEX's Director General has presented to the Board for approval annually a

Business Plan and capital expenditures, including some proposals that the Board has rejected.

(MER Rule 56.1(b)(3)(C) Add'l Facts ¶ 38 (reciting SISAMEX Board Minutes).) Consistent with

this course of performance, on December 3, 2013, the SISAMEX Director General proposed a

2014 Business Plan that provided for SISAMEX's insourcing of the Meritor 14X axle. (SUF

¶ 69.) The Meritor Directors did not approve SISAMEX's proposed 2014 Business Plan (*id.*), and

instead a Meritor Director asked that the portion of the proposed Business Plan related to

insourcing of the Meritor 14X components be decided by the Shareholders. (MER Ex. 63, 12/2/13

Burns letter, MER1344745-49; SMX Ex. 169, 12/3/13 Minutes of SISAMEX Board meeting

MER0036012-19 at -16, -18 (acknowledging receipt of Meritor-appointed Director's request).)

SISAMEX took no further action on the 14X insourcing proposal as it was not part of an

approved Business Plan.

Contrary to this course of performance, Barrera testified that the SISAMEX Board is just a "rubber stamp" and has "no say" in the insourcing of the Meritor products. (SMX Ex. 3, Barrera Dep. at 311:7-312:14.)

**Due to quality and reliability concerns, Meritor did not approve of SISAMEX sourcing from Ramkrishna or Zhuhzou.**

**Ramkrishna in India**

Meritor's Omar Garcia was responsible for coordinating Meritor's relationship with SISAMEX. (SMX Ex. 109, Kelly Dep. at 37:10-12 ("Q. What is Mr. Garcia's current position? A. He is the coordinator of the Sisamex relationship agreement.").) Garcia testified about Meritor's quality concerns with Ramkrishna:

> [Ramkrishna] wouldn't be able to deliver the amount of parts at the right moment with the right amount of quality. Like I gave you the example of the knuckles. We've been trying to resource -- we Sisamex and Meritor together have been trying source knuckles from Ramkrishna for more than three years, and they still haven't been able to meet the quality requirements for that product.

(SMX Ex. 66, Garcia Dep. at 254:18-255:2.)

Garcia also testified that Meritor had reliability concerns. (*Id*. at 231:2-5 ("[W]e knew [Ramkrishna] came, they offer a lot of businesses, we knew that they weren't going to be a reliable option. And actually that has been the case, that is true."); *id*. at 254:5-8 ("[W]e told [Sisamex] that we had significant concerns with Ramkrishna, that Ramkrishna was bidding on everything, and we thought that it was safer for them [SISAMEX] to stay with us [Meritor].").)

Later evaluations of Ramkrishna confirmed Meritor's reliability concerns. (MER Ex. 44, 3/5/14 Purchasing Report, MER0142189-226 at -216 ("Delays in SOP due to lack of performing program management at RKFL [Ramkrishna]. Tool was not kicked off on time."); MER Ex. 45, 4/2/14 Purchasing Report, MER0318094-132 at -116 (listing "Missed delivery of test parts, Poor PV/DV test results; delay part design release, Supplier unwilling to express ship PPAP parts").)

19

Ultimately, Meritor stopped evaluating Ramkrishna for the North American market. (MER Ex. 46, 12/18/14 letter to Ramkrishna, MER1455467 ("This letter is to inform you of Meritor's desire to cease and dismiss all activities on the 14x Clutch Collar and Diff Case as well as Steering Arm projects with Ramkrishna Forgings Limited (RKFL).").)

**Zhuzhou in China**

In 2013, SISAMEX asked Meritor for permission to buy side gears and differential gears from Zhuzhou, a supplier in China. (SUF ¶ 74.) At the time, Meritor was buying parts from Zhuzhou for the Chinese market but not for North America. (SMX Ex. 66, Garcia Dep. at 236:24-237:8.) Meritor had concerns about Zhuzhou's quality for the North American market:

> Q. And why was Meritor not on board with this change [SISAMEX sourcing from Zhuhzou]?
> A. A couple of things. This is a supplier for China, for the Chinese market. Meritor is not sourcing these components for the U.S. We didn't believe that Zhuzhou -- I think that's not correctly spelled -- was -- had the right quality to do product in North America, and there were significant concerns in that sense. And that's one of reasons, that's one reason I remember.

(*Id.* at 236:24-237:8 (objection omitted).) (*See also* SMX Ex. 181, 3/15/13 Hogan email, MER0802945-48 at -45 ("There were some material and [heat treat] issues"); *id.* at -46 ("They have been working on this project for several years but unable to meet [Meritor] expectation.").)

Meritor was also concerned about protecting its intellectual property. (SMX Ex. 122, Hogan Dep. at 325:1-2 ("I didn't want our intellectual property going outside of our company.").)

**ARGUMENT**

**I.    With The Court Drawing All Reasonable Inferences In Meritor's Favor, SISAMEX/ Quimmco Has The Burden Of Proving No Reasonable Jury Could Find For Meritor**

Summary judgment is proper only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party (Meritor) and draw all reasonable inferences in Meritor's favor. *See Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citation omitted). On summary judgment, the Court may not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Bd. of Educ. of The City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2009).

