**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SISTEMAS AUTOMOTRICES DE MEXICO, S.A. DE C.V., <br><br> Plaintiff, <br><br> v. <br><br> MERITOR HEAVY VEHICLE SYSTEMS, LLC, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) )|
| MERITOR HEAVY VEHICLE SYSTEMS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> QUIMMCO S.A. DE C.V. AND SISTEMAS AUTOMOTRICES DE MEXICO, S.A. DE C.V., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) )|

Civil Action Nos. 14 Civ. 5289 and 14 Civ. 5319

Judge Rebecca R. Pallmeyer

Jury Trial Demanded

**Public - Redacted**

**MERITOR'S RESPONSE TO SISAMEX'S AND QUIMMCO'S
RULE 56.1 STATEMENT OF UNDISPUTED FACTS AND
MERITOR'S RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS**

**ORAL ARGUMENT REQUESTED**

**MERITOR'S RESPONSE TO SISAMEX'S AND QUIMMCO'S
RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 56.1(b)(3), Meritor provides the following responses to

SISAMEX's and Quimmco's Rule 56.1 Statement of Undisputed Facts. As an initial matter,

Meritor objects that SISAMEX/Quimmco's Rule 56.1 Statement does not comply with Local

Rule 56.1(a). Specifically, many of the paragraphs in SISAMEX/Quimmco's Rule 56.1

Statement contain numerous unrelated factual assertions and unsupported argument, rather than

"short numbered paragraphs" of undisputed material facts. *See* L.R. 56.1(a)(3). For many of

SISAMEX/Quimmco's numbered paragraphs, Meritor had a difficult time separating legal

argument from factual statements and responding to each individual factual assertion. To

respond to SISAMEX/Quimmco's Statement and comply with the Local Rules, Meritor's

responses below separate paragraphs into individual assertions (*e.g.*, 1a., 1b., 1c., etc.), where

necessary so that Meritor can respond to each factual assertion.

1.   SISAMEX, formed in 2002 under the laws of Mexico and located in Mexico, is a
     manufacturer, distributer, and seller of axles, brake systems, and drivelines for
     medium- and heavy-duty commercial vehicles. (*See* Ex. 1 at -19, Whereas Clause
     § c.) It was formed as a joint venture by its two shareholders: Quimmco and
     Meritor Heavy Vehicle Systems, LLC ("Meritor"). (Ex. 2 at ¶ 2.) Quimmco is a
     manufacturing group organized as a corporation under the laws of Mexico with a
     principal place of business in Mexico. (*Id.* ¶ 2.) Meritor is a global supplier of
     axles, brakes, and related components for medium- and heavy-duty trucks, trailers
     and other commercial vehicles. (*Id.* ¶ 11.) It is a limited liability company
     organized under the laws of Delaware with its principal place of business in
     Michigan. (*Id.* ¶ 11.)

**RESPONSE:** Undisputed.

2.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
     § 1332. (*Id.* ¶ 12.) Venue in this judicial district is proper pursuant to 28 U.S.C.
     §§ 1391(b)(1) and (b)(3), and pursuant to the agreements at issue in the parties'
     complaints. (*Id.* ¶ 13.)

**RESPONSE:** Undisputed.

3a.     Prior to the formation of SISAMEX in 2002, Meritor had a minority share of 40% in Dirona, S.A. ("Dirona"), a Mexico-based joint venture with Quimmco, which held the majority position with a 60% stake.[1] (*Id.* ¶ 15.)

[1] The parties sometimes referred to SISAMEX as "Sistemas," "SAMSA," "SMX," "NewCo," and "JV" (for joint venture) and Meritor as "ArvinMeritor," "ARM" (for ArvinMeritor), "CVS" (for Commercial Vehicle Systems, a division of Meritor), and "MHVS" (for Meritor Heavy Vehicle Systems, LLC) in their correspondence.

**RESPONSE:** Meritor agrees that its predecessor in interest, Rockwell, had a 40% stake in

Dirona while Quimmco had a 60% stake.

3b.     Pursuant to a technology agreement between Dirona and Meritor, Meritor provided Dirona with access to its intellectual property that allowed Dirona to manufacture Meritor products and components for Mexico-based original equipment manufacturers of medium- and heavy-duty commercial vehicles ("OEMs"). (*See* Ex. 3 at 54:15-55:8; Ex. 4 at -75.)

**RESPONSE:** Meritor agrees that a "Technical Licenses and Non-Compete" between Dirona and

Rockwell existed from 1988 to 1998. (SMX Ex. 4, 4/20/01 Meritor Business Review,

MER0103774-98 at -75.)[1]

3c.     In 1997, Meritor refused to renew its technology agreement with Dirona and instead began to compete directly with Dirona by selling Meritor products and components in the Mexican market, including to Dirona's customers. (Ex. 5 at -46 ("Post an aborted attempt to transform the relationship in 1997, Meritor chose to let licenses lapse and compete with Dirona directly in the Mexican market."); Ex. 6 at 94:6-17 (Meritor was "competing with its own joint venture partner"); Ex. 7 at 29:24-30:14; 32:9-17 (same).)

**RESPONSE:** Meritor disputes that it "refused" to renew the technology agreement with Dirona.

Rockwell and Dirona attempted to negotiate a new agreement, but were unable to reach

acceptable terms. (MER Ex. 1, 9/10/97 Dirona Report to the Directors, QMC000053827-64

---

[1] Meritor refers to the exhibits cited in SISAMEX/Quimmco's Rule 56.1 Statement as "SMX Ex. __" and to Meritor's additional exhibits, which are attached to the 8/19/16 Declaration of Reid M. Bolton, as "MER Ex. __." Meritor relies on all exhibits cited herein and the declarations of Jeanne L. Booth, Larry Dowers, Thomas A. Gosnell, Kathy Mallison, and Christopher W. Patterson.

at -64.) After the technical license and non-compete expired in 1998, the parties "developed a

peaceful co-existence approach to our relationship with Dirona" during fiscal year 1999. (SMX

Ex. 8, 5/3/00 Arnold memo on Barrera meeting, MER0103893-97 at -93.)

    3d.    In 2000, Meritor also "planned to enter a more aggressive phase" of its relationship with Dirona by, among other things, (i) raising prices and/or terminating sales on components Meritor sold to Dirona and (ii) by launching "more aggressive sales efforts to 'go-after'" Dirona's customers. (Ex. 8 at -93.)

**RESPONSE:** Meritor does not dispute the quoted language.

    4a.    In response to Meritor's actions, Quimmco began searching for a new joint venture partner that could provide the joint venture with exclusive rights to manufacture products and components for the Mexican OEM market and the technological assistance to make such products. (Ex. 3 at 55:9-19, 57:7-24.)

**RESPONSE:** Meritor disagrees with the characterization in Paragraph 4 that Quimmco's only

response to "Meritor's actions" was a search "for a new joint venture partner that could provide

the joint venture with exclusive rights to manufacture products and components for the Mexican

OEM market and the technological assistance to make such products." Rather, in response to the

expiration of the Dirona/Meritor technical licenses and non-compete, Quimmco considered

multiple options, including "positioning as second tier manufacturer (with new products/in new

markets)," "second tier contractor of automotive parts for first tier suppliers," as well as

"cooperation" with a truck axle manufacturer, U.S. truck O.E.M., or European truck O.E.M.

(MER Ex. 2, 4/30/98 Roland Berger Strategy Review, QMC000006034-115 at -108, -109.)

    4b.    Quimmco entered into negotiations with Daimler Chrysler Aktiengesellschaft ("Daimler"), which was then one of Meritor's largest OEM customers. These negotiations culminated in the execution of a Memorandum of Understanding between Quimmco and Daimler ("Daimler MOU") on April 10, 2000. (Ex. 9; Ex. 3 at 63:8-63:16; *see also* Ex. 10 at ¶¶ 4-5.)

**RESPONSE:** Undisputed.

    5.    Quimmco and Daimler agreed, among other things, (i) that they would establish a joint venture in Mexico that would focus on the manufacturing of components and products used by Mexico-based OEMs, (ii) that Quimmco would seek to acquire

Meritor's minority share in Dirona but that the parties will pursue an alternative solution if Quimmco is not successful in doing so, (iii) that the new joint venture would sell products to OEM customers, including Freightliner Corporation, a Daimler subsidiary, (iv) that so long as Daimler remained a 50% shareholder in the joint venture, it would provide the joint venture with a technology license and the knowhow needed to manufacture products for Daimler and Mercedes-Benz, and (v) that neither Daimler nor Quimmco could compete with the new joint venture. (Ex. 9 Whereas Clause 6, 7; §§ 4.1, 2.1, 2.5, 8.2-8.4, 9.1-9.3; *see also* Ex. 3 at 63:18-64:16 (explaining aim of MOU was to produce Daimler's "Meritor-equivalent products" to meet Freightliner's needs); Ex. 10, ¶¶ 3-4 (explaining that "the parties contemplated that the new venture would manufacture axles, suspensions, brakes and other components for medium and heavy-duty trucks for sale to OEMs" and that "DaimlerChrysler was to provide engineering assistance to the joint venture"); Ex. 7 at 58:8-59:23.)

**RESPONSE:** Meritor disputes the description of the Daimler/Quimmco MOU. SISAMEX

Exhibit 9 does not state that the Daimler/Quimmco joint venture "would sell products to OEM

customers, including Freightliner Corporation" but that they would try to obtain business from

Freightliner. (*See* SMX Ex. 9, 4/10/00 Daimler-Quimmco MOU Whereas Clause 7,

QMC000199455-62 at -57 ("It is the intention of the Parties to obtain Freightliner Corporation as

a launch customer of NewCo.").) Meritor further disputes the characterization of the Non

Competition provision of the Daimler/Quimmco MOU in that under the MOU, Daimler "[is] free

to set up [its] own axles business in NAFTA within the [Daimler] Group, using [Daimler's]

technology for its own needs only." (*Id.* § 9.2. at -61)

6a.    At a dinner meeting on June 9, 2000, Jesus Barrera of Quimmco and Christof Traidl and Joachim Drees of Daimler informed Brad Arnold of Meritor of the planned Quimmco-Daimler joint venture. (Ex. 11 at -61; *see also* Ex. 3 at 52:7-10.) Upon learning of the Quimmco-Daimler arrangement, Mr. Arnold became "heated." (Ex. 3 at 62:23-63:4 ("And believe me when I say that the dinner we had together was not very pleasant. There were shouts between Daimler people and Meritor people and very aggressive"); Ex. 11 at -61.)

**RESPONSE:** Meritor agrees that the dinner meeting took place and that it was "sporadically

cordial and tense." (SMX Ex. 11, 6/9/00 Arnold memo on Barrera/Daimler meeting at

MER0103860-62 at -60.) Meritor disputes that Arnold first learned of the Daimler joint venture

on June 9, 2000, as Barrera had informed Arnold of a possible arrangement between Quimmco and Daimler earlier. (*See, e.g.*, SMX Ex. 8, 5/3/00 Arnold memo on Barrera meeting, MER0103893-97 at -94 ("[I]t is apparent from information from Freightliner and directly from Jesus that Quimco [sic] and or Dirona has had direct discussions with Daimler Chrysler and Powertrain.").)

> 6b.  Mr. Arnold concluded that a Quimmco-Daimler partnership would pose "unacceptable risk" to Meritor. (Ex. 8 at -94.)

**RESPONSE:** Meritor disputes SISAMEX/Quimmco's characterization of SISAMEX Exhibit 8. Arnold's memo actually states that the "unacceptable risk" is Meritor "selling it[s] shares in Dirona," not that a partnership between Quimmco and Daimler is an unacceptable risk. (*Id.*; *see also* SMX Ex. 11, 6/9/00 Arnold memo on Barrera/Daimler meeting, MER0103860-62 at -61 ("Quimco [sic] was free to make any arrangement with any party.").)

> 6c.  Meritor acknowledged that without Dirona, it would not have adequate manufacturing capacity for its own products. (Ex. 12 at -83 (noting that if Meritor were to "go it alone in Mexico," "the capacity issue would remain").)

**RESPONSE:** Meritor disputes that Meritor acknowledged that if it were to "Go It Alone In Mexico" it would not have adequate manufacturing capacity. SISAMEX Exhibit 12 does not state that Meritor would lack manufacturing capacity for its own products. (SMX Ex. 12, 11/22/02 Meritor Strategy Review presented to Meritor's Board, MER0103971-86 at -83.) The exhibit says that if Meritor were to "Go It Alone In Mexico," "The Capacity Issue Would Remain" such that Meritor would need to find alternate sources of capacity. (*Id.*)

> 6d.  Moreover, a Quimmco-Daimler joint venture would compete with Meritor not only in the Mexican OEM market, but globally. (Ex. 11 at -61 (noting that Meritor had been "competing with Dirona globally … and this was likely to continue").)

**RESPONSE:** Meritor agrees that it was competing globally with Dirona at that time in June 2000. Meritor denies that a "Quimmco-Daimler joint venture would compete with Meritor"

globally, because Meritor had the ability to block the proposed Quimmco-Daimler deal by refusing to sell its shares in Dirona. (SMX Ex. 11, 6/9/00 Arnold memo on Barrera/Daimler meeting, MER0103860-62 at -61 ("I commented very strongly that Dirona was not part of any deal in any way and as a shareholder we [Meritor] would prevent any agreement of any sort in this regard.").)

    7a.    Mr. Arnold informed other executives at Meritor that "[b]locking the [DaimlerChrysler] outcome is very important and worth a significant amount." (Ex. 13 at -27, -28.) Mr. Arnold also noted that Quimmco "will take an aggressive negotiating position," but maintained that "it is worth the effort to try" to reach an agreement with Quimmco. (*Id.*)

**RESPONSE:** Meritor does not dispute that Arnold wrote each of those statements.

    7b.    Meritor sought to restructure Dirona with the "threat" of Quimmco-Daimler partnership lurking in the background. (Ex. 14 at 40:10-13.)

**RESPONSE:** Meritor disputes that it agreed to restructure the Dirona joint venture to prevent a Quimmco-Daimler partnership. SISAMEX/Quimmco selectively quote Arnold's testimony out of context to support their characterization of events when in fact Arnold testified that "there was never any inclusion of Daimler" in the renegotiation discussions. (SMX Ex. 14, Arnold Dep. at 40:9-10.) Below is the full answer Arnold provided when asked by SISAMEX/Quimmco's counsel about whether he tried to persuade Barrera to restructure Dirona in order to prevent Quimmco from pursuing an opportunity with Daimler:

6

> Q. So let me reask the question. So you recall there was a meeting between you and Mr. Barrera whereby the joint venture would be restructured in order to persuade Quimmco to proceed with the joint venture with Meritor in lieu of pursuing an opportunity with Daimler Chrysler; is that correct?
>
>    MR. BENSINGER: Objection; leading.
>
> A. I don't quite understand why you're taking so much effort to structure that question like you are. We had -- we had a number of meetings about -- you know, tens of meetings about whether we would restructure the joint venture.
>
> Q. Uh-huh.
>
> A. There was really -- that was the sum and substance of what we talked about. **There was never any inclusion of Daimler in the discussions.** There was always that spectre of a threat on the horizon, but all of our discussions were about how we could pursue our mutual interests by restructuring the then Dirona.

(*Id.* at 39:20-40:13 (emphasis added).)

In addition, Arnold's memo to Meritor management summarizing his June 9, 2000 discussions with Barrera reflect the fact that Arnold told Barrera that Meritor – as a Dirona shareholder – would block any potential joint venture deal between Dirona and Daimler. Arnold recounted that he "commented very strongly that Dirona was not part of any deal in any way and as a shareholder we [Meritor] would prevent any agreement of any sort in this regard." (SMX Ex. 11, 6/9/00 Arnold memo on Barrera/Daimler meeting, MER0103860-62 at -61.) Arnold recounts in his memo that he stated to Barrera, "Dirona perhaps would supply a [Daimler Chrysler]-Quimco [sic] company but any other involvement would be **blocked**." (*Id.* (emphasis added).) Arnold wrote that this statement was "[v]ery strongly communicated with no lack of clarity." (*Id.*) Arnold's testimony and contemporaneous statements in his memo to management refute SISAMEX's assertion that Meritor sought to restructure Dirona because of the "threat" of a Quimmco or Dirona partnership with Daimler.

> 8a.  After the June 9, 2000 dinner meeting, Mr. Barrera returned to his hotel, where he received a call from Mr. Arnold, who asked Mr. Barrera to meet him in the hotel lounge to discuss restructuring Dirona with Meritor as an alternative to a Quimmco-Daimler partnership. (Ex. 3 at 52:21-53:2 ("And as I was going to sleep, Mr. Brad Arnold called me and said he was in the lobby and said that it was time to negotiate an agreement; that he did not want me to sign anything with Daimler.").) At that meeting, Mr. Arnold offered to restructure Dirona and to

provide the restructured entity with the exclusive rights to manufacture Meritor products for OEMs located in Mexico. (Ex. 3 at 56:22-57:24 ("[I]t was very clear to [Arnold] that he had to offer manufacturing rights to SISAMEX better that [*sic*] what Daimler had already considered to Quimmco under the [MOU]."); *Id.* at 58:1-24.

**RESPONSE:** Meritor disputes that it agreed to restructure the Dirona joint venture to prevent a Quimmco-Daimler partnership and incorporates its evidence in response to Paragraph 7 above. Meritor further disputes Barrera's description of the discussion that took place with Arnold, and that Arnold promised any exclusive manufacturing rights to a restructured Dirona joint venture, or that Arnold supposedly knew he had to offer manufacturing rights to Dirona better than the rights that Daimler was supposedly considering giving to Dirona in a potential joint venture. (*See* SMX Ex. 14, Arnold Dep. at 41:17-18 ("I frankly doubt that we had that specific a discussion."); *id.* at 42:3-5 ("I doubt if we would have been discussing such specifics at that time."); *id.* at 44:17-21 ("You know, let's leave out the word 'exclusive' and all the legal terms around capital M, Meritor products. Let's leave that all out of the discussion, because we never had that kind of specific discussion or agreement.").) Arnold's contemporaneous notes of discussions with Barrera and his testimony refute the assertion that Meritor promised to give a restructured joint venture exclusive rights to make any component of any Meritor Product.

For example, in a June 19, 2000 internal memo, Arnold reports on his further discussions with Barrera that occurred on June 15, 2000. (MER Ex. 3, MER1485684-91 at -87.) As to the "Company Organization," Arnold notes he and Barrera discussed "[b]alanced BOD membership" and "BOD control of all key management decisions including management appointments, AOP, capital plan, long term supply agreements ….. Note: BAA emphasized active involvement with control over AOP / Cap Ex." (*Id.*) As to "Company Mission," Arnold notes that he discussed with Barrera that the restructured joint venture would be a "[c]ontract manufacture[r] of components and assemblies at world class cost" and the "[p]rimary shipping

8

point for Meritor axle and brake product shipments to global OE plants located in Mexico."

(*Id*. at -88.) Arnold specifically noted that he told Barrera that "the **JV would likely not be tooled for all products. Likely all HD fronts and -160 and not -145.**" (*Id*. (emphasis added).)

> 8b. Mr. Barrera's contemporaneous handwritten notes from his discussions with Mr. Arnold recite the terms proposed in exchange for Quimmco's agreement to forgo the Daimler relationship. (Ex. 15.)

**RESPONSE:** Meritor disputes the characterization of Barrera's June 9, 2000 handwritten notes or that they recite any terms Meritor proposed in exchange for Quimmco's agreement to forgo the Daimler relationship. Barrera's handwritten notes (SMX Ex. 15, QMC000190082-86, and SMX Ex. 15A, 6/9/00 certified translation of Barrera notes, QMC000190085_T-86_T) do not mention Daimler, or "terms proposed in exchange," or forgoing a Daimler relationship.

> 8c. Mr. Arnold and Mr. Barrera agreed that the joint venture would become an equally-owned manufacturing enterprise with a mission to "supply axles, brakes and drivelines to all OEMs in Mexico, as separate products or in module form." (*Id.*) Moreover, Meritor would grant the joint venture "an exclusive manufacture license for the territory within the agreement." (Ex. 15-A; Ex. 3 at 56:6-59:16, 95:23-96:15)

**RESPONSE:** Meritor agrees that Barrera's notes show that he and Arnold discussed that the restructured joint venture would be equally owned by Meritor and Quimmco and that the parties would have "equal say on annual operating plan and capital expenditures plan." (SMX Ex. 15, 6/9/00 Barrera notes, QMC000190082-86 at -82.) Meritor disputes that Barrera's notes show that Arnold suggested that Meritor would grant the restructured joint venture an exclusive license to make any component of any Meritor Product. Rather, Barrera's notes state that the restructured joint venture's purpose would be "to supply" OEMs in Mexico (*id*.), which is consistent with Arnold's notes stating that the restructured joint venture would be a contract manufacturer as well as the primary shipping point. (MER Ex. 3, 6/19/00 Arnold memo, MER1485684-91 at -88.) Arnold testified that the intent during these discussions was that the restructured joint

venture would be the "delivery point" for products being sold to OEMs. (SMX Ex. 14, Arnold Dep. at 42:25-43:7, 44:12-21.)

Furthermore, Barrera's notes included two sections, a first section on the potential structure of the restructured joint venture and its mission, and a second section of "Comments" that included the statement that Barrera "suggested" to Arnold that "[Arnold] not present the relationship between M[eritor] and D[irona] as a manufacturing contract but rather that M issues <u>D</u> an exclusive manufacturing license for the territory in the agreement between M and Q." (SMX Ex. 15A, 6/9/00 translation of Barrera notes, QMC000190085_T-86_T at -85_T.) Barrera's notes do not state that Arnold agreed to Barrera's suggestion about how to portray the restructured joint venture to third parties.

Documents from the 2000-2001 time period show that Arnold and Barrera agreed the restructured joint venture would be a "Tier 2" contract manufacturer, not that Meritor granted SISAMEX an exclusive license for component manufacturing. For example, on April 27, 2000, Arnold wrote a memo reporting on a meeting with Barrera the day before. (MER Ex. 4, MER0103868-71 at -68.) Arnold noted that he discussed with Barrera the option that "Meritor and Quimco [sic] reformulate Dirona to a 50/50 arrangement focused on component supply as a Tier 2 entity," and that "Dirona would ultimately make more money and Quimmco would make more money under a larger Tier 2 role." (*Id*. at -69, -70.) On May 3, 2000, Arnold reports to Meritor's CEO on Arnold's April 26, 2000 meeting with Barrera. (SMX Ex. 8, MER0103893-97 at -93.) Arnold recounts the options including "[c]hanging the structure of Dirona to a Quimco [sic]-Meritor 50/50 Meritor managed operation as a Tier 2 supplier" and says that "[t]his option has been extensively discussed." (*Id*. at -94.) Arnold noted that he has "characterized that Dirona could easily be doubled in size and that Meritor and Quimco [sic] would make more money in

10

the near and long term" but that "[t]o date Quimco [sic] has been unable to digest Dirona going to Tier 2." (*Id.*)

Arnold then met with Barrera again on June 15, 2000 and reported to management. (MER Ex. 3, 6/19/00 Arnold memo, MER1485684-91 at -87.) As to the "Company Organization," Arnold noted he and Barrera discussed "[b]alanced BOD membership" and "BOD control of all key management decisions including management appointments, AOP, capital plan, long term supply agreements ….. Note: BAA emphasized active involvement with control over AOP / Cap Ex." (*Id.*) As to "Company Mission," Arnold noted that he discussed with Barrera that the restructured joint venture would be "[c]ontract manufacture[r] of components and assemblies at world class cost" and the "[p]rimary shipping point for Meritor axle and brake product shipments to global OE plants located in Mexico." (*Id.* at -88.) Arnold's report is consistent with Dirona becoming a Tier 2 contract manufacturer for Meritor.

Indeed, Arnold's August 11, 2000 report to management confirms that Barrera had finally agreed, with reluctance, that Dirona will be restructured to become a Tier 2 contract manufacturer to Meritor. Arnold reported that Barrera agreed "Dirona becomes 'NewCo' with a new Tier 2 mission" but noted that "Tier 2 is inflammatory to Rudolpho [Barrera]/Jesus [Barrera]." (SMX Ex. 35, MER0104274-76 at -74.)

Barrera's agreement to accept Tier 2 contract manufacturer status for NewCo is reflected in an April 20, 2001 Meritor "Business Review – Dirona to NewCo" reporting "Barrera's have reluctantly agreed to consider a 'Tier 2' role in exchange for substantial growth opportunity." (SMX Ex. 4, MER0103774-98 at -77.) The identical point is echoed in a Meritor "Project Tau – Dirona to NewCo" update dated August 20, 2001 (MER Ex. 5, MER0104131-53 at -34), and repeated again in an update from April 2002 (MER Ex. 6, MER0739273-82 at -75).

11

Arnold prepared for his boss, Tom Gosnell, President of Commercial Vehicle Systems, a presentation given to the Meritor Strategy Review Board on May 22, 2002. (MER Ex. 7 at MER1339807-39; MER Ex. 8, Declaration of Thomas Gosnell ¶¶ 4, 12-13.) The Strategy Review Board was comprised of senior executives of Meritor who reviewed key company initiatives. (MER Ex. 8, Gosnell Decl. ¶ 6.) The "Strategy Review – Dirona to NewCo" has a slide captioned, "Current Negotiated Framework Structure" in which Arnold notes that "NewCo Moves to Tier 2," that "Ownership Will Move to 50/50," and that there will be "new Shareholder Agreements and BOD [Board of Directors] Structure" with a "Supermajority Required For Key Operating Matters (Supply, Related Party Transactions, CapEx and Officers)." (MER Ex. 7, MER1339807-39 at -16.)

On September 25, 2002, Arnold sent Gosnell an update on the Meritor-Quimmco negotiations to restructure Dirona. (MER Ex. 8, Gosnell Decl. ¶ 15; MER Ex. 9, 9/25/02 Arnold cover email to Gosnell at MER1466145; MER Ex. 10, BAA Comments of 9/25/02 updating 5/22/02 Strategy Review Dirona to NewCo, MER1466146-60 at -46.) On the May 22, 2002 slide that said "NewCo Moves to Tier 2," that "Ownership Will Move to 50/50," and that there will be a "new Shareholder Agreement and BOD [Board of Directors] Structure" with a "Supermajority Required For Key Operating Matters (Supply, Related Party Transactions, CapEx and Officers)," Arnold wrote "No Change In Framework Structure." (*Id.* at -47.)

After the October 25, 2002 signing of the Shareholders Agreement between Meritor and Quimmco governing the restructuring of the Dirona joint venture (SMX Ex. 1 at MER0005913-87), Gosnell briefed Meritor's Board of Directors on the status of the restructuring of the Dirona joint venture. (MER Ex. 8, Gosnell Decl. ¶ 20; SMX Ex. 12, 11/22/02 Meritor presentation at MER0103971-86.) The November 22, 2002 Board presentation deck has a slide

12

captioned, "Dirona Restructuring – Deal Structure" and notes "Management of the New Company Will Be Equally Shared Between Quimmco and ARM [Meritor]," and that "The New Company Will Become a Tier Two Supplier To ARM [Meritor]." (*Id*. at -75.)

Finally, Barrera himself admitted internally that SISAMEX is a contract manufacturer for Meritor (a Tier 1 company). Meritor Exhibit 11 is an April 27, 2011 email exchange between the Quimmco CFO and Barrera. Barrera's father had asked the CFO for a comparison between SISAMEX and Meritor on the margins for sales of the Meritor 145 axle. (MER Ex. 11 at QMC000014868-E-69-E (Certified Translation).) The Quimmco CFO was asking Barrera for guidance. Barrera responded, "[u]nfortunately the information isn't comparable. One business [Meritor's] has all of the functions, including sales, design, engineering, production. **The other one, the one that is ours [Sisamex], whether we like it or not, is a contracting manufacturer**. The fact that we have similar margins is mere coincidence." (*Id*. at -68-E (emphasis added).) Thus, there is extensive evidence to refute SISAMEX/Quimmco's assertion in Paragraph 8 that Meritor granted SISAMEX an "exclusive manufacture license for the territory." SISAMEX was a Tier 2 contract manufacturer.

Meritor's industry expert, Chris Patterson, explains the relationship between Tier 1 suppliers to OEMs and Tier 2 suppliers to the Tier 1 suppliers. (MER Ex. 12, Declaration of

13

Christopher Patterson ¶¶ 14-19.) Tier 1 suppliers provide main components to OEMs as shown in the graphic below:



(*Id*. ¶ 14.) The Tier 2 supplier then supplies parts to the Tier 1 supplier. This is shown in the graphic below:



(*Id*. ¶ 14.) As explained above, the parties agreed that SISAMEX would act as a Tier 2 contract manufacturer as part of Meritor's supplier network. In the commercial vehicle industry, it is not

customary, indeed it is nearly unheard of, for Tier 2 suppliers to have the discretion to decide which parts of a Tier 1's product the Tier 2 supplier will make. (*Id*. ¶ 19.)

> 8d.   Mr. Arnold and Mr. Barrera also agreed that Meritor would take a "commission to cover sales cost, engineering & development costs" and that approval by the Board of Directors would be needed only for investments to manufacture products for clients other than Meritor. (Ex. 15 at -83.)

**RESPONSE:** Meritor agrees that Barrera's notes show that Meritor would take a commission on sales. Meritor disputes SISAMEX/Quimmco's interpretation of Barrera's notes in which they assert that "approval by the Board of Directors would be needed only for investments to manufacture products for clients other than Meritor." In fact, Barrera's notes specifically contradict this assertion as his notes state that "M wants equal say on annual operating plan and capital expenditures plan." (SMX Ex. 15, 6/9/00 Barrera notes, QMC000190082-86 at -82.) Those notes do not limit Meritor's request for control to products for clients other than Meritor.

In addition to Arnold, Meritor's Larry Burgin was on the Meritor negotiating team that met face to face with Quimmco to negotiate the restructuring of Dirona. (MER Ex. 8, Gosnell Decl. ¶ 3; SMX Ex. 6, 1/12/16 Burgin Dep. at 96:17-23 (Burgin "came on board to conclude this transaction June of 2002"); *id*. at 377:13-16 (Burgin undertook "a key leadership role in connection with the negotiation of the restructuring of the joint venture"); *id.* at 378:17-23 (Burgin was "at the negotiating table face to face with the Quimmco negotiators" and reviewed "drafts of the various agreements concerning the restructuring of the joint venture"); MER Ex. 13, 6/19/02 Meritor announcement "Larry Burgin Appointed Director of North American CVS Axle Business" at MER0735054 ("In this newly created position Larry will participate in a key leadership role for the overall business with a special emphasis on developing the full potential of ArvinMeritor's Mexican joint venture – Dirona").) (*Id.*)

Burgin testified extensively that SISAMEX Board approval of the Annual Operating Plan or Business Plan, and the capital expenditures therein, was required for SISAMEX to make components of Meritor Products. Burgin's testimony disputes the assertion that "approval by the Board of Directors would be needed only for investments to manufacture products for clients other than Meritor." For example:

> Q. Well, let me ask you this question: Is it your position that Sisamex did not have the right to insource and to manufacture itself the 14 series axle and all of the components thereof? Is that your position?
> A. I have to say it differently. **The director general had the ability to request, of the board, capital to manufacture anything that was on that list. The board then had the obligation to approve or disapprove.**

(SMX Ex. 6, 1/12/16 Burgin Dep. at 75:17-76:2 (emphasis added).)

> Q. Was it your understanding that the final executed supply agreements gave Sisamex's director general the unilateral right to insource making any core components of any Meritor product over the objection of the Meritor directors on Sisamex's board?
> A. No --

(*Id*. at 392:15-21.)

> Q. So long as Sisamex developed the capacity to do so, it could be the exclusive manufacturer of Meritor products for OEMs in Mexico, right?
>     MR. BENSINGER: Objection. Mischaracterization. Calls for a legal conclusion.
> THE WITNESS: Only -- the only way I could see that would be my definition of Sisamex being the shareholders represented by the board members. They had that authority.

(*Id*. at 150:17-151:2.)

> Q. But you agree that the discretion whether or not to manufacture the 145 series core components lies with Sisamex?
> A. I do not agree.
> Q. Why not?
> A. I just don't. It's not the way we interpreted --
> Q. Where -- where does the agreement say that Sisamex does not have the discretion to decide whether or not it would like to and can manufacture the 145 components if it has the capacity to do so?

A. Sisamex is not the director general. Sisamex is an entity owned by two shareholders.

(*Id*. at 322:8-20.)

Q. But you mentioned Supply Agreement C. Supply Agreement C, is it not correct, was intended to provide Sisamex with a supply of core components to the extent that Meritor -- Sisamex elected not to manufacture those components itself, correct?
   MR. BENSINGER: Objection to the argumentative preamble and compound. Go ahead.
THE WITNESS: The board of directors -- the way we ran the business is important. The director general and his team had the responsibility to propose to the board what they felt was in the best interest of the joint venture. The board then had to have -- as representing the shareholders, had to agree on the investment or the increase in capacity or the utilization of capacity. We had an operations meeting before every board meeting, and then we had a board meeting. So from this perspective from the board of directors agreeing, yes.

(*Id*. at 57:4-23.)

Contemporaneous documents also refute SISAMEX/Quimmco's assertion that the Board of Directors' approval would "be needed only for investments to manufacture products for clients other than Meritor." (*See* MER Ex. 14, 5/09/00 Dirona Concept Proposal, MER0103865-67 at -65 ("Company Organization … Shared key management responsibility … BOD control of all key management decisions including AOP and Capital Plan."); MER Ex. 3, 6/19/00 Arnold memo to management, MER1485684-91 at -87 ("The following reflects a very general sketch of a possibility discussed by B. Arnold and Jesus Barrera on June 15, 2000 … Balanced BOD membership … BOD control of all key management decisions including management appointments, [annual operating plan], capital plan, long term supply agreements ..… Note: BAA emphasized active involvement with control over AOP / Cap Ex"); SMX Ex. 35, 8/11/00 Arnold memo to management, MER0104274-76 at -75, -76 ("I have pushed for 50/50 and have characterized this matter as a 'deal breaker.' Jesus has said okay subject to the share value being defined and has pushed for a 'golden share' to allow

17

consolidation. I have said this is likely possible if it does not mean that Quimmco has definitive

control on BOD matters … How is the company managed … I have characterized this matter as

a 'deal breaker' … I have told Jesus very clearly that we must be actively involved in day to day

management and BOD matters."); *id.* at -74 ("Meritor View of Key Tenants of the 'Deal' As It

Now Stands … ARM actively participates in the management of the business at BOD level …

By-Laws for unanimous approval of key items (AOP, Cap Ex, New Business, Supply

Agreements, et al) **Open**"); SMX Ex. 4, 4/20/01 Business Review Dirona to NewCo,

MER0103774-98 at -79, -80 ("[Meritor] Will Actively Participate in Newco Management and

BOD … BOD Will Control Key Activity (e.g. AOP, CapEx)."); MER Ex. 15, 8/22/01 Arnold

memo to management, MER0104032-33 at -33 ("[Meritor] priority was for participation in

managing the company and that new clear shareholders agreements was a 'deal breaker' item.

Jesus acknowledged and understood our position and commented that this should not be an

issue."); MER Ex. 16, 8/21/01 Arnold email to management at MER1455705 ("The imperatives

in the negotiations are: That ARM insures that corporate governance documents including the

shareholders agreements and by-laws provide for direct ARM participation in the management of

the on-going business. Further, that these documents allow veto rights for certain critical matters

such as annual operating p[l]ans, capital expenditures, and the like."); MER Ex. 17, 4/19/02

Arnold email to management, MER1463800-02 at -01 ("Regarding governance we have in fact

had dialogue regarding this and are embodying significant language on this matter in the

shareholders agreements. We are following all previous direction regarding powers residing with

the BODY [sic] and not the chairman and that virtually all key issues require unanimous

approval."); MER Ex. 6, 4/4/02 Project Tau Dirona to NewCo presentation, MER0739273-82

at -79, -80 ("New JV Structure Allows 'Control' of Strategic Decisions," "BOD Will Control

Key Activity (e.g. AOP, CapEx).”); Bolton Decl. ¶ 4 (identifying the metadata date of MER Ex.

6 as 4/4/02; MER Ex. 18, 9/25/02 Arnold annotated Strategy Review Dirona to NewCo

presentation, MER0104277-91 at -78 (“Current Negotiated Framework Structure: NewCo Moves

to Tier 2, Ownership Will Move to 50/50 (Golden Share to Quimmco), New Shareholder

Agreements and BOD Structure, Supermajority Required For Key Operating Matters (Supply,

Related Party Transactions, CapEx and Officers)”).)