The Court may grant SISAMEX/Quimmco's motion only if the record shows that a reasonable jury could not find for Meritor as the non-moving party. *See Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992). Thus, Meritor may defeat summary judgment by showing that a dispute over a genuine issue of material fact exists, and that a reasonable jury could render a verdict for Meritor as the non-moving party. *See id*.

Under Michigan law, "the meaning of an ambiguous contract is a question of fact that must be decided by a jury." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453-54 (Mich. 2003) (citation omitted). The key question for the jury is "the intent of the parties in entering the contract." *Id.* at 454 (citation omitted); *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 815 (6th Cir. 2007) ("[E]xtrinsic evidence must shed some light on the circumstances surrounding the contract formation in order to be admissible."); *Penzien v. Dielectric Prods. Eng'g Co., Inc.*, 132 N.W.2d 130, 132 (Mich. 1965) ("[E]vidence which would

21

indicate the contemporaneous understanding of the parties," is "particularly" relevant to interpreting an ambiguous contract).

The Court may also consider evidence of usage of trade. Mich. Comp. Laws Ann. § 440.2202 (2013). Such evidence "furnish[es] the background and give[s] particular meaning to the language used." *See id.* § 440.1303 cmt. 3; *see also Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc.*, 837 N.W.2d 244, 267 (Mich. 2013).

## II.    Genuine Issues Of Material Fact Preclude Summary Judgment On The Core Issue Of Who Decides What Parts SISAMEX Makes

In denying the parties' motions to dismiss, the Court noted that the key question is "which party has the authority to decide which Core Components SISAMEX may manufacture." (14 cv 5319, D.I. 87 at 19.) In the fact section above and its response to SISAMEX/Quimmco's Rule 56.1 statement, Meritor recounts in detail contemporaneous documents that show: (1) Arnold and Barrera discussed and agreed on equal control over the joint venture via the Board of Directors; (2) Meritor senior management and the Meritor negotiators all understood that the joint venture Board would have to approve the annual Business Plans and capital expenditures that determine who makes what; and (3) the parties agreed SISAMEX would be the exclusive delivery point for Meritor Products, but did not agree that SISAMEX would have the exclusive right to make all components of all Meritor Products. (SMX Exs. 4, 8, 11, 15, 16, and 35; MER Exs. 3, 7, 10, 15, 16, 18, and 27.)

Quimmco does not cite any contemporaneous evidence supporting its position that the Director General can decide who makes what without the approval of, or over the objection of, the SISAMEX Board (or Shareholders). The one contemporaneous document Quimmco produced is Barrera's June 9, 2000 notes and they show Meritor "wants equal say on annual operating plan and capital expenditures plan." (SMX Ex. 15 at QMC000190082.) Barrera's notes contradict his

self-serving testimony that the SISAMEX Board is just a "rubber stamp" and has "no say" on the insourcing of the Meritor products. (SMX Ex. 3, Barrera Dep. at 311:7-312:14.)

The drafting history shows Meritor (not Quimmco) proposed revisions to key provisions of the agreements at issue to protect Meritor. (*See* above at 12-14.) Quimmco cites no evidence that these revisions were intended to give the Director General unilateral rights to decide what parts of Meritor Products SISAMEX makes without Board approval or over Board objection.

Indeed, when SISAMEX wanted to insource Meritor's 14X axle, the Director General sought approval from the Board. (SUF ¶ 69.) The Meritor Directors did not approve that Business Plan and instead referred the insourcing issue to the Shareholders. (MER Ex. 63, 12/2/13 Burns letter at -49; SMX Ex. 169, 12/3/13 Board Minutes at -18.) SISAMEX did not pursue the issue further. Thus, Meritor is not in breach of any agreement and acted in accordance with its rights under the Shareholders Agreement and Bylaws.

Meritor has also cited substantial evidence disputing SISAMEX/Quimmco's contention that the parties intended SISAMEX to be the exclusive manufacturer of all parts of all products. Meritor's evidence shows the parties intended the joint venture would act as the exclusive shipping point for all sales to OEMs in Mexico, but that the SISAMEX Board would decide who makes what components of Meritor Products. All three Meritor negotiators support Meritor's position. First, Arnold testified that the parties intended SISAMEX to be the exclusive "delivery point" for Meritor Products to OEMs in Mexico, not the exclusive manufacturer. (SMX Ex. 14, Arnold Dep. at 47:7-22.) He testified the language SISAMEX/Quimmco rely upon in claiming "exclusive" manufacturing rights "doesn't have anything to do with the manufacturing content of the product." (*Id*. at 78:15-79:18.) Second, Burgin and Dowers testified or submitted declarations consistent with Arnold's testimony. (SMX Ex. 6, 1/12/16 Burgin Dep. at 46:5-14; MER Ex. 19,

Dowers Decl. ¶¶ 13-15.) Third, contemporaneous documents show that Meritor intended for SISAMEX to act as the exclusive shipping point for Meritor Products and that Meritor and Quimmco through the SISAMEX Board would mutually have to agree on the components of Meritor Products that SISAMEX would make. (*See* Meritor Resp. to SUF ¶¶ 8, 11, 12(b), 13.)