> 9a. On September 5, 2000, Quimmco and Meritor entered into a Memorandum of Understanding that set forth the contours of restructuring Dirona into a new joint venture (“Meritor MOU”). (Ex. 16 at -24, § 2(c).)

**RESPONSE:** Undisputed.

> 9b. The parties agreed that the new joint venture “would be the exclusive manufacturer of and shipping point for Meritor Products and Dirona Products sold by Meritor to OEM’s plants located in Mexico for on-highway medium and heavy-duty commercial vehicles.” (*Id.* at -24, § 2(c); *see also* Ex. 14 at 84:3-4 (“[I]t was clearly understood that the joint venture would manufacture the products.”); Ex. 17 at -37 (disclosing Quimmco and Meritor signed an MOU whereby “Dirona will cease selling OEM parts in Mexico, relinquishing that opportunity to [Meritor], and will become the exclusive manufacturer of such parts for [Meritor].”).)

**RESPONSE:** Meritor does not dispute that the Meritor MOU includes the quoted language.

Although the MOU states that the restructured joint venture would be the “exclusive

manufacturer … for Meritor Products[,]” Meritor disputes that means, or that the parties agreed,

that the restructured joint venture would be the exclusive manufacturer of all components of

those products. In the commercial vehicle industry, a “manufacturer” of products does not

necessarily make all components of the products. (MER Ex. 12, Patterson Decl. ¶ 16.) For

example, people in the commercial vehicle industry understand that even though OEMs are

called “manufacturers” of commercial vehicles, they do not make all of the components that go

into the final truck. (*Id.*)

19

Instead, the parties agreed that the restructured joint venture would make some components of, and be the final assembler and shipping point or delivery point of, all Meritor Products sold to OEMs in Mexico. Arnold testified:

> Q. So to the extent that Meritor was manufacturing products for sale to OEMs in Mexico under the restructuring, those products would be manufactured by the joint venture; is that correct?
> [Objection omitted]
> A. Well, you know, the agreements are the agreements, and they're very specific about what can and cannot be done, I believe.
> BY MR. HAAS:
> Q. Uh-huh.
> A. At the time the negotiations commenced, the understanding was that Meritor would close its plant in Queretaro, Mexico, which was delivering products to OEMs, and that those products would then be delivered by the joint venture.
> Q. And manufactured by the joint venture?
> [Objection omitted]
> A. **I would say delivered by the joint venture.**
> Q. Was there an understanding that the joint venture would manufacture the products for the OEMs in Mexico?
> [Objection omitted]
> A. You know, the -- **I'm going to use the word "deliver."** And you can use the word "manufacture." Because the components are -- Meritor's product line is extremely broad. The joint venture is not as broad as Meritor's product line.
> BY MR. HAAS:
> Q. Yes. I understand.
> A. Okay. **So I'm going to say deliver its products to the OEMs.**

(SMX Ex. 14, Arnold Dep. at 45:21-47:2 (emphases added).)

> Q. -- the negotiation of the terms of the contract, that the joint venture would be the manufacturer, and not just the shipping point, not just the delivery point, but the manufacturer of the products that were to be sold by Meritor to OEMs in Mexico?
> [Objection omitted]
> A. I guess I don't really know how to answer the question after all of that exchange there. **There was an understanding that the joint venture would be the delivery point for all of Meritor's axle and brake products to the OEMs.** And I know you're going to come back and ask me manufacturer.
> Q. Right.
> A. **And I'm going to come back and say delivery.**

(*Id.* at 47:7-22 (emphases added).)

Q. So at the time when you sat down and you negotiated with Mr. Barrera … and you spoke to him and you agreed to a certain term of this agreement, did you, at that point in time, agree with him that SISAMEX would make -- would manufacture the Meritor products that were sold to the original equipment manufacturers in Mexico by Meritor?

[Objection omitted]

A. I mean, it was clearly understood that the joint venture would manufacture the products.

Q. Okay.

A. Small P products.

Q. When you say small P products, I'm talking Meritor products.

A. Well, I mean, the -- **the contract has very specifics about, you know, core components, Meritor products, by part number, right.**

Q. Yes.

A. So you're asking me to give a very specific answer. And I say just generally, yes, they were going to be the manufacturer. Yeah, no doubt, no doubt.

Q. And then we'll get --

**A. The specifics of exactly each part they were going to manufacture was a different scenario.**

(*Id.* at 83:16-84:18 (emphases added).) (*See also* SMX Ex. 4, 4/20/01 Meritor Business Review, MER0103774-98 at -78 ("Newco Will Be ARM Exclusive Shipping Point for OEM Deliveries in Mexico for Truck and Trailer Axles/brakes" and "Newco To Manufacture Agreed Content of Sales to OEM."); MER Ex. 19, Declaration of Larry Dowers ¶ 13 ("As I recall from the parties' negotiations, the intent for the restructured joint venture was that it would act as the 'shipping point' for all Meritor products sold to OEMs in Mexico. By 'shipping point,' we meant that the joint venture would act as the final touch-point for supply to Mexican OEMs. The parties' intent was not that the joint venture would make all the parts of the products Meritor sold to OEMs in Mexico.").)

9c.     Indeed, the parties specifically revised an earlier draft of the Meritor MOU to clarify that the new joint venture would not simply be Meritor's "primary" manufacturer in Mexico, but rather Meritor's "exclusive" manufacturer. (Ex. 16 at -24, § 2(c), *with* Ex. 18 at -73, § 2(b)).)

**RESPONSE:** Meritor disputes that the revisions to the MOU reflect any change in the parties' intent. The previous Meritor MOU draft included the language "would be the exclusive

21

[primary] manufacturer" in a section titled "shipment of products." Meritor agrees that the bracketed word was removed and the section header was changed, but disputes that this revision changed the meaning or purpose of the MOU or the parties' intent. (*See* Meritor's evidence in response to Paragraph 9(b) above.)

Moreover, the executed September 5, 2000 Meritor-Quimmco MOU (SMX Ex. 16, SMX001607323-36) expressly contradicts the assertion that the SISAMEX Director General would have the unilateral right to elect which parts SISAMEX would make over Meritor's objection. Section 2 is captioned "Purpose and Scope of a Restructured Dirona." (*Id*. at -24.) Section 2(d) is captioned "Tooling and Capital Investment" and states:

> Decisions with respect to creating capacity for NewCo to manufacture Meritor designed products would be based on acceptable economic returns and 'paybacks' driven by market volumes **as agreed by the Board of Directors**. Subject to the completion of the Business Plan referenced in section 10, it is currently envisioned that NewCo's initial role will be to manufacture the -16x family of components. Additional roles will be added based on economic 'paybacks' **as agreed by the Board of Directors on a case by case basis**.

(*Id*. at -24, -25 (emphasis added).) Thus the MOU establishes that the NewCo joint venture will initially focus on the 160 family of axles and that "additional roles" will be "as agreed by the Board of Directors on a case by case basis." (*Id*.) It does not state that the joint venture would make everything sold to OEMs in Mexico.

Moreover, Attachment II to the MOU lists "Matters Requiring Approval of the Parties or the Board of Directors." (*Id*. at -34.) The matters specifically requiring Board approval include "Approval of Annual Business Plans" and "Commitments for Capital Expenditures Over a Specified Amount." (*Id*.) Thus the express provisions of the MOU refute SISAMEX/Quimmco's assertion that the parties' intent was that the joint venture would manufacture everything itself or give the SISAMEX Director General the right to insource making components over the objection of the Board members.

10a.  The Meritor MOU also provided that Meritor would (i) receive ▮▮▮ commission from sales to OEMs to compensate Meritor for administrative, sales, marketing and engineering expenses, (ii) provide the new company with the designs and technical assistance necessary for the manufacture of Meritor products, and (iii) close its facility in Queretaro, Mexico—which had been competing with Dirona—and would not establish a similar facility in Mexico during the life of the joint venture. (Ex. 16 at -24-25, §§ 2(c), (i); *see also* Ex. 17 at -38 ("Dirona will cease selling OEM parts in Mexico, relinquishing that opportunity to MHVS, and will become the exclusive manufacturer of such parts for MHVS. In turn, Meritor will cease manufacturing OEM and replacement parts in Mexico and cease selling replacement parts in Mexico, relinquishing these opportunities to Dirona.").)

**RESPONSE:** Meritor disputes that it agreed to provide the joint venture with any technical assistance beyond providing it with the specifications and design drawings for the products and components approved by the Board of Directors. (*See* Meritor's evidence in response to Paragraph 11(d) below.) Meritor disputes that it agreed it would never establish a facility in Mexico that manufactures components during the life of the joint venture. (*See* SMX Ex. 14, Arnold Dep. at 45:9-15 ("Q. When you say that it was the belief that the joint venture would ultimately be Meritor's manufacturing delivery point in Mexico to OEMs in Mexico, what do you mean by that? A. Whatever we agreed to would not preclude Meritor from having a factory in Mexico. They just wouldn't be delivering to OEMs.").)

10b.  Meritor recognized that its "business model" in Mexico "needed to change" from "compete" to "collaborate." (Ex. 19 at -36.)

**RESPONSE:** Undisputed.

11a.  Shortly after the execution of the Meritor MOU, Mr. Arnold prepared an outline of a business plan for the restructured joint venture. The business plan outline recognized that SISAMEX "should have a very lean organizational structure in line with its mission as primarily a manufacturer." (Ex. 20 at -27.)

**RESPONSE:** Undisputed.

11b.  The business plan outline reflected the parties' agreement that SISAMEX would "deliver all axle and brake products to Mexican OEM from [Meritor's] product portfolio. There will be few exceptions (as agreed)." (Ex. 20 at -28.)

23

**RESPONSE:** Meritor agrees that the parties intended that SISAMEX would be the delivery point/shipping point for all Meritor Products sold to OEMs in Mexico. Meritor disputes that delivering all axle and brake products means manufacturing all components of those products. Meritor incorporates its evidence in response to Paragraph 9(b) above.

> 11c.    In the section titled "Operations," Mr. Arnold clarified that the JV's "[m]anufacturing strategy / capacity" was to encompass many different axle families as well as "core component[s]" thereof, including the components that Meritor claims SISAMEX cannot manufacture. (*Id.* at -29.)

 **RESPONSE:** Meritor disputes this statement. Arnold's Business Plan outline listed the various products that the restructured joint venture would deliver to OEMs in Mexico. Using that outline, the parties created an initial 2003-2007 SISAMEX Business Plan that was Exhibit S to the final Shareholders Agreement. (SMX Ex. 68, 1/14/03 Second Am. to Shareholders Agr. Ex. S at MER1464607-47.)

The 2003-2007 Business Plan included SISAMEX manufacturing certain limited components while purchasing other components from Meritor. Meritor's Larry Burgin developed the initial SISAMEX Business Plan working with SISAMEX's finance manager and Director General. (SMX Ex. 6, 1/12/16 Burgin Dep. at 393:16-394:22.) The SISAMEX Business Plan did not include SISAMEX making Core Components of the 145 axle or the 14X axle (which did not exist at the time). Burgin testified:

> Q. Does this capital plan and the final approved business plan that was part of the Shareholders Agreement reflect the joint venture making core components of the 145 series axle?
> A. It does not.
> Q. Does this capital plan and the final approved business plan that was part of the Shareholders Agreement reflect the restructured joint venture making core components of the 14X axle?
> A. No, because the 14X did not exist, so, no.

(*Id.* at 398:9-19.)

The SISAMEX Business Plan reflects the parties' intent that the restructured joint venture would manufacture certain Core Components for Meritor Products and buy others from Meritor, while acting as the assembler and the delivery point/shipping point for all sales of Meritor Products to OEMs in Mexico. (*See* SMX Ex. 68, 1/14/03 Second Am. to Shareholders Agr. Ex. S at MER1464607-47.)

Finally, SISAMEX's Exhibit 20 is an early draft Business Plan outline that Arnold modified on November 7, 2000. This early Business Plan outline contradicts SISAMEX/Quimmco's factual assertions. In the "Product" section of Exhibit 20, Arnold wrote:

> Generally speaking, Newco will deliver all axle and brake products to Mexican OEM from ARM product portfolio. There will be few exceptions (as agreed). **The matter of which will be tooled is to be determined.**

(SMX Ex. 20, 11/7/00 Arnold modified Business Plan outline, SMX2739227-30 at -28 (emphasis added).) This statement is consistent with the parties' intent that the restructured joint venture would deliver all products but would only be "tooled" to manufacture certain components as agreed by the parties and reflected in the Board-approved Business Plan. (*See also* SMX Ex. 68, 1/14/03 Second Am. to Shareholders Agr. Ex. S at MER1464607-47; MER Ex. 19, Dowers Decl. ¶ 14; SMX Ex. 6, 1/12/16 Burgin Dep. at 393:16-394:22, 398:9-19; SMX Ex. 5, 7/5/00 Arnold memo on Dirona strategy review, MER1160046-48 at -47 ("General Strategy: Move Dirona (NewCo) to a Tier 2 position ~ Meritor assumes full market and engineering lead"); MER Ex. 20, 6/26/01 Arnold notes on "The Tau Scenario" at MER1160065-73 at -65 (noting that the Meritor-Quimmco MOU makes "Dirona exclusive distribution point" and "Dirona supplies ARM significant components under a tier 2 scenario."); Bolton Decl. ¶ 7 (identifying the document date for MER Ex. 20 as June 26, 2001).)

      11d.    Since Meritor would be responsible for providing the restructured joint venture with intellectual property and selling the products to Mexican OEMs, the plan

provided that SISAMEX would not focus on product engineering or the sale of the products. (*Id.* at -27.)

**RESPONSE:** Meritor does not dispute that SISAMEX would not focus on product engineering or the sale of the products. The parties' intent was that Meritor would provide SISAMEX with the Meritor intellectual property necessary for SISAMEX to make parts and components and/or assemble Meritor Products that the Board of Directors of the restructured joint venture had approved in a Business Plan. (*See* SMX Ex. 20, 11/7/00 Arnold modified Business Plan outline, SMX002739227-30 at -27 ("As we go forward and as our BOD process evolves we may want to debate structure as we discuss the Annual Operating Plan.").)

Burgin testified about the key difference between "product engineering" support and "process engineering:"

> Q. Its [Meritor's] role in this restructuring was to provide sales and engineering support for Sisamex, right?
> A. **Product engineering only.** Every engineer that moved from Sisamex or Dirona into the Meritor -- I made job offers to every one of these guys. I interviewed them. I found positions for them. Every one of the engineers that moved over under my authority short term, and direct engineers later, was a product engineer focused on the design, the application, the customer interface with the product. **No manufacturing engineers move to Meritor ARMEX.**
> **Q. Meritor explicitly accepted the obligation and responsibility to provide technical assistance to the joint venture, correct?**
> MR. BENSINGER: Objection. Vague. Calls for a legal conclusion.
> BY MR. HAAS:
> **Q. You are not disputing that, right?**
> **A. Yeah, I am.**
> MR. BENSINGER: Same objection.
> THE WITNESS: There was a technical assistance agreement created that was the basis of a -- of a charge of fees and funds, and it was management services. **But the technical services was product technical services. It's very important to distinguish between product and process. They are different engineers. They have different educations.**

(SMX Ex. 6, 1/12/16 Burgin Dep. at 119:13-120:18 (emphases added).) (*See also* Dowers Decl. at ¶¶ 31-32; SMX Ex. 1, 10/25/02 Shareholders Agr. § 2.2(e), MER0005913-87 at -34.)

26

When Meritor negotiated the restructured joint venture agreement, Meritor did not intend to provide unlimited technical assistance to the joint venture. (MER Ex. 19, Dowers Decl. ¶ 33.) Meritor did agree to provide design engineering support to the joint venture where necessary to make the products and components that were in Board-approved Business Plans and capital expenditures. (*Id*. ¶ 34.) Product design engineering assistance means giving SISAMEX the design drawings and Bills of Material (parts lists) that SISAMEX needs to make certain parts to Meritor's specifications. (*Id*.) But Meritor was not obligated to provide such product design engineering support to the joint venture in order for it to manufacture products or components that the Board has not approved. (*Id*.)

12a.    The parties began negotiating the restructuring of Dirona into SISAMEX once Meritor was given the green light to proceed by its executive strategic committee in August 2001. (Ex. 21 at -32.)

**RESPONSE:** Meritor disputes that the negotiations to restructure the joint venture began in August 2001. SISAMEX Exhibit 21 states that "**definitive** negotiations" began on August 20, 2001. (SMX Ex. 21, MER0104032-33 at -32 (emphasis added).) The parties' negotiations were ongoing as of that date. Meritor incorporates its evidence in response to Paragraphs 8 and 9.

12b.    The parties specifically discussed and affirmed that SISAMEX would obtain exclusive manufacturing rights. On March 8, 2002, Meritor's outside counsel circulated talking points from a meeting the parties had the prior day that he had annotated to reflect his understanding of the parties' agreements. (Ex. 22.) Meritor's counsel acknowledged therein that the parties had "[a]greed to retain" a provision from an earlier draft of the Shareholders Agreement stating that the restructured joint venture would be the "exclusive manufacturer[] and assembler[] of, and shipping point for, [Meritor Products] … sold by ARM to OEM customers in Mexico," subject to certain exceptions. (*Id.* at -94, § 3(c).)

**RESPONSE:** Meritor does not dispute that Meritor circulated annotated discussion points that stated, "Company and Sudisa as exclusive manufacturers and assemblers of, and shipping point for, MP, DP, SP and CP sold by ARM to OEM customers in Mexico added." Meritor disputes

27

that the parties intended or agreed that the restructured joint venture would act as the exclusive

manufacturer of all components of Meritor Products. The parties intended and agreed that

SISAMEX would manufacture certain components, as agreed in a SISAMEX Board-approved

Business Plan, and that SISAMEX would be the shipping point/delivery point of all Meritor

Products sold to OEMs in Mexico. Meritor incorporates its evidence in response to Paragraphs 8,

9, and 11 above.

At Burgin's deposition, SISAMEX/Quimmco's counsel told Burgin that "Arnold testified

that Section 2.2(b) provided SISAMEX the right to be the exclusive manufacturer of Meritor

product sold by Meritor OEMs in Mexico." (SMX Ex. 6, 1/12/16 Burgin Dep. at 45:9-12.)

Counsel asked whether Burgin agreed. (*Id*. at 45:12-13.) Burgin disagreed, explaining that the

SISAMEX Director General did not have "the complete authority to make all of the components

that went into [Meritor] Products" and instead that when the deal closed on January 14, 2003, the

"clear strategy was for Sisamex to be the shipping point, assembler and shipping point, for all

products sold to OEs in Mexico." (*Id*. at 46:5-14.) Burgin testified that the SISAMEX Board of

Directors, not its Director General, had the authority to determine which parts of Meritor

Products SISAMEX could make pursuant to a Board-approved Business Plan and capital plan:

> Q. Was it not, by your own contemporaneous words, Mr. Burgin, the discretion of
> Sisamex whether or not to manufacture and to be the exclusive manufacture of
> Meritor products if Sisamex determined it had the capacity to do so?
> A. Again, my definition of Sisamex is board of directors. So the board of directors
> had that authority to suggest that, my view.

(*Id*. at 49:2-9.)

> Q. Okay. You understood that Supply Agreement A provided Sisamex the right to
> be an exclusive manufacturer and assembler and importer and shipping point,
> correct?
>     MR. BENSINGER: Objection. Vague.
> THE WITNESS: My understanding was that Sisamex had an approved capital
> plan, an approved installed capacity that existed to be fully utilized for Sisamex to

manufacture components that were in that business plan and to be the assembler
and shipping point for products in Mexico.

(*Id*. at 52:18-53:4.)

> Q. Is it your testimony that there was never the intent at the outset for Sisamex to
> manufacture the 14 series axle and its components?
>      MR. BENSINGER: Objection. Vague.
> THE WITNESS: To assemble and be the shipping point, yes.
>      BY MR. HAAS:
> Q. But to manufacture is the question. So I'm asking very pointed questions, and I
> know --
> A. I know that you are.
> Q. -- that you want to make distinctions. So let me ask it again. Let me ask it
> again and see if I can get an answer. **Is it your position that it was not the
> intent for Sisamex to manufacture the 14 series axle components at the
> outset?**
> **A. It was never the intention and let me explain why. We would have all been
> fired immediately day one because it's completely contrary to the
> global capacity of the axle business, completely contrary that -- that we
> would -- we had a clear capital plan. We had a clear investment plan. We
> had a clear manufacturing strategy.** It's in that transition plan. I can't see
> it. The only documents I have or I've had in my possession are the -- Jesus gave
> me Supply Agreement A, B and C and further amendments to those in Los Cabos.
> That's all I have. Okay? I don't have any in my files. So I know that transition
> plan was there. So, first of all, it would have been completely out of character for
> Meritor to agree for Sisamex to manufacture core components of the 145 axle. To
> assemble and ship, yes.
>      And I can even give you a good example that happened later in another job,
> since you have my resume out. In 2006 I took over a key function reporting to
> Carsten Reinhardt called DMO or Performance Plus, and in that I was to search
> the world and do analysis to find the best cost model, the best alternatives to
> manufacture products. As part of that -- and I can still remember the number
> because it was a big one; it was No. 2421 -- where we negotiated with Sisamex in
> good faith. It would have been Armando and I, maybe some purchasing guys on
> my side, Dan Kusiak or Nate Larch and Armando and Manuel. **We negotiated in
> good faith to put the carrier mounting machining in Sisamex. Okay?**
>      **So every time there was a decision needed to be made on a 145 core
> component, it wasn't -- you want to infer that it was an obligation of ours
> to allow that, and it wasn't. It was a negotiation.**

(*Id*. at 99:14-101:21 (emphases added).)

Meritor incorporates its evidence in response to Paragraphs 8, 9, and 11 above and

Paragraph 13 below, which addresses whether SISAMEX's Director General has the unilateral

29

right to decide which components of Meritor Products SISAMEX could make over the objection

of Meritor's Directors on the SISAMEX Board or over Meritor's objection as a Shareholder.

> 12c.   The annotations circulated by Meritor's counsel also affirmed the parties'
> agreement that Meritor would close its manufacturing facility in Mexico and not
> establish another one in Mexico to compete with SISAMEX. (*Id.* at -97, § 17(b)
> ("MHVS to close Queretaro facility by closing date. MHVS non-competition
> covenant expanded to provide can not compete with Company in the Mexican
> market or re-establish facility.").)

**RESPONSE:** Meritor disputes that the annotated discussion points "affirmed the parties'

agreement" that Meritor would not establish another manufacturing facility in Mexico to

manufacture components for markets other than Mexico and to manufacture components that

Meritor would supply to SISAMEX for assembly into Meritor Products. SISAMEX Exhibit 22 is

the March 7, 2002 annotated discussion points sent from Meritor's outside counsel to the

Quimmco negotiating team. The document specifically refutes SISAMEX/Quimmco's assertion,

noting that the issue of "Non-competition covenants" was still "[o]pen generally. Issues include

(a) geographic scope of covenants, (b) the scope of the 'prohibited activities,' (c) whether

MHVS's may establish a manufacturing facility in Mexico if it does not sell in Mexico, and

(d) whether MHVS covenant will be expanded in scope and time." (SMX Ex. 22, 3/7/02

annotated discussion points, MER0009793-98 at -97.)

Furthermore, both Arnold and Dowers, two of Meritor's negotiators, support Meritor's

position that it reserved the right to open a facility to manufacture components so long as it did

not act as the delivery point for sales to OEMs in Mexico. (*See* SMX Ex. 14, Arnold Dep. at

45:9-15 ("Q. When you say that it was the belief that the joint venture would ultimately be

Meritor's manufacturing delivery point in Mexico to OEMs in Mexico, what do you mean by

that? A. Whatever we agreed to would not preclude Meritor from having a factory in Mexico.

They just wouldn't be delivering to OEMs."); MER Ex. 17, 4/19/02 Dowers email to Arnold,

MER1463800-02 at -00 ("They interpreted ou[r] closing our facility as our (CVS) never

manufacturing components in Mexico. I could not give assurance that would never be the case,

but strongly reiterated that we would honor our commitments in the Supply agreements.").)

> 12d.    In May 2002, Meritor's counsel circulated a draft of the Shareholders Agreement
> that reflected changes discussed by the parties during an earlier meeting. (Ex. 23.)
> The agreement retained the word "and" in the aforementioned provision. (*Id.*
> at -58, Whereas Clause § h(5)(iv).)

**RESPONSE:** Meritor does not dispute that Meritor circulated a non-final draft version of the

Shareholders Agreement that did not yet include the "and/or" clause, which reflected the parties'

intent and agreement that SISAMEX would manufacture certain (but not all) components as

agreed in a Board-approved Business Plan and that SISAMEX would be the shipping

point/delivery point of all Meritor Products sold to OEMs in Mexico. Meritor incorporates its

evidence in response to Paragraphs 8, 9, 11, and 12 above.

> 13.    Moreover, according to the parties' two lead negotiators (Messrs. Arnold and
> Barrera), it was clear that SISAMEX had the right to elect to manufacture the
> Core Components of Meritor Products, or, alternatively, to purchase and assemble
> the components thereof. (Ex. 14 at 91:14-92:1 ("[G]enerally speaking, SISAMEX
> could make or buy components"), 93:11-18, 132:7-14; Ex. 3 at 189:19-190:8
> ("[W]e just needed a supply agreement that allow [sic] us to buy whatever
> components we did not manufacture."); Ex. 24 at -57 ("[SISAMEX] must
> exclusively buy from ARM all core components from ARM or make them ….
> The incentive will be to make themselves .…").)

**RESPONSE:** Meritor disputes that the parties' intent and agreement was for SISAMEX's

Director General to have the unilateral right to elect to have SISAMEX manufacture any Core

Components of Meritor Products over the objection of SISAMEX's Board of Directors or its

Shareholders.

First, the SISAMEX Bylaws state that "[t]he management and handling of business and

activities, operations, and policies of the Company shall be vested in the Board of Directors."

(MER Ex. 21, SISAMEX Bylaws Article 22, MER0006347-87 at -66.) The Bylaws do not say

the Director General gets to decide what components of Meritor Products SISAMEX gets to make. Instead, the Bylaws are explicit that the Board-approved Business Plan determines what SISAMEX makes. Article 32 of the SISAMEX Bylaws is entitled "Business Plan" and states in relevant part: "All business of the Company shall be conducted according to a Business Plan of the Company developed by the Director General and **approved by the Board of Directors of the Company. The Company shall only manufacture, sell and commercialize those products and components provided for in the Business Plan.**" (*Id.* Article 32 at -82 (emphasis added).)

Second, the Shareholders Agreement provisions are consistent with the SISAMEX Bylaws. Section 2.3 of the Agreement is captioned "Business Plan and Transition Plan." (SMX Ex. 1, 10/25/02 Shareholders Agr. § 2.3, MER0005913-87 at -34.) Section 2.3(a) establishes that the Board, not the Director General, approves the Business Plan:[2]

> From and after the Closing Date, all business of the Company [Sisamex] will be conducted according to a Business Plan of the Company developed by the Director General and **approved by the Board of Directors of the Company**. The initial Business Plan will cover the Company's and SUDISA's first five years of operations after the Closing Date. The initial Business Plan of the Company shall be updated no less frequently than every year by the Director General and **presented to the Board of Directors** of the Company as provided in Section 3.7(b) **for its approval**.

(*Id.* at -34, -35 (emphasis added).)

The Shareholders Agreement is explicit that the SISAMEX Director General cannot approve the Business Plan. Section 3.5.2(e) states:

---

[2] The Shareholders Agreement defines the Business Plan as follows: "'Business Plan'" shall mean the business plan of the Company, SUDISA and each other Subsidiary referred to in Section 2.3, as the same will be amended, modified, restated or replaced from time to time (at least annually) in accordance with the terms of this Agreement. The initial Business Plan will be agreed upon by the Parties at or prior to the Closing Date and attached as Exhibit S." (*Id.* at -24.)

> It is expressly agreed, moreover, that the following matters shall require approval
> by the Board of Directors (in addition to any approval of the Shareholders
> required under this Agreement, the New Company Bylaws or applicable law) and
> may **not be approved by the Chairperson, the Director General or any other
> officer of the Company**.

(*Id*. at -43 (emphasis added).) There follows a list of actions that only the SISAMEX Board (or

Shareholders) can approve. That list begins with Board (or Shareholder) approval of the

Business Plan:

> The Business Plan and the Transition Plan and any amendment or modification of
> the Business Plan or Transition Plan. For clarification, any approval, amendment
> or modification of any part of the Business Plan which includes a matter that
> would otherwise require approval of the Shareholders or the Parties as
> contemplated in this Agreement shall require such further approval of the
> Shareholders or the Parties (as applicable).

(*Id*.) Thus, while the SISAMEX Director General has authority to develop a Business Plan to

propose to the SISAMEX Board or Shareholders as the case may be, it is the SISAMEX Board

(or the Shareholders) that has the power to approve the Business Plan, not the SISAMEX

Director General or Chairman. Meritor incorporates its evidence in response to Paragraphs 8 and

12(b) above, which addresses whether SISAMEX's Director General had the unilateral right to

decide which components of Meritor Products SISAMEX could make over the objection of

Meritor's Directors on the SISAMEX Board or over Meritor's objection as a Shareholder.

Third, Arnold testified that Section 2.1(b) of the Shareholders Agreement – which says

SISAMEX shall be the "exclusive importers, manufacturers, assemblers and/or shipping points

of, Meritor Products" (*id.* at -32) – does not have anything to do with the manufacturing content

of the product, or "who makes what." When asked about Section 2.1(b) of the Shareholders

Agreement, Arnold testified:

> Q. In paragraph one, SISAMEX has the exclusive right to manufacture Meritor
> products sold by Meritor to OEMs in Mexico, correct?
>    MR. BENSINGER: Objection; mischaracterization. This is argument. Asked
> and answered.

A. The language says what it says. It says importers, manufacturers, assemblers, and/or shipping points of Meritor products.

    BY MR. HAAS:

Q. And that would include the right to manufacture exclusively those Meritor products sold to Meritor for sale to OEM in Mexico, correct?

    MR. BENSINGER: Objection; argumentative, asked and answered, and mischaracterization.

A. I don't know. I interpret this as -- I mean, just I will say what I believe this to be. That the joint venture has the exclusive right for the delivery of the products to OEMs in Mexico.

Q. Okay.

A. That's the -- the overriding direction of the joint venture restructure. That the joint venture would be the exclusive delivery point for Meritor products to OEMs in Mexico. That's my view of how this -- of what this means.

Q. And I wanted to --

A. It does not have any -- **this language doesn't have anything to do with the manufacturing content of the product, I don't believe**.

(SMX Ex. 14, Arnold Dep. at 78:15-79:18 (emphasis added).)

When asked about Supply Agreement C, Arnold was not aware of any explicit statement that SISAMEX can make Core Components over Meritor's objection. (*Id.* at 168:9-169:1 ("Q. Supply Agreement C does not include an explicit statement that SISAMEX can manufacture itself, over Meritor's objections, specific core components; is that right? A. I'm not aware of any language like that in the contract." (objection omitted)).)

Fourth, as noted in Meritor's response to Paragraph 9 above, the September 5, 2000 Meritor-Quimmco MOU (SMX Ex. 16, SMX001607323-36 at -23) expressly contradicts the assertion that the parties intended that the SISAMEX Director General would have the unilateral right to elect which parts SISAMEX would make over Meritor's objection. Section 2(d) is captioned "Tooling and Capital Investment" and states:

> Decisions with respect to creating capacity for NewCo to manufacture Meritor designed products would be based on acceptable economic returns and 'paybacks' driven by market volumes **as agreed by the Board of Directors**. Subject to the completion of the Business Plan referenced in section 10, it is currently envisioned that NewCo's initial role will be to manufacture the -16x family of components. Additional roles will be added based on economic 'paybacks' **as agreed by the Board of Directors on a case by case basis**.

(*Id*. at -25 (emphasis added).) Thus, the MOU establishes that the NewCo joint venture will initially focus on the 160 family of axles and that "additional roles" will be "as agreed by the Board of Directors on a case by case basis," refuting SISAMEX/Quimmco's assertion that the parties' intent was to give the SISAMEX Director General the right to insource components over the objection of the Meritor Board members.

Fifth, Meritor's internal documents at the time of contract formation reflect Meritor's intent and refute the assertion that the parties intended that SISAMEX's Director General should have the unilateral right to determine what parts SISAMEX would make over the objection of the Meritor Directors on SISAMEX's Board or over the objection of Meritor as a Shareholder.

In a May 9, 2000 outline entitled "Dirona Concept Proposal," Arnold comments on "Company Organization" saying that the parties would have "[s]hared key management responsibility" and "BOD control of all key management decisions including AOP [Annual Operating Plan] and Capital Plan." (MER Ex. 14, MER0103865-67 at -65.) Arnold describes the "Company Mission" as "[c]ontract manufacturer of components and assemblies" and "[p]rimary shipping point for Meritor made axle and brake products to global OE plants located in Mexico." (*Id*. at -65, -66.)

Indeed, Jesus Barrera's own handwritten notes of his meeting with Arnold on June 9, 2000, confirm that Arnold communicated Meritor's intent. (SMX Ex. 15, QMC000190082-86 at -82.) Barrera notes that "M wants 50/50 ownership" and "would like to help run the company and not be passive investors." (*Id.*) Barrera notes that "M wants equal say on annual operating plan and capital expenditures plan." (*Id.*)

In a June 19, 2000 internal memo, Arnold reports on his further discussions with Barrera that occurred on June 15, 2000. (MER Ex. 3, MER1485684-91 at -87.) As to the "Company

Organization," Arnold notes he and Barrera discussed "[b]alanced BOD membership" and "BOD control of all key management decisions including management appointments, AOP, capital plan, long term supply agreements ….. Note: BAA emphasized active involvement with control over AOP / Cap Ex." (*Id*.) As to "Company Mission," Arnold noted that he discussed with Barrera that the restructured joint venture would be "[c]ontract manufacture[r] of components and assemblies at world class cost" and the "[p]rimary shipping point for Meritor axle and brake product shipments to global OE plants located in Mexico." (*Id*. at -88.)

In an August 11, 2000 Meritor memo to management, Arnold recounts what he told Barrera about how the restructured joint venture is to be managed.[3] In the section captioned "[h]ow is the company managed," Arnold writes "I have characterized this matter [company management] as a '**deal breaker**'" and recounts "I have told Jesus very clearly that **we must be actively involved in day to day management** and BOD matters." (SMX Ex. 35, 8/11/00 Arnold summary of Dirona status, MER0104274-76 at -76 (emphases added).)

On August 21, 2001, Arnold sent an email to Tom Gosnell, President of Commercial Vehicle Systems, and other members of the Meritor Corporate Strategy Review Board concerning the negotiations for the restructuring of the Dirona joint venture. (MER Ex. 8, Gosnell Decl. ¶ 6; MER Ex. 16 at MER1455705.) The Strategy Review Board was comprised of senior executives of Meritor, who reviewed and whose approval was required for key company strategic initiatives. (MER Ex. 8, Gosnell Decl. ¶ 6.) These executives were the CEO, CFO, General Counsel, President of Light Vehicles, Senior Vice President of Business Development, and Gosnell as President of Commercial Vehicle Systems. (*Id*.) Gosnell was the primary conduit

---

[3] The metadata of the memo shows it was created on August 11, 2000. (MER Ex. 22, Declaration of Jeanne L. Booth ¶ 9.)

of all discussions, approvals, and considerations regarding the Dirona restructuring negotiation between the Meritor negotiating team, on the one hand, and the Strategy Review Board and Meritor's Board of Directors, on the other hand. (*Id*.)

> In his August 21, 2001 email, Arnold reports:
>
> Based on our meeting last meeting I believe we have reached consensus to proceed with definitive negotiations to restructure our current JV Dirona.
>
> I am accepting this direction as delegation to proceed with negotiations utilizing our internal and external resources (as appropriate) to develop the necessary documents to execute the necessary transactions to restructure Dirona as discussed.

(*Id*. ¶ 7 (quoting MER Ex. 16, 8/21/01 Arnold email to Strategy Review Board at MER1455705).) Arnold recounts the "imperatives in the negotiations" including two key points on governance: First, "[t]hat ARM insures that corporate governance documents including the shareholder agreements and by-laws provide for direct ARM participation in the management of the on-going business." (*Id*.) Second, "[t]hat these documents allow veto rights for certain critical matters such as annual operating p[l]ans [sic], capital expenditures and the like." (*Id*.) Arnold's statements are consistent with the direction that he had received from Gosnell and Meritor senior management that it was critical Meritor have control over key strategic decisions in the restructured joint venture. (*Id*.)