Finally, the executed agreements reflect these key aspects of agreed corporate governance. The SISAMEX Bylaws state that "[a]ll business of the Company shall be conducted according to a Business Plan of the Company developed by the Director General and **approved by the Board of Directors of the Company. The Company shall only manufacture, sell and commercialize those products and components provided for in the Business Plan.**" (MER Ex. 21, Art. 32 at -66 (emphasis added).) The Shareholders Agreement reflects the same and says the Director General cannot approve the Business Plan. (SMX Ex. 1, § 2.3 at -34-35, -45.) The agreements say the Board decides who makes what.

In view of the evidence Meritor has offered, and with the Court drawing all reasonable inferences in Meritor's favor, factual disputes preclude summary judgment on the core "who decides" issue with respect to Counts I and III of SISAMEX's Second Amended Complaint (14 cv 5289, D.I. 109) and all counts of Meritor's Complaint (14 cv 5319, D.I. 1).

### III. Genuine Issues Of Material Fact Preclude Summary Judgment On SISAMEX/Quimmco's Technical Assistance Claim

Count II of SISAMEX's Second Amended Complaint assumes that Meritor has the obligation to provide any technical assistance SISAMEX requests. (14 cv 5289, D.I. 109.) The evidence shows Meritor and Quimmco removed any technical assistance agreement from the Shareholders Agreement, and instead executed a Management Services Agreement that SISAMEX/Quimmco concede does not obligate Meritor to give technical assistance. (SUF ¶ 22.) Meritor's negotiators dispute that Meritor ever agreed to provide manufacturing process

engineering support to SISAMEX free of charge, as that function was SISAMEX's responsibility. (MER Ex. 19, Dowers Decl. ¶ 32.) Furthermore, Meritor has not breached any agreement because when SISAMEX has been authorized to make a part pursuant to a Board-approved Business Plan and capital expenditures, Meritor has provided SISAMEX with the necessary design drawings and Bill of Materials for the approved part. (*Id*. ¶ 31; SMX Ex. 6, 1/12/16 Burgin Dep. at 119:9-120:18 ("Product engineering only.").) Meritor, however, did not agree to provide such product design support for parts that are not part of a Board-approved Business Plan. (MER Ex. 19, Dowers Decl. ¶ 31.) Meritor's evidence and testimony from two Meritor negotiators (Dowers and Burgin) create a genuine issue of material fact as to this issue.

### IV.   Genuine Issues Of Material Fact Preclude Summary Judgment On SISAMEX/Quimmco's Third Party Sourcing Claims

Meritor cites documents and testimony providing reasonable justifications for denying SISAMEX's requests to source from Ramkrishna and Zhuzhou. (SMX Ex. 66, Garcia Dep. at 231:2-5, 254:5-8, 254:18-255:2; SMX Ex. 181; MER Exs. 44, 45, and 46.) While both suppliers sell to Meritor outside of North America, neither has been approved for the North American market due to quality and reliability concerns based on Meritor's experience with the suppliers. Meritor's evidence raises genuine issues of material fact as to the reasonableness of its concerns.

### CONCLUSION

The Court should deny SISAMEX/Quimmco's motion for partial summary judgment.

DATED: August 19, 2016                    Respectfully submitted,

MERITOR HEAVY VEHICLE SYSTEMS, LLC


By: /s/ Peter B. Bensinger, Jr.

Peter B. Bensinger, Jr.
Reid M. Bolton
Faye E. Paul
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Tel.:    (312) 494-4400
Fax:     (312) 494-4440
peter.bensinger@bartlit-beck.com
reid.bolton@bartlit-beck.com
faye.paul@bartlit-beck.com

*Attorneys for Meritor Heavy Vehicle Systems, LLC*

## CERTIFICATE OF SERVICE

I, Faye E. Paul, an attorney, hereby certify that a true and correct copy of the foregoing

document entitled MERITOR'S MEMORANDUM IN OPPOSITION TO SISAMEX'S AND

QUIMMCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT was electronically filed

with the Court's CM/ECF system and emailed to counsel listed below on August 19, 2016:

Terri L. Mascherin (tmascherin@jenner.com)
Laura B. Hulce (lhulce@jenner.com)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
Tel.:  (312) 923-2799
Fax:  (312) 840-7799

Erik Haas (ehaas@pbwt.com)
Adeel A. Mangi (aamangi@pbwt.com)
Elena Steiger Reich (esteigerreich@pbwt.com)
Muhammad U. Faridi (mfaridi@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER
 LLP
1133 Avenue of the Americas
New York, New York 10036
Tel.:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Quimmco, S.A. de C.V. and*
*Sistemas Automotrices de Mexico, S.A. de C.V.*

By: /s/  Faye E. Paul

*Attorney for Meritor Heavy Vehicle Systems, LLC*