Arnold's "Business Review Dirona to NewCo" presentation, revised April 20, 2001, notes that "ARM [Meritor] Will Actively Participate in NewCo Management and BOD." (SMX Ex. 4, MER0103774-98 at -79.) Under "Planned NewCo Business/Organization Structure," the presentation notes "BOD Will Control Key Activity (e.g. AOP, CapEx)." (*Id*. at -80.) Under "Strategic Impact for CVS [Commercial Vehicle Systems]," the presentation notes "JV Structure Allowing 'Control' of Strategic Decisions." (*Id*. at -89.) Finally, under "Recommendation – Key Imperatives," the presentation notes "JV Articles/By-Laws That Have Supermajority

Requirement For All Key NewCo Actions." (*Id*. at -95.) A later August 20, 2001 update of the presentation again echoes the identical points with the same language (MER Ex. 5 at MER0104131-53), as does a further update in April 2002 (MER Ex. 6 at MER0739273-82).

On August 23, 2001, Arnold emailed two documents to Gosnell and other Meritor employees. (MER Ex. 8, Gosnell Decl. ¶ 8; MER Ex. 23, 8/23/01 Arnold cover email at MER1460894.) First, Arnold emailed his markup of the original September 5, 2000 Meritor-Quimmco MOU annotated with his comments. (MER Ex. 24 at MER1460895-910.) Second, he attached a "Project Tau – Meeting Summary" of a negotiation session he had with Jesus Barrera of Quimmco on August 22, 2001. (MER Ex. 25 at MER1460911-12.)

In his August 22, 2001 memo to the Meritor deal team ("Project Tau"), Arnold reports on a one-on-one meeting with Barrera to review the status of negotiations for restructuring the joint venture. (*Id.* at -11.) Arnold notes that he discussed with Barrera the composition of the restructured Board of Directors having four Meritor Directors and four Quimmco Directors ("Discussed 4/4 BOD. No issue."). (*Id*. at -12.) Arnold also notes that he discussed with Barrera: "ARM [Meritor] priority was for participation in managing the company and that new clear shareholder agreements was a 'deal breaker' item. Jesus [Barrera] acknowledged and understood our position and commented that this should not be an issue." (*Id*.)

Arnold prepared for Gosnell a presentation that Gosnell made to the Meritor Strategy Review Board on May 22, 2002. (MER Ex. 7 at MER1339807-39; MER Ex. 8, Gosnell Decl. ¶ 12.) The presentation, entitled "Strategy Review – Dirona to NewCo," has a slide captioned "Current Negotiated Framework Structure" which notes that "NewCo Moves to Tier 2," that "Ownership Will Move to 50/50," and that there will be "new Shareholder Agreements and BOD [Board of Directors] Structure" with a "Supermajority Required For Key Operating Matters

(Supply, Related Party Transactions, CapEx and Officers)." (MER Ex. 7, MER1339807-39 at -16.) "NewCo Moves to Tier 2" means that the restructured joint venture would not sell Meritor Products directly to the truck manufacturers, but would instead become a contract manufacturer component supply source in Meritor's layered capacity model. (MER Ex. 8, Gosnell Decl. ¶ 13.) Thus, the Meritor senior executives understood Meritor intended to have control of the restructured joint venture through the supermajority requirement for Board action on key strategic decisions like who makes what. (*Id*.)

On August 20, 2002, Arnold copied Gosnell on an email to De La Riva, Meritor's Senior Vice President of Business Development, confirming his discussion earlier in the day. (MER Ex. 8, Gosnell Decl. ¶ 14; MER Ex. 26 at MER1456811.) Arnold notes, "[w]e are proceeding with our definitive negotiations on all fronts." (*Id*.) He says, "[i]t is understood we are getting close on 'the deal' and a final executive re-look is required before 'closure' to insure the following:

   ● Strategic interests are covered;

   ● Proper governance is insured;

   ● Economic profit is positive and growing within the BSR [Meritor Business Strategy Review]." (*Id*.)

The Meritor Business Strategy Review was Meritor's five-year business plan with which Meritor made its key strategic decisions. (MER Ex. 8, Gosnell Decl. ¶ 14.)

On September 25, 2002, Arnold sent Gosnell an update for the Meritor Corporate Strategy Review Board on the Meritor-Quimmco negotiations to restructure Dirona. (*Id*. ¶ 15.) The update consisted of an annotated version of the prior May 22, 2002 Strategy Review with comments about any new developments. (*Id*.; MER Ex. 9, 9/25/02 Arnold cover email to Gosnell

at MER1466145; MER Ex. 10, BAA comments of 9/25/02 updating 5/22/02 Strategy Review
Dirona to NewCo at MER1466146-60.) On the update to the May 22, 2002 slide that said
"NewCo Moves to Tier 2," that "Ownership Will Move to 50/50," and that there will be "new
Shareholder Agreements and BOD [Board of Directors] Structure" with a "Supermajority
Required For Key Operating Matters (Supply, Related Party Transactions, CapEx and Officers),"
Arnold wrote "No Change In Framework Structure." (*Id.* at -47.) Gosnell understood this to
mean that as of September 25, 2002, Quimmco continued to agree to these key parameters which
were critical to Meritor. (MER Ex. 8, Gosnell Decl. ¶ 15.)

      Consistent with his deposition testimony cited above, Arnold also wrote that "Newco
Will Be ARM Exclusive Shipping Point for OEM Deliveries in Mexico for Truck and Trailer
Axles/brakes." (MER Ex. 10, BAA comments of 9/25/02 updating 5/22/02 Strategy Review
Dirona to NewCo at MER1466146-60 at -48.) Consistent with Article 32 of the SISAMEX
Bylaws, Arnold wrote that he has completed negotiations such that the "JV Articles / By-Laws"
had "Supermajority Requirement For All Key NewCo Actions." (*Id*. at -54.)

      On October 1, 2002, Arnold again prepared an updated "Strategy Review Dirona to
NewCo" slide deck that Gosnell presented to the Meritor Corporate Strategy Review Board at a
point when "Definitive Agreements Have Been Drafted." (MER Ex. 8, Gosnell Decl. ¶ 16;
MER Ex. 27, MER0735574-601 at -575.) The slide entitled "Progress on Previous Open Issues,"
states as to "Shareholder / Supply Agreement Provisions" – "Supply Agreements Protect Key
Issues of Cost, Quality, and Delivery" and "Shareholder Agreement Structure Insures ARM
[Meritor] Participation And 'Control.'" (*Id*. at -576.) The slide entitled "Concern: Does The
Current Deal Structure Protect ARM [Meritor] Governance and Control?" states: "Current
Agreements Structured to Protect ARM [Meritor]" and "BOD [Board of Directors] Structure and

SHA [Shareholders Agreement] Provide for Business Plan Input / Approval." (*Id*. at -582.) This slide also states: "NewCo Non-Performance (Capacity, Quality, Delivery) Allows Direct ARM [Meritor] Operational Control." (*Id*.) This was a key point of corporate governance to ensure Meritor's ability to control the restructured joint venture's ability to meet Meritor's quality and delivery requirements and insure against customer delivery disruptions. (MER Ex. 8, Gosnell Decl. ¶ 17.)

From the slide entitled "Concern: Does The Current Deal Structure Protect ARM [Meritor] Governance and Control?," Gosnell understood this as further confirmation that Quimmco continued to agree to these key control parameters, which were critical to Meritor. (*Id*. ¶ 18.) Based on this update, the Meritor Corporate Strategy Review Board reaffirmed their delegation to the Project Tau negotiating team to proceed to closure on the Dirona restructuring in line with the previously discussed and agreed-upon framework. (*Id*.)

On October 3, 2002, Arnold emailed Gosnell and other CVS executives, confirming that "[t]he Tau project was reviewed at the Corporate Strategy Review Board today and the Board reaffirmed their delegation to proceed to closure in line with previous discussed and agreed framework." (*Id*. ¶ 19; MER Ex. 28 at MER1454742.) Arnold confirmed that the negotiating team would "move forward," and that among Meritor priorities is "[c]lear management participation and elimination of 'independent' Quimmco direction / action." (*Id.*)

On October 9, 2002, Arnold marked up a memo by Walleck, in which Arnold commented on Walleck's analysis of the proposed terms of the Dirona restructuring. (SMX Ex. 24 at MER0103455-58.) Walleck wrote:

> High prices imposed on 'Core Components' coming from ARM plants gives Componentes Automotorices [Sisamex] an incentive to re-source from themselves, or from other suppliers. If I understand the analysis that Carl's staff put together, virtually every dime of PBT ARM makes out of the deal would be

41

> lost were the JV free to outsource Supply Agreement C core components. While you may start with an agreed list of 'core components,' the high margins involved virtually assures ongoing pressure from your partners to re-source.

(*Id*. at -57 (emphasis omitted).) Arnold responded: "As negotiated, Newco must exclusively buy from ARM all core components from ARM or make them. Not sure where 'high prices' notion is coming from. Mark-up will be equal them to us and us to them. Not finalized yet but will be ███████ The incentive will be to make themselves and all capital is approved annually by BOD." (*Id*.) Arnold's comment that "all capital is approved annually by BOD" refers to the requirement that the NewCo Board would have to approve the Annual Operating Plan and the capital plan contained therein. Whatever the incentives of the joint venture, the Board was in control. On the next page, Arnold comments on the notion of "Newco making all its components" and writes, "Very unlikely and would require BOD approved investment." (*Id*. at -58.) Thus, Arnold's comments refute SISAMEX/Quimmco's assertion that the parties intended to give the Director General of the restructured joint venture unilateral authority to dictate what parts SISAMEX will make. Instead, Arnold's comments are consistent with his repeated reporting to Meritor management that Meritor could have control over who makes what components via the requirement that the Board must approve all Annual Operating Plans and capital plans, which would specify such insourcing and the investment in tooling necessary for SISAMEX to make new components like those of the 14X axle.

After the October 25, 2002 signing of the Shareholders Agreement between Meritor and Quimmco governing the restructuring of the Dirona joint venture (SMX Ex. 1 at MER0005913-87), Arnold and Gosnell prepared a briefing deck for Meritor's Board of Directors on the status of the restructuring of the Dirona joint venture presented at the November 22, 2002 meeting of the Meritor Board of Directors. (MER. Ex. 8, Gosnell Decl. ¶ 20; SMX Ex. 12 at MER0103971-86.) The November 22, 2002 Board presentation deck has a slide captioned,

"Dirona Restructuring – Deal Structure" and notes "Management of the New Company Will Be Equally Shared Between Quimmco and ARM [Meritor]" and that "The New Company Will Become a Tier Two Supplier To ARM [Meritor]." (*Id.* at -75.) The presentation includes a backup slide captioned "Concern: Does The Current Structure Protect ARM Governance and Control?" (*Id.* at -82.) The slide notes, "Current Shareholder Agreements (SHA) Structured To Protect ARM" and "BOD Structure and SHA Provisions Provide For Business Plan (AOP) Input / Approval." (*Id.*)

From Arnold's memos, presentations, and reports, Gosnell, as President of the Meritor business group responsible for negotiating the restructuring of the Dirona joint venture, understood the following: That the SISAMEX Board of Directors had to approve the Annual Operating Plan and capital expenditures set forth therein, and that because there was a supermajority requirement for Board action, the Meritor Board members had to approve SISAMEX making any parts or components of Meritor Products. (MER Ex. 8, Gosnell Decl. ¶ 21.)

Neither Arnold nor anyone else ever told Gosnell that under the newly-negotiated agreements, the SISAMEX Director General, whom Quimmco appoints, would supposedly have the unilateral right to elect to make at SISAMEX any component of any Meritor Product or that he could do so over the objection of the Meritor Directors on the SISAMEX Board. (*Id.* ¶ 22.) Gosnell never would have approved such an option or have presented such an option to Meritor senior management or the Board of Directors for their consideration, as such lack of control of the management of the restructured joint venture would have been a deal breaker. (*Id.*) That option would have endangered Meritor's customer performance and would have been totally

43

inconsistent with Meritor's long-term operational strategy for Meritor's Commercial Vehicle business. (*Id*.)

Meritor's ability to exercise mutual control over the key strategic business decisions of the restructured joint venture, including what parts SISAMEX makes, was critical to Meritor senior management. (*Id*. ¶ 23.) Because Gosnell understood from the negotiating team that the final agreements gave Meritor such control, he recommended that the deal go through. (*Id*.)

Thus, Tom Gosnell, President of Commercial Vehicle Systems, having been briefed numerous times by Arnold, never heard of what SISAMEX/Quimmco assert as an undisputed fact known by all deal participants: Supposedly that the parties intended and agreed that the SISAMEX Director General had unilateral discretion to elect to make in SISAMEX any component of any Meritor Product over Meritor's objection. (*Id*. *passim*.)

Indeed, between 2001 and October 2002, Meritor negotiating team member Dowers participated in a number of negotiations with Quimmco in which Meritor's negotiating team told Quimmco that the agreements must allow Meritor to participate in important strategic decisions like the Business Plan or capital expenditures and veto those decisions if it did not agree with what the joint venture was proposing to do. (MER Ex. 19, Dowers Decl. ¶ 9.) Drafts from that time period included many control provisions that ended up in the final Shareholders Agreement, including Section 3.5.2(c) ("the Board of Directors shall exercise general and final power and authority with respect to the management of the business and activities, operations and policies of the Company."), and Section 3.5.2(e), which listed the Company's Business Plan and capital expenditures as matters that required Board of Director approval and could not be decided by the joint venture's Director General or Chairman. (*Id*. citing MER Ex. 29, 11/15/01 Draft Shareholders Agreement, MER0010231-309 at -253, -254.)

Finally, Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, and 12 above.

14.   On June 19, 2002, Meritor's counsel circulated an updated draft of the Shareholders Agreement that replaced "and" with "or" in the aforementioned provision. (Ex. 25 at -53; Ex. 26 at -65, Whereas Clause § (h)(5)(iii).) This change made the draft agreement internally inconsistent, because the agreement stated elsewhere that the joint venture's business would be "to manufacture for, and sell exclusively to, [Meritor]." (*Id.* at -64 to -65, Whereas Clause §§ (h)(5)(i)-(ii).) A few months later, Meritor replaced "or" with "and/or." (Ex. 27; Ex. 28 at -31, -32, § 2.2; Ex. 29; Ex. 30 at -87, Whereas Clause § (h)(5)(iii).) Meritor's negotiations team stated internally that the new joint venture would do "manufacturing only," and would "Transition[] to Become a Manufacturer of Components" for use in Mexico and for export. (Ex. 31 at -25, -26.)

**RESPONSE:** Meritor disputes that the change from "and" to "or" in the draft Shareholders Agreement Whereas Clause (h)(5)(iii) made the draft agreement internally inconsistent. On the contrary, the change to "and/or" made the Agreement consistent with the parties' intent that the joint venture would manufacture some components of Meritor Products itself and act as the delivery point/shipping point for all Meritor Products sold to OEMs in Mexico. (MER Ex. 19, Dowers Decl. ¶ 16 ("Because the parties intended that the joint venture would make some products and components but not all products and components, the parties drafted a sentence that would reflect the many roles the joint venture could play in supplying Meritor with Meritor Products: 'exclusive importers, manufacturers, assemblers, and/or shipping points.' Depending on the part in question, the joint venture could be acting in all of those roles or only as the shipping point.").) The requirement that SISAMEX "manufacture for, and sell exclusively to Meritor" is internally consistent with the parties' intent that SISAMEX manufacture some components itself as set forth in a Board-approved Business Plan and act as the delivery point/shipping point for all Meritor Products sold to OEMs in Mexico. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, and 13 above. The parties also intended and

45

agreed that the restructured joint venture transition to a Tier 2 role within Meritor's larger supply network. Meritor incorporates its evidence in response to Paragraph 8 above.

Meritor disputes that "Meritor's negotiations team stated internally that the new joint venture would do "manufacturing only," and would "Transition[] to Become a Manufacturer of Components" for use in Mexico and for export. Burgin prepared the cited document a couple months after joining the deal team. (SMX Ex. 6, 1/12/16 Burgin Dep. at 168:15-18 (discussing SMX Ex. 31).) The document was not for the Meritor negotiating team; it was "prepared to educate the various functional areas within the company [Meritor] on the transaction." (*Id*. at 169:6-8.) Burgin testified this document was "designed to tell people that Meritor becomes the sales engineering entity. NewCo becomes the shipping point assembly, manufacturing site, et cetera, in Mexico." (*Id*. at 171:9-12.) Burgin explained that in the graphic on slide 2 (MER0729525) "manufacturing only means they [NewCo] don't get involved in sales or engineering. That's why it's in quotes." (*Id.* at 171:22-24.) In addition, the slide SISAMEX cites in its Exhibit 31 states that NewCo would be the "exclusive Shipping Point for ARM To Mexican OEMs" not that it would be the "exclusive manufacturer." (SMX Ex. 31, 7/24/02 Project Tau Leadership Team Meeting at MER0729523-35 at -25.)

15a. During negotiations, Meritor appreciated the risk that OEMs located in the U.S. and Canada might relocate to Mexico. (Ex. 32 at -16, § 2.3 ("The parties need to discuss the consequences of a significant migration of OEMs to Mexico."); Ex. 33 at -19, § 3.1 (same); Ex. 34 at -85 (noting the "long term risk[]" of "OEM[s] shifting substantial production to Mexico"); Ex. 6 at 185:23-188:24 (citing a recognized "risk of product moving to Mexico").)

**RESPONSE:** Undisputed.

15b. Meritor recognized that if OEMs migrated to Mexico, manufacturing business would transfer from Meritor to SISAMEX because SISAMEX would be the exclusive manufacturer of products sold to OEMs in Mexico. This risk was presented in reports to Meritor's senior management. (Ex. 34 at -85; Ex. 35 at -75 (explaining the need for an "avenue to protect against a rapid growth in Mexican produced vehicles for export").)

**RESPONSE:** Meritor disputes that the parties agreed that SISAMEX would be the exclusive manufacturer of all products and components thereof sold to OEMs in Mexico. The parties agreed that SISAMEX would manufacture some components itself as set forth in a Board-approved Business Plan and act as the delivery point/shipping point for all Meritor Products sold to OEMs in Mexico. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, and 14 above.

SISAMEX Exhibit 35[4] similarly shows that Meritor's "Key Tenants of the 'Deal'" included "Dirona becomes 'NewCo' with a new Tier 2 mission (note Tier 2 is inflammatory to Rudolpho/Jesus)" and "ARM actively participates in the management of the business at BOD level." (SMX Ex. 35, 8/11/00 Arnold Brief Summary of Dirona Status, MER0104274-76 at -74.)

Meritor does not dispute that it recognized the risk of OEM migration to Mexico.

16a. To protect itself from the risk of OEM migration, Meritor negotiated for and obtained higher sales commissions for products incorporated into trucks made by OEMs in Mexico but exported outside of Mexico ██████████████████████ ██████████████████████████████████████ ██████████ Ex. 36 at -80, -81, § 3.1, Sch. 4, Tbls. 4.1, 4.2; Ex. 37 at -04 ("ARM Protection for OEM Shift; Price Formula Agreed For Over-Threshold Production Shift as Protection").)

**RESPONSE:** Meritor agrees that it obtained higher sales commissions for products incorporated into trucks made by OEMs in Mexico but exported outside of Mexico. Meritor disputes that this commission structure was the only way it protected itself from the risk of migration of OEMs to Mexico—it also protected itself from future migration of OEMs to Mexico by: (1) establishing

---

[4] SISAMEX incorrectly describes its Exhibit 35 as a memo prepared in August of 2002. (*See* Declaration of Erik Haas (describing SISAMEX Exhibit 35 as "(Memo from B. Arnold (Meritor) to Meritor personnel (regarding negotiations about the formation of NewCo), 8/11/2002").) The metadata for this document shows that the "doc date" is two years earlier, on August 11, 2000. (*See* MER Ex. 22, Booth Decl. ¶ 9.) Furthermore, the memo states that Meritor and Quimmco had not yet signed an MOU (SMX. Ex. 35, MER0104274-76 at -74 ("Jesus has been insistent on signing a binding MOU.")), which is consistent with an August 2000 document date, not 2002.

that SISAMEX would act as the delivery point/shipping point for all products sold to OEMs in Mexico but only manufacture some components of those products as agreed between the parties; and (2) establishing control over the joint venture through the restructured Board of Directors so that it could direct which components SISAMEX manufactured itself and which components it merely assembled to ship/deliver the final product.

These protections were codified in the Shareholders Agreement and Bylaws, which provide that the Board of Directors of the restructured joint venture would annually approve a Business Plan and capital expenditure plan for the restructured joint venture. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13 and 14 above.

> 16b. The higher commission for products incorporated into trucks sold outside of Mexico was designed to compensate Meritor for the loss of manufacturing rights to SISAMEX as OEMs relocated to Mexico. (Ex. 3 at 124:5-19 ("[Meritor] took [the potential loss of production at its existing plants] into consideration and they asked for a higher commission on those sales.").)

**RESPONSE:** Meritor agrees that it obtained higher sales commissions for products incorporated into trucks made by OEMs in Mexico but exported outside of Mexico. Meritor disputes that this indicates that Meritor granted SISAMEX exclusive manufacturing rights to all products and components of products. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, and 14 above.

> 16c. Meritor also determined that increases in Mexican OEM demand would likely require SISAMEX to purchase components from Meritor, which would also help mitigate Meritor's losses from OEM migration, so long as SISAMEX did not elect to manufacture itself. (Ex. 12 at -85 ("Long term large Shifts Would Also Be Mitigated By ARM Sales to New Co But To A Lesser Extent If NewCo Capacitizes"); Ex. 6 at 212:5–21 (testifying that capacitizing refers to the process of adding manufacturing capacity); Ex. 38 at 232:20–233:19 (same).)

**RESPONSE:** Meritor agrees that it determined that SISAMEX purchases of components from Meritor would help mitigate losses from OEM migration. Meritor disputes that SISAMEX's Director General has the right to elect to manufacture any components of Meritor Products

48

without the approval of SISAMEX's Board of Directors or Shareholders. Contemporaneous documents, the executed agreements themselves, as well as the testimony of Meritor witnesses all contradict this assertion. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, and 14 above.

Furthermore, SISAMEX Exhibit 38, which SISAMEX/Quimmco's cites to support their assertion, only contains 210 pages while the citation is to nonexistent pages 232-233. Thus, SISAMEX Exhibit 38 cannot support the facts asserted in Paragraph 16(c). Meritor also disputes that the cited testimony from Burgin supports their assertion. At Burgin's deposition, when asked about SISAMEX Exhibit 12 (Burgin Exhibit 8), Burgin explained as follows:

> Q. When it says 'Long-term shifts would be mitigated by Meritor sales to Sisamex,' what is your understanding of what that refers to?
> A. That Meritor would sell complete full axles, complete full carrier assemblies and complete full houses to Sisamex for product that Sisamex did not integrate into the capacity.
> Q. Then it goes on to say 'but that mitigation would be to a lesser extent if NewCo or Sisamex capacitizes.'
> A. Capacitizes, yeah.
> Q. What is your understanding of what that means?
> A. We always understood that there was language in the agreement that Sisamex could request -- the director general, I should say, could request the desire to increase capacity and invest in capital pending board approval.
> So Meritor's view of this always was that it had the benefit, if you will, or the value of a super majority opportunity to agree, obviously, if the -- the responsibilities of the joint venture were first and foremost, but that it had that ability to agree or disagree with CapEx investment.

(SMX Ex. 6, 1/12/16 Burgin Dep. at 209:10-210:9.) Thus, the documents and testimony SISAMEX/Quimmco cite do not support the assertion that SISAMEX's Director General has the right to elect to manufacture any components of Meritor Products without the approval of SISAMEX's Board of Directors or Shareholders.

17a.    Even with its higher commissions for export products, Meritor recognized that it was at risk of additional losses of $2 to $4 million if OEM relocation exceeded its estimates. (Ex. 12 at -80, -85 (noting that a "50,000 unit shift under adverse

assumptions would yield a "$2-4M annual risk"; that the "manufacturing transition may create short/medium term 'under-absorption' issues at ARM sites"; that there is a long-term risk that "other OEM (beyond ITE) shift substantial production to Mexico"; and that the restructuring would be "perpetual" and would afford Meritor no "exit strategy").)

**RESPONSE:** Meritor agrees that it recognized that it was at risk of additional losses if OEM relocation exceeded its estimates. Meritor disputes that the higher commissions were the only mechanism it implemented to mitigate this risk. Meritor incorporates its evidence in response to Paragraphs 9, 11, 12, 13, 14, and 16 above. SISAMEX Exhibit 12 – the November 22, 2002 Meritor presentation to its own Board – highlights the mechanisms that Meritor put in place to protect itself from OEM migration. (SMX Ex. 12, MER0103971-86 at -82 ("Current Shareholder Agreements (SHA) Structured to Protect ARM … BOD Structure and SHA provisions provide for Business Plan (AOP) Input/Approval").)

> 17b. Nonetheless, Meritor believed that restructuring Dirona was a better option given the alternative of going it alone in Mexico or buying Quimmco's shares. (*Id.* at -83 to -86.)

**RESPONSE:** Meritor agrees that it believed that restructuring Dirona was a better option given the alternative of "going it alone in Mexico" or buying Quimmco's shares. Meritor disputes the suggestion that Meritor agreed to give Quimmco or SISAMEX an exclusive right to manufacture or that Meritor lacked the mechanisms to control the restructured joint venture. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14 and 16 above.

> 17c. Meritor also concluded that it could not buy out Quimmco's shares in Dirona because "all previous discussions in this area have yielded a 'crazy price'" and that "this option has *not* been viewed as practical for [Meritor]." (*Id.* at -86; *accord* Ex. 39 at -50 ("Should We Just Buy The Barrera's Out? … Expectation Is That The Barrera's Would Take A Position of 'NFW' Posture Under Any Circumstances"; "All Businessmen Have A Price…"); Ex. 12 at -86; Ex. 127 at -64 (noting that purchase of Quimmco's shares in SISAMEX "in the medium term is infeasible".)

**RESPONSE:** Undisputed.

18a.   On October 25, 2002, Quimmco and Meritor executed the Shareholders
       Agreement, which restructured Dirona into SISAMEX. (Ex. 1.) Meritor increased
       its share in the joint venture from 40% to 50% by purchasing shares from
       Quimmco, leaving Quimmco with 50% plus one share of the company. (*Id.* at
       -20, -21, Whereas Clause § g(3).) Under the Shareholders Agreement, SISAMEX
       was "[t]o manufacture for, and sell exclusively to, [Meritor] … Meritor Products,
       Dirona Products and Sudisa Products for sale to OEM Customers in Mexico." (*Id.*
       at -32, -33, § 2.1(b)(i).)

**RESPONSE:** Undisputed except as to the characterization of Shareholder Agreement

Section 2.1(b)(i), which speaks for itself.

18b.   Further, under the Shareholders Agreement, SISAMEX and its subsidiary Sudisa
       "shall be the exclusive importers, manufacturers, assemblers and/or shipping
       points of Meritor Products, Dirona Products and Sudisa Products sold by
       [Meritor] … to OEM Customers in Mexico for OE Use as provided in, subject to
       the limitations of, and during the term of, Supply Agreement A (Products for
       Company and Sudisa Sale to … [Meritor])." (*Id.*)

**RESPONSE:** Undisputed as to the quoted language, which speaks for itself.

19a.   Pursuant to Section 3.4(a) of the Shareholders Agreement, SISAMEX is "required
       to make all required capital and other expenditures … related to establishing
       capacity or acquiring tooling for the manufacture of any Meritor Products." (*Id.* at
       -37, § 3.4(a).) The agreement provides that approval by SISAMEX's Board of
       Director is not required for such expenditures. (*Id.* at -44, § 3.5.2(e)(iv) (providing
       that "approval by the Board of Directors shall not be required … as to capital or
       other expenditures as to [Meritor] Products … as contemplated in Section
       3.4(b)"); *see also* Ex. 40 at 129:7-130:5 (testifying that the parties specifically
       negotiated that the joint venture would be entitled to invest in capacity and tooling
       for Meritor Products without Board interference), *id.* at 143:6-12; Ex. 7 at 92:18-
       93:7 (testifying that SISAMEX was obligated to make expenditures for the
       manufacture of Meritor Products and that "[n]either partner could stop" such
       expenditures); Ex. 41 at -73 ("JV is authorized, without further approval, to invest
       in capital necessary for capacity or tooling for Meritor, Dirona, Sudisa
       Products.").)

**RESPONSE:** Meritor disputes SISAMEX's assertions. First, SISAMEX's quotation of

Shareholders Agreement Section 3.4(a) cuts off the key language that restricts the SISAMEX

Director General's ability to make capital expenditures without Board approval. The full text of

Section 3.4(a) is set forth below with the language that SISAMEX omits bolded:

The Company and Sudisa are required to make all required capital and other expenditures for the Company and SUDISA related to establishing capacity or acquiring tooling for the manufacture of any Meritor Products, Dirona Products, Sudisa Products or Core Components **to meet the forecasts (as updated from time to time) for such products and components delivered to the Company and/or Sudisa as contemplated in Section 4.4 of Supply Agreement A (Products for Company and Sudisa Sale to ArvinMeritor CVS-Mexico and MHVS) and Section 4.4 of Supply Agreement B (Components for Company Sale to MHVS and Affiliates) and otherwise for the Company and Sudisa to be able to satisfy their obligations under those agreements**. The Company is authorized, without further approval of the Board of Directors or Shareholders, to borrow from one or more unaffiliated financial institution lenders on market terms, all such sums as may be necessary to finance the capital and other expenditures required under this Section 3.4(a).

(SMX Ex. 1, 10/25/02 Shareholders Agr. § 3.4(a), MER0005913-87 at -37 (emphasis added).)

The language SISAMEX/Quimmco omitted from the sentence establishes that SISAMEX must make all required capital and other expenditures to acquire capacity and tooling to meet Meritor's forecasts for Meritor Products to be supplied from SISAMEX to Meritor under the Supply Agreements. On October 1, 2002, Meritor sent Quimmco revised language for Section 3.4(a) of the Shareholders Agreement. (*See* MER Ex. 30, 10/1/02 redline, MER0009678-791 at -703; MER Ex. 19, Dowers Decl. ¶ 26.)

In mid-2002, Meritor was concerned that with the joint venture acting as a Tier 2 supplier to Meritor and focusing on 160 axle manufacturing, the joint venture might need to quickly invest in additional capacity to meet Meritor's forecasts for products or components. (MER Ex. 19, Dowers Decl. ¶ 26.) Meritor's negotiation team therefore proposed a revision to Section 3.4(a) of the Shareholders Agreement in order to allow the joint venture's Director General to make capital expenditures "to meet the forecasts (as updated from time to time) for such products and components delivered to the Company and/or Sudisa as contemplated in Section 4.4 of Supply Agreement A (Products for Company and Sudisa Sale to ArvinMeritor CVS-Mexico and MHVS) and Section 4.4 of Supply Agreement B (Components for Company

52

Sale to MHVS and Affiliates) and otherwise for the Company and Sudisa to be able to satisfy their obligations under those agreements." (*Id*.; s*ee* MER Ex. 30, 10/1/02 redline, MER0009678-791 at -703.) This revision was only meant to apply to instances where there was a Board-approved Business Plan but no capacity in Meritor's network for meeting the forecast and obligations to meet customer demand for Meritor Products, not instances where capacity already existed in Meritor's supply chain but the Director General no longer wanted to purchase from Meritor or those other suppliers' existing capacity. (MER Ex. 19, Dowers Decl. ¶ 26.) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14 and 16 above.

> 19b.    Further, SISAMEX "is authorized, without further approval of the Board of Directors or Shareholders, to borrow from one or more unaffiliated financial institutional lenders on market terms, all such sums as may be necessary to finance the capital and other expenditures required under this Section 3.4(a)." (Ex. 1 at -37, §3.4(a).)

**RESPONSE:** Meritor agrees that Section 3.4(a) authorizes SISAMEX to borrow sums necessary to finance capital required under Section 3.4(a) under certain limited circumstances without **further** Board approval. Meritor, however, disputes SISAMEX's characterization of Section 3.4(a). The parties never intended Section 3.4(a) to give the SISAMEX Director General the unilateral right to elect to make at SISAMEX any component of any Meritor Product over the objection of the Meritor Directors on the SISAMEX Board. (MER Ex. 19, Dowers Decl. ¶¶ 26-28.)

At no point in the negotiations of the Shareholders Agreement did anyone from Quimmco ever suggest to Meritor that the SISAMEX Director General could decide to insource components of Meritor Products that were currently being manufactured at other Meritor facilities over the objection of the Meritor-appointed Directors. (*Id*. ¶ 27.) SISAMEX/Quimmco cite no contemporaneous parol evidence in support of their interpretation of Section 3.4(a).

Burgin testified that it was the intent of the parties that Section 3.4(a) authorize the

SISAMEX Director General to borrow funds from banks if necessary to fulfill the requirements

of the approved initial Business Plan (SMX Ex. 68, 1/14/03 Second Am. to Shareholders Agr.

Ex. S at MER1464607-47) and Transition Plan:

> Q. Section 3.4 explicitly makes clear that the company was authorized, without
> further board approval -- board of directors approval and without further approval
> from shareholders, to borrow whatever capital it required to finance the
> development of Meritor products, right?
>     MR. BENSINGER: Objection. Mischaracterization.
> THE WITNESS: Only from one perspective. **There was an approved transition
> plan and business plan that went with these documents. This was authorizing
> the director general to borrow to execute those plans, those plans, not forever
> plans.**
> Q. Where does it say that?
> A. It was the intent of the parties when we discussed it.

(SMX Ex. 6, 1/12/16 Burgin Dep. at 81:10-82:4 (emphasis added).) Burgin also testified that in

practice, the Director General came to the SISAMEX Board for approval to seek funding from

lenders.

> Q. So it's your position, contrary to the last sentence of Section 3.4(a) that you
> read, that the director general requires board approval to raise capital from
> lending facilities for the manufacture of Meritor products?
>     MR. BENSINGER: Objection. Argumentative.
> THE WITNESS: By demonstration, board approval was requested and given for
> going to financial institutions to borrow capital. So that's the way I recall the
> administration of the joint venture.

(*Id*. at 86:7-16.)

Q. Is it your position, contrary to the last section of 3.4(a), that the director general requires board approval to raise capital from lending facilities for the manufacture of Meritor products?

MR. BENSINGER: Objection. Calls for a legal conclusion. Argumentative. THE WITNESS: My recall was yes, that -- I have to finish the sentence, I think -- that it did require board approval because that's how we enacted every annual board meeting.

(*Id*. at 86:23-87:9.)

At no time did anyone ever tell Gosnell or the Meritor Corporate Strategy Review Board that the purpose or intent of Section 3.4(a) (or any other provision) was to give the SISAMEX Director General such unilateral authority, which would have been utterly unacceptable to Meritor, a "deal breaker," and totally inconsistent with all of the discussions leading up to the Meritor approval of the restructuring. (MER Ex. 8, Gosnell Decl. ¶ 24.)

Finally, SISAMEX/Quimmco's interpretation of Section 3.4(a) is inconsistent with the September 5, 2000 Meritor-Quimmco MOU and the contemporaneous parol evidence of what Arnold discussed with Barrera in June 2000 about the restructuring of the Dirona joint venture. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, and 16 above.

20a.    In the context of defining, and as a necessary corollary to, SISAMEX's "exclusive" manufacturing rights, the parties agreed in their memorandum of understanding that Meritor would be compensated for providing SISAMEX with technical assistance through the commissions it would retain from the sale of Meritor Products to Mexican OEMs. (Ex. 16 at -24, § 2(c) ( ███████████ ███████████████████████████████████████████

**RESPONSE:** Meritor disputes that the parties intended to give SISAMEX "exclusive" manufacturing rights to make every component of every Meritor Product sold to OEMs in Mexico. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, and 16 above. Meritor does not dispute that the MOU provided for a commission structure.

20b.    Section 2.2 of the Shareholders Agreement is titled "Engineering and Sales Realignment and MHVS Support," which is consistent with the parties' prior discussion that the joint venture would "realign" the engineering function to

55

Meritor, which would "support" SISAMEX going forward. (Ex. 1 at -33, -34, § 2.2.) Section 2.2(a) introduced the aspects of the "restructuring" designed "to enhance the focus" of SISAMEX's operation on manufacturing. (*Id.* at -33, § 2.2(a).)

**RESPONSE:** Meritor does not dispute the quoted language in the Shareholders Agreement. Meritor disputes that it has any contractual obligation to provide technical assistance as to manufacturing process engineering, meaning the processes and parameters that SISAMEX uses to make a particular part, or product engineering support for products or components not contained in a Board-approved Business Plan.

Section 2.2(e) of the Shareholders Agreement states that "[Meritor] agrees to provide [SISAMEX] with technical assistance for the manufacture of the Meritor Products *as provided in the Technical Assistance and Management Agreement*." (SMX Ex. 1, 10/25/02 Shareholders Agr. § 2.2(e), MER0005913-87 at -34.) (emphasis added). Thus, under the plain language of the agreement, Meritor is required to provide only technical assistance as provided for in the "Technical Assistance and Management Agreement." The First Amendment to the Shareholders Agreement changed the definition of the "Technical Assistance and Management Agreement" in the Shareholders Agreement to refer only to the "Management Services Agreement." (SMX Ex. 44, 12/12/02 First Am. to Shareholders Agr., MER0007013-19 at -15, ¶ 16.) That amendment stated that all references to the "Technical Assistance and Management Agreement" in the Shareholders Agreement shall instead only refer to the "Management Services Agreement," and that Exhibit CC to the Shareholders Agreement is amended to eliminate any reference to technical assistance. (*Id.* at -15, -17, -18, ¶¶ 17, 41.) As executed, the Management Services Agreement contains no provision obligating Meritor to provide any technical assistance. (*Id. passim.*)

Meritor further disputes that it has any contractual obligation to give SISAMEX design drawings or Bills of Materials ("BOMs") for any components of Meritor Products that were not part of a Board-approved Business Plan or Annual Operating Plan.

> 20c.  To that end, Section 2.2(c) provides that Meritor "shall assume responsibility for customer sales engineering and application engineering interface to enable [SISAMEX] to meet [its] customer service and associated technical requirements for all Meritor Products [and] Meritor Components." (*Id.* at -34, § 2.2(c).) Meritor "agrees to provide [SISAMEX] with technical assistance for the manufacture of the Meritor Products as provided in the Technical Assistance and Management Agreement." (*Id.* at -34, § 2.2(e).)

**RESPONSE:** Meritor disputes that the Shareholders Agreement contains any provision obligating Meritor to provide any technical assistance and incorporates its evidence in response to Paragraph 20(b) above. As SISAMEX/Quimmco acknowledge in Paragraph 22, the Technical Assistance and Management Agreement was removed from the Shareholders Agreement, including all references thereto, and there is no operative Technical Assistance and Management Agreement.

> 20d.  The Shareholders Agreement initially defined "Technical Assistance and Management Agreement" as an agreement that was not drafted as of the execution of the agreement but was to be "in a form to be agreed upon by the Parties at or prior to the Closing Date and attached as Exhibit K." (*Id.* at -31, § 1.1.) Likewise, Exhibit CC to the Shareholders Agreement provided that the terms of the "[t]echnical assistance" are "[t]o be agreed by the Parties." (*Id.* at -74, § 6(a).)

**RESPONSE:** Meritor does not dispute that the quoted language is in the Shareholders Agreement.

> 21a.  On December 7, 2002, Meritor's counsel circulated a draft of the First Amendment to the Shareholders Agreement. (Ex. 42.) Paragraph 39 of the draft states that the parties have agreed to, among other things, Exhibit K, which the draft specified as the "Technical Assistance and Management Agreement" to the Shareholders Agreement. (*Id.* at -11, ¶ 39.)

**RESPONSE:** Meritor does not dispute that the quoted language is in the document cited.

> 21b.  But the next day, Mr. Arnold clarified that the parties' agreement was that SISAMEX would not be charged any fees for engineering support because

Meritor's sales commissions compensated it for such assistance. (Ex. 43 at -81 (correcting assumption by D. Bell that Meritor could charge SISAMEX for technical assistance; noting "I do not believe we will be billing routine support to the JV [because] … [w]e are getting major mgt fee in another manner that covers our expenses as well as receiving a major carve out of sales for our Mexican company").)

**RESPONSE:** Meritor agrees that it does not currently bill SISAMEX for provision of proprietary Meritor Product design drawings and BOMs for parts or components of Meritor Products that SISAMEX is authorized to make pursuant to a Board-approved Business Plan or Annual Operating Plan. SISAMEX Exhibit 43 is an Arnold email to Meritor employees responding to the statement, "We recognize the responsibility to sell eng'g support to the JV." (SMX Ex. 43, 12/8/02 Arnold email at MER0736981.)

When Meritor negotiated the restructured joint venture agreement, Meritor did not intend to provide unlimited technical assistance to the joint venture. (MER Ex. 19, Dowers Decl. ¶ 31.) As it does with all of its Tier 2 suppliers, Meritor agreed to provide product design engineering support to the joint venture where necessary to make the products and components that were in Board-approved Business Plans and capital expenditures. (*Id.*) Product design engineering assistance means giving SISAMEX the design drawings and BOMs (parts lists) that SISAMEX needs to make certain parts to Meritor's specifications. (*Id.*) But Meritor was not obligated to provide such product design engineering support to the joint venture in order for it to manufacture products or components that the Board has not approved. (*Id.*)

With respect to manufacturing process engineering, Meritor does not have an obligation to provide the joint venture with this form of technical assistance. Manufacturing process engineering was the responsibility of the staff of the joint venture. (*Id.* ¶ 32.)

Engineering support has a specific meaning in the industry. Burgin testified about the key difference between product engineering support and process engineering:

Q. Its [Meritor's] role in this restructuring was to provide sales and engineering support for Sisamex, right?

A. **Product engineering only.** Every engineer that moved from Sisamex or Dirona into the Meritor -- I made job offers to every one of these guys. I interviewed them. I found positions for them. Every one of the engineers that moved over under my authority short term, and direct engineers later, was a product engineer focused on the design, the application, the customer interface with the product. **No manufacturing engineers move to Meritor ARMEX.**

**Q. Meritor explicitly accepted the obligation and responsibility to provide technical assistance to the joint venture, correct?**

    MR. BENSINGER: Objection. Vague. Calls for a legal conclusion.

    BY MR. HAAS:

**Q. You are not disputing that, right?**

**A. Yeah, I am.**

    MR. BENSINGER: Same objection.

THE WITNESS: There was a technical assistance agreement created that was the basis of a -- of a charge of fees and funds, and it was management services. **But the technical services was product technical services. It's very important to distinguish between product and process. They are different engineers. They have different educations.**

(SMX Ex. 6, 1/12/16 Burgin Dep. at 119:13-120:18 (emphases added).)

Meritor disputes that "routine support" means Meritor has any contractual obligation to give SISAMEX design drawings or BOMs for any components of Meritor Products that were not part of a Board-approved Business Plan or Annual Operating Plan. Meritor also disputes that it has any contractual obligation to provide technical assistance as to manufacturing process engineering, meaning the processes and parameters that SISAMEX uses to make a particular part. Meritor incorporates its evidence in response to Paragraphs 11 and 20 above.

    21c.      The parties determined that a separate technical assistance agreement was unnecessary because the obligation to provide technical assistance was already set forth in the Shareholders Agreement and because Meritor would not receive any additional fees for such assistance, apart from the compensation it was already receiving from the commissions on sales. (Ex. 3 at 329:4-330:1 ("[T]he parties recognized that technical assistance was going to be … recovered by the commissions paid by [SISAMEX] … on the sale of Meritor products under supply agreement A."); Ex. 40 at 307:16-309:11 (explaining that "the obligation to provide technical assistance was already in the shareholders agreement, and it was part of the necessary elements in order to manufacture the products described in supply agreement A and the components described in supply agreement B").)

59

**RESPONSE:** Meritor disputes SISAMEX/Quimmco's summary of the reasons that the

Technical Assistance and Management Agreement was modified to become only a

"Management Services Agreement." SISAMEX/Quimmco's assertions are supported only by

testimony from Jesus Barrera and Quimmco's General Counsel, Hector Hernandez, and not by

any Meritor witnesses or contemporaneous documents. Meritor incorporates its evidence in

response to Paragraphs 11, 20, and 21 above.

> 22. Thus, on December 12, 2002, the parties executed the First Amendment to the
> Shareholders Agreement, which changed the definition of the "Technical
> Assistance and Management Agreement" in the Shareholders Agreement to refer
> only to the "Management Services Agreement." (Ex. 44 at -15, ¶ 16.) The
> amendment also provides that all references to the "Technical Assistance and
> Management Agreement" in the Shareholders Agreement shall refer to the
> "Management Services Agreement," and that Exhibit CC to the Shareholders
> Agreement is amended to eliminate any reference to technical assistance. (*Id.* at
> -15, -17, -18, ¶¶ 17, 41.) The parties executed the Management Services
> Agreement on January 14, 2003. (Ex. 45.) It does not address technical assistance
> that Meritor must provide to SISAMEX. (*Id.*)

**RESPONSE:** Meritor does not dispute that the quoted language is in the First Amendment to the

Shareholders Agreement. Meritor disputes that it has any obligation to provide technical

assistance and incorporates its evidence in response to Paragraphs 11, 20, and 21 above.

> 23. For the first ten years of the joint venture, Meritor recognized its obligation to
> provide SISAMEX with technical assistance at no additional fee. (*See, e.g.*, Ex.
> 46 at -50 ("We now have full management responsibility for engineering … for
> the Mexican market."); Ex. 47 at -61 ("We are responsible for the administration
> of all technical, warranty, service, etc. for all legacy Dirona product as well as
> ARM product sold in Mexico."); Ex. 48 at -36 ("We have a fiduciary role as
> control of engineering …. We own 50% of this JV so anything that impacts [it]
> negatively impacts []Meritor. We cannot forget that and as a shareholder, we must
> be committed to supporting the business."); Ex. 49 at -54 ("They are entitled to
> the drawings."); *see also* Ex. 7 at 266:6-20 (testifying that, during his tenure as
> Director General of SISAMEX, Meritor always provided technical assistance
> whenever it was asked for it); Ex. 50 at 262:1-21 (testifying that Meritor's
> practice was to provide SISAMEX with access to bills of material whenever
> requested); Ex. 51 at 98:19-99:1; 190:14-23 (testifying that Meritor had provided
> SISAMEX access to its specification database and that, prior to 2012, Meritor had
> never denied SISAMEX access to its plants or drawings for the purpose of
> providing technical assistance); Ex. 52 at 33:14-35:1 (Meritor provided technical

assistance free of charge from 2003 through 2007); Ex. 53 at Response No. 8 ("Meritor … does not separately account for costs associated with and incurred by Meritor in providing technical assistance to SISAMEX …."); Ex. 54 at 300:9-301:7, 304:14-21 (acknowledging that he was not aware of Meritor ever recording a receivable in its financial accounting system for any payments SISAMEX owes to Meritor for technical assistance provided to SISAMEX; acknowledging that if Meritor is in fact entitled to fees for technical assistance it has provided to SISAMEX, it would have been in Meritor's interest to record a receivable for fees owed by SISAMEX).)

**RESPONSE:** Meritor does not dispute that it has repeatedly provided routine product design engineering support to the joint venture in order to make sure that the joint venture succeeds in supporting Meritor's business in Mexico. Meritor does not dispute that it is responsible for the engineering of Meritor Products and must help resolve any problems that customers have with the performance of the products. SISAMEX Exhibits 47 and 48 are examples of Meritor's willingness to help address problems its customers face. (SMX Ex. 47, 5/6/03 Swanson email to Arnold regarding product failure, MER0738359-63 at -61 ("we must support the field so Carlos is correct in that we must address the issue"); SMX Ex. 48, 1/6/04 Burgin email regarding product failures, MER0732536-37 at -36 ("[w]e have a fiduciary role as control of engineering **to support closure to this problem**") (emphasis added).)

Furthermore, Meritor does not dispute that SISAMEX is entitled to the drawings for any components that it makes pursuant to an agreement between the parties or a Business Plan approved by the SISAMEX Board of Directors. Meritor disputes that providing drawings for the products and components SISAMEX manufactures and supporting resolution of customer problems means that Meritor is obligated to provide technical assistance to SISAMEX so that it can manufacture components or products over the objection of SISAMEX's Shareholders and without a Business Plan approved by the Board of Directors. Meritor disputes that it has any contractual obligation to provide technical assistance as to manufacturing process engineering,

61

meaning the processes and parameters that SISAMEX uses to make a particular part. Meritor

incorporates its evidence in response to Paragraphs 11, 20, and 21 above.

> 24. The Shareholders Agreement required the execution of three supply agreements as a condition of closing and to effectuate the contemplated business. (Ex. 1 at -70, § 7.3(k)-(m).) The parties thereafter executed three supply agreements— Supply Agreements A, B and C. (Ex. 36; Ex. 55; Ex. 56.) (The Shareholders Agreements and the Supply Agreements are referred to collectively as the "Agreements" herein.)

**RESPONSE:** Meritor does not dispute the quoted language from the Shareholders Agreement or

that the parties executed three supply agreements.

> 25a. Supply Agreement A, executed on January 14, 2003, states that the scope of SISAMEX's business is "to manufacture for and sell exclusively to, [Meritor], Meritor Products, Dirona Products and Sudisa Products for sale to OEM Customers in Mexico on the terms and conditions set forth in this Agreement …." (Ex. 36 at -30, Whereas Clause § (a)(i).) Article 2.2 of Supply Agreement A provides that "[SISAMEX] shall be the exclusive importers, manufacturers, assemblers and/or shipping points of Meritor Products … sold by [Meritor] to OEM Customers in Mexico for OE Use as provided in, and subject to the limitations of, this Agreement." (*Id.* at -35, § 2.2(a); Ex. 14 at 67:16-69:19 (Supply Agreement A gives SISAMEX "the exclusive right to manufacture Meritor products for sales to OEMs in Mexico."); Ex. 41 at -80 (Meritor is required "to purchase 100% of requirements exclusively from JV … for sale to OE Plants in Mexico" from SISAMEX).)

**RESPONSE:** Meritor does not dispute the quoted language from Supply Agreement A. Meritor

disputes SISAMEX's characterization of Arnold's testimony, which does not support and in fact

contradicts SISAMEX/Quimmco's assertions. (*See, e.g.*, SMX Ex. 14, Arnold Dep. at 67:16-23

("I read the contract to say it's the exclusive importer, manufacturer, assembler, and/or shipping

point. That's how I read that."); *id* at 70:7-10 ("It was a clear understanding, and I believe

memorialized in the agreements, that SISAMEX would be the exclusive shipping point of Big P

products to the OEMs. That is – that is true.").)

Meritor disputes SISAMEX's characterization of SISAMEX Exhibit 41. SISAMEX

Exhibit 41 is a November 13, 2007 internal Meritor strategy presentation discussing the overall

relationship with SISAMEX. SISAMEX quotes a bullet summarizing Supply Agreement A that reads, "MHVS and ARM-Mex to purchase 100% of requirements … for sale to OE Plants in Mexico." (SMX Ex. 41, MER1011667-87 at -72.)

Meritor disputes that the quoted language supports any exclusive right for the manufacture of all components of all Meritor Products sold to OEMs in Mexico. Rather, the quoted language states that Meritor would purchase from SISAMEX all *final* Meritor Products for delivery to OEMs in Mexico. This is consistent with all the contemporaneous documents and testimony establishing that the parties intended SISAMEX to be the delivery point/shipping point for all Meritor Products sold to OEMs in Mexico. (*See also id.* at -70 ("Sisamex Contract Summary, Scope of JV: Be the exclusive manufacturer (incl. importer, assembler, and/or shipping point …)").) Moreover, to be the "manufacturer" of Meritor Products does not necessarily entail the right to manufacture all components of those products. (MER Ex. 12, Patterson Decl. ¶ 16.) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

> 25b.    Supply Agreement A defines "Meritor Products" as including products listed on Schedule 2 of the agreement and any "new products and assemblies that are improvements, upgrades, enhancements or changes to any Meritor Product identified on Schedule 2." (Ex. 36 at -33, § 1.1.) Meritor Products include the 160 rear axle, the 14_ series rear axle (such as the 145 and 14X rear axles[2]), and the 185 rear axle, as well as certain front axles.
>
> [2] Before the introduction of the 14X axle, the parties sometimes used "14X" to refer to the 14_ series of axles. (Ex. 14 119:7-18.) Meritor later introduced an axle model called the 14X axle, an improvement on the 145 axle and also a Meritor Product. (*Id.* at 146:4-147:19.)

**RESPONSE:** Undisputed.

> 26a.    The only restrictions Supply Agreement A placed on SISAMEX's exclusive manufacturing rights for Meritor Products are two express exceptions for (i) air and hydraulic disc brakes and (ii) suspensions. (*Id.* at -76, Sch. 2, Tbl. 2.3.)

**RESPONSE:** Meritor disputes SISAMEX's characterization of Supply Agreement A and incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

Meritor listed the air and hydraulic disc brakes as both Meritor Products in Supply Agreement A and Core Components in Supply Agreement C and also noted in Supply Agreement A, Table 2.3 that the joint venture required approval from Meritor itself if it wanted to manufacture those parts. (MER Ex. 8, Gosnell Decl. ¶ 30; MER Ex. 19, Dowers Decl. ¶¶ 19-20.)

The Meritor brakes division requested the additional approval because they were concerned that the joint venture would begin making these types of brakes. (*Id*. ¶ 18.) They were concerned because these types of brakes are sometimes sold separately as products and sometimes sold as components to be incorporated into an axle assembly. (*Id*.) In order to address the brake division's concern, Dowers made sure that there was language in Schedule 2, Table 2.3 of Supply Agreement A noting that while air and hydraulic disc brakes were included as products for the purposes of Supply Agreement A and also Core Components, subject to the restriction in Supply Agreement C, they would also require an additional authorization: The joint venture had to purchase them from Meritor unless Meritor itself agreed otherwise, irrespective of the level of investment or SISAMEX Board approval of a Business Plan. (*Id*. ¶ 19.) By inserting this additional approval requirement, Dowers did not intend that the brake division's additional request would remove the many protections that the Shareholders put into place requiring the Board to approve all key decisions by the joint venture, including any SISAMEX Business Plan. (*Id*. ¶ 20; *see also* MER Ex. 31, 7/31/02 Dowers email discussing whether to include brake products in restructured joint venture at MER0735000 ("Currently Board approval is required for

investments at $1.0 Mil - our declining at the Board level is the measure to stop the JV from

entering products we wish to keep.").)

Meritor agrees that Supply Agreement A specifically excludes suspensions from the list

of Meritor Products and notes that air and hydraulic disc brakes are to be treated as Core

Components under Supply Agreement C. (*See* SMX Ex. 36, 1/14/03 Supply Agr. A,

MER0006430-90 at -72.)

> 26b.  The agreement contained the exception for air and hydraulic brakes because
> Meritor had already committed their manufacturing through other joint ventures
> and facilities and thus could not commit to allowing SISAMEX to manufacture
> these products. (Ex. 52 at 40:17-42:3 (explaining that, at the time the Agreements
> were negotiated, "Meritor had an existing joint venture with WABCO … and had
> recently acquired LUCAS … [and] [b]ecause Meritor contemplated a possibility
> of manufacturing air and hydraulic disc brakes with those joint venture partners, it
> could not commit that Sisamex would have the exclusive right to manufacture
> those brakes"); Ex. 57 at -47, -48, ¶ 4 (same); Ex. 6 at 107:4-109:20 ("There was
> an intent to form a joint venture with WABCO on air disc brakes…. That's the
> one reason [those brakes] w[ere] carved out."), 112:8-15 (agreeing that it was
> "[g]enerally … fair to say that the exception … was put into the agreement
> because Meritor had either existing or contemplating obligations relating to those
> brakes"); Ex. 58 at -65 (noting that the brakes and suspensions were excluded
> because they were a "significant part" of the U.S. market and a "growing area" of
> Meritor's business).) Meritor negotiated for the exclusion of suspensions so it
> could ship directly to Mexican OEMs without any involvement from the joint
> venture. (*Id.*; Ex. 59 at -19.) .)

**RESPONSE:** Meritor agrees that suspensions were originally excluded from the joint venture.

Meritor disputes SISAMEX's statement of the reasons that air and hydraulic brakes were called

out in Schedule 2, Table 2.3 of Supply Agreement A and incorporates its evidence in response to

Paragraph 26(a) above.

> 26c.  Notably, the exception for the air and hydraulic brakes affirms the parties'
> understanding that the air and hydraulics brakes are an *exception* to the rule that
> SISAMEX dictates whether to manufacture the Meritor Products that are also
> Core Components. (*See* Ex. 36 at -76, Sch. 2, Tbl. 2.3). These are the only Core
> Components that Meritor gets to decide whether to manufacture.

**RESPONSE:** Meritor disputes SISAMEX's characterization of Supply Agreement A and

incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, 24, and

26(a)-(b) above.

> 27. Supply Agreement B obligated Meritor to purchase from SISAMEX, and for
> SISAMEX to manufacture, a percentage of Meritor's Core Components (a term
> defined in the agreement) for use in products for sale to OEM customers in the
> U.S. and Canada; among other components, Supply Agreement B granted
> SISAMEX the right to manufacture between 50% and 90% of Meritor's
> obligations for certain 16_ series components, while the 14_ series components
> were listed for future consideration once SISAMEX developed the capacity to
> manufacture them. (Ex. 55 at -98, -558, § 2.2(b) & Sch. 3.) Supply Agreement B
> also gave Meritor the option of purchasing additional Core and Non-Core
> Components from SISAMEX. (*Id.* at -98, § 2.2(a).)

**RESPONSE:** Meritor agrees that Supply Agreement B obligated Meritor to purchase a

percentage of its requirements for certain Core Components from SISAMEX. Those Core

Components were all from the "16x" series, which is consistent with the parties' intent that the

joint venture would initially manufacture components of products in the 16_ series while acting

as the delivery point/shipping point for all Meritor Products sold to OEMs in Mexico. (MER

Ex. 19, Dowers Decl. ¶ 25; SMX Ex. 16, 9/5/00 Meritor-Quimmco MOU § 2(d),

SMX001607323-36 at -25 ("Subject to the completion of the Business Plan referenced in section

10, it is currently envisioned that **NewCo's initial role will be to manufacture the -16x family**

**of components**. Additional roles will be added based on economic 'paybacks' as agreed by the

Board of Directors on a case by case basis.") (emphasis added).)

Meritor disputes that the "14_ series components were listed for future consideration

once SISAMEX developed the capacity to manufacture them." 14_ series Core Components

were listed at "0%" because the parties did not agree that SISAMEX would manufacture those

components, as opposed to acting as the delivery point/shipping point for those products. When

asked at his deposition whether it was the intent for Sisamex to manufacture the 14_ series axle

components at the outset," Burgin explained that "[i]t was never the intention and let me explain why. We would have all been fired immediately from day one because it's completely contrary to the global capacity of the axle business, completely contrary to that -- that we would -- we had a clear capital plan. We had a clear investment plan. We had a clear manufacturing strategy." (SMX Ex. 6, 1/12/16 Burgin Dep. at 100:6-13.)

To this day, Supply Agreement B has never been amended to require Meritor to purchase from SISAMEX or to require SISAMEX to manufacture for Meritor components of the 145 or 14X series of Meritor axles. (*See* SMX Ex. 55, 1/14/03 Supply Agr. B, MER0006493-577 at -563-77 (Second Am.); MER Ex. 32, 4/18/07 First Am. to Supply Agr. B at MER1464731-36.) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

> 28a. Section 2.2(a) of Supply Agreement C provided that "[SISAMEX] will purchase exclusively from [Meritor], and [Meritor] will supply to [SISAMEX], all of [SISAMEX's] requirement for Core Components[3] that [SISAMEX] does not manufacture itself …." (Ex. 56 at -83, § 2.2(a).)
>
> [3] Supply Agreement C defines the term "Core Components" slightly differently than Supply Agreement B, and some Meritor Products are included in its definition. (Ex. 56 at -81, -604, § 1.1 & Sch. 1.)

**RESPONSE:** Undisputed.

> 28b. The chief negotiators of the Agreements agree that Supply Agreement C granted SISAMEX the right to purchase from Meritor those Core Components that SISAMEX needed to meet its obligations under Supply Agreement A if SISAMEX chose not to manufacture those components itself. (Ex. 14 at 91:14-92:1 ("[G]enerally speaking, SISAMEX could make or buy components"), 93:11-18, 129:20-130:4 (declaring it "[o]bvious[]" that Meritor is only entitled to sell components to SISAMEX pursuant to Supply Agreement C if SISAMEX orders them), 132:7-14; Ex. 3 at 189:19-190:8 ("[W]e just needed a supply agreement that allow [*sic*] us to buy whatever components we did not manufacture."), 95:12-96:15, 181:3-182:6, 195:12-196:10, 203:8-204:8, 211:4-20, 231:8-232:7; Ex. 52 at 49:1-9 (agreeing that "Supply Agreement C [was] intended to provide SISAMEX with a source … of core components to the extent that SISAMEX elected not to manufacture those core components itself"), 49:22-50:23 (Section 2.2(a) "clarifies that SISAMEX may obtain from Meritor those

core components that SISAMEX does not manufacture itself"); *see also* Ex. 40 at 180:10-181:22 ("SISAMEX[] would have the right to manufacture Meritor products … but [SISAMEX] may not have the capacity at that time to … manufacture certain products, so those products would be acquired from Meritor.").)

**RESPONSE:** Meritor agrees that SISAMEX must purchase from Meritor those Core Components it does not manufacture itself. (SMX Ex. 56, 1/14/03 Supply Agr. C § 2.2(a), MER0006578-613 at -583.) Meritor disagrees with SISAMEX over who makes the decision of which Core Components SISAMEX may manufacture itself; Meritor disputes that the decision can be made by the Director General over the objection of the Board of Directors or Shareholders of the joint venture. Meritor ensured it had mutual control over the joint venture in the executed agreements. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

The negotiation parol evidence further disputes SISAMEX's position that the Director General can decide what Core Components to manufacture over the objection of the SISAMEX Board of Directors. In negotiating the Shareholders Agreement and Supply Agreements with Quimmco, Meritor created two different categories of components: "Core" and "Non-Core" components. (MER Ex. 19, Dowers Decl. ¶ 16.) With respect to Core Components, which Meritor considers the components Meritor wanted to control, Meritor insisted the joint venture buy these components from Meritor if it did not manufacture them itself pursuant to a Board-approved Business Plan. (*Id.* ¶ 16.) Consistent with this direction, Meritor – not Quimmco – inserted the "manufactures itself" language into Section 2.2 of Supply Agreement C. (*Id.*; MER Ex. 33, 5/28/02 Supply Agr. C redline with changes introduced by Meritor, MER0012537-60 at -40 (Meritor adding "does not manufacture itself" to § 2.2).) At one point, Quimmco later tried to water down this provision so that the joint venture would only have to purchase Core Components from Meritor on a "non-exclusive basis." (MER Ex. 19, Dowers Decl. ¶ 16; MER

Ex. 34, 6/12/02 Supply Agr. C redline with changes introduced by Quimmco, MER0008080-105 at -83 (Quimmco deleting the phrase "[a]ll of its requirements for Core Components that it does not manufacture itself exclusively from Supplier" and replacing it with "on a non-exclusive basis.").) Meritor rejected Quimmco's suggested change. (MER Ex. 19, Dowers Decl. ¶ 16.) The final version of Supply Agreement C included protection for Meritor such that SISAMEX could only make Core Components with Board approval or the express approval of Meritor under Supply Agreement C Section 2.4(b). (SMX Ex. 56, 1/14/03 Supply Agr. C §§ 2.2(a) and 2.4(b), MER0006578-613 at -583, -584; *see also* MER Ex. 19, Dowers Decl. ¶ 16.)

   29a.   Meritor employees also acknowledged in their correspondence that Supply Agreement C permits Meritor to sell Core Components to SISAMEX for those products that SISAMEX is not fully tooled to develop on its own. (Ex. 60 at -73 (explaining that, pursuant to Supply Agreement C, Meritor would manufacture and sell to SISAMEX components for which "Sisamex is not fully tooled and developed"); Ex. 61 at -88; Ex. 24 at -57 ("[SISAMEX] must exclusively buy from ARM all core components from ARM or make them…. The incentive will be to make themselves …."); Ex. 62 at -15 (same); Ex. 63 ("Original agreement: Sisamex not obliged to purchase carriers [considered Core Components] from MTOR"); Ex. 64 at -32, -37 (noting that there is a "new risk" of SISAMEX "insourcing" the 14X carrier assembly); Ex. 65 at -38 ("Original Agreement": … "SMX can buy from MTOR or manufacture itself" the 14X, the 145, and the 143 carrier assemblies, which are considered Core Components); Ex. 66 at 142:22-143:1 (confirming his contemporaneous understanding that "under the original supply agreements Sisamex could buy from Meritor or manufacture itself the 14X, the 145 and the 143 carrier assemblies"), 152:15-153:18 (same).)

**RESPONSE:** Meritor agrees that SISAMEX Exhibit 60 includes the quoted language, which is consistent with the parties' intent that SISAMEX would focus on manufacturing components for some products while acting as the shipping point for all sales to OEMs in Mexico, and that any future tooling or new product manufacturing would be subject to agreement by the parties and SISAMEX Board approval. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

Meritor disputes that SISAMEX Exhibit 61 includes any "acknowledgement," related to tooling or otherwise. (SMX Ex. 61, 3/14/08 SISAMEX Supply Agreement overview, MER0750475-511 at -488 ("Sisamex is required to purchase exclusively from ARM all Core Components that Sisamex does not manufacture").) Meritor disputes SISAMEX's characterization of SISAMEX Exhibit 24, which fails to quote the entire sentence. (SMX Ex. 24, 10/9/02 Arnold Mark-up of Walleck Memo, MER0103455-58 at -57 ("The incentive will be to make themselves **and all capital is approved annually by BOD**") (emphasis added).) Meritor disputes that SISAMEX Exhibit 62 is the "same" as SISAMEX Exhibit 61, as it does not include any description of who decides what SISAMEX manufactures, as opposed to acting as the delivery point/shipping point. (SMX Ex. 62, 2/8/13 Meritor presentation of SISAMEX Agreements, MER1411004-26 at -15.)

Meritor agrees that SISAMEX Exhibits 64 and 65 include the quoted language but disputes that these documents "acknowledge" that the SISAMEX Director General has the right to insource Core Components over the objection of the SISAMEX Board of Directors or Shareholders. Neither of these documents refute the fact that the SISAMEX Board of Directors has the power to approve and control SISAMEX's Business Plan and capital expenditures.

> 29b.    Meritor also acknowledged that it would lose these sales if SISAMEX chose to manufacture components supplied by Meritor. (Ex. 41 at -80 ("ARM sells significant value to Sisamex in 145 carriers and some housings. They could chose [*sic*] to localize this and if they did so we would lose the sales."); *see also* Ex. 67 at 84:23-86:2 (Supply Agreement C did not impose a purchase obligation on SISAMEX), 86:16-88:3 (same).)

**RESPONSE:** Meritor disputes the characterization of SISAMEX Exhibit 41 and the cited testimony. (SMX Ex. 41, 11/13/07 Meritor Mundo Verde presentation, MER1011667-87 at -70 ("Sisamex Contract Summary, Scope of JV: Be the exclusive manufacturer (incl. importer, assembler, and/or shipping point …)").) Meritor disputes that the testimony of Osvaldo Gallegos

supports SISAMEX's position or "acknowledges" that the Director General has the right to insource Core Components over the objection of the SISAMEX Board of Directors or Shareholders. (*See* SMX Ex. 67, Gallegos Dep. at. 78:6-15 ("Q. And so according to this document, which you helped prepare, there was no obligation under the original supply agreement for Sisamex to purchase carrier assemblies from Meritor, right? MR. VALAIK: Objection to the extent it mischaracterizes the document. Go ahead and answer. THE WITNESS: I don't remember that, whether or not it was in the contract."); *id.* at 87:6 ("I don't remember the agreement").) Meritor disputes that the testimony of Larry Burgin supports SISAMEX's position or "acknowledges" that the Director General has the right to insource parts over the objection of the SISAMEX Board of Directors. (SMX Ex. 6, 1/12/16 Burgin Dep. at 322:8-20, 475:4-11, 479:1-18.) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

        30a.    Section 2.4 of Supply Agreement C provides as follows:

> Notwithstanding anything to the contrary contained in this Agreement, [SISAMEX] shall be released from its obligation under Section 2.2 to purchase the following Core Components from [Meritor] under the circumstances indicated below in this Section 2.4, and [SISAMEX] shall be entitled to manufacture such Components itself and /or to source such Components from any of its Affiliates or any other supplier or suppliers…
> . .
>
> (a) Core Components for which [Meritor] is unable or unwilling to supply to [SISAMEX] to meet the delivery, quality or other terms and conditions of this Agreement or the [SISAMEX's] customers.
>
> (b) Core Components which [Meritor] and [SISAMEX] have agreed to be an exception to the purchase commitments of this Agreement.
>
> (c) Core Components during a Force Majeure Event as Provided in Section 8.2.
>
> (Ex. 56 at -84, § 2.4.)

**RESPONSE:** Undisputed.

30b.     This section was designed to grant SISAMEX an incremental right to purchase Core Components from third-parties if Meritor does not perform its supply obligations in Section 2.2. (Ex. 3 at 194:24-200:06 (explaining that, if "Meritor was unable or unwilling to supply [a] core component" that "SISXAMEX did not want to manufacture," this provision "allows SISAMEX … to in-source th[at] core component[] from third parties, on top of our primary right to in-source it ourselves"); Ex. 40 at 200:13-201:11 (same).)

**RESPONSE:** Meritor disputes that Section 2.4 provides an "incremental right." Section 2.4 in

conjunction with Section 2.2 allows SISAMEX to manufacture Core Components pursuant to a

SISAMEX Board-approved Business Plan and capital expenditures or with Meritor's express

approval under Section 2.4(b). Meritor incorporates its evidence in response to Paragraphs 8, 9,

11, 12, 13, 14, 16, and 20 above.

31a.     Supply Agreement C also permitted SISAMEX to purchase Non-Core Components from Meritor, subject to Meritor's agreement to supply them. (Ex. 56 at -83, § 2.1 (permitting Meritor to supply to SISAMEX "such Non-Core Components in such amounts as may be ordered by [SISAMEX] from time to time and as [Meritor] may agree to supply").)

**RESPONSE:** Meritor does not dispute this statement of fact.

31b.     Unlike Core Components, SISAMEX is not restricted from purchasing Non-Core Components from third parties.

**RESPONSE:** Meritor disputes that SISAMEX is not restricted from purchasing Non-Core

Components from third parties. SISAMEX can only purchase Non-Core Components from third

parties as approved by Meritor, whose approval cannot be unreasonably withheld. (*See* SMX

Ex. 36, 1/14/03 Supply Agr. A § 8.1, MER0006430-90 at -45, -46.)

32.     The Shareholders Agreement obligated the parties to adopt an "Initial Business Plan" covering SISAMEX's first five years of operation. (Ex. 1 at -24, -34, §§ 1.1, 2.3.) On January 14, 2003, the parties agreed to an Initial Business Plan, which was incorporated as Exhibit S to the Shareholders Agreement. (Ex. 68.) That plan stated that SISAMEX "will produce all [Meritor's] products supplied to OEM plants located in Mexico." (*Id.* at -10.) It provided for a "transition period" in which SISAMEX would focus on "capacity increases required to meet projected volumes." (*Id.* at -12.) It noted that SISAMEX's initial product families would include the non-drive front axles and 14_ and 18_ series rear axles. (*Id.* at -15 to -20.) On February 25, 2002, SISAMEX's Board of Directors adopted the

Initial Business Plan in substantially the same form, retaining all of these provisions. (Ex. 69 at -75 to -117.)

**RESPONSE:** Meritor does not dispute this statement of facts or that SISAMEX Exhibit 68 includes the quoted language. Meritor disputes that to "produce all products" means that SISAMEX would manufacture all components of Meritor Products, or that the Initial Business Plan provided that SISAMEX would manufacture all Products and Components delivered to OEMs in Mexico. (SMX Ex. 68, 1/14/03 Second Am. to Shareholders Agr. Ex. S, MER1464607-47 at -12 (stating that the "core business" of SISAMEX is to "supply, through ARM" the products going to OEM plants located in Mexico; "[Sisamex] will invest in capacity to become ARM's primary core component supply source **beyond its current North America installed capacity**.") (emphasis added).) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

33a.  Meritor made a presentation to its board of directors regarding the restructuring. (Ex. 12; Ex. 6 at 222:17–225:21.) Meritor informed its board that SISAMEX "will be CVS's exclusive manufacturer of Axles and Brakes for the Mexican market." (Ex. 12 at -75.)

**RESPONSE:** Meritor does not dispute that the quoted language is included in SISAMEX Exhibit 12. Meritor disputes that SISAMEX Exhibit 12 reflects an agreement that SISAMEX would be the exclusive manufacturer of all components of Meritor's Products or that the Director General could unilaterally insource components over the Board of Directors' objection and without a Board-approved Business Plan. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

33b.  The presentation to the board also acknowledged Meritor's long-term risk of a "substantial" shift of OEMs to Mexico due to the "perpetual" agreement with no "exit strategy." (*Id.* at -80.)

**RESPONSE:** Meritor does not dispute that the quoted language is included in SISAMEX Exhibit 12.

34a.    After execution of the Shareholders Agreement, Meritor issued a press release, agreed to by both parties, stating that SISAMEX would be "focused on manufacturing and supplying a combined offering of Dirona, Sudisa and Meritor brands of products (axles, air brakes and drivelines) for medium- and heavy-duty commercial trucks and trailers to vehicle manufacturers' facilities located in Mexico through ArvinMeritor." (Ex. 70.) Meritor stated it was "enhancing a long-term joint venture by further combining ArvinMeritor's marketing position and product technology with Quimmco's established manufacturing and operations expertise." (*Id.*; *see also* Ex. 71 at -72–73 (stating the new joint venture "will focus on manufacturing original equipment automotive components for the Mexican marketplace," including air brakes, front axles, rear axles, trailer axles, and driveline components and assemblies).)

**RESPONSE**: Meritor does not dispute that the quoted language is included in SISAMEX

Exhibits 70-71.

34b.    In a speech at a trade show in Mexico on November 12, 2002 that was made by two representatives of Quimmco and Meritor that negotiated the Agreements (Mssrs. Barrera and Arnold), and attended by others in Meritor's management, Mr. Barrera explained that SISAMEX, as a "top manufacturer" in the Mexican market, "will have the right to manufacture on an exclusive basis, among other products, Meritor axles and brakes for Mexico and will offer to its national customers, through ArvinMeritor, the most complete offering of last generation products, including all axles and brakes and other related components from the Dirona, Sudisa and Meritor brands." (Ex. 72; Ex. 73 at -29.)

**RESPONSE:** Meritor does not dispute that SISAMEX Exhibits 72 and 73 relate to a press

conference in November 2002 and that SISAMEX Exhibit 73 includes the cited quotations.

Meritor disputes that the parties intended for SISAMEX to manufacture all components of those

products "on an exclusive basis." Meritor incorporates its evidence in response to Paragraphs 8,

9, 11, 12, 13, 14, 16, and 20 above.

35a.    Meritor and SISAMEX also notified their customers that SISAMEX had the exclusive right to manufacture Meritor Products for OEMs in Mexico. In October 2002, Meritor informed International Truck and Engine, an OEM customer, that SISAMEX would be responsible for "manufacturing" and that Meritor would be responsible for "sales." (Ex. 19 at -37.) The same presentation stated that there would be a "Product Transition," and that the joint venture would "continue with current Dirona products until transition can be successfully implemented." (*Id.* at -42.)

**RESPONSE:** Meritor disputes that it communicated to OEMs in Mexico that SISAMEX would

be the exclusive manufacturer of all components of Meritor Products. SISAMEX Exhibit 19

(11/11/02 Meritor presentation to ITE at MER0730025-47) does not utilize the word "exclusive"

anywhere and the Meritor personnel involved in negotiations all dispute that the parties agreed

that SISAMEX would be the exclusive manufacturer of Meritor Products and all components

thereof, as opposed to the manufacturer of some products and components and the delivery

point/shipping point of all products sold to OEMs in Mexico. Meritor incorporates its evidence

in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

> 35b.  In March 2003, Mr. Burgin directed that customers be informed that "[f]uture
> plans are to conclude the integration with the JV, transfer business from US into
> JV and expand presence in Mexico. Important to let [customers] know[] that we
> are the only mfg. in Mexico of axles, brakes, and other major components."
> (Ex. 74 at -45.)

**RESPONSE:** Meritor does not dispute that SISAMEX Exhibit 74 includes the quoted language.

Meritor disputes that SISAMEX Exhibit 74 meant that SISAMEX would manufacture all

products and all components of those products, as opposed to manufacturing some products and

components and acting as the delivery point/shipping point for all products. SISAMEX Exhibit

74 includes Larry Burgin's comments on the intent of the joint venture, pointing out that the joint

venture will be the shipping point and the 160 axle manufacturer: "On April 1st we will actually

change the 'face to customer' by having the JV be the shipping point and ArvinMeritor

performing the engineering, sales, marketing, and invoicing.… Also, at that time we will begin

to expand synergies at the JV to better serve the market (ie integrating the 160 axle

manufacturing into Mexico)[.]" (SMX Ex. 74, 3/5/03 Burgin email, MER0730444-45 at -45.)

Meritor further disputes that SISAMEX Exhibit 74 meant that SISAMEX's Director General has

the right to insource Core Components over the objection of the joint venture's Board of

Directors and Shareholders. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

      36.      In April 2008, Meritor and SISAMEX told Freightliner, another OEM customer, that all axles, brakes, and drivelines required by Freightliner's plants in Mexico were to be manufactured by SISAMEX. (Ex. 75 at -48, -49 (noting that Meritor was "clear that all axles, brakes and drivelines required in [Freightliner's Mexico plants] will come out of Sisamex"); Ex. 38 at 153:8-19.) An email summarizing the information provided to Freightliner was forwarded to Carsten Reinhardt, Meritor's then-Chief Operating Officer, and Joseph Plomin, Meritor's then-Vice President and General Manager of the Truck Americas Business Units. (Ex. 75.) Neither Mr. Reinhardt nor Mr. Plomin expressed any disagreements with the information provided to Freightliner. And in May 2010, in reference to a visit to Mexico by a Chinese supplier, Mr. Hogan pointed out that "if they are touring Mexico with the thought of entering this country some day, then we would be able to supply them but only through Sisamex." (Ex.76 at -29.)

**RESPONSE:** Meritor disputes SISAMEX/Quimmco's characterization of SISAMEX Exhibit 75—that document does not state that Meritor told Freightliner that all products for its Mexico plant "were to be manufactured" by SISAMEX. Instead, SISAMEX Exhibit 75 is a set of emails between Meritor employees that states that all products would "come out of Sisamex" or would be "supplied out of Sisamex," which is consistent with the parties' agreement that SISAMEX would act as the shipping point/delivery point for all sales to OEMs in Mexico but SISAMEX would not necessarily be the manufacturer of each of the components of those products. (SMX Ex. 75, 5/5/08 Meritor email, SMX001793147-49 at -47, -48.) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

      Similarly, Meritor disputes SISAMEX's characterization of SISAMEX Exhibit 76. SISAMEX Exhibit 76 is a 2010 email from Ken Hogan about a potential Chinese supplier stating that Meritor would be required to supply the Chinese supplier "only through Sisamex," which is consistent with the intent of the parties that SISAMEX would act as the exclusive shipping point for all products sold to OEMs in Mexico. (SMX Ex. 76, 5/14/10 Hogan email to Wang at MER0876527-29 at -29.) SISAMEX Exhibit 76 is silent on what components of Meritor

76

products SISAMEX would manufacture or whether the SISAMEX Board of Directors controls

which products and components SISAMEX makes. Meritor incorporates its evidence in response

to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

> 37a.  In late 2010 and early 2011, Meritor conducted a careful analysis and review of
> the Shareholders Agreement and Supply Agreements A, B, and C in order to
> determine whether Meritor was required to consolidate SISAMEX into its
> financial statements. (Ex. 77; Ex. 54 at 60:6-17, 71:6-72:24, 82:7-17; Ex. 78
> at -905; Ex. 79.)

**RESPONSE:** Undisputed. Meritor objects to the relevance of this determination, as Quimmco's

auditors similarly found that it did not have sufficient control to consolidate the joint venture.

(MER Ex. 35, 2/16/16 Lambreton Dep. at 313:14-314:4.)

> 37b.  Meritor concluded, and informed its auditors, that it could not consolidate
> SISAMEX into its financial statements because Meritor does not have the power
> to direct the activities of SISAMEX that most significantly impact SISAMEX's
> economic performance. (*Id.* at -55, -56.)

**RESPONSE:** Undisputed. Meritor objects to the relevance of this determination, as Quimmco's

auditors similarly found that it did not have sufficient control to consolidate the joint venture.

(MER Ex. 35, 2/16/16 Lambreton Dep. at 313:14-314:4.)

> 37c.  Further, Meritor found that it is not the primary beneficiary of SISAMEX and that
> the power inherent in SISAMEX's management structure is weighted toward
> Quimmco because Quimmco appoints SISAMEX's Director General and
> Chairperson of the Board of Directors. (*Id.* at -55; Ex. 54 at 120:18-121:2.)

**RESPONSE:** Meritor disputes SISAMEX/Quimmco's characterization of this statement to the

extent SISAMEX suggests that this analysis was conducted for any purpose other than whether

Meritor must consolidate its interest in SISAMEX from an accounting perspective under FASB

Statement of Financial Accounting Standard 167. (SMX Ex. 54, Wright Dep. at 67:5-12 ("Q. Is it

correct that Meritor concluded that if it was the primary beneficiary of any of its joint ventures in

which it held a significant variable interest, it could be required to consolidate the joint venture

into its financial statement? A. Yes, that's why we performed the analysis to determine whether

there was a primary beneficiary and whether from an accounting perspective we would have to consolidate or not.").) Meritor disputes that an analysis conducted for financial accounting consolidation purposes in 2010-2011 is relevant to whether the Director General can unilaterally decide to insource production without the approval of or over the objection of the SISAMEX Board. (*See also* MER Ex. 36, 12/21/10 VIE Draft Analysis "Shared Power" tab, MER1477621 at last sheet ("ARM and JV partner both appoint equal BOD members. JV partner appoints managing director. All significant contracts approved by both parties. Control over the JV is shared.").) Meritor objects to the relevance of this determination, as Quimmco's auditors similarly found that it did not have sufficient control to consolidate the joint venture. (MER Ex. 35, 2/16/16 Lambreton Dep. at 313:14-314:4.)

> 37d.  Meritor also found that Quimmco—and not Meritor—has shared or absolute control over key activities (*e.g.*, manufacturing operations, labor relationships, financing activities and certain other functions as discussed above) that most significantly impact SISAMEX's economic performance. (Ex. 79 at -56; Ex. 54 at 140:1-141:6.)

**RESPONSE:** Meritor disputes SISAMEX/Quimmco's characterization of this statement to the extent it suggests that this analysis was conducted for any purpose other than whether Meritor must consolidate its interest in SISAMEX under FASB Statement of Financial Accounting Standard 167. Meritor objects to the relevance of this determination, as Quimmco's auditors similarly found that it did not have sufficient control to consolidate the joint venture. (MER Ex. 35, 2/16/16 Lambreton Dep. at 313:14-314:4.) Meritor incorporates its response to Paragraph 37(c) above.

> 37e.  Moreover, the Director General of SISAMEX has discretion in selecting the suppliers from whom SISAMEX purchases products. (Meritor Internal Memo, 1/28/2011, Ex. 79 at -56.)

**RESPONSE:** Meritor disputes SISAMEX's characterization of this statement to the extent SISAMEX/Quimmco suggest that this analysis was conducted for any purpose other than

whether Meritor must consolidate its interest in SISAMEX under FASB Statement of Financial

Accounting Standard 167. Meritor objects to the relevance of this determination, as Quimmco's

auditors similarly found that it did not have sufficient control to consolidate the joint venture.

(MER Ex. 35, 2/16/16 Lambreton Dep. at 313:14-314:4.) Meritor incorporates its evidence in

response to Paragraph 37(c) above.

> 38.    After the execution of the Agreements, the parties contemplated a transition
> period during which SISAMEX would purchase Core Components from Meritor
> while SISAMEX built its capacity to manufacture those Core Components itself.
> (Ex. 80 (noting timeline for "Manufacturing Integration"); Ex. 68, at -12 ("[I]t is
> expected the first year of this business plan will be a transition period …."); Ex.
> 14 at 95:24-96:8 ("[T]hese transition times took time."); Ex. 52 at 56:14-22; Ex.
> 40 at 259:22-260:21; Ex. 81 (SISAMEX will be "making all housings, carriers,
> shafts, etc."); Ex. 6 at 248:13-249:8 (agreeing that his contemporaneous email
> expressed "with absolutely no ambiguity" that SISAMEX "has the right to
> manufacture these products as soon as they can tool and integrate."); Ex. 37 at -05
> (stating that the new joint venture would "purchase content from ARM starting at
> 50% and declining to 15% of 'transfer product'"); Ex. 6 at 205:6-208:21
> (confirming that the percentage of content purchased from Meritor would
> decrease as SISAMEX integrated the manufacture and assembly of axles sold in
> Mexico).)

**RESPONSE:** Meritor disputes this statement to the extent SISAMEX/Quimmco suggest that the

parties "contemplated" that SISAMEX would manufacture all Core Components itself. The

parties agreed that SISAMEX would manufacture the components of 160 rear axle and certain

other components and act as the delivery point/shipping point for all products sold to OEMs in

Mexico. The parties agreed that they would discuss and agree on any further components or

products that SISAMEX would make on a case by case basis. (*See* SMX Ex. 16, 9/5/00

Meritor/Quimmco MOU, SMX1607323-36 at -25 ("Additional roles will be added based on

economic 'paybacks' as agreed by the Board of Directors on a case by case basis.").) Meritor

incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

> 39a.    During this period, Meritor acknowledged that it "must commit and work
> aggressively to convert over" its manufacturing business for the Mexican OEM
> market to SISAMEX. (Ex. 82; *see also* Ex. 83 (noting that Meritor was "in the

process of transferring production for Mexican OE's from Frankfort to Guadalajara," which was "necessitated by the JV agreement"); Ex. 74 at -45 (noting that Meritor would "bring the ArvinMeritor technology to the Mexican market with an installed manufacturing base in Monterrey" and that future plans included "conclud[ing] the integration with the JV, transfer[ing] business from US into JV and expand[ing] presence in Mexico").)

**RESPONSE:** Undisputed.

39b.  To facilitate the transition process, Mr. Burgin arranged for Meritor to provide to SISAMEX the technical specifications for "all" the products and components that Meritor sold to OEMs in Mexico. (Ex. 81 (SISAMEX requires specifications for all Meritor Products sold in Mexico because "Sistemas will get to make these products as soon as they can tool and integrate."); Ex. 6 at 248:13-249:8 (agreeing that his contemporaneous email expressed "with absolutely no ambiguity" that SISAMEX "has the right to manufacture these products as soon as they can tool and integrate.").

**RESPONSE:** Meritor does not dispute the quotations cited in SISAMEX Exhibit 81 but disputes that SISAMEX Exhibit 81 reflects Meritor's intent that SISAMEX manufacture "all" products and components sold to OEMs in Mexico, as opposed to those products and components in a Business Plan approved by the SISAMEX Board of Directors. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

40.  Meritor also recognized that the decision on which products SISAMEX should manufacture was to be made by SISAMEX. (Ex. 84 at -81 ("[T]he JV ultimately decides what products will be localized in Mexico and the associated timing.").) Mr. Burgin wrote in an email that "I assume the Newco decision to make axles to sell to us in Mexico will consider assembling carriers [Core Components] in Mexico." (Ex. 85 at -14.)

**RESPONSE:** Meritor disputes that the decision of which products or components SISAMEX manufactures was to be made by the Director General, as opposed to the SISAMEX Board of Directors. Meritor disputes that the parties agreed that the joint venture would manufacture all parts of all products sold to OEMs in Mexico. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above. Meritor agrees that the joint venture, through the Board of Directors, decides what products and components SISAMEX makes itself and

which products and components it imports, assembles, and/or acts as the delivery point/shipping

point for products sold to OEMs in Mexico.

41a.　　In 2003, when SISAMEX considered insourcing the 145 axle housings, a Core
Component, Mr. Burgin told Mr. Arnold that SISAMEX's Director General "is
doing the analysis now to determine savings to Sisamex if he manufactures
instead of buying." (Ex. 86 at -30.) Since SISAMEX was purchasing the 145
housings from Meritor pursuant to Supply Agreement C and Meritor was required
to purchase certain of its requirements for 160 axle housings from SISAMEX
pursuant to Supply Agreement B, Mr. Burgin acknowledged that Meritor faces
the risk of "excess capacity" at its factory if SISAMEX "internally tool[s] 145 and
still push[es] supply agreement B on 160 housings at us." (*Id.*)

**RESPONSE:** Meritor does not dispute that it faced the risk of excess capacity in the short term

to medium term if SISAMEX internally tooled for the 145 housings. Meritor does not dispute

that SISAMEX's Director General considered insourcing the 145 axle housing. SISAMEX

Exhibit 86 further states that if the Director General needed any capacity to manufacture 145

axle housings, it would need to be approved by the joint venture Board and that "capex would be

difficult to obtain even through the JV. (Trying to set stage.)." (SMX Ex. 86, 6/11/03 Burgin

email to Arnold at MER0731530.)

41b.　　Later that year, Mr. Burgin asked SISAMEX's Director General to "[c]larify [his]
plans to integrate 145's and when." (Ex. 87 at -02.) Mr. Burgin also specified that
"we have obligations to move the mfg. of products sold and mfg. into trailer in
Mexico to our JV in Guadalajara." (Ex. 88 at -96.) He noted that SISAMEX "will
want to integrate mfg. ASAP to get their full value." (Ex. 83 at -21.)

**RESPONSE:** Meritor does not dispute that SISAMEX Exhibits 83, 87, and 88 include the cited

quotations. Meritor disputes that these documents relate to the same topic and objects that

SISAMEX mischaracterizes SISAMEX Exhibit 87. First, SISAMEX Exhibit 83, dated October

15, 2003, discusses the transfer of production from one Meritor facility to Guadalajara but does

not suggest that the SISAMEX Director General can unilaterally decide to insource

manufacturing of products or components without the approval of or over the SISAMEX Board

of Directors' objection. (SMX Ex. 83, 10/15/03 Burgin email at MER0732121.) Second,

SISAMEX Exhibit 88, like SISAMEX Exhibit 83, is an email from Burgin discussing the transfer of production to Guadalajara but nowhere suggests that the SISAMEX Director General can unilaterally decide to insource manufacturing of products or components without the approval of or over the objection of the SISAMEX Board of Directors. (SMX Ex. 88, 9/4/03 Burgin email at MER0731996-97.) Finally, the quote in SISAMEX Exhibit 87 specifically refers to 145 axle housings, which the parties agreed SISAMEX would manufacture, not the entire 145 axle or other components thereof. (SMX Ex. 87, 12/22/03 Burgin email at SMX000941202-03.)

Documents from 2003 show that Meritor and SISAMEX agreed that SISAMEX should evaluate manufacturing the 145 housings. In an email dated July 10, 2003, Burgin notes that the parties had agreed to consider a 145/160 housing change. (MER Ex. 37 at MER0739007.) On August 27, 2003, Meritor's engineering report noted that "Sisamex will develop 145 housing series." (MER Ex. 38 at MER1389898-900 at -898.)

42a.   Based on its analysis of demand and profit incentives, SISAMEX concentrated first on insourcing the 160 axle and its components. (Ex. 14 at 123:11-15 (noting that the "market usage this product was higher than other products"); Ex. 89 at 105:19-24 (stating that it "was a natural choice" to start with the 160 axle "because the market … was using 160 mainly"); Ex. 3 at 236:18-237:8.)

**RESPONSE:** Meritor does not dispute that SISAMEX manufactures components of the 160 axle pursuant to a Business Plan approved by the Board of Directors. (*See* SMX Ex. 90, 7/18/03 Report for the Board of Directors, SMX000904661 at slide 34 ("Core Components Progress: 160 Rear Axle Integration").) Meritor disputes that the reason SISAMEX concentrated first on insourcing the 160 axle was "based on its analysis of demand and profit incentives." Rather, SISAMEX focused on manufacturing the components of the 160 axle because the parties agreed on this approach and Meritor determined that SISAMEX would become a "center of excellence" focused on the 160 axle. (SMX Ex. 6, 1/12/16 Burgin Dep. at 375:15-20 ("there was a clear plan to make Sisamex the global producer, if you will, of the 160 family, and that's why Supply

Agreement B included 75 percent of gearing, 90 percent of diff cases and so forth in the 160 family. It was to be the center of excellence."); SMX Ex. 16, 9/5/00 Meritor-Quimmco MOU § 2(d), SMX1607323-36 at -25 ("Subject to the completion of the Business Plan referenced in section 10, it is currently envisioned that **NewCo's initial role will be to manufacture the -16x family of components**. Additional roles will be added based on economic 'paybacks' as agreed by the Board of Directors on a case by case basis.") (emphasis added).) Apart from the 160 axle series, Meritor and Quimmco agreed that the joint venture would manufacture and act as the delivery point/shipping point of all other products until the SISAMEX Board of Directors agreed to a change in the Business Plan. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20 above.

> 42b.    SISAMEX initially purchased Core Components of the 160 axle under Supply Agreement C from Meritor and assembled them into a full axle that it then sold to Meritor under Supply Agreement A. (See Ex. 90 at Slide 15.) SISAMEX thereafter—with technological assistance from Meritor—began manufacturing the Core Components of the 160 axle, which it also then assembled together into a complete axle at SISAMEX. (Ex. 14 at 138:12-140:16.) By 2004, SISAMEX had integrated most of the Core Components of the 160 axle. (*Id.* at 138:14-17 ("After the conclusion of the agreements, and after the transition period, SISAMEX manufactured most of these components.").)

**RESPONSE:** Meritor does not dispute that SISAMEX manufactured components of the 160 axle pursuant to a Board-approved Business Plan. (SMX Ex. 90, 7/18/03 Report for the Board of Directors, SMX000904661 at slide 34.)

> 43.    At the time SISAMEX insourced the 160 axle, Meritor understood that SISAMEX also had the right to insource other Meritor Products. (*See* Ex. 14 at 106:12-20 (agreeing that the right to manufacture Meritor products includes the right to manufacture components thereof); Ex. 52 at 43:17-44:23 (same); Ex. 3 at 111:9-113:1 (recalling conversations with Mr. Arnold discussing that SISAMEX would insource components of "every product that is [listed in the exhibits to Supply Agreement A] sooner or later"), 231:8-232:22 (Quimmco and Meritor had "many discussions" during the negotiations period agreeing that SISAMEX would manufacture components of Meritor products); Ex. 89 at 110:23-112:1; *see also* Ex. 81 (SISAMEX will be "making all housings, carriers, shafts, etc." and

requires specifications for all Meritor Products sold in Mexico because "Sisamex will get to make these products as soon as they can tool and integrate").)

**RESPONSE:** As discussed above, Meritor disputes that the parties intended for the joint venture to manufacture every component of every product. (*See* SMX Ex. 14, Arnold Dep. at 78:15-79:18 (noting that § 2.1(b) of the Shareholders Agreement "doesn't have anything to do with the manufacturing content of the product.").) Meritor further disputes that SISAMEX's Director General has the right to unilaterally insource any Meritor Products or components without a Business Plan approved by the Board of Directors. Meritor disputes that SISAMEX's Director General has the right to unilaterally insource any Meritor Products without the approval of or over the objection of the Board of Directors and Shareholders. Meritor does not dispute the quotations cited in SISAMEX Exhibit 81, but disputes that SISAMEX Exhibit 81 reflects Meritor's intent that SISAMEX manufacture "all" products and components sold to OEMs in Mexico as opposed to manufacturing some products and components and acting as the shipping point/delivery point for all products sold to OEMs in Mexico. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

44. Shortly thereafter, Mr. Burgin, who was overseeing the implementation of the Agreements but was reassigned, prepared a transition presentation for a new liaison that "[told] the whole story" regarding the SISAMEX relationship. (Ex. 60 at -53.) The presentation graphically depicts the division of responsibilities for the supply of Meritor Products to OEMs in Mexico, with SISAMEX responsible for the "manufacturing" and Meritor responsible for "sales, marketing, engineering and service." (*Id.* at -63.) The presentation goes on to clarify that, under Supply Agreement A, "Sisamex has 'rights' to 100% of market for mfg. and selling to ARM for Drive Axles, Steer Axles, Brakes, Drivelines." (*Id.* at -71.)

**RESPONSE:** Meritor does not dispute that SISAMEX Exhibit 60 includes the quoted language but disputes that the presentation supports SISAMEX's position that it has the exclusive right to make all Meritor Products or components thereof or that SISAMEX's Director General can insource any component of a Meritor Product without the approval of or over the objection of

84

SISAMEX's Board of Directors or Shareholders. SISAMEX Exhibit 60 actually includes a

number of assertions consistent with Meritor's position on the interpretation of the agreements.

(*See* SMX Ex. 60, 10/13/06 Meritor CVS Mexico Background presentation, MER0724653-82

at -65 ("BOD Controls Key Activity (e.g. AOP, CapEx)"); *id.* at -70 ("Sisamex has moved to

Tier 2," "Sisamex is ARM Exclusive Shipping Point for OEM Deliveries in Mexico for Truck

and Trailer axles/brakes.").) Meritor also incorporates its evidence in response to Paragraphs 8,

9, 11, 12, 13, 14, 16, 20, and 42 above.

> 45a.　In 2003, SISAMEX also began the process of manufacturing Core Components of
> the 145 axle, another Meritor Product. (Ex. 91 at -55 (showing financial
> assumption that SISAMEX would be manufacturing 145 housing).) SISAMEX
> first focused on manufacturing 145 housings, a Core Component of the 145 axle.
> (*Id.*)

**RESPONSE:** Meritor does not dispute that SISAMEX considered insourcing the 145 axle

housing, discussed the proposal with Meritor employees, included it in a Business Plan for the

Board of Directors to review, and that the parties agreed that SISAMEX would investigate the

matter. (SMX Ex. 87, 12/22/03 Burgin email, SMX000941202-03 at -02 ("Housings .… Clarify

your plans to integrate 145's and when."); MER Ex. 37, 7/10/03 Burgin email at MER0739007

(noting that the parties had agreed on 145/160 housings and were preparing a "letter of

understanding"); MER Ex. 38, 8/27/03 Meritor Engineering Monthly Report, MER1389898-900

at -898 ("SISAMEX will develop 145 housing series."); SMX Ex. 90, 7/18/03 Report for the

Board of Directors, SMX000904661 at slide 15 (noting a financial assumption that SISAMEX

will make the 145 axle housing).)

> 45b.　Despite concern that SISAMEX's insourcing of 145 housings would leave
> Meritor with excess capacity (*see* ¶ 41, *supra*), Meritor assisted SISAMEX with
> its insourcing. (Ex. 92 at -34 (stating SISAMEX has "taken on the manufacturing
> for all of the 9.5 mm 145 Mexican housing requirements … they will need our
> help with providing 9.5 – 145 to them"); *see also* Ex. 93 at -05 ("[T]here are some
> components (finished product actually) we ship to Sisamex and we ARM keep all
> the profit. This is for some finished brakes, some front axles, and some 145

> Components such as carriers, housings. I set this up on a transfer price so we would keep 100% of profit in ARM unless SMX mfgd. Which then they would get profit per supply agreement A.").)

**RESPONSE:** Meritor does not dispute that SISAMEX began manufacturing 145 axle housings pursuant to an agreement between the parties and a Business Plan approved by the SISAMEX Board of Directors. (MER Ex. 35, 2/16/16 Lambreton Dep. at 206:9-22.)

    46a.    In or about July 2003, SISAMEX was considering manufacturing a particular type of front axle categorized as a Meritor Product for sale to General Motors México. (Ex. 94 at -500, -01.)

**RESPONSE:** Meritor disputes that SISAMEX Exhibit 94 refers to a front axle, as the email specifically discusses brakes. (SMX Ex. 94, 8/11/03 Breer email to Burgin, MER0739499-501 at -500 ("Sisamex has contacted Jim Smythe regarding the move of GM Mexico brakes").) Meritor does not dispute that Meritor's sales team was evaluating the possibility of moving the shipping point/delivery point for GM products to SISAMEX. As stated above, the intent of the parties was that the joint venture would act as the shipping point/delivery point for all products sold to OEMs in Mexico. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

    46b.    Meritor determined that SISAMEX's manufacturing would not be in Meritor's financial interest, but recognized that SISAMEX had the right to manufacture the products. (*See* Ex. 95 at -62 (noting that the "[u]ltimate problem is that it is contractual and we must do analysis and keep moving").)

**RESPONSE:** Meritor disputes that it "recognized that Sisamex had the right to manufacture the products." Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above. SISAMEX Exhibit 95, which SISAMEX cites to support its assertion, refers to "moving" the shipping point, not the manufacture of the product or its components, and actually states that it was not in either Meritor's or SISAMEX's financial interest to make this GM front

axle product. (SMX Ex. 95, 7/15/03 Smith email to Walker, MER0738962-63 at -62 ("This

move seems to have much more downside than upside for everyone involved.").)

> 46c.    Mr. Burgin persuaded SISAMEX's Director General not to manufacture the front
> axle, and acknowledged that Meritor would need SISAMEX's "approval to not
> integrate" the product. (Ex. 96 at -29.)

**RESPONSE:** Meritor does not dispute that SISAMEX Exhibit 96 includes the quoted language.

Meritor disputes that the parties' discussions about SISAMEX not acting as the shipping point or

assembly point for certain products that the parties previously thought SISAMEX would act as

the shipping point or assembly point means the Director General can manufacture components of

products without SISAMEX Board approval. (SMX Ex. 6, 1/12/16 Burgin Dep. at 71:14-20 ("we

all agreed -- Armando and I and everyone -- it didn't make sense to move that capital for that

[GM front axle] product. So there was always to be -- that product, there may be some heavy

axles, like the 380s and so forth, that they were always going to buy from Meritor.").) Meritor

incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

> 46d.    In January 2006, SISAMEX learned that Meritor was not purchasing the front
> axles from SISAMEX and was instead shipping them directly to General Motors
> México in violation of Supply Agreement A. (Ex. 97; Ex. 98.) ███████████
> ████████████████████████████ (Ex. 99.)

**RESPONSE:** █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████. (SMX Ex. 99, 4/20/06 GM

migration agreement at QMC000067912-15 at -13 (noting the parties "have not reached a

satisfactory agreement with the customer in order to finish its migration and shipping point

change to Sisamex"); MER Ex. 39, 2/6/06 Burgin email to Mirandez at MER0719963 ("Since

the beginning of the JV we have attempted to change the shipping point with GM and it looks

doubtful it would materialize with a beneficial commercial model.").)

46e.    Meritor understood that SISAMEX's agreement to allow Meritor to manufacture and ship the front axle to General Motors México was a "workaround" and an "exception" to SISAMEX's rights under the Shareholders Agreement and Supply Agreement A. (Ex. 6 at 73:6-7; 73:20-74:15.)

**RESPONSE:** Meritor agrees that the parties entered the agreement, reflected in SISAMEX

Exhibit 99, in order to address a customer's refusal to change the shipping point for products it

purchased from Meritor. (SMX Ex. 99, 4/20/06 GM migration agreement at

QMC000067912-15.) Meritor disputes that SISAMEX's "rights" under the agreements included

the right to manufacture any components or products without approval by the SISAMEX Board

of Directors. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16,

20, and 42 above.

47.    In 2004, Meritor realized that it had been distributing certain trailer axles, brakes, and components that constituted Meritor Products to Mexican OEMs through a Mexico-based company known as Trasa. (Ex. 100 at -10 ("Sudisa [SISAMEX's subsidiary] is entitled to make the product …").) Since Meritor did not use SISAMEX as a shipping point or importer of these products, Meritor concluded that it was "effectively in breach" of the contracts granting SISAMEX exclusive rights. (*Id.*)

**RESPONSE:** Meritor does not dispute the quoted statements but objects that it is irrelevant to

any of the issues in dispute between the parties. Meritor agrees that SISAMEX has the right to

act as the shipping point/delivery point of all products sold to OEMs in Mexico.

48a.    In 2009, SISAMEX planned that its subsidiary Sudisa would begin manufacturing a form of suspensions known as Trailing Arm Suspensions, or RFS suspensions. (Ex. 101 at -74.)

**RESPONSE:** Undisputed.

48b.    Meritor refused to provide SISAMEX technical assistance free of charge for this product on the ground Supply Agreement A initially excluded it from the definition of Meritor Products. (Ex. 36 at -72, Sch. 2.) The parties agreed to add these suspensions to the definition of "Meritor Products" in the Second Amendment to Supply Agreement A. (Ex. 102.)

**RESPONSE:** Meritor agrees that it refused to support SISAMEX's manufacture of RFS suspensions because RFS suspensions were not Meritor Products under Supply Agreement A. (SMX Ex. 36, 1/14/03 Supply Agr. A, MER0006430-90 at -72, Sch. 2; MER Ex. 40, 7/22/04 Carvalho email to Barrera at MER0746703-04 at -03 ("As you know this product is outside the scope of the Sisamex JV agreement.").) Because RFS suspensions were not Meritor Products and because SISAMEX did not have an approved Business Plan that authorized SISAMEX to make these RFS suspensions, Meritor refused to provide product design drawings or other technical assistance to SISAMEX. Meritor agrees that the parties agreed to add the suspensions to Supply Agreement A several years later. (SMX Ex. 102, 9/22/09 Second Am. to Supply Agr. A at MER1480046-59.)

> 48c.   But in exchange for adding the suspensions to Supply Agreement A, Meritor required that SISAMEX agree to pay Meritor for the technical assistance related to that product only. (*Id.*)

**RESPONSE:** Undisputed.

> 48d.   Meritor told SISAMEX that this fee was appropriate because Meritor was under no obligation to support the RFS suspensions since the product was not previously included in Supply Agreement A. (Ex. 101 at -72.) (stating that the fee was "to support the technology, legal support, troy testing, etc. that are not part of ARM's responsibility as this is not in the scope of the JV or in supply agreement A"); Ex. 6 at 264:24-265:14 (agreeing that "the only reason" SISAMEX had to pay an incremental charge for technical assistance was "because the product was outside the scope of the joint venture").)

**RESPONSE:** Meritor disputes that it has any obligation to provide technical assistance. Meritor agrees that it provides product engineering support in the form of product designs and Bills of Materials for those components SISAMEX manufactures pursuant to a Board-approved Business Plan. Meritor incorporates its evidence in response to Paragraphs 11, 20, 21, and 23 above.

> 48e.   Meritor recognized that including RFS suspensions in the definition of Meritor Products permitted SISAMEX to manufacture the RFS suspensions and their successor products, MTA suspensions. (Ex. 103 (objecting to the amendment to add RFS suspensions to Supply Agreement A because he would "hate to give up

the possibility of ever bringing internal in MX or having to give them the MTA because we put RFS into [Supply Agreement] A").)

**RESPONSE:** Meritor does not dispute that SISAMEX Exhibit 103 contains the quoted language. Meritor disputes that adding RFS suspensions to Supply Agreement A as a Meritor Product permits SISAMEX to manufacture all components of the product over the objection of the SISAMEX Board of Directors and without an approved Business Plan. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

    49a.    In September 2009, SISAMEX informed Meritor it wanted to begin manufacturing automatic slack adjusters, a brake component. (Ex. 104 at -37; Ex. 105 at 291:1-8.)

**RESPONSE:** Undisputed.

    49b.    Meritor responded that SISAMEX was not entitled to manufacture the slack adjusters on the sole ground that they were not considered Meritor Products under Supply Agreement A, and, therefore, not within the purview of SISAMEX's exclusive manufacturing rights. (Ex. 106 (informing SISAMEX that "Meritor proprietary slack adjusters are NOT Meritor Products as defined in our agreements and are not eligible for in-sourcing by SISAMEX nor is the intellectual property for ArvinMeritor slack adjusters in any way accessible by SISAMEX"); *see also* Ex. 105 at 294:16-296:4, 296:22-297:3; Ex. 107 at -02 (informing SISAMEX that "ArvinMeritor slack adjusters are not a Meritor Product as defined in Schedule 2 of Supply Agreement A, and therefore SISAMEX is not entitled to access to the intellectual property for that product. Accordingly you can not [sic] 'insource'."); Ex. 106.)

**RESPONSE:** Meritor disputes that the "sole" ground for refusing to allow SISAMEX to manufacture the slack adjuster was that it was not a Meritor Product. SISAMEX Exhibit 106 is an October 14, 2009 letter from Meritor to SISAMEX informing the Director General that Meritor is adjusting the price for sales of that component. (SMX Ex. 106 at MER1104411.) The letter does not attempt to provide a comprehensive list of reasons, but rather points out in a concluding paragraph that Meritor "confirm[s] our earlier statements, we would emphasize" that the slack adjusters are not Meritor Products. (*Id.*) Furthermore, even if slack adjusters are Meritor Products under Supply Agreement A, SISAMEX's Director General is not authorized to

begin manufacturing the components thereof (as opposed to acting as the shipping point/delivery

point for the final product) unless they are included in a Business Plan approved by the

SISAMEX Board of Directors. Meritor incorporates its evidence in response to Paragraphs 8, 9,

11, 12, 13, 14, 16, 20, and 42 above.

> 50a.    In 2006 and 2007, revenue pressure at Meritor led to a comprehensive review of
> Meritor's global business by Carsten Reinhardt, the new President of Meritor's
> Commercial Vehicle Systems. (*See* Ex. 6 at 126:5-131:15.) One initiative that
> Meritor implemented was to build a plant in Cienega de Flores, Mexico to
> manufacture products for sale to OEMs located in the U.S. (Ex.108 (beginning
> discussions of a plant in Mexico).)

**RESPONSE:** Undisputed.

> 50b.    Meritor agreed in the Shareholders Agreement not to "establish a facility in
> Mexico that shall manufacture or assemble Meritor Products … or Meritor
> Components for sale by [Meritor] or any [Meritor] Affiliate to any OEM
> Customer in Mexico …." (Ex. 1 at § 5(b).)

**RESPONSE:** Undisputed.

> 50c.    Consistent with the plain reading of that provision, Meritor acknowledged for
> years that the plant would only manufacture products for export outside of
> Mexico and would not be able to sell its products to OEM customers in Mexico
> because SISAMEX had the exclusive right to manufacture and sell products in
> Mexico. (Ex. 108 ("If brakes are for Mexican OEM's, then Sisamex has right to
> mfg. and sell to ARMEX."); Ex. 109 at 94:18-23; *see also* Ex. 110 ("No negative
> impact to SISAMEX JV agreement [because t]his Mexico facility will become an
> ARM 'wholly owned' facility supplying the USA and Canadian markets."); Ex.
> 111 at -97 ("[W]e have complete control of Mexican market from a commercial
> standpoint, we just have to manufacture in the JV.").)

**RESPONSE:** Meritor disputes that SISAMEX's "exclusive right" extends beyond acting as the

shipping point/delivery point for all products sold to OEMs in Mexico. Meritor incorporates its

evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

Furthermore, SISAMEX/Quimmco misquote SISAMEX Exhibit 110, which does not say

"No negative impact to Sisamex JV agreement [because t]his Mexico facility will become an

ARM 'wholly owned' facility supplying the USA and Canadian markets." (SMX Ex. 110,

4/20/07 Meritor internal letter, MCKINSEY_SISAMEX-0001425-28 at -28.) The quotes

SISAMEX/Quimmco cite are from two completely separate paragraphs of the memo and are not

related in any way. The actual quotes are "No negative impact to Sisamex JV agreement," and

then later: "This Mexico facility will become an ARM 'wholly owned' facility supplying the

USA and Canadian markets." (*Id.*)

> 51.    Quimmco grew concerned that Meritor's new plant might compete with
> SISAMEX in violation of the non-compete provision in the Shareholders
> Agreement. By letter dated January 30, 2008, Quimmco requested that Meritor
> acknowledge SISAMEX's exclusive manufacturing rights, stating that "[w]hen
> we have raised this matter with representatives of MHVS in the past we have been
> assured that 100% of the production from the Monterrey Facility would be sold
> outside of Mexico." (Ex.112.) Meritor's counsel did not refute these prior
> assurances in response, but rather affirmed to Quimmco that Meritor's new plant
> in Mexico would not violate the non-compete provision of the Shareholders
> Agreement. (Ex. 113.)

**RESPONSE:** Undisputed except as to the phrase "Meritor's counsel did not refute these prior

assurances in response." Meritor counsel did not acquiesce to any Quimmco assertion, but rather

confirmed that Meritor's new plant would not violate the non-compete provisions of the

Shareholders Agreement. Meritor objects that this Paragraph's assertions are irrelevant to any of

the issues in dispute between the parties.

> 52.    Meritor opened a manufacturing plant in Cienega de Flores, Mexico in 2008.
> (Ex. 114 at Slides 11-13.) Meritor was clear, both internally and with its OEM
> customers, that SISAMEX retained the exclusive right to manufacture Meritor
> Products for sale to OEMs in Mexico. For example, when a Meritor employee
> inquired whether Meritor could "produce all required assemblies in the new future
> plant in Mexico and ship products from there to the ITE Escobodo plant [an OEM
> plant in Mexico] as well as all U.S. plants," Mr. Burgin responded that the
> "[s]imple answer is no to escobodoN [sic] sisamex gets it." (Ex. 115.)

**RESPONSE:** Meritor disputes that SISAMEX's "exclusive right" extends beyond acting as the

shipping point/delivery point for all products sold to OEMs in Mexico. Meritor incorporates its

evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

Meritor disputes that SISAMEX Exhibits 114 or 115 support SISAMEX's position that it has the exclusive right to manufacture all products and components thereof, as both exhibits confirm that SISAMEX "gets" the sales and all products must "come out" of SISAMEX as the exclusive shipping point for those products, not that SISAMEX has the right to manufacture all products and all components of those products without the approval of or over the objection of SISAMEX's Board of Directors or Shareholders. (SMX Ex. 114, 4/23/08 Valdes email to Freightliner at SMX001789723-24 at -23 ("I wanted to first thank you again for the opportunity to show how we position our supply and capacity readiness your Saltillo facility to be supplied out of Sisamex."); SMX Ex. 115, 2/29/08 Burgin email to Sanko at MER0948093 (noting that if Meritor's facility manufactures drivelines for an OEM in Mexico, those drivelines must be shipped through SISAMEX.).)

53a.    In May 2008, Meritor and SISAMEX met with Freightliner, an OEM, to discuss supply of parts and components to Freightliner's new plant in Saltillo, Mexico. (Ex. 75.)

**RESPONSE:** Undisputed.

53b.    During this meeting, in response to Freightliner's inquiry whether Freightliner's plant in Saltillo would be supplied by Meritor's new plant in Monterrey, Meritor responded that its Monterrey plant "was centered on components and … front axles for exports out of Mexico" and that "all axles, brakes and drivelines required [by Freightliner's Mexican plants] will come out of Sisamex and front axles required in [North America] will come out of the [Meritor's new facility]." (*Id.*; *see also* Ex. 114 at Slide 6 ("SISAMEX, will be focused on the manufacturing of Meritor products."); Ex. 116 at -01 ("[W]e are told that SISAMEX has the right under the current JV agreement to make all products that go under all trucks built in Mexico (even if the trucks are exported back to the US) so we are not planning on supplying FTL Saltillo anything directly out of the new plant.").)

**RESPONSE:** Meritor does not dispute that the quoted language appears in the cited exhibits. Meritor disputes that the statement in SISAMEX Exhibit 116 that SISAMEX "has the right under the JV agreement to make all products that go under all trucks built in Mexico" means that

SISAMEX has the right to make all components of all Meritor Products without a Board-approved Business Plan and capital expenditures. Meritor incorporates it evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, and 20.

> 53c.  Even as late as 2010, Meritor continued to acknowledge that SISAMEX had the right to supply OEMs in Mexico. By email dated March 6, 2010, Meritor executive Joseph Plomin stated that Meritor's "chance to participate in Mexico migration via [its Mexican plant] is limited, at this point this is an export factory, w/out any rights to sell in local market. We are selling direct to SMX but they have right to insource that supply at any time." (Ex. 117 at -45.)

**RESPONSE:** Meritor does not dispute that SISAMEX has the right to act as the exclusive shipping point for all sales to OEMs in Mexico or that SISAMEX can insource and manufacture any products or components that are in a Business Plan authorized by the SISAMEX Board of Directors or Shareholders. Meritor disputes that it "acknowledged" that the Director General has the unilateral right to decide to start making components of products. (SMX Ex. 105, Plomin Dep. at 30:22-31:20 ("At the time we were having a lengthy discussion with SISAMEX about how we would optimize the manufacturing footprint, and I think it was clear that we were discussing solutions that optimize it, but never defined the unilateral right for SISAMEX to make products on their own decision.").) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

> 53d.  And by email dated May 11, 2010, Ken Hogan referred to a visit by a Chinese OEM, stating that "if they are touring Mexico with the thought of entering the country some day, then we would be able to supply them but only through Sisamex." (Ex. 76 at -29.)

**RESPONSE:** Meritor does not dispute that SISAMEX has the right to act as the exclusive shipping point for all sales to OEMs in Mexico, such that any Meritor sales to a Chinese OEM in Mexico would have to go through SISAMEX. SISAMEX Exhibit 76 is a May 14, 2010 email from Ken Hogan about a potential Chinese supplier, stating that Meritor would be required to supply the Chinese supplier "only through Sisamex," which is consistent with the parties' intent

that SISAMEX would act as the exclusive shipping point for all products sold to OEMs in

Mexico. (SMX Ex. 76, MER0876527-29 at -29.) SISAMEX Exhibit 76 is silent on what

components SISAMEX would manufacture or whether the SISAMEX Board of Directors

controls which components SISAMEX makes. Meritor incorporates its evidence in response to

Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

> 54.     In the 2007 to 2009 time frame, Meritor employees repeatedly acknowledged
> SISAMEX's right to manufacture Core Components, including Core Components
> of the 14_ series of axles. (*See, e.g.*, Ex. 119 at -36 (stating that there was "[n]o
> contractual limitation to SMX producing 145's"); Ex. 120 at -07 ("SMX buys
> all -14_gears from ARM Greenfield … Not contractually required today but
> desired"); Ex. 121 at -97 ("There is risk that Sisamex will compete with ARM by:
> Industrializing components/products currently made in ARM facilities"); Ex. 118
> (noting that SISAMEX could "fully integrate[] all incremental product demand,"
> and the quantifying impact "should SMX fully integrate the -14_"); Ex. 123 at
> Slide 2 (acknowledging that the Agreements "allow[] Sisamex to produce [145
> front carrier assemblies] for Mexican production"); Ex. 41 at -80 (analysis of
> Supply Agreement C acknowledging that while Meritor "sells significant value to
> Sisamex in 145 carriers and some housings," SISAMEX "could chose [*sic*] to
> localize this and if they did so we would lose the sales"; acknowledging that
> Meritor would lose these sales if SISAMEX chose to manufacture these
> components); Ex. 105 at 107:9-20 (Meritor's financial calculations assumed
> SISAMEX would insource 14_); Ex. 122 at 109:20-114:1 (Meritor's calculations
> concerning re-sourcing of the 14_ series axle contemplated that SISAMEX would
> manufacture itself, and not buy any components from Meritor).)

**RESPONSE:** Meritor does not dispute that the cited documents contain the quotations. Meritor

disputes that any of these documents and citations support SISAMEX's position that SISAMEX

has the exclusive right to manufacture all components of Meritor Products sold to OEMs in

Mexico. Meritor further disputes that the SISAMEX Director General can unilaterally decide to

insource or make any products and components without the approval of or over the objection of

SISAMEX's Board of Directors or Shareholders. Meritor does not dispute that SISAMEX can

manufacture any product or component in a Business Plan approved by the SISAMEX Board of

Directors or Shareholders. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11,

12, 13, 14, 16, 20, and 42 above.

55.     In 2007, Meritor recognized that it faced the risk of significant losses from potential increased OEM migration—and in particular, Freightliner Corporation's relocation—to Mexico, which would entitle SISAMEX to manufacture the 14_ series axles and their Core Components that Meritor was manufacturing in its plants in United States and Canada. (Ex. 124 at -55 ($13.2 million loss from possible migration); Ex. 109 at 82:12-84:2; *see also* Ex. 125 at -83 (citing a loss of "~420+ per truck moved to Mexico" and "~$11M+/yr impact"); *See generally* Ex. 126 at -97 ("Sales to the customer in MEXICO are owned/controlled by Sisamex. Effectively, that customer moving to mexico, has caused us to lose the sales as if it were lost to a competitor.").) Meritor also concluded that Freightliner's move would nearly double SISAMEX's value, from $102.5 million to $196.2 million. (Ex. 124 at -57.)

**RESPONSE:** Meritor disputes that the migration of OEMs to Mexico would "entitle Sisamex to manufacture the 14_ series axles and their Core Components that Meritor was manufacturing in its plants in United States and Canada." Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above. As stated in SISAMEX Exhibit 126, "sales to the customer in MEXICO are owned/controlled by Sisamex" because it acts as the final shipping point/delivery point for those sales and is entitled to a portion of the sales revenue. (SMX Ex. 126, 4/11/07 Kelly email to Parshad at MER0659897-98.) Any product or component manufacturing must be in a Business Plan approved by the SISAMEX Board of Directors or Shareholders. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

56a.    In 2009, Meritor's concerns were realized when Daimler Truck North America ("DNTA") announced that it was shutting down plants in North America of its Freightliner subsidiary. (Ex. 192.)

**RESPONSE:** Meritor does not dispute that DTNA announced it was shutting down certain U.S. plants in 2009.

56b.    Meritor forecasted a $10 million annual adverse impact on earnings "assuming SMX fully integrates the manufacturing content of all products (e.g., -14_ platforms)." (Ex. 127 at -62 (EBITDA impact "assuming SMX fully integrates the manufacturing content of all products (e.g. -14_ platforms)".) *See also* Ex. 118 (calculation "assuming SMX fully integrates all incremental product demand (NDF, drive axles all families, driveline and brake)"); Ex. 128 at -18 ("If SMX

fully integrated then we would have an incremental risk."); Ex. 129 at -15 ("Given production increase is primarily for export to US and Canada the product mix will substantially change to -14_ product platforms"); Ex. 130 at -308 ("*This could hurt a lot* …"); Ex. 131 at -500 ("Not sure where you left off on the actual Sisamex Agreement discussion – But we really need to watch this for FY10 – Believe as more customer plants are built down south + the volume that is moved in FY 10 to Mexico from NA customers to reduce costs at existing plants (Running them at max capacity) – Our impact from Sisamex plus from lost sales to Sisamex needs to be addressed – Cannot loose [*sic*] sight of this.").)

**RESPONSE:** Meritor does not dispute that the cited documents contain the quotations. Meritor

disputes that any of these documents and citations support SISAMEX/Quimmco's position that

the SISAMEX Director General can unilaterally decide to insource or manufacture any products

or components without a Business Plan approved by the Board of Directors and over the

objection of SISAMEX's Board of Directors or Shareholders. Meritor incorporates its evidence

in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above. None of the cited documents

refute the parties' agreement that the parties would discuss SISAMEX's future manufacturing

and tooling to make additional components of products pursuant to a Board-approved Business

Plan and capital expenditures. Meritor does not dispute that SISAMEX can make any product or

component in a Business Plan approved by the SISAMEX Board of Directors or Shareholders.

57.     With the risk of significant OEM migration realized, Meritor concluded that an amendment to the Supply Agreements was necessary to preclude SISAMEX from exercising its right to manufacture the 14_ series axles and Core Components for the relocated OEMs. (*See, e.g.*, Ex. 119 at -44 (negotiation goals include "Restrict SMX supply of 145 product line"); Ex. 132 at -59 ("Improv[ing] current contract via logical negotiation," with Meritor "[r]equest[ing] an understanding that all -145 carriers come from ARM"); Ex. 133 at -26 (suggesting revision to Supply Agreement C to "block[] localization of 14_"); Ex. 134 at -600 (suggesting "Agreement Modification" of "No 145 Content in SMX"); Ex. 127 at -65 (recommending Meritor enter "negotiations to revise Supply Agreement B and C" by "[l]ock[ing] in SMX requirement to purchase -14_ platform core components"); Ex. 105 at 62:4-63:1 (Meritor "wanted to continue selling the 145 carrier assembly to SISAMEX and not have SISAMEX insource the 145 carrier assembly."); Ex. 135 ("We need to develop a strategy to mitigate the impact of the FTL Project …."); *see also* Ex. 136 at -18 (stating that the migration of OEMs to Mexico "has the potential to be VERY ugly"); Ex. 137 at -81 (Meritor employee expressing disappointment in the terms of the Agreements by stating,

"[i]t was a bad agreement 10 years ago; it is a bad agreement today; and it will be a bad agreement in the future.").)

**RESPONSE:** Meritor does not dispute that the cited documents contain the quotations. Meritor disputes that an amendment to the Supply Agreements "was necessary to preclude Sisamex from exercising its right." None of the documents SISAMEX/Quimmco cites state that such an amendment was "necessary." Furthermore, SISAMEX Exhibit 132 is a set of notes Arnold prepared on February 11, 2009, listing the options Meritor has for dealing with SISAMEX, where the very first option is "Status Quo" and "Normal support of BOD." (SMX Ex. 132, MER0870358-59 at -59.) As stated in Arnold's memos and reports at the time of restructuring in 2001 and 2002, Meritor intended to exercise control over the joint venture, including any SISAMEX insourcing, through the governance mechanisms in the Shareholders Agreement and SISAMEX Bylaws to which the parties had agreed. These mechanisms included the supermajority requirement for Board action, the requirement that SISAMEX only make components and products pursuant to a Board-approved Business Plan and capital expenditures, and the express statement that the SISAMEX Director General and Chairperson did not have the authority to approve the Business Plan or capital expenditures above $1 million per project. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above. (*See also* SMX Ex. 70, 11/12/02 Meritor press release at MER0730021-24 at -22 ("The joint venture will be renamed [Sisamex] and will be mutually managed by ArvinMeritor and Quimmco.").)

58. Meritor considered, but ultimately rejected, increasing its share in SISAMEX and terminating the joint venture altogether. (*Id.* at -81; Ex. 138 (discussing potential for buyout of SISAMEX); Ex. 139 at -83 (stating options including "[r]estructure / renegotiate current Sisamex supply agreements / pricing structure … [p]articularly Supply Agreement A," "ARM to Buy-out QuimmCo's share," and "[t]erminate JV"); Ex. 140 at -99 (considering "[p]otential restructuring or buy-out of Sisamex JV"); Ex. 132 at -59.)

**RESPONSE:** Undisputed.

59. Meritor also considered manufacturing the 14_ series of carrier assemblies at its plant in Cienega, Mexico, but held off making any investments for that purpose until it reached an agreement with SISAMEX that SISAMEX would not manufacture those components. (Ex. 142 at -23 (Meritor planned to "push for an agreement" with SISAMEX but "not mak[e] an expenditure til all was clear").) Meritor acknowledged that it would be "prudent to hold off" on an investment in 14_ carrier assembly capacity at Meritor's plant in Mexico "until Sisamex negotiation is finalized." (Ex. 141 at -89.) Meritor acknowledged that there would be a "huge downside" for it because "Sisamex could pull the 145 carrier assy at any time." (*Id.*; Ex. 109 at 210:24-212:20 (confirming understanding that SISAMEX could "pull the 145 carrier assembly"), 216:1-4 (same); Ex. 105 at 185:15-190:6; *see also* Ex. 142 at -24 ("Have we reached a written agreement with Sisamex with respect to the 145 carriers out of Greenfield…. I want to make sure we don't spend the $500K to move a line down and the subsequent week sisamex says they are going to produce in their plant."); Ex. 143 at -35 ("Sisamex may begin to assemble 145 carriers if no action is taken resulting in lost burden absorption in ARM plants.").)

**RESPONSE:** Meritor does not dispute that the cited documents contain the quoted language.

Meritor disputes that any of these documents and citations support SISAMEX/Quimmco's

position that SISAMEX has the exclusive right to manufacture all components of all products

sold to OEMs in Mexico. Meritor further disputes that any of these documents support

SISAMEX/Quimmco's position that the SISAMEX Director General can unilaterally decide to

insource or make any products and components without a Business Plan approved by the Board

of Directors and over the objection of SISAMEX's Board of Directors or Shareholders. Meritor

incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

60a. Having concluded that an amendment to the agreements was necessary to avoid incurring the loss it anticipated from SISAMEX's exercise of its insourcing rights, Meritor's strategy team recommended that it "[e]ngage Sisamex/Quimmco in negotiations to revise Supply Agreement[s] B and C." (Ex. 127 at -65.)

**RESPONSE:** Meritor disputes that it determined an amendment was "necessary." Rather,

Meritor recommended that it engage in negotiations with SISAMEX to clarify Supply

Agreements B and C as well as "[e]stablish a dedicated resource base to 'Optimize Sisamex.'"

(SMX Ex. 127, 5/4/09 Axle Business Unit Review presentation, MER1440060-67 at -65; *see also* SMX Ex. 132, 2/11/09 Arnold notes, MER0870358-59 at -59 (listing the options Meritor has for dealing with SISAMEX, including the very first option of "Status Quo" and "Normal support of BOD.").) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

> 60b.   Meritor proposed that the revisions include a commitment by SISAMEX to "purchase -14_ platform core components." (*Id.*) In exchange, Meritor would offer "additional purchases to benefit the JV EBITDA." (*Id.*)

**RESPONSE:** Undisputed.

> 60c.   Meritor approached SISAMEX about amending the Supply Agreements in this manner, offering to make additional purchases of components under Supply Agreement B in exchange for SISAMEX agreeing to purchase the 14_ series of carrier assemblies from Meritor's facility in Cienega.

**RESPONSE:** Undisputed.

> 60d.   A presentation created by Meritor for SISAMEX contained tables showing the value of each proposed amendment and represented to SISAMEX that Meritor's proposals would benefit SISAMEX by $10.8 million and Meritor by $4.2 million. (*See* Ex. 144 at -38 to -39; Ex. 145 at -39 to -40.) Meritor also prepared a second set of numbers, but concluded that "[u]nder no circumstances should this go to Manuel [Valdés]," the Director General of SISAMEX. (Ex. 144 at -35; *see also* Ex. 145 at -36 ("DO NOT FORWARD").) The second set of calculations— referred to as the "Real Numbers"—showed that Meritor would benefit by $7 million and SISAMEX would lose $0.2 million. (Ex. 144 at -40; Ex. 145 at -41.) Meritor recognized that if it presented SISAMEX with its calculations for how its proposals would impact SISAMEX, it would "beg[] the question as to why Sisamex would agree with such negative impact." (Ex. 146 at -37.)

**RESPONSE:** Meritor agrees that it engaged in negotiations with SISAMEX as its counterparty, but disputes that SISAMEX's Director General (and Quimmco) was not also preparing a position on the relative value of manufacturing various components or products. (SMX Ex. 105, Plomin Dep. at 191:11-16 ("I think it's quite normal in situations like this when you're negotiating with another party and you have your own position and they have their position that you make your own internal calculations, and you would keep them to yourselves."); MER Ex. 41, 7/17/09

Valdes email to Barrera, SMX001862660-E-61-E at -60-E ("They didn't like my tone. . . . Today

we spoke on good terms."); MER Ex. 42, 9/21/09 Valdes email to Barrera at QMC000195077-

E-78-E at -78-E ("I sincerely disagree that the solution to everything is to integrate ourselves … I

honestly believe that the problem isn't in what we do or don't do but rather it is in how Supply

Agreement A is written for certain products…. Perhaps now that they mention they want to

change Supply Agreement B and C, we could say: if you are prepared to change Supply

Agreement A so that the JV isn't 'trapped' by your price policy, then maybe it's worth thinking

about.").)

> 61a.    In August 2009, Mr. Arnold circulated a presentation identifying consideration
> Meritor could offer SISAMEX, including an increase in Meritor's commitment to
> purchase components from SISAMEX under Supply Agreement B. (Ex. 147.)

**RESPONSE:** Undisputed.

> 61b.    Meritor executive Mr. Kelly provided comments and proposed to limit
> SISAMEX's ability to make capital investments required to manufacture Meritor
> Products. (*Id.*) Mr. Arnold responded, stating that "SMX is required to make the
> investment to meet any committed volumes in the supply agreement for
> components or for meeting supply to Mexican OEM. BOD approval is not
> required for such investment. We cannot block per se." (*Id.*)

**RESPONSE:** Meritor does not dispute that Section 3.4(a) of the Shareholders Agreement

requires that SISAMEX ensure it has capacity required by a SISAMEX Board-approved

Business Plan to meet committed volumes in Meritor's forecasts so that Meritor can meet its

obligations to customers. Meritor disputes that SISAMEX's Director General can make capital

expenditures of more than $1 million per project or borrow money from lenders without Board

approval of a Business Plan authorizing SISAMEX to make the components or products at issue.

Meritor also disputes that SISAMEX's Director General can make capital expenditures of

$1 million or more per project or borrow money from lenders without Board approval of a

Business Plan authorizing SISAMEX to make the components or products at issue where such

capital expenditures are unnecessary to meet Meritor's forecasts in light of existing capacity.

(*See also* SMX Ex. 132, 2/11/09 Arnold notes, MER0870358-59 at -59 (noting that 3.4 "does not address content or the logic of buying from ARM to avoid investment").) Meritor further disputes that Section 3.4(a) authorizes the Director General to make capital expenditures to increase capacity where such increases in capacity are unnecessary to meet the Meritor forecasts. (MER Ex. 19, Dowers Decl. ¶ 28.) Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

> 61c.   On September 3, 2009, Mr. Plomin circulated a presentation summarizing Meritor's proposed modifications to the supply agreements. (Ex. 148.) On September 8, 2009, Meritor presented its proposed modifications to the Supply Agreements to SISAMEX. (*See* Ex. 149.)

**RESPONSE:** Undisputed.

> 62a.   On September 11, 2009, SISAMEX responded, accepting Meritor's proposal in principle, but only on a temporary basis with no permanent modifications to the Agreements. (*See* Ex. 150 at -906 ("We are convinced that our 'lateral' interim agreements work better than changing or amending our supply agreements ….")

**RESPONSE:** Undisputed.

> 62b.   SISAMEX rejected permanent amendments, in part, because it wanted the option to insource 14_ axles in the future. (*Id.* at -906 ("Committing to buy 14_ diff cases and carrier mountings or two piece knuckles in Sisamex makes sense today but may not make sense in the future"); Ex. 7 at 257:20-258:6 (SISAMEX did not want to permanently amend Supply Agreement C because it did not want "an obligation to buy … 145s from Meritor" after the conclusion of the interim agreement).)

**RESPONSE:** Meritor disputes that the SISAMEX Director General can unilaterally decide to make any components without a Board-approved Business Plan and capital expenditures and over the objection of SISAMEX's Board of Directors or Shareholders. Meritor incorporates its evidence in response to Paragraphs 8, 9, 10, 11, 12, 13, 14, 16, and 20 above.

> 62c.   By email dated September 15, 2009, Mr. Arnold conceded that "this is about as good as we are going to do," acknowledging that an interim agreement created a

"medium term risk of underutilized assy capacity if and when SMX moves -14_ assy inside." (Ex. 150 at -98.)

**RESPONSE:** Meritor does not dispute that SISAMEX Exhibit 150 contains the quoted language, but disputes that Arnold's statements support SISAMEX's position that the Director General can unilaterally decide to insource any products or components without a Business Plan approved by the SISAMEX Board of Directors or Shareholders, or an agreement between the parties pursuant to Supply Agreement C Section 2.4(b). Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

63a.  On November 23, 2010, SISAMEX and Meritor executed the Interim Purchasing Commitments Agreements ("IPCA"). (Ex. 151.) SISAMEX agreed not to insource 14_ series carrier assemblies and waived Meritor's obligation under Supply Agreement B to purchase 16_ series housings from SISAMEX. (*Id.*) In exchange, Meritor agreed to purchase additional components under Supply Agreement B and decrease the cost of 14_ series carrier assemblies by moving production from the U.S. to Cienega, Mexico. (*Id.*) The IPCA specified that it "neither modifies nor replaces current terms and conditions, rights and obligations of [Meritor] and SISAMEX under Supply Agreements A, B and C" and would expire at the end of 2013. (*Id.*)

**RESPONSE:** Undisputed.

63b.  Throughout negotiations of the IPCA, Meritor did not assert that SISAMEX did not have the right to insource the Core Components of the 14_ axle. (*See* Ex. 105 at 188:11-190:6; Ex. 122 at 102:10-16; Ex. 89 at 201:23-202:3, 241:1-24.) Even after the execution of the IPCA, Meritor acknowledged that it was "selling direct to SMX but they have right [*sic*] to insource that supply at any time." (Ex. 117.) Meritor also acknowledged "[t]here is risk, due to lack of manufacturing control and contractual agreement, that Sisamex may [i]ndustrialize components/products currently made in [Meritor] wholly owned facilities[.]" (Ex. 152 at -77.)

**RESPONSE:** Meritor does not dispute that it negotiated the Interim Purchasing Commitments Agreement at arms-length with SISAMEX. Meritor disputes that the Director General can unilaterally decide to insource any products or components without a Business Plan approved by the SISAMEX Board of Directors or Shareholders, or an agreement between the parties pursuant

to Supply Agreement C Section 2.4(b). Meritor incorporates its evidence in response to

Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

> 64a.   In October 2012, SISAMEX informed Meritor that upon expiration of the IPCA on December 31, 2013, SISAMEX planned to manufacture 14_ series carrier assemblies and gear sets, which are considered Core Components under Supply Agreement C. (Ex. 153 at -319.)

**RESPONSE:** Meritor disputes that SISAMEX Exhibit 153 "informed Meritor" of the proposal.

SISAMEX Exhibit 153 is a presentation that SISAMEX's Director General distributed to all of

SISAMEX's Board of Directors, including Directors appointed by both Quimmco and Meritor,

which included a proposal that SISAMEX insource 14_ series carriers upon expiration of the

Interim Purchasing Commitments Agreement. (SMX Ex. 153, 10/3/12 SISAMEX Board Ops

Meeting Pre-Read, MER0847265-319 at -319.)

> 64b.   In November 2012, SISAMEX informed Meritor that, beginning in January 2013, SISAMEX intended to manufacture and assemble certain components of the Non-Drive Front Axles, which are considered Meritor Products under Supply Agreement A. (Ex.154 at -62, -63.) In September 2013, SISAMEX informed Meritor that it would no longer purchase completed 185 axles—also considered Meritor Products under Supply Agreement A—from Meritor but instead purchase components of the 185 axle from Meritor and assemble them at SISAMEX. (Ex. 155 at -50; *see also* Ex. 156 at -35.)

**RESPONSE:** Undisputed.

> 65.   Meritor's analysis showed that if SISAMEX insourced the 14X carrier assembly, even though it would benefit as a shareholder of SISAMEX, Meritor would suffer a "significant impact" resulting from a loss in its own manufacturing margin. Meritor calculated that it would suffer revenue loss of $80 million, a gross margin loss of $0.5 million, and restructuring cost of approximately $0.5 million. (Ex. 157 at -69; Ex. 66 at 166:13-169:11 (noting "it was important to Meritor that Sisamex not insource the 14X carrier assembly"); Ex. 122 at 302:6-303:25, 311:2-313:25 (Meritor "calculated that Meritor would earn more profits by selling 14X carrier assemblies to Sisamex than by having Sisamex manufacture those carrier assemblies.").)

**RESPONSE:** Meritor disputes this assertion to the extent it omits that Meritor's analysis also

showed additional losses of $7 million in lost fixed absorption from SISAMEX's proposed

insourcing of the 14X carrier assembly. (SMX Ex. 157, 10/15/13 draft presentation 14X impact slide, MER0790568-69 at -69.)

66.   After learning of SISAMEX's plan to insource, Meritor began analyzing whether it could persuade SISAMEX to forgo its plan to insource by offering to increase Meritor's purchase of components from SISAMEX under Supply Agreement B, as well as threatening to not purchase certain components that it had been previously purchasing. (Ex. 158 at -43 ("[W]e are looking into several options in order to maintain that business in our plants."); Ex. 159 at -92 ("[W]e are looking into several options in order to maintain the 14X business in our plants."); Ex. 160 at -66 ("I believe their threat is real, so we must find alternatives to this situation."); Ex. 161 at -97 (discussing analysis of financial harm to Meritor "if Sisamex industrialize[s] the 14x carrier assembly and/or 14x gear cutting"); *see also* Email from S. Doyle to Meritor Personnel, 2/14/2014, Ex. 162 at -06 (instructing Meritor employees to "think of [SISAMEX] the same way you would with any other supplier … in sharing information [and] assisting them").)

**RESPONSE:** Meritor does not dispute that the cited documents contain the quotations. Meritor disputes that any of the cited exhibits address whether the SISAMEX Director General can unilaterally decide to make any components without a Board-approved Business Plan and capital expenditures and over the objection of SISAMEX's Board of Directors or Shareholders. Meritor incorporates its evidence in response to Paragraphs 8, 9, 10, 11, 12, 13, 14, 16, and 20 above.

67a.   In early 2013, Meritor proposed to define the SISAMEX Board of Directors' role as determining "how SMX can improve its operating performance without a transfer of wealth from either Quimmco or Meritor[.]" (Ex. 163 at -33.)

**RESPONSE:** Meritor disputes that SISAMEX Exhibit 163 discusses defining the role of the SISAMEX Board of Directors or making any change to the Board of Directors. (SMX Ex. 163, 2/15/13 Hogan/Valdes email, MER0912132-34 at -33 ("Project Purpose: How SMX can improve its operating performance without a transfer of wealth from either Quimmco or Meritor?"); *id.* ("Success defined with BOD approval subject to conditions and within current JV scope or BOD agreement to restructure agreements.").) There is no mention in SISAMEX Exhibit 163 of how the parties should define the SISAMEX Board's role.

> 67b.     Meritor sought to prevent SISAMEX from manufacturing components of the 14_
>          series axle if SISAMEX's manufacturing of these products would not optimize
>          Meritor's profits as a third party vendor to the joint venture.

**RESPONSE:** Meritor disputes that it sought to "optimize Meritor's profits as a third party

vendor to the joint venture." Meritor sought ways for the parties to work together and identify

ways to optimize profits for both partners to the joint venture without hurting either Shareholder

in the joint venture. (*See* SMX Ex. 164, 2/15/13 Hogan email to Kelly, MER0596646-48 at -46

(defining transfer of wealth as "good for SMX but comes at the expense of MTO[R] and/or

Quimmco."); SMX Ex. 122, Hogan Dep. at 298:8-14 ("[T]he proposal did nothing to lower the,

you know, the overall economics of the products, it did not lower cost whatsoever, so it does

nothing to help benefit any of our customers or companies. And all it in fact did was just transfer,

you know, by transferring the production it just moved profits, if you will, out of our company to

Sisamex.").)

> 67c.     Meritor executive John Kelly stated that Meritor's proposed limitation on
>          SISAMEX's Board was novel and not reflected in the Agreements. (Ex. 109 at
>          298:22-300:4; Ex. 164 at -46 (stating it was "[n]ot clear to [him] what a transfer
>          of wealth means"); *see also* Ex. 6 at 140:2-141:3 (agreeing that nothing in the
>          contract allows SISAMEX to take into consideration "transfer of wealth" from
>          one partner to the other).)

**RESPONSE:** Meritor disputes the characterization of Kelly's testimony, disputes that the parties

proposed a limitation on the SISAMEX Board, and objects that SISAMEX has misquoted

Kelly's testimony. Kelly's testimony does not address the "proposed limitation," does not call

anything "novel," and does not address whether any proposed limitation is "not reflected in the

agreements." (SMX Ex. 109, Kelly Dep. at 298:25-299:1 ("I don't know if that's in the

agreement"); *id.* at 300:8-9 ("I don't know what's in the agreement.").)

> 67d.     SISAMEX's Director General noted that a "transfer of wealth" is "already
>          happening" and doubted that the parties could address this issue "within the scope
>          of the existing Supply Agreement A product commissions." (Ex. 163 at -32.)

**RESPONSE:** Undisputed.

68. Moreover, Meritor's proposal ran contrary to the repeated acknowledgment by the Meritor-appointed members of SISAMEX's Board of Directors that they owed a fiduciary duty to act in the best interests of SISAMEX—not the interests of a shareholder in its capacity as a third-party vendor or seller. (*See* Ex. 165 at -88 (noting that "as a board member [he] must also support interests of the JV"); Ex. 166 at -27 ("Thinking as an independent BOD member I'd suggest we need to have a binding commitment from ARM (since we have a history of sticking them with no volume on a whim[.)]"); Ex. 6 at 51:7-52:16 ("I very clearly knew my first responsibility as a board member was to the joint venture"); Ex. 109 at 25:8-18 ("I was supposed to act on the best interest of Sisamex" over the interest of other parties, including "Sistemas's suppliers or customers.").)

**RESPONSE:** Meritor disputes the first sentence of Paragraph 68, but agrees that the Directors on the SISAMEX Board owe a fiduciary duty to the joint venture. Meritor disputes that any proposal was made to change the duties of the SISAMEX Board of Directors. SISAMEX Exhibit 163 does not propose any change to the role of SISAMEX's Board of Directors. Meritor incorporates its evidence in response to Paragraph 67 above.

69a. On November 16, 2012, Meritor informed SISAMEX it could not insource Non-Drive Front Axles because it was not commercially beneficial for Meritor. (Ex. 167 at -80 ("[W]e reviewed your request recently and it's not commercially beneficial for Meritor. Therefore Sisamex cannot go ahead with their insourcing plan of these Meritor Products.").)

**RESPONSE:** Meritor does not dispute that Meritor employee Osvaldo Gallegos wrote the quoted language in SISAMEX Exhibit 167.

69b. On October 17, 2013, Meritor impeded SISAMEX's effort to insource the 185 axle because the initiative "attempts to redistribute profit and fixed absorption from Meritor to our JVs." (Ex. 168 at -11.)

**RESPONSE:** Meritor does not dispute that the quoted language is in SISAMEX Exhibit 168 but disputes that this was the only reason Meritor did not agree to SISAMEX's proposal to insource the 185 axle—Meritor pointed out that moving the production was inefficient and created unnecessary complications. (SMX Ex. 168, 10/17/13 Garcia letter at MER0783511 ("As you know, the total volume for this part number is around 510 units, of which 180 go to Sisamex. We

107

do not believe a good solution is to split this small volume into two assembly plants,

complicating the problem for both plants.").)

> 69c. On December 3, 2013, the Meritor-appointed members of SISAMEX's Board of Directors refused to authorize SISAMEX's 2014 Business Plan because it included insourcing 14_ series gear sets and carrier assemblies. (Ex. 169 at -17.)

**RESPONSE:** Meritor agrees that the Meritor-appointed Directors on SISAMEX's Board did not

agree to approve the 2014 Business Plan and that "[b]y virtue of the fact that the consensus

required to approve the 2014 *Sisamex* Business Plan was not reached, it was not authorized, with

the exception of new capital investments (*Capex*) that were unanimously authorized by the

Board of Directors …." (SISAMEX Ex. 169, 12/3/13 Board of Directors Meeting Minutes,

MER0036012-19 at -17.)

> 70a. At the same time Meritor impeded SISAMEX's ability to insource 14_ series axles, it recognized internally that SISAMEX had the right to insource any Meritor Product it chooses. (Ex. 170 at -97 ("What if Sisamex chooses other alternatives?"); Ex. 171 at -09 (chart recognizing that since January 14, 2003 until the IPCA, SISAMEX was not obligated to purchase any Meritor Products or Core Components from Meritor under Supply Agreement C), -21 ("*Sisamex is not obligated to buy *any* % of requirements for MX market from MTOR"); Ex. 62 at -15 (same); Ex. 63 ("Original agreement: Sisamex not obliged to purchase carriers from MTOR"); Ex. 64 at -32, -37 (noting that there is a "new risk" of SISAMEX "insourcing" the 14X carrier assembly); Ex. 65 at -38 ("Original Agreement": … "SMX can buy from MTOR or manufacture itself" the 14X, 145, 143 carrier assemblies); Ex. 66 at 142:22-143:1 (confirming his contemporaneous understanding that "under the original under the original supply agreements Sisamex could buy from Meritor or manufacture itself the 14X, the 145 and the 143 carrier assemblies"), 152:15-153:18 (same); Ex. 172 at -72 (explaining that Meritor will not insource 160 axles because it will "drive a decision for them to insource 14X into Sisamex at a $5M hit to us").)

**RESPONSE:** Meritor agrees that SISAMEX can insource and make any products or

components in a Business Plan approved by the SISAMEX Board of Directors or the

Shareholders. Meritor further agrees that SISAMEX can make capital expenditures pursuant to a

Business Plan approved by the SISAMEX Board of Directors or the Shareholders. Meritor

incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

108

70b.　Meritor, having refused to grant Meritor permission to insource these products, is instead manufacturing them at its factory in Cienega, Mexico. (Ex. 54 at 276:15-277:10, 280:11-22.)

**RESPONSE:** Meritor does not dispute that it manufactures certain Core Components at its

factory in Cienega, Mexico, which it then sells to a number of other facilities, including

SISAMEX pursuant to Supply Agreement C. Meritor disputes that the reason it manufactures

these Core Components in its factory in Cienega, Mexico is because it "refused to grant

[SISAMEX] permission to insource these products." SISAMEX can only manufacture those

products or components included in a Business Plan approved by the SISAMEX Board of

Directors or the Shareholders. Meritor incorporates its evidence in response to Paragraphs 8, 9,

11, 12, 13, 14, 16, 20, and 42 above.

71.　Under Supply Agreements A and B, SISAMEX has the right to purchase non-core components from third party suppliers subject only to approval by Meritor's engineering and purchasing representatives, which cannot be unreasonably withheld. (Ex.36 at -6009, § 8.1; Ex. 55 at -509, § 8.1.) Meritor has an affirmative obligation to support SISAMEX in developing "best-in-class procurement practices, including using commercially reasonable efforts to provide [SISAMEX] with access to [Meritor's] third-party vendors on equivalent terms and conditions as available to [Meritor]." (Ex. 36 at -6009, § 8.1.)

**RESPONSE:** Undisputed.

72.　In 2012 and 2013, SISAMEX explored sourcing drive pinions and input shafts from Ramkrishna Forgings Limited ("Ramkrishna" or "RKFL"). (Ex. 173; Ex. 174.) At that time, SISAMEX purchased drive pinions from Meritor and another supplier, Fox Valley Forge. (Ex. 66 at 246:4-12.) After Meritor received SISAMEX's request to change the source of drive pinions and input shafts to Ramkrishna, ███████████████████████████████████████████ ███████████████████████████████████████ (Ex. 66 at 251:16-23.) Meritor lowered its price for the input shaft and informed SISAMEX that it would not allow SISAMEX to purchase the materials from Ramkrishna. (Ex. 175 at -85 ("Meritor does not support resourcing this part."); Ex. 176 at -90 ("Sisamex is specifically precluded from purchasing" drive pinions and other non-core components "from any third party supplier" other than Fox Valley, which SISAMEX was already purchasing from."); Ex. 177 at -36 (stating that Meritor "does <u>not</u> support the outsourcing or resourcing of drive pinions, side gearing, input shafts, and helical gears").)

**RESPONSE:** Undisputed.

> 73a.   Omar Garcia, the Meritor employee who refused to approve SISAMEX's request, worked in Meritor's business unit, and not the company's engineering or purchasing departments. (Ex. 66 245:15–20.)

**RESPONSE:** Meritor agrees that Omar Garcia works in Meritor's business unit but disputes that

Garcia's role did not include acting as the coordinator of all communications with SISAMEX,

including communications related to engineering and purchasing issues. (*See* MER Ex. 43,

6/26/13 Forry email to Medina at MER0287204 ("His primary responsibility will be managing

the Sisamex relationship."); SMX Ex. 109, Kelly Dep. at 37:10-12 ("Q. What is Mr. Garcia's

current position? A. He is the coordinator of the Sisamex relationship agreement"); SMX

Ex. 183, 9/17/13 Pinotti (engineering) email to Garcia at MER0794198-201; SMX Ex. 66,

Garcia Dep. at 19:18-20:2 ("We have a meeting in which I bring engineering, I bring purchasing,

I bring current management from Meritor, and we try to exactly what I was saying, listen to the

ideas that Sisamex has, listen to the progress of the projects that Sisamex has, and we provide

feedback, right?").)

> 73b.   Mr. Garcia intervened in the engineering approval process and instructed Meritor's engineers to block engineering approval, even though SISAMEX's re-sourcing request had already been approved by the engineering team "months ago." (Ex. 178 at -57, -58.)

**RESPONSE:** Meritor disputes that Meritor's engineers had already approved SISAMEX's

resourcing request. The "PCCR" approval referenced in SISAMEX Exhibit 178 is an

intermediate approval for resources to be assigned to an engineering task or a drawing to be

modified. (SMX Ex. 66, Garcia Dep. at 270:7-12 (noting that PCCRs are "normally issues

testing, resources assigned, testing resources assigned, drawings to be modified.").) Garcia

further testified that Carlos Pinotti from Meritor engineering asked that Garcia become involved

in SISAMEX resourcing requests and "take control" of the PCCR process. (*Id.* at 271:4-6 ("You

can see he's saying his next sentence that he says, It is important that you take control of the process with Sisamex."); *see also* SMX Ex. 178, 12/2/13 Pinotti email to Garcia, MER0784557-59 at -57 (stating that it is "important that you to [sic] take control of the process with Sisamex. I mean requests like this one should be rejected before being addressed to engineering.").) Garcia further testified that PCCRs were sometimes approved even though the engineering organization had not approved the issue more generally. (SMX Ex. 66, Garcia Dep. at 272:8-11 ("That meant when the PCCR system changed that the people that participating in the moment in the PCCR meeting didn't have a concern. That doesn't mean that the engineering organization did not have a concern.").)

> 73c.    Mr. Garcia was not aware of any documents stating that Ramkrishna's products had quality issues. (Ex. 66 at 262:1-266:10.)

**RESPONSE:** Meritor disputes the characterization of Garcia's testimony. Garcia testified that he was aware of quality concerns with Ramkrishna and that he informed SISAMEX of Meritor's concerns with Ramkrishna's quality, among other misgivings Meritor had with Ramkrishna. (SMX Ex. 66, Garcia Dep. at 265:22-266:1 ("We discussed about quality, we discussed about Ramkrishna and the many businesses they were getting, we discussed about the savings actually not going to be there because we were proposing something to them.").) Garcia testified:

> Q. And tell me what those significant concerns were. I'm asking you to be specific.
> A. That they wouldn't be able to deliver the amount of parts at the right moment with the right amount of quality. Like I gave you the example of the knuckles. We've been trying to resource -- we Sisamex and Meritor together have been trying source knuckles from Ramkrishna for more than three years, and they still haven't been able to meet the quality requirements for that product.
>
> Q. And what gave you reason to believe that Ramkrishna would not be able to deliver drive pinions as they were needed by Sisamex?
>
> A. This is from PPAP that I got from my purchasing people, we -- Meritor visits a lot of suppliers and makes many studies and determines whether a supplier is reliable or not. Then we normally try to determine which components we should

be pursuing first. And one of those I think was knuckles. And as I'm telling you, it hasn't been successful still.

(*Id.* at 254:18-255:12.)

SISAMEX Exhibit 179 is further evidence of the concerns Meritor had with Ramkrishna as a supplier. In SISAMEX Exhibit 179, Mark Gursky from Meritor's purchasing group noted that Ramkrishna might not be a good supplier for the requested components yet. (SMX Ex. 179, 12/17/13 Martinez/Gursky correspondence, MER0141661-63 at -62 ("I'm not totally sold on giving more to RKFL **at this point**, but it seems it could be a good program for NA **at some point**.") (emphasis added).)

Garcia testified that Meritor was concerned Ramkrishna would have reliability problems. (SMX Ex. 66, Garcia Dep. at 257:21-25 ("Q. You just explained to me that the reason that Meritor was not permitting Sisamex to resource components to Ramkrishna was that Meritor had concerns about Ramakrishna's [sic] reliability, correct? A. That is one of the reasons that was given to me."); *id*. at 231:2-5 ("we knew [Ramkrishna] came, they offer a lot of businesses, we knew that they weren't going to be a reliable option. And actually that has been the case, that is true."); *id*. at 254:5-8 ("As I was saying, we told [Sisamex] that we had significant concerns with Ramkrishna, that Ramkrishna was bidding on everything, and we thought that it was safer for them to stay with us.").) Meritor was particularly concerned about SISAMEX sourcing from an unreliable supplier like Ramkrishna because SISAMEX proposed shifting a substantial amount of their purchasing to Ramkrishna. (*Id*. at 232:25-233:6 ("And Sisamex was ready to give them a big business. Ramkrishna a few years ago came, and with all the -- Dana, with us, with Detroit Axle, with everybody, offered very competitive businesses. And it was so good, too good to be true, we knew that they weren't going to be able to deliver, which has happened.").)

Subsequent evaluations of Ramkrishna confirmed Meritor's concerns about their reliability. (MER Ex. 44, 3/5/14 North American Axle Purchasing Report, MER0142189-226 at -216 ("Delays in SOP due to lack of performing program management at RKFL. Tool was not kicked off on time."); MER Ex. 45, 4/2/14 North American Axle Purchasing Report, MER0318094-132 at -116 (listing "Missed delivery of test parts for May 5 lab tests, Poor PV/DV test results; delay part design release, Supplier unwilling to express ship PPAP parts").) Ultimately Meritor abandoned its evaluation of Ramkrishna as a supplier for certain components for the North American market. (MER Ex. 46, 12/18/14 letter to Ramkrishna at MER1455467 ("This letter is to inform you of Meritor's desire to cease and dismiss all activities on the 14x Clutch Collar and Diff Case as well as Steering Arm projects with Ramkrishna Forgings Limited (RKFL)."); Bolton Decl. ¶ 8.)

> 73d.   In fact, contemporaneous documents reflect that Meritor was developing Ramkrishna as a supplier of the same parts SISAMEX wanted to purchase from Ramkrishna. (Ex. 179 at -61 ("It is my understanding that SMX won't be allowed to buy forgings from [Ramkrishna]," but "since [Ramkrishna] is already developing the parts, Omar Garcia asked me if I would like to continue the development for MERITOR (only) as layered capacity…. And I said yes, because if the market comes back, we need an alternative source.").)

**RESPONSE:** Meritor agrees that it attempted to continue developing Ramkrishna as a potential source of supply, but disputes that it would have denied SISAMEX the ability to source from Ramkrishna if Meritor had ultimately approved Ramkrishna as a supplier for those components in North America. Garcia testified:

> I can tell you that today we don't buy from Ramkrishna. But again, it's -- it is always best that Meritor goes first with the alternative supplier, learns about it. Meritor has many more resources than Sisamex and has done a better job in making sure that that supplier is reliable and delivers quality supply, right? So this wouldn't be a bad situation, Meritor continues developing, with time, with patience, and with the right resources, Meritor begins sourcing it and then Sisamex has access to U.S. supplier.

(SMX Ex. 66, Garcia Dep. at 284:21-285:6.)

73e.    Meritor has sourced components from Ramkrishna since at least 2008. (Ex. 180 at 6.)

**RESPONSE:** Meritor agrees that it has sourced components from Ramkrishna for markets outside North America. Meritor disputes that sourcing for components in markets outside North America is equivalent to sourcing those components for North America. (*See, e.g.,* SMX Ex. 66, Garcia Dep. at 237:1-8 (discussing the difference between the Chinese market and North American market).)

73f.    Because of Meritor's refusal to allow SISAMEX to purchase these parts from Ramkrishna, SISAMEX continues to purchase them from Meritor. (Ex. 66 at 294:10-295:14.)

**RESPONSE:** Meritor disputes the characterization of Garcia's testimony. Garcia testified that SISAMEX could purchase the parts at issue either from Meritor or a different third party supplier located in North America: Fox Valley Forging. (SMX Ex. 66, Garcia Dep. at 246:16-20 ("Meritor didn't have a lot of business with Sisamex. Of the entirety of the drive pinions of Sisamex, Meritor had only one-third. The other two-thirds were at a supplier called Fox Valley Forgings."); *id.* at 290:10-17 ("Q. [Y]ou write that Meritor's position is that Sisamex can only source drive pinions from Morristown or Fox Valley Forgings. Do you see that? A. At the moment that's true, yeah. Q. And do you give any reasons for that? A. Because there's no other supplier that is approved at the moment.").)

74a.    SISAMEX determined that it could increase its profits by purchasing side gears and differential pinions from Zhuzhou Gear Co. ("Zhuzhou") instead of Meritor. After SISAMEX informed Meritor of its desire to re-source these parts in 2013 (Ex. 122 at 324:1-5), Meritor concluded that SISAMEX's plan is "likely not commercially good for MTOR so we will likely not enable them to purchase anywhere except [Meritor's plant in] Morristown." (Ex. 181 at -45; *see also* Ex. 66 at 242:17-24.)

**RESPONSE:** Meritor objects that SISAMEX/Quimmco misquotes SISAMEX Exhibit 181, disputes the characterization of SISAMEX Exhibit 181, and disputes that Meritor refused to

approve Zhuzhou for commercial reasons. (*See, e.g.*, SMX Ex. 181, 3/15/13 Hogan email, MER0802945-48 at -46 ("There were some material and [heat treat] issues"); *id.* ("They have been working on this project for several years but unable to meet [Meritor] expectation."); SMX Ex. 66, Garcia Dep. at 242:17-21 (Q. And if Sisamex were to resource these parts from Morristown to Zhuzhou, Meritor would have lost those sales, correct? A. And we -- yes. And we probably would have a significant quality issue in the market."); *id.* at 242:25-243:4 ("Q. Is there any reason that you have to believe that the parts discussed in this e-mail chain have significant quality issues? A. I know and I was told that they were not to the quality performance that we needed in North America.").) Garcia testified:

> Q. And why was Meritor not on board with this change?
> A. A couple of things. This is a supplier for China, for the Chinese market. Meritor is not sourcing these components for the U.S. We didn't believe that Zhuzhou -- I think that's not correctly spelled -- was -- had the right quality to do product in North America, and there were significant concerns in that sense. And that's one of reasons, that's one reason I remember.

(*Id.* at 236:24-237:8 (objection omitted).)

> Q. So I just want to be clear. One of the reasons that you were not approving this change is because the products that Zhuzhou made were not of high enough quality to be used in North America?
> A. That's my understanding, yes.

(*Id.* at 237:10-14.)

Meritor agrees that it was evaluating Zhuzhou as a potential supplier for the North American market. Meritor agrees that it denied SISAMEX's request to source from Zhuzhou because the supplier had not yet passed evaluations as an approved supplier for the North American market. (*See* SMX Ex. 181, 3/15/13 Hogan email at MER0802945-48 at -45 ("I think we let SMX know we are already in the supplier development phase and it is too early for them to consider as a viable option.").) In the Spring of 2013, Meritor had been evaluating Zhuzhou as a potential supplier for certain components for a number of years but the supplier had been

115

"unable to meet MTOR expectation[s]." (*Id.* at -46.) In addition, Meritor had concerns with Zhuzhou's ability to abide by contractual restrictions that were in place. (SMX Ex. 122, Hogan Dep. at 325:1-2 ("I didn't want our intellectual property going outside of our company.").)

    74b.    Even though Meritor purchased parts and components from Zhuzhou, it prohibited SISAMEX from doing so on the ground that Zhuzhou had signed an agreement not to compete with Meritor, which Zhuzhou would purportedly breach by providing parts to SISAMEX. (Ex. 182 at -92, -93.)

**RESPONSE:** Meritor agrees that one of the reasons Meritor refused to approve Zhuzhou as a third party supplier to SISAMEX was that Meritor worried about the risk that it would lose control of intellectual property. (SMX Ex. 122, Hogan Dep. at 325:1-2 ("I didn't want our intellectual property going outside of our company.").) Meritor disputes that the Zhuzhou non-compete agreement was the only reason Meritor did not approve SISAMEX sourcing from Zhuzhou, as Meritor's witnesses pointed out other reasons Meritor was concerned with SISAMEX sourcing from Zhuzhou for North America. (SMX Ex. 66, Garcia Dep. at 237:1-8 ("This is a supplier for China, for the Chinese market. Meritor is not sourcing these components for the U.S. We didn't believe that Zhuzhou -- I think that's not correctly spelled -- was -- had the right quality to do product in North America, and there were significant concerns in that sense. And that's one of reasons, that's one reason I remember.").)

    74c.    The decision to not allow SISAMEX to purchase side gears and differential pinions from Zhuzhou was made by Mr. Garcia, not anyone in Meritor's engineering or purchasing departments. (Ex. 66 at 245:11-23.)

**RESPONSE:** Meritor agrees that Garcia works in Meritor's business unit and not in engineering or purchasing, but disputes that Garcia's role did not include acting as the coordinator of all communications with SISAMEX, including communications related to engineering and purchasing issues. (*See* MER Ex. 43, 6/26/13 Forry email to Medina at MER0287204 ("His primary responsibility will be managing the Sisamex relationship."); SMX Ex. 109, Kelly Dep.

at 37:10-12 ("Q. What is Mr. Garcia's current position? A. He is the coordinator of the Sisamex relationship agreement"); SMX Ex. 183, 9/17/13 Pinotti (engineering) email to Garcia at MER0794198-201; SMX Ex. 66, Garcia Dep. at 19:18-20:2 ("We have a meeting in which I bring engineering, I bring purchasing, I bring current management from Meritor, and we try to exactly what I was saying, listen to the ideas that Sisamex has, listen to the progress of the projects that Sisamex has, and we provide feedback, right?"); *id.* at 242:25-243:4 ("Q. Is there any reason that you have to believe that the parts discussed in this e-mail chain have significant quality issues? A. I know and I was told that they were not to the quality performance that we needed in North America.").)

74d.    At the time Meritor refused to allow SISAMEX to purchase side gears and differential pinions from Zhuzhou,



(Ex. 66 at 238:16-18.)

(Ex. 183 at -98.)

In 2015, Meritor began purchasing side gears and differential pinions from Zhuzhou for use by its Chinese joint venture. (Meritor's Responses to SISAMEX and Quimmco's Second Set of Interrogatories, Ex. 180, at 5.)

**RESPONSE:**

. (SMX Ex. 66, Garcia Dep. at 242:17-243:4 ("I know and I was told that they were not to the quality performance that we needed in North America."); *id.* at 287:1-3 ("the fact that these parts, let's say that they were approved for use in Meritor China, that is not the same region as NAFTA, right, North America."); *id.* at 242:5-10 ("Q. And Meritor continues to purchase these parts from Zhuzhou, doesn't it? A. I

don't know that. I know that we don't use them in North America. Q. You know that they don't

use them in North America? A. Correct.").)

Meritor agrees that it considered evaluating Zhuzhou as a supplier for Meritor before

considering approving Zhuzhou as a supplier for SISAMEX in order to ensure Zhuzhou met

performance criteria. (*Id.* at 240:25-241:5 ("Q. Why do you not want them released for Sisamex?

A. There are many reasons. For example, often it's that, assuming that's the case, we need to

begin learning about that supplier, make sure that that supplier has a supply, reliability and

quality reliability for a period of time, and then we can advise Sisamex to do so.").)

> 75a.     Until early 2012, Meritor never claimed that SISAMEX was not entitled to
> technical assistance free of charge. (Ex. 3 at 331:24-332:10; *see also* Ex. 7 at
> 266:6-20 (testifying that, during his tenure as Director General of SISAMEX,
> Meritor always provided technical assistance whenever it was asked for it); Ex. 50
> at 262:1-21 (testifying that Meritor's practice was to provide SISAMEX with
> access to bills of material whenever requested); Ex. 51 at 98:19-99:1, 190:14-23
> (testifying that Meritor had provided SISAMEX access to its specification
> database and that, prior to 2012, Meritor had never denied SISAMEX access to its
> plants or drawings for the purpose of providing technical assistance); Ex. 52 at
> 33:14-35:1 (Meritor provided technical assistance free of charge from 2003 until
> he left the company in 2007).)

**RESPONSE:** Meritor agrees that it has provided proprietary Meritor design drawings and

BOMs to SISAMEX so that SISAMEX can make components and products that the SISAMEX

Board of Directors or Shareholders have approved SISAMEX to make pursuant to a SISAMEX

Board-approved Business Plan and capital expenditures plan. Meritor has not provided

SISAMEX with such proprietary Meritor design drawings and BOMs for components and

products that the SISAMEX Board or Shareholders have not authorized SISAMEX to make

pursuant to a SISAMEX Board-approved Business Plan and capital expenditures plan. For

example, Meritor has not voluntarily agreed to provide SISAMEX with all of its design drawings

for the components of the 14X axle as neither the SISAMEX Board nor the Shareholders have

approved a Business Plan providing for SISAMEX to make all the components of the Meritor 14X axle.

     75b.    On June 7, 2012, Meritor, through its counsel, asserted that Meritor has no obligation to provide technical assistance to SISAMEX to manufacture Meritor Products, but acknowledged that it had previously provided such technical assistance free of charge. (Ex. 184 at -18, -19.)

**RESPONSE:** Undisputed to the extent technical assistance means Meritor provided manufacturing process engineering support free of charge as a courtesy and not as a contractual obligation.

     75c.    Less than a month after Meritor's June 7th assertion, Meritor again acknowledged that it "has full responsibility for engineering and sales in Mexico and therefore the JV relies on us to pursue this or other potential business in Mexico." (Ex. 185 at -60.)

**RESPONSE:** Undisputed in so far as engineering means product design support and does not mean manufacturing process engineering support.

     76.    In November 2013, Meritor evaluated for the first time whether the use of "and/or" in the Shareholders Agreement and the Supply Agreement provisions governing SISAMEX's exclusive rights allows Meritor to decide which function SISAMEX can serve (importer, manufacturer, assembler, or shipping point). (Ex. 186, at -83.) Meritor had never previously asserted that that provision gave Meritor the right to control which function SISAMEX performs. (*See* Ex. 105 at 81:16-82:5 (admitting he was not aware of any documents before 2012 disputing SISAMEX's right to insource), 288:12-16 (admitting he was not aware of any document before 2012 telling SISAMEX it did not have the right to insource).) Indeed, Meritor witnesses acknowledge that Supply Agreement A grants SISAMEX exclusive rights to manufacture Dirona Product and Sudisa Products, and the right to be the exclusive shipping point and assembler of Meritor Products. (Ex. 6 351:11–18; 354:15–20; Ex. 67 36:20–37:6; Ex. 14 at 52:16–53:18; Ex. 38 at 177:1–178:3.) All of those rights are encompassed within the same phrase and in the same manner. (Ex. 36 at § 2.2(b).) Meritor also for the first time considered asserting that SISAMEX's exercising its right to begin manufacturing Meritor Products under Supply Agreement A would constitute an impermissible "change in the business" of the joint venture. (Ex. 186, at -83 (citing the Shareholder Agreement, § 3.5.viii).) Finally, Meritor also considered claiming that its ownership of Meritor intellectual property meant it could elect not to provide it to SISAMEX. (*Id.*)

**RESPONSE:** Meritor disputes that it, and not SISAMEX/Quimmco, is the entity with a "new reading of Supply Agreement A." SISAMEX/Quimmco lacks any parol evidence to support their current interpretation of the agreements from the time period when the parties were negotiating the agreements. Apart from draft agreements exchanged between Meritor and Quimmco, Quimmco produced only one document of parol evidence: Barrera's handwritten notes of his June 9, 2000 meeting with Arnold (SMX Ex. 15), which strongly support Meritor's position as discussed in response to Paragraphs 8-13 above. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 14, 16, 20, and 42 above.

77. In its Complaint, Meritor claimed that Supply Agreement C "obligates Sisamex to purchase its requirement for specific components—including some of those at issue in this case—from [Meritor]." (Ex. 187 at ¶ 6.) It contended that, pursuant to Supply Agreement C, SISAMEX is "obligated to purchase exclusively from [Meritor]" any core component that SISAMEX "was not specifically given the right to manufacture under the Shareholders Agreement or by subsequent agreement of the Shareholders." (*Id.* at ¶ 50.) According to Meritor, the manufacture of "all gear sets, housings, and carrier mountings for the 14x axle, and all carrier assemblies for any Meritor axle … was thus expressly reserved to [Meritor]" by Supply Agreement C. (*Id.*)

**RESPONSE:** Undisputed.

78. SISAMEX's interpretation of the Agreements is supported by testimony of former Meritor employees with first-hand knowledge of the Agreements and their implementation. These employees, whose testimony is recited above, include: (i) Brad Arnold, who participated in the key meeting with Daimler that was the impetus for the restructuring and was the lead negotiator of the Agreements for Meritor (Ex. 14 at 44:1–16, 70:16–23, 83:16–84:4, 91:14–92:1, 97:6–13, 106:12–20, 109:1–9, 132:7–133:6); Sergio Carvalho, who participated in the negotiation of the restructuring and its implementation (Ex. 188 (requesting Carvalho's input as a "key stakeholder" in restructuring negotiations); Ex. 52 at 26:6–17, 27:2–28:1, 30:20–31:19, 32:21-33:2, 33:14-24, 34:20-35:9, 40:17-42:2, 43:17-44:23, 49:1-9, 50:2-23, 51:9-52:6, 53:24-54:24, 56:14-22, 85:8–22); (iii) Manuel Valdés, who worked at Meritor from 2007 to 2008 and was involved in Meritor's communications to the OEMs moving to Mexico (Ex. 89 at 24:15–22, 26:20–29:13, 108:6–109:15, 110:12–112:14, 114:5–20, 238:23–239:22, 246:7–247:7); and (iv) Larry Burgin, who reported to Mr. Arnold and assisted him in the negotiation and implementation of the Agreements (Ex. 6 at 63:8-17, 163:1-7, 248:24-249:8, 61:16-62:17, 264:11-266:7). Christopher W. Patterson, Meritor's

expert witness, also provided testimony supporting SISAMEX's interpretations of the Agreements. (Ex. 38 at 182:2-11, 173:16-174:1, 170:4-9.)

**RESPONSE:** Meritor disputes that SISAMEX's interpretation is supported by the cited testimony. Arnold and Burgin's testimony as recounted in detail above supports Meritor's position and undermines SISAMEX/Quimmco's proffered interpretation. Carvalho's testimony is discredited by his boss, Tom Gosnell, to whom Carvalho reported, by the testimony of Burgin, and by the Declaration of Dowers. (MER Ex. 8, Gosnell Decl. ¶¶ 25-29; SMX Ex. 6, 1/12/16 Burgin Dep. at 36:15-17 ("Q. So it's your position that Mr. Carvalho is lying? A. It is my position."); MER Ex. 19, Dowers Decl. ¶¶ 23-25.) Valdes is SISAMEX's current Director General and his testimony is self-serving and contrary to the contemporaneous documents Meritor cites above.

79.    At his deposition, Mr. Burgin disputed only immaterial issues. For example, he disputed Messrs. Barrera and Mirandez's testimony concerning their request that he sign a declaration reflecting the parties' understanding of the Agreements and course of conduct following the Agreements' execution. (Ex. 189 at ¶¶ 1–4, 6–7.) Messrs. Barrera and Mirandez testified that Mr. Burgin had told them that representatives from Meritor requested that he "lie" in connection with his testimony in this litigation. (Ex. 3 at 251:16–253:2; Ex. 7 at 301:19–303:16.) Mr. Burgin stated in a declaration executed after the first day of his deposition, but before the second, that he did not have any conversations with Meritor's counsel in the time period he met with Messrs. Barrera and Mirandez. (Ex. 189 at ¶ 5.) At the second day of his deposition, however, he admitted that he had in fact discussed the subject matter of this litigation with Meritor's counsel prior to communicating with Messrs. Barrera and Mirandez. (Ex. 190 at 630:13-631:5.) He also conceded that he and Meritor had concealed from the public that he was demoted in July 2009. (*Id.* at 540:18.)

121

**RESPONSE:** Meritor objects to the relevance of Burgin's testimony related to his retirement from Meritor. Meritor further disagrees that Burgin only disputed "immaterial" issues in his deposition. Burgin was one of three Meritor negotiators who negotiated face to face with Quimmco on the restructuring of the Dirona joint venture. In the foregoing responses, Meritor cites extensively to Burgin's deposition testimony and documents that support Meritor's position and undermines SISAMEX/Quimmco's arguments.

Burgin testified extensively that SISAMEX Board approval of the Annual Operating Plan or Business Plan, and the capital expenditures therein, was required for SISAMEX to make components of Meritor Products. Burgin's testimony disputes the assertion that "approval by the Board of Directors would be needed only for investments to manufacture products for clients other than Meritor." For example:

> Q. Well, let me ask you this question: Is it your position that Sisamex did not have the right to insource and to manufacture itself the 14 series axle and all of the components thereof? Is that your position?
> A. I have to say it differently. **The director general had the ability to request, of the board, capital to manufacture anything that was on that list. The board then had the obligation to approve or disapprove.**

(SMX Ex. 6, 1/12/16 Burgin Dep. at 75:17-76:2 (emphasis added).)

> Q. Was it your understanding that the final executed supply agreements gave Sisamex's director general the unilateral right to insource making any core components of any Meritor product over the objection of the Meritor directors on Sisamex's board?
> A. No --

(*Id.* at 392:15-21.)

> Q. So, so long as Sisamex developed the capacity to do so, it could be the exclusive manufacturer of Meritor products for OEMs in Mexico, right?
> MR. BENSINGER: Objection. Mischaracterization. Calls for a legal

conclusion.
THE WITNESS: Only -- the only way I could see that would be my definition of
Sisamex being the shareholders represented by the board members. They had that
authority.

(*Id*. at 150:17-151:2.)

    Q. But you agree that the discretion whether or not to manufacture the 145 series
core components lies with Sisamex?
A. I do not agree.
Q. Why not?
A. I just don't. It's not the way we interpreted --
Q. Where -- does the agreement say that Sisamex does not have the discretion to
decide whether or not it would like to and can manufacture the 145 components if
it has the capacity to do so?
A. Sisamex is not the director general. Sisamex is an entity owned by two
shareholders.

(*Id*. at 322:8-20.)

    Q. But you mentioned Supply Agreement C. Supply Agreement C, is it not
correct, was intended to provide Sisamex with a supply of core components to the
extent that Meritor -- Sisamex elected not to manufacture those components itself,
correct?
    MR. BENSINGER: Objection to the argumentative preamble and compound.
    Go ahead.
THE WITNESS: The board of directors -- the way we ran the business is
important. The director general and his team had the responsibility to propose to
the board what they felt was in the best interest of the joint venture. The board
then had to have -- as representing the shareholders, had to agree on the
investment or the increase in capacity or the utilization of capacity. We had an
operations meeting before every board meeting, and then we had a board meeting.
So from this perspective from the board of directors agreeing, yes.

(*Id*. at 57:4-23). Burgin's testimony also disputes SISAMEX's core contention that the parties

intended that the joint venture have the exclusive right to manufacture all products and

components of those products. Meritor incorporates its evidence in response to Paragraphs 8, 9,

11, 12, 13, 14, 16, 20, and 42 above.

    80.    Meritor's remaining current employees disclaimed knowledge of the Agreements'
    terms and interpretation or refused to testify on these matters based on the
    attorney-client privilege. (*See, e.g.*, Ex. 66 at 25:22-26:13, 35:3-15, 38:24-40:7,
    41:20-42:25; Ex. 122 at 29:14-31:2, 33:14-18, 35:10-37:12, 41:25-42:9, 45:4-
    46:4, 63:23-65:9, 77:15-78:11, 98:16-100:11, 130:24-131:17, 133:13-17, 159:1-

160:3, 170:14-171:3, 196:18-197:9; Ex. 109 at 108:3-9, 110:15-111:18, 152:6-17, 164:4-11, 202:23-203:22, 208:7-13, 212:9-213:16, 228:7-229:13, 239:3-11, 260:14-261:25; Ex. 105 at 50:24-51:24, 68:17-69:19, 74:8-13, 78:18-79:6, 278:16-281:2.) These Meritor employees also could not point to any contemporaneous document supporting Meritor's current interpretation of the Agreements or to any contemporaneous document where Meritor disagreed with SISAMEX's interpretation of the Agreements. (*See* Ex. 122 at 235:4-7 (no recollection of anybody at Meritor telling Sisamex that it was not permitted to insource the manufacturing of 14X carriers); Ex. 109 at 285:4-286:6 (unable to identify any internal or external Meritor communication prior to 2002 where it took the position that Sisamex did not have the right to choose to manufacture Meritor Products for sale to OEMs in Mexico); Ex. 105 at 81:16-82:5 (no recollection, prior to 2012, of any document referencing a dispute with SISAMEX about SISAMEX's right to insource or anyone ever communicating to SISAMEX that it did not have the right to insource); Ex. 105 at 197:18-190:6; Ex. 105. at 298:19-299:3 (no recollection of Meritor ever telling Sisamex it could not insource the 145 or 14X).)

**RESPONSE:** Meritor disputes the assertion that it has not introduced any documents supporting its interpretation of the agreements. Meritor has introduced substantial evidence in support of its interpretation of the disputed agreements as set forth above. Meritor incorporates its evidence in response to Paragraphs 8, 9, 11, 12, 13, 16, 20, 24, 42, 60, and 79 above.

**MERITOR'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS**

Pursuant to Local Rule 56.1(b)(3)(C), Meritor provides the following statement of additional facts:

1.      Meritor sought to restructure the previous Dirona joint venture due to the lack of control Meritor had over that joint venture. (MER Ex. 19, Dowers Decl. ¶¶ 3-6; SMX Ex. 4, 4/20/01 Meritor Business Review, MER0103774-98 at -75 ("ARM Has Had A Difficult Time Influencing the Venture With Barrera's Having Dominate [sic] Role in Running the Company."); SMX Ex. 5, 7/5/00 internal memo at MER1160046-48 at -46 ("JV has operated essentially as a Quimmco (Barrera) subsidiary versus a JV since 1988"); *id.* ("Rockwell/Meritor relationship with the Barrera's has been sporadically problematic."); SMX Ex. 14, Arnold Dep. at 37:17-20 ("Q. Prior to the restructuring, is it fair to say that Quimmco controlled the management of the Dirona joint venture? A. Yes.").)

2.      Meritor told Quimmco that it would block any attempt by Daimler or Quimmco to force Meritor to sell its shares in the Dirona joint venture so that Daimler could form a joint venture with Dirona. (MER Ex. 4, 4/27/00 Arnold memo to management, MER0103868-71 at -70 ("The writer emphasized we would not sell our shares to help a likely alliance of some sort with DC or AAM. Jesus rebutted that Meritor could not stop Dirona from selling components to DC (Powertrain). The writer reiterated the Meritor position that Meritor could block any significant Dirona structure with DC or others. Jesus did not refute but commented on how long and expensive a battle it might be to prove our position."); SMX Ex. 14, Arnold Dep. at 38:25-39:9; SMX Ex. 11, 6/9/00 Arnold memo to management, MER0103860-62 at -61 (noting that Arnold "commented very strongly that Dirona was not part of any deal in any way and as a shareholder we would prevent any agreement of any sort in this regard…. I stated perhaps Dirona perhaps would supply a DC-Quimmco company but any other involvement would be

blocked. (Very strongly communicated with no lack of clarity) ... Meritor would not sell its

shares (Very strongly communicated).")); MER Ex. 20, 6/26/01 Arnold notes at MER1160065-73

at -65 ("[Meritor] blocking Dirona's alignment with other parties would involve a 'showdown'

and likely legal action.").)

3.     Christof Traidl, a third party declarant purportedly supporting Quimmco's version

of the events prior to the joint venture restructuring, was dismissed from his job at Daimler for

accepting a loan from the Barreras, which was a "clear violation of company policy, and also the

most commonly accepted business ethics." (SMX Ex. 38, Patterson Dep. at 91:9-21; MER

Ex. 12, Patterson Decl. ¶ 20.)

4.     Brad Arnold told Jesus Barrera in June 2000 that Meritor required control over

the restructured joint venture. (SMX Ex. 15, 6/9/00 Barrera notes, QMC000190082-86 at -82

("M[eritor] wants new or revised bylaws. M[eritor] wants equal say on annual operating plan and

capital expenditures plan."); MER Ex. 3, 6/19/00 Arnold memo to management,

MER1485684-91 at -87 ("The following reflects a very general sketch of a possibility discussed

by B. Arnold and Jesus Barrera on June 15, 2000 ... Balanced BOD membership ... BOD

control of all key management decisions including management appointments, AOP [annual

operating plan], capital plan, long term supply agreements ..... Note: BAA emphasized active

involvement with control over AOP / Cap Ex"); SMX Ex. 35, 8/11/00 Arnold memo to

management, MER0104274-76 at -75, -76 ("I have pushed for 50/50 and have characterized this

matter as a 'deal breaker.' Jesus has said okay subject to the share value being defined and has

pushed for a 'golden share' to allow consolidation. I have said this is likely possible if it does not

mean that Quimmco has definitive control on BOD matters ... How is the company managed.....

I have characterized this matter as a 'deal breaker' [and] I have told Jesus very clearly that we must be actively involved in day to day management and BOD matters[.]").)

5. The Memorandum of Understanding between Meritor and Quimmco, executed September 5, 2000, contains a section on the "Purpose and Scope of a Restructured Dirona" captioned "Tooling and Capital Investment," which states:

> Decisions with respect to creating capacity for NewCo to manufacture Meritor designed products would be based on acceptable economic returns and 'paybacks' driven by market volumes **as agreed by the Board of Directors**. Subject to the completion of the Business Plan referenced in section 10, it is currently envisioned that NewCo's initial role will be to manufacture the -16x family of components. Additional roles will be added based on economic 'paybacks' **as agreed by the Board of Directors on a case by case basis**.

(SMX Ex. 16, SMX1607323-36 at -24, -25 (emphasis added).)

6. Attachment II to the Meritor MOU lists "Matters Requiring Approval of the Parties or the Board of Directors," which includes "Approval of Annual Business Plans" and "Commitments for Capital Expenditures Over a Specified Amount" as two of the items requiring approval of the parties or Directors. (*Id*. at -34.)

7. The parties did not agree that SISAMEX would manufacture all components of all products. (SMX Ex. 6, 1/12/16 Burgin Dep. at 385:20-23 ("Q. And Quimmco never raised, in the negotiations, the desire to have Sisamex make the 145 series axle components? A. Not that I recall."); SMX Ex. 14, Arnold Dep. at 45:21-47:2, 47:7-22; *see also* SMX Ex. 4, 4/20/01 Meritor Business Review, MER0103774-98 at -78 ("Newco Will Be ARM Exclusive Shipping Point for OEM Deliveries in Mexico for Truck and Trailer Axles/brakes" and "Newco To Manufacture Agreed Content of Sales to OEM"); MER Ex. 19, Dowers Decl. ¶ 13 ("As I recall from the parties' negotiations, the intent for the restructured joint venture was that it would act as the 'shipping point' for all Meritor products sold to OEMs in Mexico. By 'shipping point,' we meant that the joint venture would act as the final touch-point for supply to Mexican OEMs. The

parties' intent was not that the joint venture would make all the parts of the products Meritor sold to OEMs in Mexico.").)

8.     On August 22, 2001, Arnold reported to Meritor management that he told Barrera that Meritor required control over the restructured joint venture and that Barrera "acknowledged and understood" Meritor's position. (MER Ex. 15, MER0104032-33 at -33 ("[Meritor] priority was for participation in managing the company and that new clear shareholders agreements was a 'deal breaker' item. Jesus [Barrera] acknowledged and understood our position and commented that this should not be an issue.").)

9.     Meritor's intent in restructuring Dirona to a 50/50 joint venture with Quimmco was that Meritor would have mutual and equal control of the key strategic joint venture business decisions, including who makes what and to whom they may be sold, so that it could include the joint venture in its Global Layered Capacity strategy. (MER Ex. 8, Gosnell Decl. ¶ 5 ("'Global Layered Capacity' meant that Meritor has redundancy at various plants and the ability to allocate the making of parts efficiently within its global network of plants in response to changing market conditions. Critical to Meritor's willingness to restructure Dirona was Meritor's ability to decide where to make parts to meet shifting market demand for Meritor Products and to whom those products may be sold, as well as the ability to ensure against production disruptions to safeguard customer deliveries."); MER Ex. 19, Dowers Decl. ¶¶ 3-4.)

10.    Meritor's internal emails, proposals, and presentations evidence its intent to control the joint venture through participation in SISAMEX's Board of Directors and that Meritor's interests were protected because the Board would have to approve SISAMEX's annual Business Plans and capital expenditures. (MER Ex. 14, 5/09/00 Dirona Concept Proposal at MER0103865-67 at -65 ("Company Organization … Shared key management responsibility.…

BOD control of all key management decisions including AOP and Capital Plan."); SMX Ex. 35, 8/11/00 Arnold memo to management, MER0104274-76 at -74 ("Meritor View of Key Tenants of the 'Deal' As It Now Stands..… ARM actively participates in the management of the business at BOD level … By-Laws for unanimous approval of key items (AOP, Cap Ex, New Business, Supply Agreements, et al) **Open**"); SMX Ex. 4, 4/20/01 Meritor Business Review, MER0103774-98 at -79, -80 ("[Meritor] Will Actively Participate in Newco Management and BOD … BOD Will Control Key Activity (e.g. AOP, CapEx)"); MER Ex. 6, 4/4/02 Project Tau Dirona to NewCo presentation, MER0739273-82 at -79, -80 ("New JV Structure Allows 'Control' of Strategic Decisions," "BOD will Control Key Activity (e.g. AOP, CapEx)"); MER Ex. 18, 9/25/02 Arnold annotated Strategy Review Dirona to NewCo presentation, MER0104277-91 at -78 ("Current Negotiated Framework Structure … New Shareholder Agreements and BOD Structure[:] Supermajority Required For Key Operating Matters (Supply, Related Party Transactions, CapEx and Officers) … No Change in Framework Structure"); *id.* at -85 ("JV Articles/By-Laws That Have Supermajority Requirement For All Key NewCo Actions (*Complete*)"); MER Ex. 16, 8/21/01 Arnold email to management at MER1455705 ("The imperatives in the negotiations are: That ARM insures that corporate governance documents including the shareholders agreements and by-laws provide for direct ARM participation in the management of the on-going business. Further, that these documents allow veto rights for certain critical matters such as annual operating p[l]ans, capital expenditures, and the like."); MER Ex. 17, 4/19/02 Arnold email to management, MER1463800-02 at -01 ("Regarding governance we have in fact had dialogue regarding this and are embodying significant language on this matter in the shareholders agreements. We are following all previous direction regarding powers residing with the BODY [sic] and not the chairman and that virtually all key issues require unanimous

approval."); MER Ex. 26, 8/20/02 Arnold email to management at MER1456811 ("It is understood we are getting close on 'the deal' and a final executive re-look is required before 'closure' to insure the following: Strategic interests are covered … Proper governance is insured."); MER Ex. 28, 10/3/02 Arnold email to management at MER1454742 ("Our negotiation team will move forward. Our priority remains: Clear management participation and elimination of 'independent' Quimmco direction/action.").)

11.    Meritor is a Tier 1 supplier to OEMs. (MER Ex. 19, Dowers Decl. ¶ 24; MER Ex. 12, Patterson Decl. ¶ 8.)

12.    SISAMEX is a Tier 2 supplier to Meritor. (MER Ex.8, Gosnell Decl. ¶ 13; MER Ex. 19, Dowers Decl. ¶ 24.) A Tier 2 supplier is a manufacturing entity that enters an agreement with a Tier 1 supplier to make whatever components or products the Tier 1 requests. (MER Ex. 8, Gosnell Decl. ¶ 13; MER Ex. 19, Dowers Decl. ¶ 24.) In the case of SISAMEX, this means that the restructured joint venture would not sell Meritor Products directly to the truck manufacturers, but would instead become a contract manufacturer component supply source within Meritor's layered capacity model. (MER Ex. 8, Gosnell Decl. ¶ 13; MER Ex. 19, Dowers Decl. ¶ 27.)

13.    In negotiations, Arnold and Barrera agreed the restructured joint venture would be a "Tier 2" contract manufacturer for Meritor. (MER Ex. 4, 4/27/00 Arnold memo, MER0103868-71 at -69, -70 (describing Arnold conversation with Barrera and option that "Meritor and Quimmco reformulate Dirona to a 50/50 arrangement focused on component supply **as a Tier 2 entity**," and that "Dirona would ultimately make more money and Quimco [sic] would make more money under a larger Tier 2 role[]") (emphasis added); SMX Ex. 8, 5/3/00 Arnold memo, MER0103893-97 at -94) (recounting Arnold's April 26, 2000 meeting

with Barrera and noting that the options for restructuring the Dirona joint venture include
"[c]hanging the structure of Dirona to a Quimco [sic]-Meritor 50/50 Meritor managed operation
**as a Tier 2 supplier**" and that "[t]his option has been extensively discussed[]") (emphasis
added); *id.* (noting that Arnold has "characterized that Dirona could easily be doubled in size and
that Meritor and Quimco [sic] would make more money in the near and long term" but that "[t]o
date Quimco [sic] has been unable to digest Dirona going to Tier 2[]"); MER Ex. 3, 6/19/00
Arnold memo, MER1485684-91 at -87 (recounting 6/15/00 meeting between Arnold and Barrera
and noting that as to the "Company Organization," he and Barrera discussed "[b]alanced BOD
membership" and "BOD control of all key management decisions including management
appointments, AOP, capital plan, long term supply agreements ….. Note: BAA emphasized
active involvement with control over AOP / Cap Ex"); *id.* at -88 (recounting that Arnold and
Barrera discussed the restructured joint venture's "Company Mission," including that it would be
"**[c]ontract manufacture[r]** of components and assemblies at world class cost" and the
"[p]rimary shipping point for Meritor axle and brake product shipments to global OE plants
located in Mexico[]") (emphasis added); SMX Ex. 35, 8/11/00 Arnold memo, MER0104274-76
at -74 (recounting Arnold meeting with Barrera and that Barrera agreed "Dirona becomes
'NewCo' with a **new Tier 2 mission**" but noting that "**Tier 2** is inflammatory to Rudolpho
[Barrera]/Jesus [Barrera]") (emphasis added); SMX Ex. 4, 4/20/01 Meritor Business Review
Dirona to NewCo, MER0103774-98 at -77 ("Barrera's have reluctantly agreed to consider a
'Tier 2' role in exchange for substantial growth opportunity[.]"); MER Ex. 5, 8/20/01 Meritor
presentation, MER0104131-53 at -34 (same); MER Ex. 6, 4/4/02 Meritor presentation,
MER0739273-82 at -75 (same); MER Ex. 7, 5/22/02 Meritor presentation, MER1339807-39 at -
16 (noting that the "Current Negotiated Framework Structure" includes "**NewCo Moves to**

**Tier 2**," "Ownership Will Move to 50/50," and "new Shareholder Agreements and BOD [Board

of Directors] Structure" with a "Supermajority Required For Key Operating Matters (Supply,

Related Party Transactions, CapEx and Officers)[]") (emphasis added); MER Ex. 10, BAA

Comments of 9/25/02 updating 5/22/02 Strategy Review Dirona to NewCo, MER1466146-60

at -47) (noting that there has been "No Change In Framework Structure" since previous

presentation); SMX Ex. 12, 11/22/02 Meritor presentation, MER0103971-86 at -75 (describing

"Dirona Restructuring – Deal Structure" and "Management of the New Company Will Be

Equally Shared Between Quimmco and ARM [Meritor]," and that "**The New Company Will**

**Become a Tier Two Supplier To ARM [Meritor]**.") (emphasis added); MER Ex. 11, 4/27/11

Barrera email to Lambreton, QMC000014868-E-69-E at -68-E ("One business [Meritor's] has all

of the functions, including sales, design, engineering, production. **The other one, the one that is**

**ours [Sisamex], whether we like it or not, is a contracting manufacturer**. The fact that we

have similar margins is mere coincidence.") (emphasis added).)

      14.    In the negotiations of the Shareholders Agreement, Meritor revised Section 3.4(a)

to protect Meritor from a scenario in which Meritor would be unable to satisfy OEM customer

orders for Meritor axles on account of SISAMEX's inability to meet Meritor forecasts. In mid-

2002, Meritor was concerned that with the joint venture acting as a Tier 2 supplier to Meritor and

focusing on 160 axle manufacturing, the joint venture might need to quickly invest in additional

capacity to meet Meritor's forecasts for products or components. (MER Ex. 19, Dowers Decl.

¶ 26.) Meritor's negotiation team therefore proposed a revision to Section 3.4(a) of the

Shareholders Agreement in order to allow the joint venture's Director General to make capital

expenditures "to meet the forecasts (as updated from time to time) for such products and

components delivered to the Company and/or Sudisa as contemplated in Section 4.4 of Supply

Agreement A (Products for Company and Sudisa Sale to ArvinMeritor CVS-Mexico and MHVS) and Section 4.4 of Supply Agreement B (Components for Company Sale to MHVS and Affiliates) and otherwise for the Company and Sudisa to be able to satisfy their obligations under those agreements." (*Id*. (quoting MER Ex. 30, 10/1/02 redline at MER0009678 at -703); *see also* SMX Ex. 1, 10/25/02 Shareholders Agr. § 3.4(a), MER0005913-87 at -37.) This revision was only meant to apply to instances where there was no capacity in Meritor's network for meeting the forecast and obligations to meet customer demand, not instances where capacity already existed in Meritor's supply chain but the Director General no longer wanted to purchase from Meritor or those other suppliers' existing capacity. (MER Ex. 19, Dowers Decl. ¶ 26.)

15.    The parties never intended for Section 3.4(a) to give the SISAMEX Director General the unilateral right to elect to make at SISAMEX any component of any Meritor Product without SISAMEX Board approval over Meritor's objection as a Shareholder if any Meritor-appointed Board member invoked Shareholders Agreement Section 3.5.2(f) or SISAMEX Bylaws Article 25 requiring that the Shareholders decide any matter that normally requires SISAMEX Board approval. (MER Ex. 19, Dowers Decl. ¶ 28.) In practice, the Director General went to the Board for approval of funding and capital expenditures. (SMX Ex. 6, 1/12/16 Burgin Dep. at 86:23-87:9 ("Q. Is it your position, contrary to the last section of 3.4(a), that the director general requires board approval to raise capital from lending facilities for the manufacture of Meritor products? MR. BENSINGER: Objection. Calls for a legal conclusion. Argumentative. THE WITNESS: My recall was yes, that -- I have to finish the sentence, I think -- that it did require board approval because that's how we enacted every annual board meeting."); *id*. at 86:7-16.)

16.     At no point in the negotiations of the Shareholders Agreement did anyone from Quimmco ever suggest to Meritor that the SISAMEX Director General could decide to insource components of Meritor Products that were currently being manufactured at other Meritor facilities over the objection of the Meritor-appointed Directors. (MER Ex. 19, Dowers Decl. ¶ 27.)

17.     At no time did anyone ever tell Gosnell or the Meritor Corporate Strategy Review Board that the purpose or intent of Section 3.4(a) (or any other provision) was to give the SISAMEX Director General such unilateral authority, which would have been utterly unacceptable to Meritor, a "deal breaker," and totally inconsistent with all of the discussions leading up to the Meritor approval of the restructuring. (MER Ex. 8, Gosnell Decl. ¶ 24.)

18.     In negotiating the Shareholders Agreement and Supply Agreements with Quimmco, Meritor created two different categories of components: "Core" and "Non-Core." (MER Ex. 19, Dowers Decl. ¶ 16.)

19.     With respect to Core Components, which Meritor considers the components it particularly needed to control, Meritor insisted the joint venture buy these components from Meritor if it did not manufacture them itself pursuant to a Board-approved Business Plan. (*Id.* ¶ 16.) Consistent with this direction, Meritor – not Quimmco – inserted the "manufactures itself" language into Section 2.2 of Supply Agreement C. (*Id.*; MER Ex. 33, 5/28/02 Supply Agr. C redline with changes introduced by Meritor, MER0012537-60 at -40 (Meritor adding "does not manufacture itself" to § 2.2).)

20.     Quimmco attempted to remove this provision so that the joint venture would only have to purchase Core Components from Meritor on a "non-exclusive basis." (MER Ex. 19, Dowers Decl. ¶ 16; MER Ex. 34, 6/12/02 Supply Agr. C redline with changes introduced by

Quimmco, MER0008080-105 at -83 (Quimmco deleting the phrase "[a]ll of its requirements for Core Components that it does not manufacture itself exclusively from Supplier" and replacing it with "on a non-exclusive basis.").) Meritor rejected Quimmco's suggested edit. (SMX Ex. 56, Supply Agr. C §§ 2.2(a) and 2.4(b), MER0006578-613 at -583.)

21.    Meritor listed the hydraulic and air disc brakes as both Meritor Products in Supply Agreement A and Core Components in Supply Agreement C and also noted in Supply Agreement A, Table 2.3 that the joint venture required approval from Meritor itself if it wanted to manufacture those parts. (MER Ex. 8, Gosnell Decl. ¶ 30; MER Ex. 19, Dowers Decl. ¶¶ 19-20.)

22.    The Meritor brakes division requested the additional approval because they were concerned that the joint venture would begin making these types of brakes. (*Id*.) They were concerned because these types of brakes are sometimes sold separately as products and sometimes sold as components to be incorporated into an axle assembly. (*Id*.) In order to address the brake division's concern, Dowers made sure that there was language in Schedule 2, Table 2.3 of Supply Agreement A noting that while air and hydraulic disc brakes were included as products for the purposes of Supply Agreement A and also Core Components, subject to the restriction in Supply Agreement C, they would also require an additional authorization: The joint venture had to purchase them from Meritor unless Meritor itself agreed otherwise, irrespective of the level of investment or SISAMEX Board approval of a Business Plan. (*Id*. ¶ 19.) By inserting this additional approval requirement, Dowers did not intend that the brake division's additional request would remove the many protections that the Shareholders put into place requiring the Board to approve all key decisions by the joint venture, including any SISAMEX Business Plan. (*Id*. ¶ 20; s*ee also* MER Ex. 31, 7/31/02 Dowers email discussing whether to include brake

135

products in restructured joint venture at MER0735000 ("Currently Board approval is required for investments at $1.0 Mil - our declining at the Board level is the measure to stop the JV from entering products we wish to keep.").)

23. Gosnell, Burgin, and Dowers all dispute Carvalho's supposed understanding of the rights of the parties that:

> Sisamex had the exclusive right to manufacture all Meritor Products for sale by Meritor to original equipment manufacturers ("OEMs") in Mexico. Sisamex's right to manufacture Meritor Products included the right to manufacture their component parts, including those defined by the parties as "Core Components." Sisamex had the sole discretion to determine which Meritor Products and components, including Core Components, it manufactured for sale to OEMs in Mexico. Sisamex did not require Meritor's consent to manufacture Meritor Products and their components for sale to OEMs in Mexico.

(MER Ex. 8, Gosnell Decl. ¶ 28; SMX Ex. 6, 1/12/16 Burgin Dep. at 36:15-17 ("Q. So it's your position that Mr. Carvalho is lying? A. It is my position."); MER Ex. 19, Dowers Decl. ¶ 22.) Sergio Carvalho was never General Manager of Commercial Vehicle Systems as that position did not exist, was not a member of the negotiating team restructuring the Dirona joint venture, was not on the Meritor Corporate Strategy Review Board assessing the deal terms, and did not meet with Gosnell when Gosnell met with the negotiation team in connection with the proposed deal terms. (MER Ex. 8, Gosnell Decl. ¶¶ 25, 27; MER Ex. 19, Dowers Decl. ¶¶ 21-22.)

24. On December 12, 2002, the parties executed the First Amendment to the Shareholders Agreement, which changed the definition of the "Technical Assistance and Management Agreement" in the Shareholders Agreement to refer only to the "Management Services Agreement." (SMX Ex. 44, MER0007013-19 at -15, ¶ 16.) The amendment also provides that all references to the "Technical Assistance and Management Agreement" in the Shareholders Agreement shall refer to the "Management Services Agreement," and that Exhibit CC to the Shareholders Agreement is amended to eliminate any reference to technical assistance.

(*Id.* at -15, -17, -18, ¶¶ 17, 41.) The parties executed the Management Services Agreement on January 14, 2003. (SMX Ex. 45 at MER0009212-26.) As executed, the Management Services Agreement contains no obligation by Meritor to provide technical assistance. (*Id. passim*.)

25.     In a press release issued after Meritor and Quimmco had signed the Shareholders Agreement, Meritor stated that the new joint venture would be "mutually managed by [the parties]." (SMX Ex. 70, 11/12/02 Meritor Press Release, MER0730021-24 at -22 ("The joint venture will be renamed [Sisamex] and will be mutually managed by ArvinMeritor and Quimmco.").)

26.     Brad Arnold inserted the "mutually managed" language into the draft press release, which Quimmco subsequently approved. (MER Ex. 47, 10/29/02 Arnold annotated draft press release with file name "Dirona release marked by BAA 10-29-02," MER0103877-79 at -77 (inserting "such that management of the new company Sistemas Automotrices will be mutually managed by Arvinmeritor and its longstanding partner Quimmco"); Bolton Decl. ¶ 5 (identifying the file name for MER Ex. 47 as "Dirona release marked by BAA 10-29-02"); MER Ex. 48, 10/30/02 Quimmco revised draft press release, MER0735977-80 at -78 (containing "mutually manage" language).)

27.     The SISAMEX Bylaws state that "[t]he management and handling of business and activities, operations, and policies of the Company shall be vested in the Board of Directors." (MER Ex. 21, SISAMEX Bylaws Article 22, MER0006347-87 at -66.) Article 32 of the SISAMEX Bylaws is entitled "Business Plan" and states in relevant part: "All business of the Company shall be conducted according to a Business Plan of the Company developed by the Director General and **approved by the Board of Directors of the Company. The Company**

**shall only manufacture, sell and commercialize those products and components provided for in the Business Plan.**" (*Id.* Article 32 at -82 (emphasis added).)

28.     The Shareholders Agreement provisions also require that the Director General get Board of Directors approval for all business conducted by the joint venture. (SMX Ex. 1, 10/25/02 Shareholders Agr. § 2.3, MER0005913-87 at -34, -35 ("From and after the Closing Date, all business of the Company [SISAMEX] will be conducted according to a Business Plan of the Company developed by the Director General and **approved by the Board of Directors of the Company**. The initial Business Plan will cover the Company's and SUDISA's first five years of operations after the Closing Date. The initial Business Plan of the Company shall be updated no less frequently than every year by the Director General and **presented to the Board of Directors** of the Company as provided in Section 3.7(b) **for its approval**.") (emphasis added).)

29.     The Shareholders Agreement is explicit that the SISAMEX Director General cannot approve the Business Plan. Section 3.5.2(e) states:

> It is expressly agreed, moreover, that the following matters shall require approval by the Board of Directors (in addition to any approval of the Shareholders required under this Agreement, the New Company Bylaws or applicable law) and may **not be approved by the Chairperson, the Director General or any other officer of the Company.**

(*Id.* at -43 (emphasis added).) There follows a list of actions that only the SISAMEX Board (or Shareholders) can approve, including the Business Plan and Transition Plan. (*Id.*)

30.     The Shareholders Agreement and SISAMEX Bylaws have a supermajority requirement for SISAMEX Board action. Shareholders Agreement Section 3.5.2(d) provides in relevant part:

> The Board of Directors shall legally transact business when a quorum of at least six (6) of the Directors are present at the meeting of the Board of Directors. No business shall be conducted at a Board of Directors meeting unless a quorum is

138

> then present at the meeting. Each Director shall have one vote on each matter
> presented to the Board of Directors for approval. Approval of any matter
> presented to the Board of Directors shall require the affirmative vote of not less
> than six (6) Directors.

(SMX Ex. 1, 10/25/02 Shareholders Agr. § 3.5.2(d), MER0005913-87 at -43; MER Ex. 21,

SISAMEX Bylaws Article 25, MER0006347-87 at -69.) ("The attendance of at least six (6)

Directors shall be necessary to constitute a quorum, and the resolutions of the Board shall be

valid only if they are approved by at least six (6) Directors present at the meeting. Each Director

shall have one vote on each matter presented to the Board of Directors for approval. In the event

of an equality of votes the Chairperson will not have a casting vote.").)

31.    Meritor and Quimmco agreed that SISAMEX "will not conduct any other

business, or manufacture, assemble or sell any other products, components or assemblies,

without the mutual agreement of the Parties." (SMX Ex. 1, 10/25/02 Shareholders Agr.

§ 2.1(b)(iii), MER0005913-87 at -33.)

32.    Meritor and Quimmco agreed that any SISAMEX Director could request that any

issue requiring Board approval would be instead submitted for approval to the Shareholders.

Shareholders Agreement Section 3.5.2(f) provides in relevant part: "Notwithstanding anything to

the contrary contained herein, any Director may elect at any time that any matter which would

otherwise require approval of the Board of Directors pursuant to Section 3.5.2(e) above shall

instead be submitted for approval by the Shareholders pursuant to Section 3.5.1(a)(xviii);

provided that this Section 3.5.2(f) shall not apply to Section 3.5.2(e)(xix)." (*Id.* § 3.5.2(f) at -46.)

Article 25 of the SISAMEX Bylaws provides in relevant part: "Notwithstanding anything to the

contrary contained herein, any Director may elect at any time that any matter which would

otherwise require approval of the Board of Directors pursuant to this Article 25 shall instead be

submitted for approval by the Shareholders pursuant to Article 15 of these bylaws." (MER

Ex. 21, SISAMEX Bylaws Article 25, MER0006347-87 at -70.)

33. In February 2009, SISAMEX informed Meritor that it was out of cash and about

to breach its financial covenants with banks. (MER Ex. 49, 2/13/09 Hopgood email to Snodgrass

MER1098815-16 at -15 ("Info on Sisamex outlook. Will be talking to the bank for sure. They are

essentially out of cash at this point as evidenced by their innability [sic] to pay us for trade

receivables. I will be discussing details with Jesus S. And Pedro next week.").) At that time,

Arnold was assessing the SISAMEX relationship and various options for dealing with the

recession and migrations of OEMs to Mexico, including maintaining the "Status Quo" via

"Normal support of BOD," or initiating "logical negotiation" to try to reach agreement about

what SISAMEX should make. (MER Ex. 50, 2/11/09 Arnold email at MER1058221 attaching

MER Ex. 51, SISAMEX Options at MER1058222.)

34. On March 18, 2009, Arnold asked the SISAMEX Director General, Armando

Mirandez, if SISAMEX was interested in modifying the agreements to reflect an updated

agreement about who makes what and Mirandez said "sure." (MER Ex. 52, 3/18/09 Arnold

email at MER1057890 ("Today I floated the idea of permanent changes to Supply Ag B and C

(those controlling our joint obligations to buy and sell) … Armando said 'sure' … He said it so

quickly I discussed more at length what we had in mind… He still said 'sure.'").)

35. In July 2009, Arnold sent SISAMEX a rough proposal. (MER Ex. 53, 7/16/09

Arnold cover email at SMX001861812 attaching MER Ex. 54, 7/17/09 Arnold presentation at

SMX001861813.) The slide captioned "ARM Strategy," said "[i]n absence of mutual agreements

take actions to protect ARM profitability; – In-source / resource from SISAMEX; – Re-price

non-core components." (*Id.*)

36.     SISAMEX's Manuel Valdes emailed back saying, "[a]s your file clearly states: In [the] absence of mutual agreements, the JV has the obligation to protect the shareholders profitability and thus it will insource 145 carrier assemblies and gear set cutting for the Mexican market to fully utilize its assets." (MER Ex. 55, 7/16/09 Valdes email, MER1049771-73 at -72.) Meritor's Joe Plomin then called Valdes to address his "inflammatory" mischaracterization of what Meritor had said and Valdes admitted it was an "emotional response" as SISAMEX was "under pressure because of their financial situation." (SMX Ex. 105, Plomin Dep. at 182:15-183:15.) Valdes said he was "sorry" and "[l]et's get back to trying to make the optimum solution that's good for both companies and that he would discontinue the saber rattling via e-mail." (*Id.*) The parties then negotiated a three-year interim agreement reflecting mutual supply obligations that did not modify the original Supply Agreements. (SMX Ex. 151, 1/1/10 Interim Agr. at SXM001892459-60.)

37.     Although SISAMEX has never asserted that it does not need Board of Directors approval of Business Plans or for capital expenditures over $1 million prior to this litigation, Jesus Barrera testified under oath at his deposition in 2016 that, as to whether the Board controls what parts SISAMEX can make, the Board of Directors is just a "rubber stamp" and has "no say" on the insourcing of Meritor Products. (SMX Ex. 3, 2/11/16 Barrera Dep. at 311:19-22.)

38.     The Board of Directors would not always approve the Director General's Business Plan or capital expenditures. (*See, e.g.*, MER Ex. 56, 11/15/04 Board of Directors Meeting Minutes, MER1386246-61 at -52 (acknowledging and approving the Business Plan 2005 but approving only "investments considered as urgent" from the capital plan and withholding approval of other items until the next meeting to allow the Directors to "thoroughly analyze the investments proposed by the Director General"); MER Ex. 57, 10/25/05 Board of

Directors Meeting Minutes, MER1228463-70 at -68, -69 ("Upon deliberation of the Business Plan 2006 of *Sisamex* … [t]he members of the Board of Directors acknowledge and approve the Business Plan 2006 of *Sisamex* presented by the Director General, except for the Working Capital Analysis [and] … [t]he Board of Directors approved the Capital Plan for year 2006 presented by Director General."); MER Ex. 58, 11/20/07 Board of Directors Meeting Minutes, MER1391053-60 at -57, -58 (reviewing the 2008 Business Plan but "request[ing] Director General to fulfill the recommendations of the Directors" including "the implementation of additional operating improvements by the administration of *Sisamex*" and "the need to rebound the increment of the raw materials to the clients" and approving only certain portions of the proposed capital plan); MER Ex. 59, 11/19/09 Board of Directors Meeting Minutes, MER1073856-61 at -60 (reviewing the proposed Business Plan 2010 but "request[ing] that the General Management take the actions necessary to improve the Business Plan" with respect to the percentage of net sales required for EBITDA for fiscal year 2010 and requiring "[t]he General Management of *Sisamex* … to present a new Business Plan 2010 under the terms requested, for discussion and approval at the next Meeting of the Board of Directors."); MER Ex. 60, 11/22/11 Board of Directors Meeting Minutes, MER0004145-54 at -52 ("The Board Members requested that Sisamex's General Management undertake a review of the sales volumes included in the Long-term Business Plan and present it once again for review and approval at the next Board of Directors Meeting.").)

39.     At the August 2013 Board of Directors meeting, SISAMEX's Director General proposed to the Board of Directors that SISAMEX "increase the contribution margin of 14X axles through a process of integration of its components." The Board of Directors did not approve this initiative, but "[took] note" of the initiative at that time. (MER Ex. 61, 12/3/13

redraft of August 2013 Board of Directors Meeting Minutes, QMC000046404-12 at -409.) In advance of the December 2013 Board of Directors meeting, the Director General submitted a 2014 Business Plan to the Board of Directors that included the proposal that SISAMEX insource the 14X components along with related capital expenditures exceeding $1 million in support of the 14X insourcing. (MER Ex. 62, 11/29/13 SISAMEX Board meeting Pre-Read at QMC000038058-100.)

40.　　On December 3, 2013, the Meritor-appointed members of SISAMEX's Board of Directors refused to authorize SISAMEX's 2014 Business Plan and a Meritor-appointed Director, Tim Burns, asked that the portion of the Director General's proposed SISAMEX 2014 Business Plan that called for insourcing of the Meritor 14X components be instead decided by the Shareholders. (MER Ex. 63, 12/2/13 Burns letter, MER1344745-49; MER Ex. 64, 3/6/14 revised Meeting Minutes of 12/3/13 Board of Directors Meeting, SMX002898655-62 at -60 ("By virtue of the fact that the consensus required to approve the 2014 *Sisamex* Business Plan was not reached, it was not authorized."); *id.* ("The Board members stated that representatives of shareholders *MHVS* and *Quimmco* will meet in January in Monterrey, Nuevo Leon to discuss the topic of the 2014 *Sisamex* Business Plan."); Bolton Decl. ¶ 6 (identifying the document date for MER Ex. 64 as March, 6, 2014).)

DATED: August 19, 2016　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　MERITOR HEAVY VEHICLE SYSTEMS, LLC

　　　　　　　　　　　　　　　　　　By: /s/ Peter B. Bensinger, Jr.

　　　　　　　　　　　　　　　　　　　Peter B. Bensinger, Jr.
　　　　　　　　　　　　　　　　　　　Reid M. Bolton
　　　　　　　　　　　　　　　　　　　Faye E. Paul

BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Tel.:    (312) 494-4400
Fax:    (312) 494-4440
peter.bensinger@bartlit-beck.com
reid.bolton@bartlit-beck.com
faye.paul@bartlit-beck.com
*Attorneys for Meritor Heavy Vehicle Systems, LLC*

**CERTIFICATE OF SERVICE**

I, Faye E. Paul, an attorney, hereby certify that a true and correct copy of the foregoing

document entitled MERITOR'S RESPONSE TO SISAMEX'S AND QUIMMCO'S RULE 56.1

STATEMENT OF UNDISPUTED FACTS AND MERITOR'S RULE 56.1(b)(3)(C)

STATEMENT OF ADDITIONAL FACTS was electronically filed with the Court's CM/ECF

system and emailed to counsel listed below on August 19, 2016:

Terri L. Mascherin
(tmascherin@jenner.com)
Laura B. Hulce (lhulce@jenner.com)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
Tel.: (312) 923-2799
Fax: (312) 840-7799

Erik Haas (ehaas@pbwt.com)
Adeel A. Mangi (aamangi@pbwt.com)
Elena Steiger Reich (esteigerreich@pbwt.com)
Muhammad U. Faridi (mfaridi@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER
LLP
1133 Avenue of the Americas
New York, New York 10036
Tel.: (212) 336-2000
Fax: (212) 336-2222

*Attorneys for Quimmco, S.A. de C.V. and*
*Sistemas Automotrices de Mexico, S.A. de C.V.*

By: /s/ Faye E. Paul

*Attorney for Meritor Heavy Vehicle Systems, LLC*